# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| ACCENTIA BIOPHARMACEUTICALS, INC., et al., | Case No. 8:08-bk-17795-KRM |
| | (Jointly Administered) |
| Debtors. | |

_____/

### DEBTORS' MOTION FOR APPROVAL OF SETTLEMENT BETWEEN THE DEBTORS AND LAURUS MASTER FUND, LTD. (IN LIQUIDATION) AND ITS AFFILIATES AND ASSIGNEES, PURSUANT TO 11 U.S.C. § 105(a) AND RULE 9019(a) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

> A hearing on this Motion will be held on May 14, 2010, at 10:00 a.m., in Courtroom 9B, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Tampa, Florida, before the Honorable K. Rodney May, Bankruptcy Judge.

Accentia Biopharmaceuticals, Inc. ("Accentia") and its subsidiaries, Biovest International, Inc. ("Biovest"), Analytica International, Inc. ("Analytica"), TEAMM Pharmaceuticals, Inc. ("TEAMM"), AccentRx, Inc. ("AccentRx"), Accentia Specialty Pharmacy, Inc. ("ASP"), Biovax, Inc. ("Biovax"), AutovaxID, Inc. ("AutovaxID"), Biolender, LLC ("Biolender") and Biolender II, LLC ("Biolender II"), as debtors and debtors in possession (hereinafter collectively referred to as the "Debtors"), by and through their undersigned attorneys, hereby move, pursuant to 11 U.S.C. § 105(a) and Federal Rule of Bankruptcy Procedure 9019(a), for entry of an order approving a settlement and compromise of all disputes between the Debtors and Laurus Master Fund, Ltd. (In Liquidation) ("Laurus"), Valens U.S. SPV I, LLC ("Valens U.S."), Valens Offshore SPV I, Ltd. ("Valens Offshore I"), Valens Offshore SPV II, Corp. ("Valens Offshore II"), PSource Structured Debt Limited ("PSource"),

and LV Administrative Services, Inc. ("LV" and together with Laurus, Valens U.S., Valens Offshore I, Valens Offshore II and PSource, and each of their respective assignees and affiliates, hereinafter collectively referred to as "Laurus/Valens") as more particularly described below in this Motion. In support of this Motion, the Debtors state as follows:

## A. Preliminary Statement

1.      By way of this Motion, the Debtors seek approval of a settlement and compromise of all disputes and claims between the Debtors and Laurus/Valens (the "Settlement"), including as to (a) the allowed amount of all claims of Laurus/Valens against the Debtors in these cases, (b) the assets of the Debtors securing the allowed claims of Laurus/Valens against the Debtors, (c) the future royalty rights of Laurus/Valens in Biovest's biologic and other products, and (d) the allowed equity interests of Laurus/Valens in Accentia and Biovest.[1] The Debtors intend to incorporate the terms of the Settlement into the respective plans of reorganization to be filed by Accentia (the "Accentia Plan") and Biovest (the "Biovest Plan" and together with the Accentia Plan, hereinafter referred to as the "Plans") in these cases. As discussed below, the proposed Settlement will avoid the potentially complex, contested, and costly litigation that would otherwise immediately ensue between the Debtors and Laurus/Valens, will provide substantial benefits to the Debtors' estates and creditors and the equity security holders of Accentia and Biovest, and falls well above the lowest point in the range of reasonableness. For all of the reasons set forth more fully hereinafter, the Debtors respectfully request that this Court grant this Motion and approve the Settlement.

---

[1]      The specific terms of the Settlement are described in Paragraphs 85 and 86 below.

**B. Jurisdiction and Venue**

2.    This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§157 and 1334. The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

**C. General Background**

3.    On November 10, 2008 (the "Petition Date"), the Debtors filed with this Court their Voluntary Petitions for relief under Chapter 11 of the Bankruptcy Code.

4.    The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.    On November 13, 2008, this Court entered its Order Granting Debtor's *Ex Parte* Emergency Motion for Order Directing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b) in each of the Debtors' Chapter 11 cases (collectively, the "Joint Administration Order"). Pursuant to the Joint Administration Order, the Debtors' Chapter 11 cases are being jointly administered for procedural purposes only under In re: Accentia Biopharmaceuticals, Inc., Case No. 8:08-bk-17795-KRM.

6.    Accentia, a publicly traded Florida corporation, has three operating divisions: (i) the Drug Development Division, (ii) the Pharmaceutical Product Consulting Division, and (iii) the Instruments and Cell Production Division (through its subsidiary, Biovest). Accentia's Drug Development Division is in the process of advancing a portfolio of potential blockbuster drug candidates, including BiovaxID®, Revimmune™ and SinuNase™. The first product candidate, BiovaxID®, is an anti-cancer vaccine that is focused on treating such cancers as non-Hodgkins lymphoma and Multiple Myeloma. The second product candidate, Revimmune™, is being developed as a treatment for Multiple Sclerosis and Sickle Cell Anemia. The third product candidate is SinuNase™ being developed as an intranasal treatment of chronic sinusitis.

Accentia's Pharmaceutical Product Consulting Division, operating through its subsidiary Analytica, provides a broad range of consulting and development services, including pricing and market assessments, to the biopharmaceutical industry throughout the United States, the European Union and Asia, utilizing teams of employees at offices in New York and Germany.

7.        Biovest, a publicly traded Delaware corporation, has two operating divisions: (i) the Drug Development Division and (ii) the Instruments and Cell Production Division. Biovest is a majority-owned subsidiary of Accentia (approximately 75% of the issued and outstanding shares of Biovest Common Stock (as defined below) are currently held by Accentia) with its remaining shares being publicly traded. Accentia also currently holds a contractual right to a royalty interest of 19.50% in Biovest's biologic products (four percent (4.00%) of such aggregate royalty interest has been assigned by Accentia to Laurus/Valens as described below). Biovest has a foundation in the manufacture of biological drugs for research and clinical trials. The Drug Development Division is a pioneer in the development of advanced individualized immunotherapies for life-threatening cancers of the blood system. Prior to the Petition Date, Biovest completed a pivotal Phase 3 clinical trial at 24 major medical institutions in the United States for BiovaxID®, which is a patient-specific anti-cancer vaccine focusing on the treatment of follicular non-Hodgkin's lymphoma. Biovest is in the process of seeking approval for the marketing and sale of BiovaxID® in the United States, the European Union, Japan, Australia, Switzerland and Russia. Biovest has commenced selling BiovaxID® in the European Union under the EU's Named Patient Program. Biovest also manufactures and markets the patent pending AutovaxID™ cell culture system, which is an automated cell culture instrument for the production of cell-based materials and therapeutics, including vaccines.

8.        Prior to the Petition Date, Biovest licensed its subsidiary, Biovax, to manufacture vaccines for the Phase 3 clinical trial of BiovaxID®. In addition, prior to the Petition Date,

AutovaxID was involved in the manufacturing of the AutovaxID$^{TM}$ cell culture system. These entities, for which Biovest is the sole member and manager, have no current business operations.

9.     Biolender and Biolender II, both Delaware limited liability companies, were formed to facilitate transactions based upon the ability to obtain certain tax credits. These entities, for which Biovest is the sole member and manager, have no current business operations.

10.     Prior to the Petition Date, TEAMM marketed and sold, through its sales force, a portfolio of specialty pharmaceutical products to the biotechnology and medical markets. As of the Petition Date, TEAMM had ceased its business operations.

11.     AccentRx was a mail order specialty pharmacy focused on pharmaceuticals for AIDS patients and organ transplant patients. The assets of AccentRx were sold in December 2003. Since 2003, AccentRx has not conducted any business operations.

12.     ASP's business is limited to collecting royalty payments and otherwise has no other business operations.

13.     As of date of this Motion, the Debtors' principal executive and administrative offices, approximately 7,400 square feet, are located at 324 Hyde Park Avenue, Suite 350 in Tampa, Florida. Analytica currently leases office space (approximately 4,500 square feet) in New York, New York, and also subleases office space (approximately 2,000 square feet) in Lorrach, Germany. Biovest currently leases manufacturing space (approximately 33,000 square feet) in Minneapolis, Minnesota for its operations as described above.

14.     No previous application for the relief sought herein has been made by the Debtors to this Court or any other court.

15.     No trustee or examiner has been appointed in these cases. On December 1, 2008, the Office of the United States Trustee appointed an Unsecured Creditors Committee (the "Committee") in these cases pursuant to Section 1102 of the Bankruptcy Code [Docket No. 74].

On June 9, 2009, the Office of the United States Trustee filed a notice with the Court amending the membership of the Committee [Docket No. 336].

### D. Prepetition Financing Transactions between the Debtors and Laurus/Valens

**(I)    Biovest Prepetition Financing Transactions[2]**

16.    The description of the prepetition financing transactions between Biovest and Laurus/Valens as set forth hereinbelow (the "Biovest Financing Transactions") is being provided by the Debtors, and Laurus/Valens will not be bound by any such description and reserves the right to assert that the Debtors' description is not accurate or complete.

17.    LV, as agent for Laurus, Valens U.S., Valens Offshore I, Valens Offshore II and PSource, has filed proofs of claim (the "Biovest Proofs of Claim") in the Chapter 11 cases of Biovest, Biovax, AutovaxID, Biolender and Biolender II, asserting a secured claim of $22,654,082.65 (consisting of $15,331,095.16 of principal and $7,322,987.49 of interest and fees) plus a secured claim of $7,500,000.00 with respect to the AutovaxID Royalty (as defined below). From a review of the Biovest Proofs of Claim, it appears that the lenders/obligees with respect to the Biovest Financing Transactions are Laurus, Valens U.S., Valens Offshore I, Valens Offshore II and PSource.

*March 31, 2006 Transactions*

18.    On March 31, 2006, Biovest and Laurus entered into a Note and Warrant Purchase Agreement (the "Biovest Purchase Agreement"), pursuant to which Laurus purchased a Secured Promissory Note in the original principal amount of $7,799,000.00 from Biovest (the "March 2006 Note") and the Laurus Warrant (as defined below). Following the execution and

---

2    The description of the various loan and other financing documents as set forth below is qualified in its entirety by the actual terms of all such documents and, to the extent of any inconsistencies between the description in this Motion and the terms of such documents, the terms of such documents shall control. All of such documents are available upon written request to undersigned counsel for the Debtors.

delivery of the March 2006 Note, Laurus advised the Debtors that it had assigned its rights to portions of the March 2006 Note to each of Valens U.S. and Valens Offshore II.

19.    At the closing of the March 31, 2006 loan transaction, $299,000.00 of fees due to Laurus were deducted from the loan proceeds, and the residual balance of $7,500,000.00 was placed into a restricted non-interest bearing account (the "March 2006 Restricted Account"), for the benefit and under the control of Laurus, with North Fork Bank, a financial institution selected by Laurus, pursuant to a letter agreement between the parties dated March 31, 2006, which provided that certain pre-conditions had to be met before the funds therein could be disbursed.

20.    The March 2006 Note provides for an interest rate computed at (i) the prime rate plus two percent (2%), but never to be less than nine percent (9%), with respect to funds actually advanced out of the March 2006 Restricted Account to Biovest, and (ii) the prime rate for funds remaining in the March 2006 Restricted Account (such interest to be due at maturity). Commencing May 1, 2006, Biovest was required to make interest only payments to Laurus. Commencing July 1, 2006 and on each subsequent month thereafter, Biovest was required to make monthly amortization payments of principal (initially $9,060.61 based on the $299,000.00 advance at closing but subject to increase as funds were released from the March 2006 Restricted Account) and interest to Laurus. The maturity date of the March 2006 Note was March 31, 2009.

21.    The March 2006 Note contains a number of events of default. In the event of any default by Biovest under the March 2006 Note, the default rate of interest would be additional interest of two percent (2%) per month (applied to the entire principal balance irrespective of the amount actually advanced out of the March 2006 Restricted Account to Biovest), and Laurus had the right to demand repayment in full of all obligations thereunder in an amount equal to 130% of the then outstanding principal amount of the March 2006 Note (also irrespective of the

amount actually advanced out of the March 2006 Restricted Account to Biovest), plus accrued and unpaid interest and unpaid costs and fees.

22.     In connection with the closing of the Biovest Purchase Agreement, certain additional documents were executed and/or delivered by Laurus, Biovest and their respective affiliates, including but not limited to the following:

(a)     Biovest and Biovax executed a Master Security Agreement (the "March 2006 Security Agreement") in favor of Laurus, which grants to Laurus a security interest in substantially all of the assets of Biovest and Biovax (including after-acquired property) to secure Biovest's obligations under the March 2006 Note and under any other related documents;

(b)     Biovest executed an Intellectual Property Security Agreement in favor of Laurus, which grants to Laurus a security interest in substantially all of the intellectual property of Biovest (including after-acquired property) to secure Biovest's obligations under the March 2006 Note or otherwise;

(c)     Biovest executed and issued to Laurus a Common Stock Purchase Warrant (the "Laurus Warrant") for the purchase by Laurus, on or before March 31, 2021, of up to 18,087,889 shares of the common stock of Biovest ("Biovest Common Stock") at an exercise price of $0.01 per share, subject to certain adjustment provisions. Based on 80,390,663 shares of Biovest Common Stock outstanding on the date of issuance, and assuming the purchase of all of the shares of Biovest Common Stock subject to the Laurus Warrant on the date of issuance, Laurus would have owned approximately 18.4% of the outstanding shares of Biovest Common Stock at the time of the March 31, 2006 loan closing. Upon the grant by Accentia in October 2006 of an additional warrant to purchase 10,000,000 shares of Biovest Common Stock owned by Accentia, as described in the summary of the Accentia Financing Transactions contained hereinbelow, Laurus then held warrants that if exercised would give Laurus control of approximately 25% of the outstanding shares of Biovest Common Stock. That percentage ownership interest could rise higher if Laurus/Valens exercises its right to exchange its debt/warrants into shares of Biovest Common Stock pursuant to the September 2006 Debenture transaction entered into with Accentia described below. During the period from July 31, 2006 through August 31, 2007, Laurus exercised 4,716,531 warrants under the Laurus Warrant, resulting in the issuance of 4,665,752 shares of Biovest Common Stock to Laurus at a cost to Laurus of $47,165.31. As of the Petition Date, there remained 13,371,358 warrants subject to the Laurus Warrant to purchase shares of Biovest Common Stock;

(d)     Biovest, Biovax and Laurus executed a Stock Pledge Agreement (the "March 2006 Stock Pledge Agreement"), pursuant to which Biovest pledged to Laurus all of its equity interests in Biovax (plus any other equity interests subsequently

acquired by Biovest) to secure Biovest's obligations under the March 2006 Note and under any other related documents;

(e)    Accentia executed a Guaranty in favor of Laurus (the "Accentia Guaranty"), pursuant to which Accentia guaranteed the payment of sixty-four percent (64%) of Biovest's obligations under the March 2006 Note and under any other related documents;

(f)    Accentia and Laurus executed the Accentia Pledge Agreement, pursuant to which Accentia pledged to Laurus all of its equity interests in Biovest (plus any other equity interests in Biovest subsequently acquired by Accentia) to secure Biovest's obligations under the March 2006 Note and under any other related documents and Accentia's obligations under the Accentia Guaranty. At the time of the March 31, 2006 loan closing, Accentia owned 53,115,818 shares of the Biovest Common Stock;

(g)    Accentia and Laurus executed a Subordination Agreement, with the consent of Biovest, pursuant to which Accentia and its subsidiaries agreed to subordinate, subject to certain exceptions, any indebtedness owing and liens granted to them from Biovest and its subsidiaries to any indebtedness owing and liens granted to Laurus from Biovest and its subsidiaries. At the time of the execution of the Subordination Agreement, Biovest's indebtedness to Accentia was approximately $8.2 million;

(h)    Biovax executed a Subsidiary Guaranty in favor of Laurus (the "March 2006 Subsidiary Guaranty"), pursuant to which Biovax guaranteed the payment of Biovest's obligations under the March 2006 Note and under any other related documents; and

(i)    In April 2006, Accentia, Analytica and Laurus entered into an Amended and Restated Stock Pledge Agreement, pursuant to which Accentia pledged to Laurus all of its equity interests in TEAMM and Analytica to secure Biovest's obligations under the March 2006 Note and under any other related documents.

23.    On April 21, 2006, Biolender executed a Joinder Agreement in favor of Laurus. Pursuant to the terms of that Joinder Agreement, Biolender agreed to become an assignor under the March 2006 Security Agreement, a pledgor under the March 2006 Stock Pledge Agreement, and a guarantor under the March 2006 Subsidiary Guaranty and to be bound by the terms and conditions of all of those documents. On December 8, 2006, Biolender II and AutovaxID executed a Joinder Agreement in favor of Laurus. Pursuant to the terms of that Joinder Agreement, each of Biolender II and AutovaxID agreed to become an assignor under the March

2006 Security Agreement, a pledgor under the March 2006 Stock Pledge Agreement, and a guarantor under the March 2006 Subsidiary Guaranty and to be bound by the terms and conditions of all of those documents.

*March 19, 2007 Transactions*

24.     On March 19, 2007, Biovest and its subsidiaries (Biovax, AutovaxID, Biolender and Biolender II), Accentia and Laurus entered into a letter agreement (the "March 2007 Letter Agreement") as a result of certain defaults by Biovest under the March 2006 Note. Specifically, Biovest had failed to make principal payments in the amount of approximately $512,000.00 and interest payments in the amount of approximately $181,000.00 under the March 2006 Note for the months of January, February and March 2007.

25.     In addition, on March 19, 2007, Biovest and its subsidiaries (Biovax, AutovaxID, Biolender and Biolender II), Accentia, Analytica, TEAMM and Laurus entered into a Consent and Agreement (the "March 2007 Consent Agreement"). The purpose of the March 2007 Consent Agreement was to permit Biovest to pursue a debt and/or equity securities offering to raise up to $45 million from potential unidentified investors through a best efforts underwriting attempt by an investment bank. The March 2007 Consent Agreement was negotiated as an integral part of the concessions made by the Debtors in the March 2007 Letter Agreement as described below.

26.     Under the March 2007 Letter Agreement, the parties reached an agreement whereby Laurus would agree to a waiver of the principal and interest payment defaults and continue to forbear in exercising its rights against Biovest under the March 2006 Note or against Accentia under the Accentia Guaranty (which would have triggered cross defaults under several Accentia debt obligations, including Accentia obligations to Laurus) while Biovest sought to

raise capital through an investment bank. The principal terms of the March 2007 Letter Agreement were as follows:

(a) Laurus waived the events of default arising from the missed principal and interest payments under the March 2006 Note;

(b) The missed principal payments would be due and payable on March 31, 2009, the maturity date of the March 2006 Note;

(c) The missed interest payments would be due and payable immediately from funds Biovest had on hand or funds advanced from other sources, including Accentia;

(d) Future principal and accrued interest payments under the March 2006 Note for April through July 2007 were added to the March 2006 Note balance, and commencing August 1, 2007 and on the first day of each month thereafter, Biovest was required to make monthly amortization payments of principal of $267,070.24 plus interest to Laurus; and

(e) Upon satisfaction of certain conditions, Laurus consented to Biovest seeking an unsecured bridge loan financing in an aggregate amount of up to $7.0 million (and simultaneously executed the March 2007 Consent Agreement to facilitate Biovest's pursuit of a larger capital raise through an investment bank).

27. As part of the March 2007 Consent Agreement, Laurus agreed that, in the event Biovest was successful in its efforts to raise capital through an investment bank, Laurus would not sell any of the shares of the Biovest Common Stock that it owned or acquired through the future exercise of warrants for a period of three (3) years, subject to certain exceptions (the "2007 Lock-up Agreement"). The securities offering never closed and, therefore, the 2007 Lock-up Agreement never became effective.

28. As an integral part of the March 2007 Consent Agreement, Biovest and AutovaxID granted to Laurus a non-cancelable royalty (the "AutovaxID Royalty") equal to three percent (3%) of world-wide Net Sales (defined as gross receipts from the world-wide sales of AutovaxID™ Instruments less any rebates, returns and discounts) of AutovaxID™ Instruments (defined as the automated cell and biologic production instrument known as AutovaxID™) for a period of five years commencing on May 31, 2007. The AutovaxID Royalty payments to Laurus

are required to aggregate a minimum of $8.0 million, with $500,000 of the minimum royalty being payable on December 31, 2007 and the remaining balance, less actual royalties paid, being immediately due at the end of the five year term on May 31, 2012. The AutovaxID Royalty payments are due and payable quarterly within forty-five (45) days following the end of each fiscal quarter of Biovest.

29.     The March 2007 Letter Agreement became effective on April 17, 2007, upon the payment by Biovest of the approximately $181,000.00 in past due interest under the March 2006 Note to Laurus.

*October 30, 2007 Transactions*

30.     On October 30, 2007, Biovest and Valens Offshore II entered into a Note Purchase Agreement (the "Valens Offshore October Purchase Agreement"), pursuant to which Valens Offshore II purchased a Secured Promissory Note in the original principal amount of $255,000.00 from Biovest (the "Valens Offshore October 2007 Note"). On October 30, 2007, Biovest and Valens U.S. entered into a Note Purchase Agreement (the "Valens U.S. October Purchase Agreement"), pursuant to which Valens U.S. purchased a Secured Promissory Note in the original principal amount of $245,000.00 from Biovest (the "Valens U.S. October 2007 Note" and together with the Valens Offshore October 2007 Note, hereinafter collectively the "Valens October 2007 Notes").

31.     The Valens October 2007 Notes provide for an interest rate computed at the prime rate plus two percent (2%), but never to be less than nine percent (9%). Commencing November 1, 2007, Biovest was required to make monthly interest only payments and all principal was due at maturity. The maturity date of the Valens October 2007 Notes was March 31, 2009.

32.     The Valens October 2007 Notes contain a number of events of default, and also have cross-default provisions as to the other loan transactions with Biovest. In the event of any

default by Biovest under the Valens October 2007 Notes, the default rate of interest would be additional interest of five percent (5%) per annum, and Valens Offshore II and Valens U.S. had the right to demand repayment in full of all obligations thereunder in an amount equal to 130% of the then outstanding principal amount of the Valens October 2007 Notes plus accrued and unpaid interest and unpaid costs and fees.

33.     In connection with the closing of the Valens Offshore October Purchase Agreement and the Valens U.S. October Purchase Agreement, certain additional documents were executed by Biovest and Valens Offshore II and Valens U.S. (or their agent), including but not limited to the following:

(a)     Biovest executed a Master Security Agreement (the "October 2007 Security Agreement") in favor of LV, as agent for Valens Offshore II and Valens U.S., which grants to LV (for the ratable benefit of LV, Valens Offshore II and Valens U.S.) a security interest in substantially all of the assets of Biovest (including after-acquired property) to secure Biovest's obligations under the Valens October 2007 Notes and under any other related documents;

(b)     Biovest and Valens Offshore II executed a Royalty Agreement (the "Valens Offshore October 2007 Royalty Agreement"), pursuant to which Biovest granted to Valens Offshore II a royalty (the "Valens Offshore October 2007 Royalty") equal to 1.08% of the Net Sales (defined as the gross amount invoiced for Biovest Biologic Products (as defined below) sold by Biovest less deductions for commissions, discounts or rebates) and License Revenue (defined as any and all revenue or other consideration received by Biovest from a licensee for Biovest Biologic Products) from any Biovest Biologic Products received by Biovest. The term "Biovest Biologic Products" was defined in the Royalty Agreement as all biopharmaceutical products including but not limited to monoclonal antibodies, peptides, infectious disease and cancer vaccines, autologous cancer vaccines such as for non-Hodgkins lymphoma and renal cell carcinoma, cell-based therapies, stem cells, cytokines, and viruses produced by mammalian cell culture techniques which are currently owned, licensed or being developed by Biovest or its subsidiaries or which may be subsequently acquired or developed by Biovest, and included the BiovaxID® anti-cancer vaccine. The term of the Valens Offshore October 2007 Royalty is for so long as Biovest manufactures, sells, commercializes, conducts a clinical trial, or licenses any Biovest Biologic Product. Royalty payments are due and payable quarterly within sixty (60) days following the end of each calendar quarter of Biovest;

(c)     Biovest and Valens U.S. executed a Royalty Agreement (the "Valens U.S. October 2007 Royalty Agreement"), pursuant to which Biovest granted to Valens

U.S. a royalty (the "Valens U.S. October 2007 Royalty") equal to 0.92% of the Net Sales and License Revenue from any Biovest Biologic Products received by Biovest. The term of the Valens U.S. October 2007 Royalty is for so long as Biovest manufactures, sells, commercializes, conducts a clinical trial, or licenses any Biovest Biologic Product. Royalty payments are due and payable quarterly within sixty (60) days following the end of each calendar quarter of Biovest; and

(d)     Accentia, Valens Offshore II, Valens U.S., and LV executed a Subordination Agreement, with the consent of Biovest, pursuant to which Accentia agreed to subordinate any indebtedness owing and liens granted to it from Biovest and its subsidiaries to any indebtedness owing and liens granted to LV from Biovest and its subsidiaries in connection with the Valens October 2007 Notes.

*October 31, 2007 Transactions*

34.     On October 31, 2007, Biovest and its subsidiaries (Biovax, AutovaxID, Biolender, and Biolender II), Accentia, Laurus, Valens Offshore II, and Valens U.S. entered into an Amendment (the "October 2007 Amendment") in order to memorialize certain amendments to the March 2006 Note. The principal terms of the October 2007 Amendment are as follows:

(a)     All principal payments under the March 2006 Note for the months of April through December 2007 were postponed until March 31, 2009;

(b)     All interest payments under the March 2006 Note for the months of April through December 2007 were postponed until March 31, 2009;

(c)     On January 2, 2008 and on each subsequent month thereafter, Biovest was required to resume making monthly amortization payments under the March 2006 Note;

(d)     On March 31, 2009, Biovest was required to make payments of $1,754,226.12 to Laurus, $47,034.42 to Valens Offshore II and $14,550.29 to Valens U.S.; and

(e)     Each Debtor which was a party to the October 2007 Amendment reaffirmed its obligations and liens and released Laurus, Valens Offshore II and Valens U.S. from all claims and causes of action, including as to the October 2007 Amendment.

35.     The October 2007 Amendment, by its terms, was effective as of April 1, 2007.

*December 10, 2007 Transactions*

36.     On December 10, 2007, Biovest and Valens Offshore II entered into a Note Purchase Agreement (the "Valens Offshore December Purchase Agreement"), pursuant to which

Valens Offshore II purchased a Secured Promissory Note in the original principal amount of $3,600,000.00 from Biovest (the "Valens Offshore December 2007 Note"). On December 10, 2007, Biovest and Valens U.S. entered into a Note Purchase Agreement (the "Valens U.S. December Purchase Agreement"), pursuant to which Valens U.S. purchased a Secured Promissory Note in the original principal amount of $4,900,000.00 from Biovest (the "Valens U.S. December 2007 Note" and together with the Valens Offshore December 2007 Note, hereinafter collectively the "Valens December 2007 Notes").

37.     At the December 10, 2007 closings, $3,316,970.41 of the loan proceeds was placed into an interest bearing restricted bank account (the "December 10 Restricted Account"), for the benefit and under the control of LV, pursuant to a Restricted Account Agreement among North Fork Bank, Biovest and LV.   From the period from December 2007 to April 2008, $3.1 million from the December 10 Restricted Account was disbursed in non-equal installments to Biovest to fund operating expenses in accordance with operating budgets prepared by Biovest and approved by Laurus.   The residual balance in the December 10 Restricted Account in the amount of $240,758.55 was paid to Laurus on June 27, 2008 and applied to the March 2006 Note.

38.     In connection with the December 10, 2007 loan closings, Biovest, Laurus, Valens Offshore II and Valens U.S. entered into a side letter agreement which provided for the prepayment of the following items from the loan proceeds: (i) principal amounts due and owing under the March 2006 Note for the months of December 2007 through May 2008, (ii) interest that would accrue under the March 2006 Note during the period from December 1, 2007 through May 31, 2008, (iii) interest that would accrue under the Valens U.S. October 2007 Note during the period from December 1, 2007 through May 31, 2008, (iv) interest that would accrue under the Valens Offshore October 2007 Note during the period from December 1, 2007 through May

31, 2008, (v) interest that would accrue under the Valens U.S. December 2007 Note during the period from December 1, 2007 through May 31, 2008, and (vi) interest that would accrue under the Valens Offshore December 2007 Note during the period from December 1, 2007 through May 31, 2008. A total of $2,689,532.93 was paid to Laurus, Valens U.S., Valens Offshore II and Valens Offshore I.

39.     The Valens December 2007 Notes provide for an interest rate computed at the prime rate plus two percent (2%), but never to be less than eleven percent (11%). Interest was charged on all principal, including any prepaid principal placed in the December 10 Restricted Account. Commencing January 2, 2008, Biovest was required to make monthly interest only payments to Valens Offshore II and Valens U.S. and, subject to one exception as to a sale of Biovest's Minnesota operations, all principal was due at maturity. The maturity date of the Valens December 2007 Notes was June 10, 2008 (a total note term of approximately six (6) months).

40.     The Valens December 2007 Notes contain a number of events of default, and also have cross-default provisions as to the other loan transactions with Biovest, including the October 30, 2007 loan transactions with Valens Offshore II and Valens U.S. and the March 31, 2006 loan transactions with Laurus. In the event of any default by Biovest under the Valens December 2007 Notes, the default rate of interest would be additional interest of five percent (5%) per annum, and Valens Offshore II and Valens U.S. had the right to demand repayment in full of all obligations thereunder in an amount equal to 130% of the then outstanding principal amount of the Valens December 2007 Notes plus accrued but unpaid interest and unpaid costs and fees. The default penalty would be computed on the entire principal balance and unpaid interest and fees irrespective of the amounts held in the December 10 Restricted Account.

41.     In connection with the closing of the Valens Offshore December Purchase Agreement and the Valens U.S. December Purchase Agreement, certain additional documents were executed by Biovest and its affiliates and Valens Offshore II and Valens U.S. (or their agent), including but not limited to the following:

(a)     Biovest and its subsidiaries (Biovax, AutovaxID, Biolender and Biolender II) executed a Master Security Agreement in favor of LV, as agent for Valens Offshore II and Valens U.S., which grants to LV (for the ratable benefit of LV, Valens Offshore II and Valens U.S.) a security interest in substantially all of the assets of Biovest and such subsidiaries (including after-acquired property) to secure Biovest's obligations under the Valens December 2007 Notes and under any other related documents;

(b)     Biovest executed an Intellectual Property Security Agreement in favor of LV, as agent for Valens Offshore II and Valens U.S., which grants to LV a security interest in substantially all of the intellectual property of Biovest (including after-acquired property) to secure Biovest's obligations under the Valens December 2007 Notes or otherwise;

(c)     Biovax, AutovaxID, Biolender and Biolender II executed a Subsidiary Guaranty in favor of LV, Valens Offshore II and Valens U.S., pursuant to which such subsidiaries guaranteed the payment of Biovest's obligations under the Valens December 2007 Notes and under any other related documents;

(d)     Biovest and LV executed a Stock Pledge Agreement, pursuant to which Biovest pledged to LV all of its equity interests in Biovax, AutovaxID, Biolender and Biolender II (plus any other equity interests subsequently acquired by Biovest) to secure Biovest's obligations under the Valens December 2007 Notes and under any other related documents;

(e)     Biovest and Valens Offshore II executed a Royalty Agreement (the "Valens Offshore December 2007 Royalty Agreement"), pursuant to which Biovest granted to Valens Offshore II a royalty (the "Valens Offshore December 2007 Royalty") equal to 2.96% (which, when aggregated with the Valens Offshore October 2007 Royalty, equals a total royalty of 4.04%) of the Net Sales and License Revenue from any Biovest Biologic Products received by Biovest. The term of the Valens Offshore December 2007 Royalty is for so long as Biovest manufactures, sells, commercializes, conducts a clinical trial, or licenses any Biovest Biologic Product. Royalty payments are due and payable quarterly within sixty (60) days following the end of each calendar quarter of Biovest; and

(f)     Biovest and Valens U.S. executed a Royalty Agreement (the "Valens U.S. December 2007 Royalty Agreement"), pursuant to which Biovest granted to Valens U.S. a royalty (the "Valens U.S. December 2007 Royalty") equal to 4.04% (which, when aggregated with the Valens U.S. October 2007 Royalty, equals a

17

total royalty of 4.96%) of the Net Sales and License Revenue from any Biovest Biologic Products received by Biovest. The term of the Valens U.S. December 2007 Royalty is for so long as Biovest manufactures, sells, commercializes, conducts a clinical trial, or licenses any Biovest Biologic Product. Royalty payments are due and payable quarterly within sixty (60) days following the end of each calendar quarter of Biovest.

*May 30, 2008 Transactions*

42.    On May 30, 2008, Biovest, Valens Offshore II and Valens U.S. entered into an Amendment Agreement (the "May 2008 Agreement") which provided for the extension of the maturity dates of the Valens December 2007 Notes for an additional 143 days from June 10, 2008 to October 31, 2008 in return for certain concessions by the Debtors as described below.

43.    In connection with the execution of the May 2008 Agreement, Biovest, Valens Offshore II, Valens U.S. and other parties entered into the following additional agreements:

(a)    Biovest, Laurus, Valens U.S., Valens Offshore I, Valens Offshore II and PSource entered into an amendment to the Valens Offshore December 2007 Royalty Agreement which increased the royalty percentage therein by 6.50% to 9.46% (which, when aggregated with the Valens Offshore October 2007 Royalty, equals a total royalty of 10.54%, and then, when aggregated with the Valens U.S. October 2007 Royalty and the Valens U.S. December 2007 Royalty (a total royalty of 4.96%), equals a total royalty of 15.50% with respect to the Biovest Biologic Products). The Valens Offshore December 2007 Royalty Agreement was also modified so that the applicable royalty percentages apply not only to the net sale of Biovest Biologic Products but also to any proceeds Biovest might receive from a strategic partner for the licensing of Biovest Biologic Products. This transaction was a condition to the June 18, 2008 transaction between Laurus and Accentia as described below;

(b)    Biovest and its subsidiaries (Biovax, AutovaxID, Biolender and Biolender II) executed a Reaffirmation and Ratification Agreement, pursuant to which such parties reaffirmed their obligations and liens to Laurus/Valens and released Laurus/Valens from all causes of action, including as to the documents executed in connection with the May 30, 2008 transactions; and

(c)    Accentia executed a letter confirming that its limited obligation (64%) under the Accentia Guaranty was equal to $4,991,360 together with all other obligations covered thereby.

44.    This transaction introduced Valens Offshore I and PSource as assignees of the March 2006 Note, the Valens October 2007 Notes, and the Valens December 2007 Notes.

45. On July 31, 2008, Biovest, Laurus, Valens U.S., Valens Offshore I, Valens Offshore II and PSource entered into an Amendment Agreement (the "July 2008 Agreement"). The principal terms of the July 2008 Agreement are as follows:

(a) The maturity dates of the March 2006 Note, the Valens October 2007 Notes and the Valens December 2007 Notes were extended nine (9) months from October 31, 2008 to July 31, 2009;

(b) The entire principal amount of the March 2006 Note would be payable on July 31, 2009;

(c) The interest rates under the March 2006 Note and the Valens December 2007 Notes were increased to 30% per annum, with 10% to be payable monthly starting September 1, 2008 and 20% due at maturity;

(d) The default payment under the March 2006 Note, the Valens October 2007 Notes, and the Valens December 2007 Notes was reduced from 130% to 100%;

(e) Biovest agreed to pay Laurus/Valens at maturity on July 31, 2009 an additional sum of $4,404,328.55, which represented 30% of the outstanding principal amount outstanding under the March 2006 Note and the Valens December 2007 Notes;

(f) Biovest agreed to prepay the March 2006 Note, the Valens October 2007 Notes and the Valens December 2007 Notes with all license fees and other revenue received from a third party in any licensing arrangement for BiovaxID®; and

(g) Biovest agreed that the outstanding principal obligations to Laurus/Valens totaled $14,681,095.16 as follows: (i) March 2006 Note – $5,681,095.16, (ii) Valens U.S. October 2007 Note – $245,000.00, (iii) Valens Offshore October 2007 Note – $255,000.00, (iv) Valens U.S. December 2007 Note – $4,900,000.00, and (v) Valens Offshore December 2007 Note – $3,600,000.00.

46. Biovest and its subsidiaries (Biovax, AutovaxID, Biolender and Biolender II) also executed a Reaffirmation and Ratification Agreement, pursuant to which such parties reaffirmed their obligations and liens to Laurus/Valens and released Laurus/Valens from all causes of action, including as to the documents executed in connection with the July 31, 2008 transactions.

47.    On September 19, 2008, Biovest and Valens U.S. entered into a Securities Purchase Agreement (the "September 2008 Purchase Agreement"), pursuant to which it was anticipated that Valens U.S. and/or its affiliates would purchase from Biovest a significant portion of the $5,000,000.00 of principal amount of the 15% Secured Convertible Debentures Due March 31, 2010 (the "September 2008 Debentures"). The only closing, however, was the purchase by Valens U.S. of a September 2008 Debenture in the original principal amount of $650,000.00 (the "Valens U.S. Debenture").

48.    The Valens U.S. Debenture provides for an interest rate of fifteen percent (15%), with the first payment beginning October 1, 2008. The Valens U.S. Debenture is convertible into shares of Biovest Common Stock at the rate of $0.32 per share and, provided certain conditions are satisfied, Biovest may, at its option, redeem the Valens U.S. Debenture for an amount equal to 110% of the then outstanding principal. Valens U.S. has the right to elect to be repaid in one of the following methods: (a) commencing six months after closing, the Valens U.S. Debenture could be amortized through twelve equal monthly payments, or (b) a single lump-sum payment of all remaining outstanding principal and accrued interest on March 31, 2010. All principal amortization payments and monthly interest payments could be made in cash or Biovest could elect to make the payments in shares of Biovest Common Stock, subject to certain specified conditions. The maturity date of the Valens U.S. Debenture is March 31, 2010.

49.    In connection with the closing of the September 2008 Purchase Agreement, certain additional documents were executed and/or delivered by Valens U.S., Biovest and their respective affiliates, including but not limited to the following:

(a)     Biovest executed a Security Agreement in favor of Valens U.S., which grants to Valens U.S. a security interest in substantially all of the assets of Biovest (including after-acquired property) to secure Biovest's obligations under the Valens U.S. Debenture and under any other related documents; provided that, such security interest was subordinated as described below;

(b)     Biovest executed an Intellectual Property Security Agreement in favor of Valens U.S., which grants to Valens U.S. a security interest in substantially all of the intellectual property of Biovest (including after-acquired property) to secure Biovest's obligations under the Valens U.S. Debenture or otherwise;

(c)     Biovest executed and issued to Valens U.S. a Common Stock Purchase Warrant (the "<u>Valens U.S. Warrant</u>") for the purchase by Valens U.S., on or before September 22, 2013, of up to 1,015,625 shares of Biovest Common Stock at an exercise price of $0.40 per share, subject to certain adjustment provisions;

(d)     Accentia, PSource, LV, Valens Offshore I and Valens Offshore II executed a Subordination Agreement, with the consent of Biovest, pursuant to which Accentia agreed to subordinate any indebtedness owing and liens granted to it from Biovest and its subsidiaries to any indebtedness owing and liens granted to the foregoing lenders from Biovest and its subsidiaries (relates to Valens U.S. Debenture);

(e)     Accentia, PSource, LV, Valens Offshore I and Valens Offshore II executed a Subordination Agreement, with the consent of Biovest, pursuant to which Accentia agreed to subordinate any indebtedness owing and liens granted to it from Biovest and its subsidiaries to any indebtedness owing and liens granted to the foregoing lenders from Biovest and its subsidiaries (relates to the March 2006 Note, the Valens October 2007 Notes and the Valens December 2007 Notes); and

(f)     Biovest, LV, Valens Offshore I, Valens Offshore and PSource executed a letter agreement which provided that all of the loan transactions described above (March 2006, October 2007, December 2007, and September 2008) would be cross-defaulted.

*Summary of Biovest Financing Transactions*

50.     In summary, as a result of the Biovest Financing Transactions, Laurus/Valens has asserted the following secured and other claims against Biovest, its subsidiaries (Biovax, AutovaxID, Biolender and Biolender II) and Accentia, and the following equity interests in Biovest, as of the Petition Date:

(a)     a secured claim for principal of $15,331,095.16 due under the March 2006 Note, the Valens October 2007 Notes, the Valens December 2007 Notes and the Valens U.S. Debenture;

(b)     a secured claim for interest and fees of $7,322,987.49 due under, or related to, the March 2006 Note, the Valens October 2007 Notes, the Valens December 2007 Notes and the Valens U.S. Debenture;

(c)     a royalty in the aggregate amount of 15.50% of the Net Sales and License Revenue received from the Biovest Biologic Products, including the BiovaxID® anti-cancer vaccine (which, when combined with the 4.00% royalty rights in the Biovest Biologic Products assigned by Accentia to Laurus/Valens as described below, equals a total royalty of 19.50%);

(d)     a secured claim for the remaining guaranteed minimum payment of $7,500,000.00 due as to the AutovaxID Royalty (which is the royalty equal to 3% of world-wide net sales of the AutovaxID™ Instrument);

(e)     warrants to purchase 13,371,358 shares of Biovest Common Stock at an exercise price of $0.01 per share (which, when combined with (i) the warrant issued by Accentia to Laurus to purchase 10,000,000 shares of Biovest Common Stock owned by Accentia at an exercise price of $0.01 per share as described below, (ii) the warrants described in subparagraph (f) below, and (iii) the shares of Biovest Common Stock described in subparagraph (h) below, would equal a total equity ownership of approximately 20.94% of the Biovest Common Stock as of the Petition Date, assuming all such warrants were then exercised);

(f)     warrants to purchase 1,015,625 shares of Biovest Common Stock at an exercise price of $0.40 per share;

(g)     the right to convert the Valens U.S. Debenture into shares of Biovest Common Stock at a conversion price of $0.32 per share (the outstanding principal and accrued interest under the Valens U.S. Debenture is included in the amounts set forth in subparagraphs (a) and (b) above);

(h)     ownership of 1,148,708 shares of Biovest Common Stock, subject to a restrictive legend;

(i)     a guaranty from Accentia for up to $4,991,360 of the Biovest indebtedness to Laurus/Valens;

(j)     guaranties from the subsidiaries of Biovest and Analytica of the indebtedness of Biovest to Laurus/Valens; and

(k)     first priority liens in substantially all of the assets of Biovest and its subsidiaries and of certain of the other Debtors as described above, including certain shares of Biovest Common Stock owned by Accentia.

**(II)   Accentia Prepetition Financing Transactions[3]**

51.    The description of the prepetition financing transactions between Accentia and Laurus as set forth hereinbelow (the "Accentia Financing Transactions") is being provided by the Debtors, and Laurus/Valens will not be bound by any such description and reserves the right to assert that the Debtors' description is not accurate or complete.

52.    LV, as agent for Laurus, has filed a proof of claim in the Chapter 11 case of Accentia (the "Accentia Proof of Claim"), asserting a secured claim of $18,368,284.24, and a proof of claim in the Chapter 11 case of Analytica (the "Analytica Proof of Claim"), asserting a secured claim of $34,884,063.00.

*April 29, 2005 Transactions*

53.    On April 29, 2005, Accentia and Laurus entered into a Securities Purchase Agreement (the "Accentia Purchase Agreement"), pursuant to which Laurus purchased from Accentia a Secured Convertible Term Note in the original principal amount of $5,000,000.00 (the "April 2005 Term Note") and the April 2005 Warrant (as defined below).  In addition, on April 29, 2005, Accentia and Analytica executed in favor of Laurus a Secured Revolving Note in the original principal amount of $5,000,000.00 less any amounts allocated to the April 2005 Minimum Borrowing Note (the "April 2005 Revolving Note"), and Accentia executed in favor of Laurus a Secured Convertible Minimum Borrowing Note in the original principal amount of $2,500,000.00 (the "April 2005 Minimum Borrowing Note" and together with the April 2005 Term Note and the April 2005 Revolving Note, hereinafter collectively the "April 2005 Notes").  Advances under the April 2005 Notes at the closing totaled $10 million and the loan proceeds

---

[3]    The description of the various loan and other financing documents as set forth below is qualified in its entirety by the actual terms of all such documents and, to the extent of any inconsistencies between the description in this Motion and the terms of such documents, the terms of such documents shall control.  All of such documents are available upon written request to undersigned counsel for the Debtors.

were used (i) to pay off Accentia's existing indebtedness to Missouri State Bank and Trust Company, (ii) for working capital for Accentia, and (iii) to pay the fees of Laurus.

54.     The April 2005 Term Note provided for an interest rate computed at the greater of (i) the prime rate plus four percent (4%) and (ii) ten percent (10%), but never to be less than ten percent (10%).   Commencing May 4, 2005, Accentia was required to make interest only payments to Laurus.   Commencing October 1, 2005 and on each subsequent month thereafter, Accentia was required to make monthly amortization payments of principal in the amount of $161,290.32 plus interest to Laurus.  The maturity date of the April 2005 Term Note was April 29, 2006.  The April 2005 Term Note contained a conversion feature which allowed Laurus, under certain conditions, to convert the indebtedness thereunder into shares of the common stock of Accentia (the "Accentia Common Stock") at an initial fixed conversion price of $3.30 per share (thereafter adjusted on June 18, 2008 to $1.20 per share).  Accentia also had the right, at its option, to redeem the April 2005 Term Note in an amount equal to 130% of principal plus interest and outstanding charges and fees.

55.     The April 2005 Revolving Note provided for an interest rate computed at the prime rate plus two percent (2%), but never to be less than seven and three-quarters percent (7.75%).  Commencing May 4, 2005, Accentia was required to make interest only payments to Laurus, with all outstanding principal due at maturity.  The maturity date of the April 2005 Revolving Note was April 29, 2006.  The April 2005 Revolving Note contained a conversion feature which allowed Laurus, under certain conditions, to convert the indebtedness thereunder into shares of Accentia Common Stock at an initial fixed conversion price of $3.30 per share (thereafter adjusted to $6.80 per share).

56.     The April 2005 Minimum Borrowing Note provided for an interest rate computed at the prime rate plus two percent (2%), but never to be less than seven and three-quarters

percent (7.75%). Commencing May 4, 2005, Accentia was required to make interest only payments to Laurus, with all outstanding principal due at maturity. The maturity date of the April 2005 Minimum Borrowing Note was April 29, 2006. The April 2005 Minimum Borrowing Note contained a conversion feature which allowed Laurus, under certain conditions, to convert the indebtedness thereunder into shares of Accentia Common Stock at an initial fixed conversion price of $3.30 per share (thereafter adjusted to $6.80 per share). Accentia also had the right, at its option, to redeem the April 2005 Minimum Borrowing Note in an amount equal to 130% of principal plus interest and outstanding charges and fees.

57. The April 2005 Notes contain a number of events of default. In the event of any default by Accentia or Analytica (as the case may be) under the April 2005 Notes, the default rate of interest would be additional interest of one and one-half percent (1.5%) per month, and Laurus had the right to demand repayment in full of all obligations thereunder in an amount equal to 130% of the then outstanding principal amount of the April 2005 Notes plus accrued and unpaid interest and unpaid costs and fees.

58. In connection with the closing of the Accentia Purchase Agreement, certain additional documents were executed and/or delivered by Laurus and Accentia and its affiliates, including but not limited to the following:

(a) Accentia, Analytica and Laurus executed a Security Agreement (the "April 2005 Security Agreement"), which addressed the terms and conditions for loans to be made under the April 2005 Revolving Note and the April 2005 Minimum Borrowing Note (including, among other things, as to availability and borrowing base requirements, fees due to Laurus, a grant of a security interest in all collateral of Accentia and Analytica, rate of interest on overadvances, and an early termination fee);

(b) Accentia and Analytica executed a Master Security Agreement (the "April 2005 Master Security Agreement") in favor of Laurus, which grants to Laurus a security interest in substantially all of the assets of Accentia and Analytica (including after-acquired property) to secure their obligations under the April 2005 Notes and under any other related documents;

(c)     Accentia executed a Grant of Security Interest in Patents and Trademarks in favor of Laurus, which grants to Laurus a security interest in substantially all of the intellectual property of Accentia (including after-acquired property) to secure Accentia's obligations under the April 2005 Notes or otherwise;

(d)     Accentia executed and issued to Laurus a Common Stock Purchase Warrant (the "April 2005 Warrant") for the purchase by Laurus, on or before April 29, 2010, of up to 1,030,928 shares of Accentia Common Stock at an exercise price of $3.88 per share (later adjusted to $6.85 per share), with the number of shares and the exercise price being subject to certain adjustment provisions;

(e)     Accentia, Analytica and Laurus executed a Stock Pledge Agreement (the "April 2005 Stock Pledge Agreement"), pursuant to which Accentia pledged to Laurus all of its equity interests in TEAMM and Analytica (plus any other equity interests subsequently acquired by Accentia) and 43,934,809 shares of Biovest Common Stock held by Accentia, to secure Accentia's obligations under the April 2005 Notes and under any other related documents;

(f)     Accentia and Laurus executed an Intercompany Note Pledge Agreement, pursuant to which Accentia pledged to Laurus (i) a promissory note from Biovest in the amount of $12,500,000 and (ii) a promissory note from TEAMM in the amount of $20,000,000, to secure Accentia's obligations under the April 2005 Notes and under any other related documents;

(g)     Analytica executed a Subsidiary Guaranty in favor of Laurus (the "April 2005 Subsidiary Guaranty"), pursuant to which Analytica guaranteed the payment of Accentia's obligations under the April 2005 Notes and the obligations of Accentia, Analytica and TEAMM under any other related documents;

(h)     The Francis E. O'Donnell, Jr. Irrevocable Trust No. 1 ("O'Donnell Trust") and Laurus executed the O'Donnell Stock Pledge Agreement (the "O'Donnell Stock Pledge Agreement"), pursuant to which the O'Donnell Trust pledged to Laurus 1,500,000 shares of the common stock of Star Scientific, Inc. to secure Accentia's obligations under the April 2005 Notes and under any other related documents;

(i)     McKesson Corporation and Laurus executed a Subordination Agreement, with the consent of Accentia and Analytica, pursuant to which McKesson Corporation agreed to subordinate up to $10 million of indebtedness owing and liens granted to it by Accentia and its subsidiaries and affiliates to any indebtedness owing and liens granted to Laurus from Accentia and its subsidiaries and affiliates; and

(j)     Laurus, Accentia and Analytica entered into a letter agreement confirming an advance in excess of the amount Laurus interpreted to be permitted under the formula in the April 2005 Revolving Note in an amount equal to $1,150,676.80 (the "First Overadvance"). Laurus agreed to defer the immediate payment provisions as to the First Overadvance for a period of 180 days until October 29, 2005. The First Overadvance accrued interest at ten percent (10%) and interest only payments were required starting May 1, 2005.

59.     On July 8, 2005, Accentia, Analytica and Laurus entered into a Consent Agreement, pursuant to which Laurus consented to Accentia borrowing up to $2,000,000.00, on an unsecured basis, from Hopkins Capital Group, LLC, Hopkins Capital Group II, LLC, or other affiliates of Accentia (the "Hopkins Capital Entities"), and Accentia repaying such loans out of the proceeds of an initial public offering (the "IPO").

*August 16, 2005 Transactions*

60.     On August 16, 2005, Accentia, Analytica, TEAMM and Laurus entered into an Omnibus Amendment and Consent (the "First Omnibus Amendment") in order to increase the principal balance of the April 2005 Term Note by $5,000,000.00, and thus provide Accentia with capital to pay its operating expenses until the IPO, and permit Accentia to borrow $7,500,000.00 (inclusive of the $2,000,000.00 described above) from the Hopkins Capital Entities. In the First Omnibus Amendment, Accentia, Analytica and TEAMM reaffirmed their obligations and liens to Laurus in connection with the loan transactions between such parties and Laurus.

61.     In connection with the closing of the First Omnibus Amendment, certain additional documents were executed and/or delivered by Laurus and Accentia and its affiliates, including but not limited to the following:

   (a)      The April 2005 Term Note was amended and restated (the "August 2005 Term Note") to (i) increase the principal balance from $5,000,000.00 to $10,000,000.00, (ii) increase the monthly principal payments to $322,580.64, and (iii) change the fixed conversion price to $6.95 per share (adjusted for a stock split effected on May 16, 2005);

   (b)      The April 2005 Revolving Note was amended and restated (the "August 2005 Revolving Note") to delete the conversion rights in favor of Laurus;

   (c)      The April 2005 Minimum Borrowing Note was amended and restated (the "August 2005 Minimum Borrowing Note") but no changes were made;

   (d)      The April 2005 Warrant was amended and restated to change (i) the expiration date from April 29, 2010 to August 16, 2010, (ii) the number of shares of Accentia Common Stock subject thereto from 1,030,928 shares to 979,312 shares

(subject to adjustment based on the IPO), and (iii) the exercise price from $3.88 per share to $8.169 per share (subject to adjustment based on the IPO);

(e)     Accentia executed and issued to Laurus a new Common Stock Purchase Warrant (the "August 2005 Warrant") for the purchase by Laurus, on or before August 16, 2015, of up to 277,778 shares of Accentia Common Stock at an exercise price of $0.01 per share. The August 2005 Warrant was fully exercised by Laurus on July 31, 2006;

(f)     The O'Donnell Trust executed an Amendment, Reaffirmation and Ratification Agreement, pursuant to which the O'Donnell Trust reaffirmed it obligations and liens to Laurus under the O'Donnell Stock Pledge Agreement and increased the number of pledged shares of the common stock of Star Scientific, Inc. thereunder from 1,500,000 shares to 2,500,000 shares;

(g)     The Hopkins Capital Entities and Laurus executed a Subordination Agreement, with the consent of Accentia, pursuant to which the Hopkins Capital Entities agreed to subordinate the indebtedness owing and liens granted to them by Accentia and its subsidiaries and affiliates to any indebtedness owing and liens granted to Laurus from Accentia and its subsidiaries and affiliates; and

(h)     McKesson Corporation and Laurus executed an Amended and Restated Subordination Agreement, with the consent of Accentia and Analytica, pursuant to which McKesson Corporation agreed to subordinate up to $15 million of indebtedness owing and liens granted to it by Accentia and its subsidiaries and affiliates to any indebtedness owing and liens granted to Laurus from Accentia and its subsidiaries and affiliates

*December 29, 2005 Transactions*

62.    On December 29, 2005, Laurus, Accentia, Analytica and the O'Donnell Trust entered into a letter agreement increasing the First Overadvance approved on April 29, 2005 from $1,150,676.80 to $2,500,000.00 (the "Second Overadvance"). Laurus agreed to defer the immediate payment provisions as to the Second Overadvance for a period of 180 days until July 1, 2006. The Second Overadvance accrued interest at ten percent (10%) and interest only payments were required starting February 1, 2006. In the letter agreement, Accentia, Analytica and the O'Donnell Trust reaffirmed their obligations and liens to Laurus in connection with the loan transactions between such parties and Laurus. In consideration for the Second Overadvance, Accentia executed and issued to Laurus a new Common Stock Purchase Warrant

(the "December 2005 Warrant") for the purchase by Laurus, on or before December 29, 2015, of up to 51,000 shares of Accentia Common Stock at an exercise price of $0.01 per share. The December 2005 Warrant was fully exercised by Laurus on July 31, 2006.

*February 13, 2006 Transactions*

63.　On February 13, 2006, Accentia, Analytica, and Laurus entered into a Second Omnibus Amendment and Waiver (the "Second Omnibus Amendment") in order to provide for (i) the waiver by Laurus of certain events of default as a result of investments by Accentia in Biovest and incurrence of debt by Accentia and TEAMM from Missouri State Bank and Trust Company, and (ii) the postponement of principal amounts due under the August 2005 Term Note for the months of January through June 2006, with such postponed principal payments to be due at maturity of the August 2005 Term Note.

64.　In connection with the closing of the Second Omnibus Amendment, certain additional documents were executed and/or delivered by Laurus and Accentia and its affiliates, including but not limited to the following:

(a)　The April 2005 Security Agreement was amended and restated (the "February 2006 Security Agreement");

(b)　The August 2005 Term Note was amended and restated (the "February 2006 Term Note") to change the fixed conversion price to $6.80 per share;

(c)　The August 2005 Revolving Note was amended and restated (the "February 2006 Revolving Note") but no changes were made;

(d)　The August 2005 Minimum Borrowing Note was amended and restated (the "February 2006 Minimum Borrowing Note" and together with the February 2006 Term Note and the February 2006 Revolving Note, hereinafter collectively the "Accentia Notes") to change the fixed conversion price to $6.80 per share;

(e)　Accentia executed and issued to Laurus a new Common Stock Purchase Warrant (the "February 2006 Warrant") for the purchase by Laurus, on or before February 13, 2016, of up to 62,000 shares of Accentia Common Stock at an exercise price of $0.01 per share. The February 2006 Warrant was fully exercised by Laurus on July 31, 2006;

(f)    The O'Donnell Trust executed a Reaffirmation and Ratification Agreement, pursuant to which the O'Donnell Trust reaffirmed it obligations and liens to Laurus under the O'Donnell Stock Pledge Agreement; and

(g)    TEAMM executed a Joinder Agreement in favor of Laurus, pursuant to which TEAMM agreed to become an assignee under the April 2005 Master Security Agreement, a pledgor under the April 2005 Stock Pledge Agreement, and a guarantor under the April 2005 Subsidiary Guaranty and to be bound by the terms and conditions of all of those documents.

*July 13, 2006 Transactions*

65.    On July 13, 2006, Laurus, Accentia, Analytica and TEAMM entered into a letter agreement increasing the Second Overadvance from $2,500,000.00 to $7,500,000.00 (the "Third Overadvance"). Laurus agreed to defer the immediate payment provisions as to the Third Overadvance for a period of approximately five (5) months until January 1, 2007. The Third Overadvance accrued interest at the prime rate plus two percent (2%) and interest only payments were required starting August 1, 2006. In consideration for the Third Overadvance, Accentia issued to Laurus 100,000 shares of Accentia Common Stock. The parties agreed that the Third Overadvance would be used (i) to pay off the Second Overadvance from Laurus, (ii) to pay off the debt of TEAMM to Harbinger Mezzanine Partners, L.P., so as to give Laurus a first lien on the assets of TEAMM, (iii) to pay the fees and expenses of Laurus, and (iv) for Accentia's working capital.

66.    In connection with the closing of the July 13, 2006 letter agreement, certain additional documents were executed and/or delivered by Laurus and Accentia and its affiliates, including but not limited to the following:

(a)    TEAMM executed a Grant of Security Interest in Patents and Trademarks in favor of Laurus which grants to Laurus a security interest in substantially all of the intellectual property of TEAMM (including after-acquired property) to secure TEAMM's obligations to Laurus under the loan transactions involving Accentia;

(b)    Accentia, Analytica and TEAMM executed a Reaffirmation and Ratification Agreement, pursuant to which such parties reaffirmed their obligations and liens to Laurus under the loan transactions involving Accentia;

(c)    TEAMM executed a Joinder Agreement in favor of Laurus, pursuant to which TEAMM agreed to become an "Eligible Subsidiary" under the February 2006 Security Agreement;

(d)    The O'Donnell Trust executed a Reaffirmation and Ratification Agreement, pursuant to which the O'Donnell Trust reaffirmed it obligations and liens to Laurus under the O'Donnell Stock Pledge Agreement; and

(e)    McKesson Corporation and Laurus executed a Second Amended and Restated Subordination Agreement, with the consent of Accentia and Analytica, pursuant to which McKesson Corporation agreed to subordinate up to $20 million of indebtedness owing and liens granted to it by Accentia and its subsidiaries and affiliates to any indebtedness owing and liens granted to Laurus from Accentia and its subsidiaries and affiliates.

### *September 29, 2006 Transactions*

67.    On September 29, 2006, Accentia and Laurus entered into a Securities Purchase Agreement (the "September 2006 Purchase Agreement"), pursuant to which Laurus purchased from Accentia $5,000,000.00 of principal amount of the 8% Secured Convertible Debentures Due September 29, 2010 (the "September 2006 Debentures"). Laurus/Valens has asserted that, as of the Petition Date, the outstanding balance due and owing to it under the September 2006 Debentures was $3,347,388.16 (consisting of principal in the amount of $3,315,782.02 and interest and fees of $31,606.14).

68.    The September 2006 Debentures are convertible at any time, at the option of Laurus, into shares of Accentia Common Stock at a rate of $2.60 per share, subject to adjustment for stock splits, stock dividends, and the like. In the event that Accentia issues or grants in the future any rights to purchase any shares of Accentia Common Stock, or other securities convertible into shares of Accentia Common Stock, for an effective per share price less than the conversion price then in effect, the conversion price of the September 2006 Debentures will be decreased to equal such lower price. The September 2006 Debentures are also exchangeable for shares of Biovest Common Stock held by Accentia at an exchange price of $1.00 per share, subject to adjustment for stock splits, stock dividends, and the like, at any time after the earlier to

occur of (i) September 29, 2007 or (ii) such time as the closing price of Biovest Common Stock exceeds $2.25 for each of 20 consecutive trading days, subject to certain volume requirements and other conditions. In the event that Biovest issues or grants in the future any rights to purchase any shares of Biovest Common Stock, or other securities convertible into shares of Biovest Common Stock, for an effective per share price less than the exchange price then in effect, the exchange price for the September 2006 Debentures will be decreased to equal such lower price. The above-described adjustments to the conversion price or exchange price for future stock issuances by Accentia or Biovest will not apply to certain exempt issuances, including stock issuances pursuant to employee stock option plans and strategic transactions. The September 2006 Debentures also have certain redemption rights. The maturity date of the September 2006 Debentures is September 29, 2010.

69.     Prior to maturity, the September 2006 Debentures bear interest at 8% per annum with interest payable quarterly in arrears in cash, or, at Accentia's option, in shares of Accentia Common Stock. Accentia's ability to pay interest with shares of Accentia Common Stock is subject to specified conditions. From and after an event of default under the September 2006 Debentures and for so long as the event of default is continuing, the September 2006 Debentures will bear default interest at a rate of 18% per annum.

70.     In connection with the closing of the September 2006 Purchase Agreement, certain additional documents were executed and/or delivered by Laurus, Accentia, Biovest and other parties, including but not limited to the following:

(a)     Accentia executed a Pledge Agreement whereby Accentia pledged (and agreed to deliver to a designated agent for the benefit of investors under the September 2006 Purchase Agreement, including Laurus) 18,000,000 shares of Biovest Common Stock owned by Accentia (the "Pledged Biovest Shares"). The Pledged Biovest Shares are available to Laurus and other investors under the September 2006 Purchase Agreement either through a voluntary exchange of indebtedness under the September 2006 Debentures or an exercise of a September 2006 Warrant (as defined below). In addition, under certain circumstances, Accentia

32

could elect to make certain required monthly redemption payments under the September 2006 Debentures by delivery of Pledged Biovest Shares;

(b)     Accentia executed and issued to Laurus a Common Stock Purchase Warrant (the "September 2006 Warrant") for the purchase by Laurus, on or before September 2011, of up to 627,240 shares of Accentia Common Stock at an exercise price of $2.75 per share, provided that the September 2006 Warrant may be alternatively exercised for up to 3,600,000 shares of Biovest Common Stock owned by Accentia at an exercise price of $1.10 per share;

(c)     Accentia and Biovest executed a Lock-Up Agreement (the "September 2006 Lock-Up Agreement") with each purchaser under the September 2006 Debenture, whereby each purchaser agreed to refrain from the sale or other disposition of any shares of Biovest Common Stock for a period of one year from the date of the September 2006 Purchase Agreement, with certain defined exceptions. The September 2006 Lock-Up Agreement made specific exception for sales of Biovest Common Stock by Laurus, who was permitted to sell such Biovest Common Stock subject to daily volume restrictions during the lock-up period; and

(d)     Laurus and the other purchasers under the September 2006 Purchase Agreement entered into an Intercreditor Agreement (the "September 2006 Intercreditor Agreement"), confirming that Laurus retained a first priority lien in all collateral of Accentia except for designated "junior priority collateral," as to which the other purchasers under the September 2006 Purchase Agreement were granted a first priority lien. The junior priority collateral was defined as Accentia's right, title and interest in and to the Pledged Biovest Shares, the certificates representing such Pledged Biovest Shares, all options and other rights, contractual or otherwise, in respect thereof and all dividends, distributions, cash, instruments, investment property and other property (including but not limited to, any stock dividend and any distribution in connection with a stock split) from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Pledged Biovest Shares. The September 2006 Intercreditor Agreement set forth the terms of agreements as to standstill periods and rights of action by Laurus and the other purchasers under certain circumstances.

*October 31, 2006 Transactions*

71.     On October 31, 2006, Laurus and Accentia and certain of its affiliates entered into two (2) Consents (the "October 2006 Consents"). Pursuant to the October 2006 Consents, Laurus agreed to the following:

(a)     The sale by TEAMM of its rights in the Xodol and Histex product lines, provided that 50% of the net sale proceeds was used to pay down Accentia's debt to Laurus;

(b)     The sale by Analytica of the clinical trial division of IMOR-Analytica GmbH, provided that 50% of the net sale proceeds was used to pay down Accentia's debt to Laurus;

(c)     The sale by Accentia to Biovest of Accentia's membership interest in Biolender in exchange for the issuance by Biovest to Accentia of 10,000,000 shares of Biovest Common Stock (subject to prior pledge agreements in favor of Laurus);

(d)     An increase of up to $3.1 million in intercompany loans from Accentia to Biovest;

(e)     The release of funds to Biovest from the March 2006 Restricted Account;

(f)     A waiver of its right of first refusal to provide financing to Biovest and a consent to certain transactions in connection with the closing of the new market tax credit transaction for St. Louis, Missouri;

(g)     Certain modifications to Accentia's business plan as relating to Biovest;

(h)     The termination of a Biologics Commercialization Agreement between Accentia and Biovest and the grant by Biovest to Accentia through a Royalty Agreement dated October 31, 2006 (the "Accentia Royalty Agreement") of a passive 19.50% royalty (the "Accentia Royalty") to be paid by Biovest to Accentia on the sale of biologic products, in exchange for the issuance of 5,000,000 shares of Biovest Common Stock to Accentia; and

(i)     The termination of an anti-dilution/right of first refusal agreement between Accentia and Biovest, in exchange for the issuance of 5,000,000 shares of Biovest Common Stock to Accentia.

72.     In consideration for Laurus entering into the October 2006 Consents, Accentia executed and issued to Laurus a Warrant (the "October 2006 Warrant") for the purchase by Laurus, on or before October 31, 2013, of up to 10,000,000 shares of Biovest Common Stock owned by Accentia at an exercise price of $0.01 per share.

*August 29, 2007 Transactions*

73.     On August 29, 2007, Laurus, Accentia, Analytica and TEAMM entered into a letter agreement (the "August 2007 Letter Agreement") fixing the new overadvance amount at $4,400,000.00 (the "Fourth Overadvance"). Laurus agreed to defer the immediate payment provisions as to the Fourth Overadvance for a period of approximately two (2) months until October 21, 2007. The Fourth Overadvance accrued interest at the prime rate plus two percent

(2%) and interest only payments were required starting October 1, 2007. In consideration for the Fourth Overadvance, Accentia paid the sum of $70,000 to Laurus Capital Management, LLC.

*October 21/31, 2007 Transactions*

74.     On October 21, 2007, Laurus, Accentia, Analytica and TEAMM entered into an amendment to the August 2007 Letter Agreement, pursuant to which Laurus agreed to extend the maturity date of the Fourth Overadvance from October 21, 2007 to March 31, 2008. In consideration for the approximate five month extension of that maturity date, on October 31, 2007, Accentia executed and issued to Laurus a Common Stock Purchase Warrant (the "October 2007 Warrant") for the purchase by Laurus, on or before October 31, 2014, of up to 4,024,398 shares of Accentia Common Stock at an exercise price of $2.67 per share. Accentia retained the right to repurchase the October 2007 Warrant for $4,000,000.00 at any time prior to the first to occur of March 31, 2008 or the public announcement of unblinded top line results of the first SinuNase clinical trial.

*January 2008 Transactions*

75.     In January 2008, Accentia issued shares of its Series A-1 Convertible Preferred Stock, par value $1.00 per share (the "Preferred Stock"), in the amount of $3,000,000.00 to Valens U.S. and Valens Offshore as part of a private placement of $8.7 million (the "January 2008 Private Placement"). The Preferred Stock is convertible at any time, at the option of the holder, into shares of Accentia Common Stock at the rate of $2.67 per share, subject to adjustment for stock splits, stock dividends, and the like. In the event that Accentia issues or grants in the future any rights to purchase any shares of Accentia Common Stock, or other securities convertible into shares of Accentia Common Stock, for an effective per share price less than the conversion price then in effect, the conversion price of the Preferred Stock will be decreased to equal such lower price. The Preferred Stock has liquidation preferences ahead of

the holders of Accentia Common Stock and the holders of junior preferred stock of Accentia in the event of a liquidation or bankruptcy of Accentia, up to the amount of the purchase price for the Preferred Stock. Accentia has the right to force the conversion of the Preferred Stock into shares of Accentia Common Stock if the shares of Accentia Common Stock trade at 250% of the purchase price for a stated time and certain defined conditions are met. All remaining unconverted Preferred Stock will be redeemed by Accentia, in cash, at the stated value on the maturity date of March 31, 2011, provided that the convertible debentures issued by Accentia in September 2006 and February 2007 are no longer outstanding. As a part of the January 2008 Private Placement, Accentia also issued warrants to the purchasers of the Preferred Stock giving them the right to purchase up to 1,634,639 shares of Accentia Common Stock at an exercise price of $2.67 per share. Valens U.S. and Valens Offshore received warrants to purchase up to 196,629 and 365,169 shares of Accentia Common Stock, respectively. These warrants will expire on January 17, 2014. Accentia agreed with all holders of the Preferred Stock that, beginning on July 15, 2008 and on the 15th day of each month thereafter, Accentia would redeem a number of shares of Preferred Stock held by such holders equal to the aggregate number of shares of Preferred Stock held by such holders divided by 32, with all shares of Preferred Stock held by such holders to be redeemed on or before March 15, 2011. Under this redemption right, Accentia was to redeem the Preferred Stock by issuing to such holders a stock certificate representing that number of shares of Accentia Common Stock determined by multiplying the stated value by the number of shares of Preferred Stock being redeemed and then dividing the total by a number equal to ninety percent (90%) of the volume weighted average price of the Accentia Common Stock for the twenty (20) calendar days prior to each redemption date. Laurus/Valens has asserted that, as of the Petition Date, the outstanding balance due and owing to it under the Preferred Stock was $2,624,996.00.

76.    On June 18, 2008, Accentia, Analytica, TEAMM, Valens Offshore I, Valens U.S. and PSource entered into a Payoff and Amendment Agreement (the "Accentia Payoff Agreement") and other documents as described below to memorialize a number of agreements and conditions primarily related to the payoff of the Accentia Notes on or before December 31, 2008.

77.    The primary transactions and agreements that occurred between the parties with respect to the Accentia Payoff Agreement are as follows:

(a)    Upon receipt by Laurus/Valens of the Payoff Documents (as defined in the Accentia Payoff Agreement), the following occurred:

(i)    The February 2006 Revolving Note was deemed paid in full;

(ii)    Laurus/Valens released all liens and security interests in the assets of TEAMM;

(iii)    Laurus/Valens released all liens and security interests from Accentia, except for liens on the assets of Analytica and the collateral assignment of the Accentia Royalty Agreement as well as other exceptions;

(iv)    Laurus/Valens released all liens and security interests under the O'Donnell Stock Pledge Agreement;

(v)    Interest would not accrue on the February 2006 Term Note and the February 2006 Minimum Borrowing Note for the period from June 18, 2008 through December 31, 2008;

(vi)    The maturity dates for the February 2006 Term Note and the February 2006 Minimum Borrowing Note were extended to December 31, 2008; and

(vii)    The fixed conversion price under the February 2006 Term Note and the February 2006 Minimum Borrowing Note was changed to $1.20 per share.

(b)    Subject to certain scenarios, upon the receipt by Laurus/Valens of $8,800,000.00, the February 2006 Term Note and the February 2006 Minimum Borrowing Note would be deemed paid in full;

(c)    The collateral previously pledged by Accentia (and not released as described above) as well as any new collateral pledged in connection with the Accentia

Payoff Agreement would only secure Accentia's obligations as to the Payoff Documents, the Accentia Guaranty, the February 2006 Term Note, and the February 2006 Minimum Borrowing Note;

(d)     Accentia, through the execution of four (4) separate Assignment of Rights under Royalty Agreements (the "<u>Royalty Assignment Agreements</u>") and with the consent of Biovest, assigned, collectively, four percent (4.00%) of the Accentia Royalty to Valens U.S. (2.08% of the 4.00%), Valens Offshore I (22.84% of the 4.00%), PSource (10.18% of the 4.00%), and Erato Corp. (64.90% of the 4.00%) (collectively, the "<u>Assignee Royalties</u>"). The Royalty Assignment Agreements further provided that if a sale of Analytica did not close by December 31, 2008 and Laurus/Valens had not received $8,800,000.00, then, at the option of Laurus/Valens, the Assignee Royalties could be further increased or Laurus/Valens could take an assignment of all of the stock in Analytica;

(e)     Accentia, with the consent of Biovest, collaterally assigned all of its rights under the Accentia Royalty Agreement to Laurus/Valens as security for the Accentia Guaranty;

(f)     Accentia, Analytica, Laurus, Valens Offshore I, Valens U.S. and PSource entered into an Assignment of Sale Proceeds relating to the assignment of any proceeds from the sale of Analytica to Laurus/Valens, with the first $8.8 million of sale proceeds to be paid to Laurus/Valens and any amounts above $8.8 million to be shared equally by Laurus/Valens and the Debtors. This Assignment expired by its terms on January 1, 2009;

(g)     Accentia, Analytica and TEAMM executed a Reaffirmation and Ratification Agreement, pursuant to which they reaffirmed their obligations and liens to Laurus/Valens and released Laurus/Valens from all claims and causes of action;

(h)     Accentia, Valens Offshore I and Valens U.S. entered into a side letter pursuant to which Accentia agreed to make an offer, on or before June 24, 2008, to redeem the shares of Preferred Stock held by Valens Offshore I and Valens U.S.;

(i)     Accentia and Laurus/Valens entered into a side letter to negotiate in good faith as to a return to Biovest of their royalties in the event it was necessary in order to allow Biovest to consummate a licensing arrangement with an unaffiliated third party; and

(j)     Accentia, Laurus/Valens and other purchasers of Accentia June 2008 Secured Debentures entered into a Consent and Waiver Agreement which provided, *inter alia,* that certain provisions of earlier Accentia debentures were deemed not applicable and/or waived with respect to the Accentia Payoff Agreement. The Consent and Waiver Agreement also had the effect of adjusting the applicable conversion price and warrant exercise price on previously-issued debentures and warrants for all holders of such instruments.

*Summary of Accentia Financing Transactions*

78.     In summary, as a result of the Accentia Financing Transactions, Laurus/Valens has asserted the following secured and other claims against Accentia and Analytica, and the following equity interests in Accentia, as of the Petition Date:

(a)     a secured claim for principal of $8,800,000.00 and interest and fees of $82,642.77 due under the Accentia Notes (including the right to convert such claim into shares of Accentia Common Stock as described above);

(b)     a claim for principal and interest and fees in the aggregate amount of $3,347,388.16 due under the September 2006 Debentures, secured by the Biovest Pledged Shares (including the right to convert such claim into shares of Accentia Common Stock or exchange such claim into shares of Biovest Common Stock as described above);

(c)     a claim in the amount of $2,624,996.00 under the Preferred Stock (including the right to convert such claim into shares of Accentia Common Stock as described above);

(d)     a secured claim of $4,991,360 for the Biovest indebtedness to Laurus/Valens, pursuant to the Accentia Guaranty;

(e)     a collateral assignment of all of Accentia's rights under the Accentia Royalty Agreement as security for the Accentia Guaranty;

(f)     four percent (4.00%) of the Accentia Royalty (which, when combined with the 15.50% royalty rights in the Biovest Biologic Products assigned by Biovest to Laurus/Valens as described above, equals a total royalty of 19.50% in the Biovest Biologic Products, such 4.00% being subject to further increase as described in the Royalty Assignment Agreements);

(g)     an assignment of the first $8.8 million of proceeds from the sale of Analytica plus a sharing in sale proceeds above that amount;

(h)     warrants to purchase 10,000,000 shares of Biovest Common Stock owned by Accentia at an exercise price of $.01 per share;

(i)     warrants to purchase 1,000,000 shares of Accentia Common Stock at an exercise price of $2.67 per share (issued in connection with the April 29, 2005 transactions, as amended in the August 16, 2005 transactions);

(j)     warrants to purchase 627,240 shares of Accentia Common Stock at an exercise price of $2.75 per share or, alternatively, 3,600,000 shares of Biovest Common Stock owned by Accentia at an exercise price of $1.10 per share (issued in connection with the September 2006 Debentures);

(k)     warrants to purchase 4,024,398 shares of Accentia Common Stock at an exercise price of $2.67 per share (issued in connection with the October 31, 2007 transactions);

(l)     warrants to purchase 561,798 shares of Accentia Common Stock at an exercise price of $2.67 per share (issued in connection with the Preferred Stock);

(m)     a guaranty from Analytica of the indebtedness of Accentia to Laurus/Valens; and

(n)     first priority liens in substantially all of the assets of Analytica and in all of the equity interests of Analytica owned by Accentia.

### E.  Settlement Terms

79.     Beginning in the fourth calendar quarter of 2009, the Debtors and Laurus/Valens and their respective counsel engaged in extensive communications regarding a settlement of all disputes in order to arrive at a consensual plan of reorganization in these cases.  As part of that process, the Debtors and their counsel expended a significant amount of time in reviewing, investigating, and analyzing the Biovest Financing Transactions and the Accentia Financing Transactions (including all of the documents related thereto executed by the parties) and any potential claims and causes of action against Laurus/Valens.  Following that investigation and analysis, the Debtors informed Laurus/Valens and their counsel that the Debtors believed they had potential claims and/or causes of action against Laurus/Valens, including, but not limited to, claims and/or causes of action for: (i) lender liability, including breach of fiduciary duty and fraud, (ii) violations of Florida law, including violations of deceptive and unfair trade practices and usury, (iii) re-characterization of claims, equitable subordination, and avoidance of default penalties, (iv) matters under Chapter 5 of the Bankruptcy Code, including avoidance of fraudulent transfers or obligations and preferences, and (v) rejection of existing stock purchase warrants issued to Laurus/Valens.  In support of their position, the Debtors provided

Laurus/Valens and their counsel with a lengthy memorandum detailing the factual and legal support for such claims and/or causes of action.

80. In response to the foregoing, Laurus/Valens informed the Debtors that they disputed all of the Debtors' allegations and would vigorously oppose any litigation efforts commenced by the Debtors. Laurus/Valens further informed the Debtors that they believed they were entitled to all of the claims set forth in the Biovest Proofs of Claim (as summarized in Paragraph 50 above) and in the Accentia Proof of Claim and in the Analytica Proof of Claim ( as summarized in Paragraph 78 above), including (i) all of the asserted principal, interest and fees against Biovest and Accentia, (ii) all of the asserted security interests against the assets of Biovest and Accentia and their various subsidiaries, (iii) a royalty interest equal to 19.50% of the net sales and license revenue from the Biovest Biologic Products, including the BiovaxID® anti-cancer vaccine (subject to a possible increase of that percentage interest as a result of the June 2008 transactions with Accentia as well as the collateral assignment of the Accentia Royalty Agreement), (iv) an equity interest in Biovest of at least twenty percent (20%) of the issued and outstanding shares of Biovest Common Stock, (v) the entire AutovaxID Royalty, including the entire remaining minimum guaranteed amount of $7,500,000.00, and (vi) numerous warrants to purchase or otherwise acquire additional shares of Biovest Common Stock and Accentia Common Stock. Finally, Laurus/Valens informed the Debtors that, in the event the Debtors attempted to commence any litigation against Laurus/Valens, they would seek to foreclose on their security interests, which, if successful, would have left no value for unsecured creditors of the Debtors.

81. After several months of extensive negotiations and meetings between the parties, the Debtors and Laurus/Valens have agreed to resolve all issues and claims between them arising under or in connection with the Biovest Financing Transactions, the Biovest Proofs of Claim, the

Accentia Financing Transactions, the Accentia Proof of Claim, and the Analytica Proof of Claim in accordance with the settlement terms described below in this Motion. The Debtors believe that the Settlement will (i) provide both Biovest and Accentia with the "breathing room" necessary to concentrate on achieving regulatory and other approvals of their drug candidates, and (ii) enable both Biovest and Accentia to propose the Biovest Plan and the Accentia Plan, respectively, in these cases so as to exit Chapter 11 in the near future.

82. The Settlement between Biovest and its subsidiaries, Biovax, AutovaxID, Biolender and Biolender II (the "Biovest Subsidiaries" and together with Biovest, the "Biovest Entities"), and Laurus/Valens as to the Biovest Financing Transactions and the Biovest Proofs of Claim will be memorialized in the settlement documents to be executed between those parties and certain other parties, copies of which are attached to this Motion as Composite Exhibit 1 and incorporated herein by this reference thereto (the "Biovest Settlement Documents").[4] The Settlement between Accentia and Analytica (collectively, the "Accentia Entities") and Laurus/Valens as to the Accentia Financing Transactions, the Accentia Proof of Claim and the Analytica Proof of Claim will be memorialized in the settlement documents to be executed between those parties and certain other parties, copies of which are attached to this Motion as Composite Exhibit 2 and incorporated herein by this reference thereto (the "Accentia Settlement Documents").[5]

---

[4] In order to reduce photocopying and mailing costs, copies of the Biovest Settlement Documents are not being served on all parties listed in the Certificate of Service below. Any party wishing to receive copies of the Biovest Settlement Documents, in electronic format, may do so upon written request to undersigned counsel for the Debtors. In addition, by no later than two (2) days following the date of this Motion, copies of the Biovest Settlement Documents will be posted on the website of undersigned counsel for the Debtors at www.srbp.com.

[5] As of the date of this Motion, the Accentia Settlement Documents have not been completed by the parties. The parties expect to file the Accentia Settlement Documents with the Court by no later than ten (10) days after the date of this Motion, and the Debtors will serve notice of such filing on all parties served with this Motion. Upon such filing, any party wishing to receive copies of the Accentia Settlement Documents, in electronic format, may do so upon written request to undersigned counsel for the Debtors. In addition, by no later than two (2) days following such filing, copies of the Accentia Settlement Documents will be posted on the website of undersigned counsel for the Debtors at www.srbp.com.

83.     The Settlement between the Debtors and Laurus/Valens is subject to the entry of an order of this Court granting this Motion and approving the Settlement in all respects (the "Approval Order"). In the event the Court does not enter the Approval Order, the Settlement will be null and void in all respects. The Approval Order must be final and non-appealable (i.e., no motions or other requests for reconsideration or rehearing, and no appeals, of the Approval Order shall have been filed with the Court within fourteen (14) days after the date of the entry of the Approval Order) by no later than forty-five (45) days after the date of this Motion and, if not, either the Debtors or Laurus/Valens may terminate the Settlement and the parties will have all rights as existed before the filing of this Motion.

84.     The Debtors intend to incorporate the terms of the Settlement into the Plans to be filed in these cases. The Plans shall be in form and substance satisfactory to Laurus/Valens and shall not contain any terms or provisions inconsistent with the Settlement or that would adversely affect the rights of Laurus/Valens thereunder. The closing of the Settlement (the "Closing") for both Biovest and Accentia must occur concurrently and will occur upon the entry of final, non-appealable orders of the Court confirming the Plans and the satisfaction or waiver of the other conditions to Closing set forth in the Term Loan and Security Agreements between the parties.

**(I)     Settlement Terms with the Biovest Entities**

85.     The pertinent terms and conditions of the Settlement with the Biovest Entities as to the Biovest Financing Transactions are summarized below (the "Biovest Settlement Terms"):[6]

(a)     Laurus/Valens will have an allowed secured claim against Biovest in the amount of $24,900,000.00 (the "Biovest Allowed Secured Claim") in full and final satisfaction of all principal asserted by Laurus/Valens against Biovest and the Biovest Subsidiaries in the Biovest Proofs of Claim. As originally proposed, the

---

[6]     This summary is qualified in its entirety by the Biovest Settlement Documents and, to the extent of any inconsistencies between this Motion and the Biovest Settlement Documents, the Biovest Settlement Documents shall control. In addition, unless otherwise defined in this Motion, capitalized terms used in this Paragraph 85 shall have the meanings ascribed thereto in the Biovest Settlement Documents.

amount of the Biovest Allowed Secured Claim was $14,900,000.00; however, under the Settlement, Laurus/Valens gave Biovest the option to reduce Laurus/Valens' agreed upon twenty percent (20%) equity ownership in the Biovest Common Stock to be received in exchange for a reduction of the 19.50% royalty in the Biovest Biologic Products (as described in subparagraph (j) below), by adding $500,000.00 to such original claim amount for every one percent (1%) reduction in such equity ownership. Biovest has informed Laurus/Valens that it will add $10,000,000.00 to the original amount of the Biovest Allowed Secured Claim (resulting in a total claim amount of $24,900,000.00) in exchange for the cancellation of the entire twenty percent (20%) equity ownership in the Biovest Common Stock that would have been received by Laurus/Valens. The Biovest Allowed Secured Claim will be evidenced by one or more term notes (the "Biovest Term A Notes") with a maturity date (the "Biovest Term A Note Maturity Date") of two (2) years following the date of the Closing of the Settlement (the "Biovest Closing Date"). The Biovest Term A Notes will be issued on the Biovest Closing Date and the outstanding balances thereunder (including all accrued and unpaid interest) will be due and payable in full on the Biovest Term A Note Maturity Date. The Biovest Term A Notes will bear interest at the rate of eight percent (8%) per annum and will be subject to a default rate of interest of twelve percent (12%), in each case based on a 365 day year. Interest will be payable at the time of any principal payment or prepayment of principal under the Biovest Term A Notes. Biovest may prepay the Biovest Term A Notes, without penalty, at any time. In addition, Biovest is required to make mandatory prepayments under the Biovest Term A Notes as follows (each, a "Term A Note Mandatory Prepayment"): (i) a prepayment equal to thirty percent (30%) of the Net Proceeds (i.e., the gross proceeds received less any investment banking or similar fees and commissions and legal costs and expenses incurred by Biovest) of any Capital Raise (excluding (x) any additional loans to Biovest from either the DIP Lender (as defined below) or Accentia up to a maximum amount equal to the difference between $3,000,000.00 and the outstanding balance of the DIP Loan (as defined below) as of the Biovest Closing Date, and (y) the first $1,500,000.00 of Net Proceeds received by Biovest after the Biovest Closing Date, and (z) cash proceeds received by Biovest from the exercise of stock options or stock purchase warrants if the stock option or stock purchase warrant was issued prior to the Biovest Closing Date or issued pursuant to the Biovest Plan), but only up to the then outstanding principal and accrued interest under the Biovest Term A Notes, and (ii) from any intercompany funding by Accentia to Biovest, provided that thirty percent (30%) of such intercompany funding shall first be used by Accentia to prepay the Accentia Term Notes and, if the Accentia Term Notes have been paid in full, the balance of such thirty percent (30%) of the intercompany funding shall then be used to prepay the Biovest Term A Notes, and (iii) a prepayment equal to fifty percent (50%) of positive Net Cash Flow of Biovest for each fiscal quarter after the Biovest Closing Date, less the amount of Biologic Products Capital Expenditures made during such fiscal quarter or during any prior fiscal quarter ending after the Biovest Closing Date (excluding any such expenditures that have previously been taken into account in calculating the prepayment amount for any prior fiscal quarter). The term "Biologic Products Capital Expenditures" shall mean capital expenditures of Biovest or the Biovest

Subsidiaries directly related to the development and production of the Biovest Biologic Products, including any capital expenditures incurred by Biovest or the Biovest Subsidiaries in modifying or expanding their biologics manufacturing facilities, but shall not include any allocation for corporate overhead or other general and administrative expenses. Any Term A Note Mandatory Prepayment will be applied, pro rata, as a reduction of principal on the then outstanding balance of the Biovest Term A Notes and interest accrued on such paid principal amount through the date of payment.

(b)     Laurus/Valens will have an additional allowed secured claim against Biovest in the amount of $4,160,000.00 (the "Biovest Additional Allowed Secured Claim") in full and final satisfaction of the interest, penalties, fees, and default interest in the amount of $7,332,987.49 asserted by Laurus/Valens against Biovest and the Biovest Subsidiaries in the Biovest Proofs of Claim. As originally proposed, the amount of the Biovest Additional Allowed Secured Claim was $3,660,000.00; however, under the Settlement, Laurus/Valens gave Biovest the option to terminate the AutovaxID Royalty in exchange for adding $500,000.00 to such original claim amount. Biovest has informed Laurus/Valens that it will add $500,000.00 to the original amount of the Biovest Additional Allowed Secured Claim (resulting in a total claim amount of $4,160,000.00) in exchange for the termination of the AutovaxID Royalty. The Biovest Additional Allowed Secured Claim will be evidenced by one or more term notes (the "Biovest Term B Notes") with a maturity date (the "Biovest Term B Note Maturity Date") of three (3) years following the Biovest Closing Date. The Biovest Term B Notes will be issued on the Biovest Closing Date and the outstanding balances thereunder (including all accrued and unpaid interest) will be due and payable in full on the Biovest Term B Note Maturity Date. The Biovest Term B Notes will bear interest at the rate of eight percent (8%) per annum and will be subject to a default rate of interest of twelve percent (12%), in each case based on a 365 day year. Interest will be payable at the time of any principal payment or prepayment of principal under the Biovest Term B Notes. Biovest may prepay the Biovest Term B Notes, without penalty, at any time. In addition, provided that the Biovest Term A Notes have been paid in full, Biovest is required to make mandatory prepayments under the Biovest Term B Notes (each, a "Term B Note Mandatory Prepayment") from any intercompany funding by Accentia to Biovest (excluding any additional loans to Biovest from Accentia up to a maximum amount equal to the difference between $3,000,000.00 and the outstanding balance of the DIP Loan as of the Biovest Closing Date), provided that thirty percent (30%) of such intercompany funding shall first be used by Accentia to prepay the Accentia Term Notes and, if the Accentia Term Notes have been paid in full, the balance of such thirty percent (30%) of the intercompany funding shall be used to prepay the Biovest Term B Notes, but only up to the outstanding principal and accrued interest under the Biovest Term B Notes. Any Term B Note Mandatory Prepayment will be applied, pro rata, as a reduction of principal on the then outstanding balance of the Biovest Term B Notes and interest accrued on such paid principal amount through the date of payment.

(c)  On notice to and with the prior written consent of Laurus/Valens, Biovest may convert all or any portion of the outstanding principal and accrued interest on either the Biovest Term A Notes or the Biovest Term B Notes (collectively, the "Biovest Term Notes") into shares of Biovest Common Stock. The number of shares of Biovest Common Stock issuable on a conversion (the "Biovest Conversion Shares") shall be equal to (i) an amount equal to the aggregate portion of the principal and accrued and unpaid interest thereon outstanding under the Biovest Term Note being converted, divided by (ii) ninety percent (90%) of the average closing price publicly reported for the Biovest Common Stock for the ten (10) trading days immediately preceding the date of the notice of conversion. Sales of the Biovest Conversion Shares by Laurus/Valens will be subject to the limitations on the number of shares of Biovest Common Stock that may be sold from time to time contained in Rule 144(e) of the Rules and Regulations under the Securities Act of 1933, as amended, promulgated by the United States Securities and Exchange Commission ("Rule 144(e)"), without regard to whether or not Laurus/Valens is considered an "Affiliate" of Biovest for purposes of Rule 144(e).

(d)  The Biovest Term Notes will be secured by a first lien and security interest in (i) all of the assets of Biovest (including all Intellectual Property), junior only to the lien granted by the Court to Corps Real, LLC (the "DIP Lender") for its debtor in possession financing loan (the "DIP Loan") to Biovest (which loan amount as of the Biovest Closing Date cannot exceed $3,000,000.00), and (ii) all of the assets of the Biovest Subsidiaries, which will secure Guaranties (as to the entire indebtedness under the Biovest Term Notes) to be executed by the Biovest Subsidiaries in favor of Laurus/Valens.

(e)  The Biovest Term Notes will also be guaranteed by Accentia (the "Accentia Guaranty"), up to a maximum amount of $4,991,360.00. The Accentia Guaranty will be secured by a pledge by Accentia of 20,115,818 shares of Biovest Common Stock owned by Accentia.

(f)  Analytica will execute a security agreement (the "Analytica Security Agreement"), a separate grant of a security interest in its Intellectual Property (the "Analytica IP Grant") and a guaranty (the "Analytica Guaranty") in favor of Laurus/Valens to secure the obligations of Accentia under the Accentia Guaranty and under the Accentia Term Notes. The Analytica Security Agreement, the Analytica IP Grant and the Analytica Guaranty, insofar as they relate to the Accentia Guaranty, are also limited to a maximum amount of $4,991,360.00.

(g)  Accentia will enter into a subordination agreement (the "Accentia Subordination Agreement") with Laurus/Valens, pursuant to which Accentia will agree to subordinate any indebtedness owing, or liens granted, to it by Biovest and the Biovest Subsidiaries to any indebtedness owing, or liens granted, to Laurus/Valens under the Biovest Settlement Documents; provided that, (i) Accentia will be allowed to elect, pursuant to the terms of the Biovest Plan, to convert its secured claim against Biovest in the amount of $11,991,510.00 into shares of Biovest Common Stock, and (ii) Biovest will be permitted to make certain payments to Accentia related to the sharing of expenses and shared

46

administrative and overhead costs between the companies and the repayment of any future loan made by Accentia to Biovest in lieu of an additional loan from the DIP Lender.

(h)     All warrants held by Laurus/Valens for the purchase of shares of Biovest Common Stock as described in Paragraph 50 above (including the warrant received from Accentia for the purchase of 10,000,000 shares of Biovest Common Stock owned by Accentia) (collectively, the "Biovest Warrants") will be terminated and cancelled as of the Closing. Laurus/Valens will not have any rejection damages or other claims against Biovest or Accentia in connection with the termination and cancellation of the Biovest Warrants.

(i)     In consideration for the cancellation of the Biovest Warrants, on the Biovest Closing Date, Laurus/Valens will receive that number of shares of Biovest Common Stock equal to 9.99% of the fully diluted issued and outstanding shares of Biovest Common Stock as of the Biovest Closing Date (after taking into account any shares of Biovest Common Stock to be issued to creditors of Biovest and the Biovest Subsidiaries under the Biovest Plan and any shares of Biovest Common Stock subject to issuance under existing stock purchase warrants and other agreements, but excluding any shares of Biovest Common Stock subject to issuance pursuant to outstanding stock options for employees and directors of Biovest) (the "Closing Shares"). Except for the Closing Shares, Laurus/Valens will not be entitled to receive any shares of Biovest Common Stock under the Security Agreement or the Accentia Security Agreement. The Closing Shares will be issued subject to the provisions of Rule 144. In addition, Laurus/Valens will agree that they will not offer, sell, contract to sell, hypothecate, pledge or otherwise dispose of any of the Closing Shares (i) during the six (6) month period following the closing of each of the first two (2) common equity offerings of Biovest (whether in a registered public offering or in a private placement transaction), with gross proceeds of $10,000,000 or more, and (ii) during the three (3) month period following the closing of a common equity offering of Biovest (whether in a registered public offering or in a private placement transaction) that closes within three (3) months after the Biovest Closing Date, with gross proceeds of between and including $5,000,000 and $10,000,000.

(j)     In full and final satisfaction of the 19.50% royalty asserted by Laurus/Valens in the Biovest Biologic Products (the "Laurus/Valens Royalty"), Laurus/ Valens will receive (i) a new perpetual royalty equal to 6.25% of the gross revenues from the sale, license or other disposition of the Biovest Biologic Products received by Biovest or its sublicensees or transferees, and (ii) as consideration for the reduction of the Laurus/Valens Royalty, that number of shares of Biovest Common Stock equal to twenty percent (20%) of the fully diluted issued and outstanding shares of Biovest Common Stock as of the Biovest Closing Date (after taking into account any shares of Biovest Common Stock to be issued to creditors of Biovest and the Biovest Subsidiaries under the Biovest Plan and any shares of Biovest Common Stock subject to issuance under existing stock purchase warrants and other agreements, but excluding any shares of Biovest Common Stock subject to issuance pursuant to outstanding stock options for

employees and directors of Biovest); provided that, Biovest has the option to reduce the number of shares of Biovest Common Stock by one percent (1%) for each $500,000.00 added to the principal amount of the Biovest Allowed Secured Claim. As stated in subparagraph (a) above, Biovest has informed Laurus/Valens that it will exercise this option in its entirety, such that Laurus/Valens will not receive any shares of Biovest Common Stock under this subparagraph (j).

(k) At the Closing, Biovest, Accentia and Laurus/Valens will enter into several agreements terminating the Laurus/Valens Royalty in its entirety.

(l) The AutovaxID Royalty (including the guaranteed minimum amount of $7,500,000.00) will be terminated as of the Biovest Closing Date and, as consideration therefor, $500,000.00 will be added to the Biovest Additional Allowed Secured Claim of $3,660,000.00 as described in subparagraph (b) above.

(m) Biovest will amend and restate its certificate of incorporation and bylaws to incorporate provisions (i) required by the Biovest Plan and the Bankruptcy Code and (ii) to provide Laurus/Valens with the right, upon an Event of Default under Section 20(a) of the Security Agreement (after giving effect to any applicable grace period provided therein) (a "Trigger Event"), to appoint and maintain one-third (1/3) of the total number of directors of Biovest (the "Designated Directors"). Following a Trigger Event, such right to appoint Designated Directors will continue notwithstanding Biovest's cure of any such Event of Default until the Biovest Term Notes have been paid in full. Such amendments and restatements will be attached to the Biovest Plan and will become effective on the Effective Date of the Biovest Plan.

(n) Laurus/Valens and the DIP Lender will enter into a subordination agreement, (the "DIP Lender Subordination Agreement"), pursuant to which Laurus/Valens will agree to subordinate any indebtedness owing, or liens granted, to it by Biovest to any indebtedness owing (up to a maximum amount of $3,000,000.00), or liens granted, to the DIP Lender under the DIP Loan; provided that, the DIP Lender Subordination Agreement will not prohibit any mandatory prepayments, or the issuance of any Biovest Conversion Shares, to Laurus/Valens under the Biovest Term Notes.

(o) Accentia and Biovest will enter into an agreement, effective as of the Biovest Closing Date, terminating the 19.50% royalty in the Biovest Biologic Products granted to Accentia by Biovest on October 31, 2006.

(p) Laurus/Valens will support, and vote for the acceptance of, a plan of reorganization proposed by Biovest and the Biovest Subsidiaries that is consistent with the Biovest Settlement Terms.

(q) Except as to any obligations under the Biovest Settlement Documents or the Biovest Plan, the Biovest Entities and Laurus/Valens and their respective officers, directors, employees, agents, and attorneys will be deemed to have released each other, as of the Biovest Closing Date, from any and all claims of any nature

whatsoever, and appropriate language will be included in the Approval Order regarding such releases.

(r)     All of the Biovest Settlement Documents (except for the DIP Lender Subordination Agreement) will be governed by the laws of the State of New York. Until the Biovest Closing Date, the Court will have and retain exclusive jurisdiction over the Settlement and any disputes arising thereunder. Following the Biovest Closing Date, the state and/or federal courts in the State of New York will have jurisdiction over the Biovest Settlement Documents.

(s)     On the Biovest Closing Date, Laurus/Valens will withdraw the Biovest Proofs of Claim with prejudice.

(t)     Effective as of the Biovest Closing Date, any and all prepetition documents between the Debtors and Laurus/Valens with respect to the Biovest Financing Transactions shall be deemed cancelled and void and of no further force and effect.

## (II)    Settlement Terms with the Accentia Entities

86.     The pertinent terms and conditions of the Settlement with the Accentia Entities as to the Accentia Financing Transactions are summarized below (the "Accentia Settlement Terms"):[7]

(a)     Laurus/Valens will have an allowed secured claim against Accentia in the amount of $8,800,000.00 (the "Accentia Allowed Secured Claim") in full and final satisfaction of all secured claims asserted by Laurus/Valens against Accentia in the Accentia Proof of Claim (excluding the 2006 Debenture Claim as described below) and against Analytica in the Analytica Proof of Claim. The Accentia Allowed Secured Claim will be evidenced by one or more term notes (the "Accentia Term Notes") with a maturity date (the "Accentia Term Note Maturity Date") of two (2) years following the date of the Closing of the Settlement (the "Accentia Closing Date"). The Accentia Term Notes will be issued on the Accentia Closing Date and the outstanding balances thereunder (including all accrued and unpaid interest) will be due and payable in full on the Accentia Term Note Maturity Date. The Accentia Term Notes will bear interest at the rate of eight and one-half percent (8.5%) per annum and will be subject to a default rate of interest of twelve and one-half percent (12.5%), in each case based on a 365 day year. Interest will be payable at the time of any principal payment or prepayment of principal under the Accentia Term Notes. Accentia may prepay the Accentia Term Notes, without penalty, at any time. In addition, Accentia is required to make mandatory prepayments under the Accentia Term Notes as

---

[7]     This summary is qualified in its entirety by the Accentia Settlement Documents and, to the extent of any inconsistencies between this Motion and the Accentia Settlement Documents, the Accentia Settlement Documents shall control. In addition, unless otherwise defined in this Motion, capitalized terms used in this Paragraph 86 shall have the meanings ascribed thereto in the Accentia Settlement Documents.

follows (each, an "<u>Accentia Term Note Mandatory Prepayment</u>"): (i) on that date which is eighteen (18) months following the Accentia Closing Date, a payment of principal in the amount of $4,400,000.00, less the amount of any prior optional prepayments of principal by Accentia, and (ii) a prepayment equal to thirty percent (30%) of the Net Proceeds (i.e., the gross proceeds received less any investment banking or similar fees and commissions and legal costs and expenses incurred by Accentia) of any Capital Raise (excluding (x) the first $1,500,000.00 of Net Proceeds received by Accentia after the Accentia Closing Date, and (y) cash proceeds received by Accentia from the exercise of stock options or stock purchase warrants if the stock option or stock purchase warrant was issued prior to the Accentia Closing Date or issued pursuant to the Accentia Plan), but only up to the then outstanding principal and accrued interest under the Accentia Term Notes. Any Accentia Term Note Mandatory Prepayment will be applied, pro rata, as a reduction of principal on the then outstanding balance of the Accentia Term Notes and interest accrued on such paid principal amount through the date of payment.

(b)     On notice to and with the prior written consent of Laurus/Valens, Accentia may convert all or any portion of the outstanding principal and accrued interest on the Accentia Term Notes into shares of Accentia Common Stock. The number of shares of Accentia Common Stock issuable on a conversion (the "<u>Accentia Conversion Shares</u>") shall be equal to (i) an amount equal to the aggregate portion of the principal and accrued and unpaid interest thereon outstanding under the Accentia Term Note being converted, divided by (ii) ninety percent (90%) of the average closing price publicly reported for the Accentia Common Stock for the ten (10) trading days immediately preceding the date of the notice of conversion. Sales of the Accentia Conversion Shares by Laurus/Valens will be subject to the limitations on the number of shares of Accentia Common Stock that may be sold from time to time contained in Rule 144(e), without regard to whether or not Laurus/Valens is considered an "Affiliate" of Accentia for purposes of Rule 144(e).

(c)     The Accentia Term Notes will be secured by a first lien and security interest in (i) all of the assets of Accentia (including all Intellectual Property), junior only to the lien granted to the holders of the 8% Original Issue Discount Secured Convertible Debentures due June 19, 2011, issued by Accentia, and (ii) all of the assets of Analytica pursuant to the Analytica Security Agreement and the Analytica IP Grant, which will secure the Analytica Guaranty (as to the entire indebtedness under the Accentia Term Notes).

(d)     As further collateral for the Accentia Term Notes, Accentia will pledge to Laurus/Valens (i) all of its equity interests in Analytica, and (ii) 20,115,818 shares of Biovest Common Stock owned by Accentia.

(e)     Laurus/Valens will have an allowed claim in the amount of $3,347,388.16 with respect to the September 2006 Debentures (the "<u>2006 Debenture Claim</u>"). On the Accentia Closing Date, the 2006 Debenture Claim will be satisfied by the conversion of the 2006 Debenture Claim into shares of Accentia Common Stock

at the fixed conversion price per share set forth in the Laurus/Valens prepetition debenture documents (i.e., Laurus/Valens will receive that number of shares of Accentia Common Stock determined by dividing the 2006 Debenture Claim by such fixed conversion price, which equals 1,275,301 shares of Accentia common stock).

(f)     Laurus/Valens will have an allowed claim in the amount of $2,624,996.00 with respect to the Preferred Stock (the "Preferred Stock Claim"). On the Accentia Closing Date, the Preferred Stock Claim will be satisfied by the conversion of the Preferred Stock Claim into shares of Accentia Common Stock in accordance with the terms of the Laurus/Valens prepetition documents governing the Preferred Stock. Upon this conversion, Laurus/Valens will receive 983,145 shares of Accentia Common Stock.

(g)     All warrants held by Laurus/Valens for the purchase of shares of Accentia Common Stock as described in Paragraph 78 above (collectively, the "Accentia Warrants") will be terminated and cancelled as of the Closing. Laurus/Valens will not have any rejection damages or other claims against Accentia in connection with the termination and cancellation of the Accentia Warrants.

(h)     Laurus/Valens will support, and vote for the acceptance of, a plan of reorganization proposed by Accentia and its subsidiaries that is consistent with the Accentia Settlement Terms.

(i)     Except as to any obligations under the Accentia Settlement Documents or the Accentia Plan, the Accentia Entities (together with TEAMM, AccentRx and ASP) and Laurus/Valens and their respective officers, directors, employees, agents, and attorneys will be deemed to have released each other, as of the Accentia Closing Date, from any and all claims of any nature whatsoever, and appropriate language will be included in the Approval Order regarding such releases.

(j)     All of the Accentia Settlement Documents will be governed by the laws of the State of New York. Until the Accentia Closing Date, the Court will have and retain exclusive jurisdiction over the Settlement and any disputes arising thereunder. Following the Accentia Closing Date, the state and/or federal courts in the State of New York will have jurisdiction over the Accentia Settlement Documents.

(k)     On the Accentia Closing Date, Laurus/Valens will withdraw the Accentia Proof of Claim and the Analytica Proof of Claim with prejudice.

(l)     Effective as of the Accentia Closing Date, any and all prepetition documents between the Debtors and Laurus/Valens with respect to the Accentia Financing Transactions shall be deemed cancelled and void and of no further force and effect.

87.     Nothing in this Motion shall be deemed to be an admission by or against any party to this compromise.

## F.  Relief Requested and Legal Argument

88.     The Settlement will resolve all claims between the Debtors and Laurus/Valens, and will provide a tangible benefit to the Debtors' estates and their creditors and stockholders by eliminating the potential for costly and contentious litigation and appeals.  Thus, the parties request approval of the Settlement pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

89.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  In practice, Section 105(a) of the Bankruptcy Code grants bankruptcy courts broad statutory authority to enforce the Bankruptcy Code's provisions either under the specific statutory language of the Bankruptcy Code or under equitable common law doctrines.  *See In re EZ Pay Services, Inc.*, 389 B.R. 278, 284 (Bankr. M.D. Fla. 2008) ("Bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process.").

90.     Bankruptcy Rule 9019(a), which governs approval of compromises and settlements, provides, in pertinent part:

> On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States Trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).  Neither Bankruptcy Rule 9019 nor any other section of the Bankruptcy Code explicitly sets forth the standards by which the Court is to evaluate a proposed settlement for approval.

91.     However, "[s]ettlements are generally favored in bankruptcy proceedings, in that they provide for an often needed and efficient resolution of the bankruptcy case."  *Tindall v.*

*Mavrode (In re Mavrode)*, 205 B.R. 716, 719 (Bankr. D. N.J. 1997); *see also In re Stein*, 236 B.R. 34, 37 (D. Ore. 1999) ("Pursuant to Bankruptcy Rule 9019(a), compromises are favored in bankruptcy . . ."). The Supreme Court has held that compromises and settlements in bankruptcy should be approved if they are "fair and equitable." *Protective Comm. for Indep. Stockholders of T.M.T. Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1960). *Anderson* is the seminal case for approval of settlements in bankruptcy cases, and the Supreme Court in *Anderson* held as follows:

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the Bankruptcy Judge has appraised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the Judge should form an educated estimate of the complexity, expense and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

*Id.* (citations omitted).

92.     The standard for approving a settlement or compromise is well established. The Court must consider all of the relevant facts and evaluate whether the proposed compromise falls below the "lowest point in the range of reasonableness." *Anaconda-Ericsson, Inc. v. Hessen (In re Teltronics Servs., Inc.)*, 762 F.2d 185, 189 (2d Cir. 1985); *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *In re Bicoastal Corp.*, 164 B.R. 1009, 1016 (Bankr. M.D. Fla. 1993); *Chopin Associates v. Smith (In re Holywell Corp.)*, 93 B.R. 291, 294 (Bankr. S.D. Fla. 1988). If it does not, the Court should approve the settlement.

93.     As the former Fifth Circuit Court of Appeals held in *Rivercity v. Herpel (In re Jackson Brewing Co.)*,[8] "[t]o assure a proper compromise the bankruptcy judge must be apprised of all necessary facts for an intelligent, objective and educated evaluation. He must compare the terms of the compromise with the likely rewards of litigation." 624 F.2d 599, 602 (5th Cir. 1980) (citing *Anderson*, 390 U.S. at 425 (quotation marks omitted)). Approval of a settlement "does not depend upon establishing as a matter of legal certainty that the subject claim or counterclaim is or is not worthless or valuable." *Florida Trailer and Equipment Co. v. Deal*, 284 F.2d 567, 571 (5th Cir. 1960). Rather, the Court's responsibility is only to "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the zone of reasonableness.'" *W.T. Grant Co.*, 699 F.2d at 608 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)). As the court stated in *Florida Trailer*:

> [T]he very uncertainties of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind the Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty.

284 F.2d at 571.

94.     In order to evaluate whether to approve a settlement, the Court must consider the four factors set forth by the Eleventh Circuit in *Wallis v. Justice Oaks, II, Ltd. (In re Justice Oaks II, Ltd.)*, 898 F.2d 1544, 1549 (11th Cir. 1990) (the "Justice Oaks II Factors"):

(a)     The probability of success in the litigation;

(b)     The difficulties, if any, to be encountered in the matter of collection;

(c)     The complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and

---

[8]     The decisions of the former Fifth Circuit constitute binding precedent within the Eleventh Circuit. *Bonner v. City of Pritchard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

(d)     The paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* (citation omitted).

95.     Applying each of these factors to the circumstances of these cases, it is undeniable that the Settlement falls well above the lowest point in the range of reasonableness, and accordingly should be approved. In addition, the Settlement satisfies all four of the Justice Oaks II Factors for the reasons set forth below.

96.     First, although each of the Debtors and Laurus/Valens believe they will prevail in any potential litigation, the ultimate probability of success in litigating the disputes with Laurus/Valens is uncertain as the arguments cited by Laurus/Valens in the negotiations between the parties pose a risk that the Debtors may not ultimately prevail in any litigation. It is also likely that any litigation involving the Debtors and Laurus/Valens will be complex, costly and protracted. As the Court can see from the disclosures set forth above in this Motion, the prepetition transactions between the parties are extensive and quite complicated. In resolving any litigation, the Debtors would need to engage several experts on valuation and other matters. The Debtors believe that even if they were successful, in whole or in part, in any potential litigation, the benefits to their creditors and stockholders would be greatly reduced by the significant time and costs of litigating the action. Finally, the costs of such litigation would deprive the Debtors of the funds necessary to move forward on seeking regulatory approval of their drug candidate products.

97.     Second, if the Debtors were to prevail in any litigation, it may be difficult to collect from Laurus, which is presently subject to a Cayman Islands liquidation proceeding. Furthermore, any adverse ruling against Laurus/Valens in any litigation would most likely be appealed by Laurus/Valens, leading to further delays and litigation costs.

98. Third, as stated above, any litigation between the parties will be extremely complex and costly and the Debtors will most definitely expend a substantial amount in fees and costs pursuing such litigation. Moreover, discovery will be very costly to all parties. Lastly and perhaps most significant, the issues to be determined are complex and will take considerable time and effort to litigate.

99. Fourth, in the Debtors' business judgment, the Debtors believe it is in the paramount interest of the estates' creditors and stockholders to settle with Laurus/Valens under the Biovest Settlement Terms and the Accentia Settlement Terms. Eliminating the possibility of litigation with Laurus/Valens provides the Debtors with the ability to propose plans of reorganization in these cases and exit from Chapter 11 and to focus on their business operations.

100. Application of the relevant factors should leave this Court with the inescapable conclusion that the settlement and compromises embodied in the proposed Settlement between the Debtors and Laurus/Valens are well above the lowest point in the range of reasonableness. The Settlement provides a reasoned and fair solution to the myriad of issues that would otherwise result in protracted litigation. The Settlement represents a fair compromise of the disputes and issues referenced herein. Accordingly, the Settlement satisfies all four of the Justice Oaks II Factors and should be approved as fair and equitable and in the best interests of all creditors.

### G. Notice

101. A copy of this Motion is being mailed to all creditors of the Debtors, all parties set forth on the Master Service List for these jointly administered Chapter 11 cases, Laurus/Valens and its counsel, and the Committee and its counsel. Accordingly, the Debtors request that the Court enter an order finding that such notice of this Motion is adequate and sufficient and complies with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure

and the Local Rules of this Court. The Debtors submit that, given the nature of the relief requested herein, no other or further notice need be given.

WHEREFORE, the Debtors request that this Court enter an order granting this Motion and authorizing and approving the Settlement between the Debtors and Laurus/Valens, including the Biovest Settlement Terms and the Accentia Settlement Terms, and for such other and further relief as is just and proper.

Dated: April 16, 2010

/s/ Charles A. Postler
Charles A. Postler (Florida Bar No. 455318)
Stichter, Riedel, Blain & Prosser, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
cpostler@srbp.com
PH   (813) 229-0144
FAX  (813) 229-1811
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **Debtors' Motion for Approval of Settlement Between the Debtors and Laurus Master Fund, Ltd. (in Liquidation) and its Affiliates and Assignees, Pursuant to 11 U.S.C. § 105(a) and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure** has been furnished on this 16th day of April, 2010, (i) by **CM/ECF Transmission** (with attached Composite Exhibit 1) to the United States Trustee, 501 East Polk Street, Suite 1200, Tampa, Florida 33602, and (ii) by **U.S. Mail** or **CM/ECF Transmission** (without attached Composite Exhibit 1, unless received by the following parties by CM/ECF Transmission) to (a) all parties set forth on the Master Service List for these cases attached hereto as Schedule 1, and (b) all creditors of the Debtors set forth on the Court's mailing matrices for these cases attached hereto as Schedule 2.

/s/ Charles A. Postler
Charles A. Postler