# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

In re:                                              Chapter 11

BIOVEST INTERNATIONAL, INC.,                        Case No. 8:08-bk-17796-KRM

BIOVAX, INC.,                                       Case No. 8:08-bk-17803-KRM

AUTOVAXID, INC.,                                    Case No. 8:08-bk-17804-KRM

BIOLENDER, LLC,                                     Case No. 8:08-bk-17805-KRM

BIOLENDER II, LLC,                                  Case No. 8:08-bk-17806-KRM

    Debtors.
_____/


## JOINT PLAN OF REORGANIZATION OF BIOVEST INTERNATIONAL, INC., BIOVAX, INC., AUTOVAXID, INC., BIOLENDER, LLC, AND BIOLENDER II, LLC UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE

STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
Charles A. Postler (Florida Bar No. 455318)
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:    (813) 229-0144
Facsimile:    (813) 229-1811
Email:        cpostler@srbp.com
Counsel for Debtors and Debtors in Possession

Tampa, Florida
Dated as of May 14, 2010

PURSUANT TO SECTION 1125 OF TITLE 11 OF THE UNITED STATES CODE, NOTHING CONTAINED IN THIS JOINT PLAN OF REORGANIZATION (THE "PLAN") SHOULD BE CONSTRUED AS CONSTITUTING A SOLICITATION OF ACCEPTANCES OF THE PLAN UNTIL SUCH TIME AS THE DEBTORS' DISCLOSURE STATEMENT (AS DEFINED HEREIN) HAS BEEN APPROVED BY AN ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA DIVISION, AND DISTRIBUTED, WITH APPROPRIATE BALLOTS (INCLUDING THE BIOVEST STOCKHOLDER BALLOTS), TO ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR AN AMENDED AND RESTATED PLAN AND AN AMENDED OR AN AMENDED AND RESTATED DISCLOSURE STATEMENT FROM TIME TO TIME HEREAFTER. REFERENCE IS MADE TO SUCH DISCLOSURE STATEMENT FOR A DISCUSSION OF THE DEBTORS' HISTORY, BUSINESSES, PROPERTIES, AND OPERATIONS, THE PROJECTIONS FOR THE DEBTORS' FUTURE OPERATIONS, A SUMMARY OF SIGNIFICANT EVENTS WHICH HAVE OCCURRED TO DATE IN THE BANKRUPTCY CASES, A SUMMARY OF THE MEANS OF IMPLEMENTING AND FUNDING THE PLAN, AND THE PROCEDURES FOR VOTING ON THE PLAN. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE HEREBY ADVISED AND ENCOURAGED TO READ THE DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THE PLAN AND THE DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

# TABLE OF CONTENTS

ARTICLE 1      INTRODUCTION.................................................................................1

ARTICLE 2      DEFINED TERMS; RULES OF CONSTRUCTION.....................................2
     2.1      Defined Terms..............................................................................2
     2.2      Rules of Construction..................................................................30

ARTICLE 3      TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX
     CLAIMS, AND DIP LOAN CLAIMS .......................................................30
     3.1      Administrative Expense Claims. ....................................................30
     3.2      Priority Tax Claims.....................................................................31
     3.3      DIP Loan Claims. ......................................................................31

ARTICLE 4      DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS .............33
     4.1      Class 1: Priority Claims..............................................................34
     4.2      Class 2: Secured Claims and Other Claims of Laurus/Valens. ...............34
     4.3      Class 3: Secured Claims and Other Claims of Accentia. ......................34
     4.4      Class 4: Secured Claims and Other Claims of the 2008 Secured Debentures Holders..34
     4.5      Class 5: Secured Tax Claims of Governmental Units.............................34
     4.6      Class 6: Other Secured Claims......................................................34
     4.7      Class 7: Unsecured Claims of Ronald E. Osman under the Osman Note......................34
     4.8      Class 8: Unsecured Claims (Unsecured Claims Not Otherwise Classified). .................34
     4.9      Class 9: Unsecured Convenience Claims. .........................................34
     4.10      Class 10: Intercompany Claims. ....................................................35
     4.11      Class 11: Subordinated Securities Claims. ........................................35
     4.12      Class 12: Equity Interests. ...........................................................35
     4.13      Class 13: Subsidiary Equity Interests. .............................................35

ARTICLE 5      TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS...................35
     5.1      Unclassified Claims....................................................................35
     5.2      Class 1: Priority Claims..............................................................35
     5.3      Class 2: Secured Claims and Other Claims of Laurus/Valens. ...............36
     5.4      Class 3: Secured Claims and Other Claims of Accentia. ......................41
     5.5      Class 4: Secured Claims and Other Claims of the 2008 Secured Debentures Holders..42
     5.6      Class 5: Secured Tax Claims of Governmental Units.............................43
     5.7      Class 6: Other Secured Claims......................................................44
     5.8      Class 7: Unsecured Claims of Ronald E. Osman under the Osman Note......................44
     5.9      Class 8: Unsecured Claims (Unsecured Claims Not Otherwise Classified). .................45
     5.10      Class 9: Unsecured Convenience Claims. .........................................47
     5.11      Class 10: Intercompany Claims. ....................................................48
     5.12      Class 11: Subordinated Securities Claims. ........................................48
     5.13      Class 12: Equity Interests. ...........................................................49
     5.14      Class 13: Subsidiary Equity Interests. .............................................49

ARTICLE 6      ACCEPTANCE OR REJECTION OF THE PLAN ......................................50
     6.1      Each Impaired Class Entitled to Vote Separately..................................50
     6.2      Acceptance by Impaired Classes.....................................................50
     6.3      Presumed Acceptance of Plan by Unimpaired Classes..........................50
     6.4      Deemed Non-Acceptance of Plan....................................................50
     6.5      Impairment Controversies. ...........................................................51

ARTICLE 7 TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........51
 7.1 Assumption or Rejection of Executory Contracts and Unexpired Leases. .....................51
 7.2 Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases. .51
 7.3 Inclusiveness. .................................................................................................................52
 7.4 Cure of Defaults. ............................................................................................................52
 7.5 Claims under Rejected Executory Contracts and Unexpired Leases. ............................52
 7.6 Insurance Policies. ..........................................................................................................53
 7.7 Indemnification Rights. ..................................................................................................53
 7.8 Existing Biovest Stock Options. ....................................................................................53
 7.9 Existing Biovest Stock Warrants. ...................................................................................54

ARTICLE 8 MEANS OF IMPLEMENTATION OF THE PLAN .............................................54
 8.1 General Overview of the Plan. .......................................................................................54
 8.2 Effective Date Actions. ...................................................................................................55
 8.3 Vesting of Property of the Estates in Reorganized Biovest. ..........................................56
 8.4 Continued Corporate Existence; Dissolution. ...............................................................56
 8.5 Corporate Action. ...........................................................................................................57
 8.6 Boards of Directors and Executive Officers of the Reorganized Debtors. .....................57
 8.7 Amendment and Restatement of Certificate of Incorporation and Bylaws of Biovest....58
 8.8 Issuance of Reorganized Biovest Common Stock. ........................................................58
 8.9 Exemptions from Securities Laws. .................................................................................58
 8.10 Delinquency in Filing SEC Reports. ..............................................................................61
 8.11 Section 1146 Exemption. ...............................................................................................61
 8.12 Pursuit of Causes of Action. ..........................................................................................61
 8.13 Prosecution and Settlement of Claims and Causes of Action. .......................................63
 8.14 Effectuating Documents; Further Transactions. .............................................................63
 8.15 Cancellation of Existing Loan Documents and Agreements. ..........................................63
 8.16 Exit Financing. ...............................................................................................................64
 8.17 Exclusivity Period. .........................................................................................................64
 8.18 Dissolution of the Committee. ........................................................................................64

ARTICLE 9 PROVISIONS GOVERNING DISTRIBUTIONS .................................................64
 9.1 Initial Distribution. .........................................................................................................64
 9.2 Execution and Delivery of Plan Notes and Security Documents. ...................................64
 9.3 Determination of Claims. ...............................................................................................65
 9.4 Distributions as to Allowed Claims in Classes 8 and 11 ...............................................66
 9.5 Unclaimed Distributions. ................................................................................................66
 9.6 Transfer of Claim. ..........................................................................................................67
 9.7 One Distribution Per Holder. ..........................................................................................67
 9.8 Effect of Pre-Confirmation Distributions. .....................................................................67
 9.9 No Interest on Claims. ....................................................................................................67
 9.10 Determination of Voting and Distribution Rights of Holders of Equity Interests. ..........68
 9.11 Fractional Shares. ...........................................................................................................68
 9.12 Certain Restrictions on Stock Transfers. ........................................................................68
 9.13 Compliance with Tax Requirements. ..............................................................................69

ARTICLE 10 SUBSTANTIVE CONSOLIDATION OF THE DEBTORS' ESTATES ......................69
 10.1 Request for Substantive Consolidation. .........................................................................69
 10.2 Effect of Substantive Consolidation. .............................................................................69

iv

ARTICLE 11    CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE .................................................................................70
    11.1    Conditions Precedent to Confirmation of the Plan. ........................................70
    11.2    Conditions Precedent to the Effective Date. .................................................70
    11.3    Notice of the Effective Date. .......................................................................71

ARTICLE 12    DISCHARGE, EXCULPATION FROM LIABILITY, RELEASE, AND GENERAL INJUNCTION ........................................................................................71
    12.1    Discharge of Claims and Termination of Equity Interests. ...........................71
    12.2    Exculpation from Liability. ..........................................................................72
    12.3    Release. .......................................................................................................72
    12.4    General Injunction. ......................................................................................73
    12.5    Term of Certain Injunctions and Automatic Stay. ........................................73
    12.6    No Liability for Tax Claims. ........................................................................74
    12.7    Regulatory or Enforcement Actions. ...........................................................74

ARTICLE 13    RETENTION OF JURISDICTION ...........................................................74
    13.1    General Retention. .......................................................................................74
    13.2    Specific Purposes. .......................................................................................75
    13.3    Closing of the Biovest Bankruptcy Cases. ..................................................77

ARTICLE 14    MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS............77
    14.1    Modification of Plan. ...................................................................................77
    14.2    Confirmation Over Objections. ....................................................................78

ARTICLE 15    MISCELLANEOUS PROVISIONS ...........................................................79
    15.1    No Admissions. ...........................................................................................79
    15.2    Revocation or Withdrawal of the Plan. ........................................................79
    15.3    Standard for Approval of the Bankruptcy Court. ..........................................79
    15.4    Further Assurances. .....................................................................................79
    15.5    Headings. ....................................................................................................79
    15.6    Notices. ......................................................................................................79
    15.7    Governing Law. ..........................................................................................80
    15.8    Limitation on Allowance. ............................................................................80
    15.9    Estimated Claims. .......................................................................................80
    15.10    Consent to Jurisdiction. ...............................................................................80
    15.11    Setoffs. .......................................................................................................81
    15.12    Successors and Assigns. ..............................................................................81
    15.13    Modification of Payment Terms. ..................................................................81
    15.14    Entire Agreement. .......................................................................................81
    15.15    Severability of Plan Provisions. ...................................................................81
    15.16    Controlling Document. .................................................................................82
    15.17    Plan Supplement. ........................................................................................82
    15.18    Computation of Time. ..................................................................................82
    15.19    Substantial Consummation. ..........................................................................82

# INDEX TO EXHIBITS TO PLAN

Exhibit A   &ndash;   DIP Loan Documents

Exhibit B   &ndash;   Schedule of Intercompany Claims

Exhibit C   &ndash;   Rejected Contracts

Exhibit D   &ndash;   Reorganized Biovest Bylaws

Exhibit E   &ndash;   Reorganized Biovest Charter

Exhibit F   &ndash;   Schedule of Potential Causes of Action

Exhibit G   &ndash;   Pro Forma Recapitalization of Reorganized Biovest

# ARTICLE 1
# INTRODUCTION

Biovest International, Inc. and its wholly-owned subsidiaries, Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC, as Debtors and Debtors in Possession in the Biovest Bankruptcy Cases, hereby propose the following joint plan for the reorganization of the Debtors and the resolution of the outstanding Claims against and Equity Interests in the Debtors pursuant to the provisions of Chapter 11 of the Bankruptcy Code, and request Confirmation of the Plan pursuant to Section 1129 of the Bankruptcy Code. Capitalized terms used in the Plan shall have the meanings ascribed to such terms in Article 2.1 of the Plan. The Debtors are the proponents of the Plan within the meaning of Section 1129 of the Bankruptcy Code.

In summary, but subject to more specific details provided herein, the Plan provides for the reorganization of the Debtors and the payment in full of all of the Allowed Claims against the Debtors and the retention by the Biovest Stockholders of their Equity Interests in Biovest subject to dilution as provided in the Plan. Although the Debtors' Estates are presently being jointly administered for procedural purposes, the Debtors and their Estates have not yet been substantively consolidated. Accordingly, the Plan is really five distinct plans, one for each of the Debtors. The Articles of the Plan generally apply to all of the Debtors, except where otherwise indicated.

Article 10 of the Plan constitutes a motion by the Debtors seeking the substantive consolidation of the Debtors' Estates. If such motion is granted and the Plan is confirmed by the Bankruptcy Court, then, on the Effective Date of the Plan, the Properties of all of the Debtors' Estates will be consolidated into one estate to be thereafter known as the Biovest Estate. The Biovest Estate and the implementation of the Plan will be managed by the Board of Directors of Biovest.

Under Section 1125(b) of the Bankruptcy Code, a vote to accept or reject the Plan cannot be solicited from the Holder of a Claim or Equity Interest until such time as the Debtors' Disclosure Statement has been approved by the Bankruptcy Court and distributed to Holders of Claims and Equity Interests. The Debtors' Disclosure Statement was approved by the Bankruptcy Court in the Biovest Disclosure Statement Approval Order, and has been distributed simultaneously with the Plan to all Holders of Claims and Equity Interests whose votes are being solicited. The Disclosure Statement contains, among other things, (a) a discussion of the Debtors' history, businesses, properties, and operations, (b) the Projections for the Debtors' future operations, (c) a summary of significant events which have occurred to date in the Bankruptcy Cases, (d) a summary of the means of implementing and funding the Plan, and (e) the procedures for voting on the Plan. No materials, other than the Plan and the accompanying Disclosure Statement, Biovest Disclosure Statement Approval Order, and Ballot or Biovest Stockholder Ballot, have been approved by the Debtors or the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT, AND ANY EXHIBITS ATTACHED THERETO, IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

Subject to certain restrictions and requirements set forth in Section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications to the Plan set forth in

Article 14 of the Plan, the Debtors expressly reserve the right to alter, amend, modify, revoke or withdraw the Plan, one or more times, prior to the Plan's substantial consummation.

THE PLAN HAS BEEN APPROVED BY THE BOARD OF DIRECTORS OF BIOVEST. IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, AND THE DEBTORS RECOMMEND THAT CREDITORS AND HOLDERS OF EQUITY INTERESTS VOTE TO ACCEPT THE PLAN.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THE PLAN AND IN THE ACCOMPANYING DISCLOSURE STATEMENT CONCERNING THE HISTORY OF THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, THE PROJECTIONS FOR THE FUTURE OPERATIONS OF THE DEBTORS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY.

THE PLAN AND THE DISCLOSURE STATEMENT HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING OR SELLING OR TRANSFERRING SECURITIES OF ACCENTIA BIOPHARMACEUTICALS, INC. OR BIOVEST SHOULD EVALUATE THE PLAN AND THE DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

**ARTICLE 2**
**DEFINED TERMS; RULES OF CONSTRUCTION**

2.1     **Defined Terms**.

2.1.1          As used in the Plan, the following terms (which appear in the Plan as capitalized terms) shall have the meanings set forth below:

**"1 Month Anniversary Date"** means the date that is one (1) month after the Effective Date.

**"4 Month Anniversary Date"** means the date that is four (4) months after the Effective Date.

**"6 Month Anniversary Date"** means the date that is six (6) months after the Effective Date.

**"12 Month Anniversary Date"** means the date that is twelve (12) months after the Effective Date.

**"2008 Secured Debentures"** means the 15% Secured Convertible Debentures Due March 31, 2010, issued by Biovest to the 2008 Secured Debentures Holders in September and October 2008, in the non-converted aggregate principal amount of $1,450,000 (Kathleen M. O'Donnell, Trustee, Irrevocable Trust #1 FBO Francis E. O'Donnell, Jr. ($100,000.00), Ronald E. Osman ($400,000.00), Philip E. Rosensweig ($300,000.00), and Valens U.S. ($650,000.00)).

**"2008 Secured Debentures Allowed Class 4 Claim"** has the meaning ascribed to such term in Article 5.5.1 of the Plan.

**"2008 Secured Debentures Claims"** means any and all Secured Claims and other Claims of the 2008 Secured Debentures Holders represented by, relating to, or arising under or in connection with the 2008 Secured Debentures Documents.

**"2008 Secured Debentures Documents"** means all of the Prepetition documents evidencing the 2008 Secured Debentures Claims and any and all other documents executed by Biovest, Accentia, the 2008 Secured Debentures Holders, or Laurus/Valens in any way relating to the 2008 Secured Debentures Claims, as any such documents have been amended, modified or supplemented thereafter in accordance with their terms.

**"2008 Secured Debentures Holders"** means, collectively, Kathleen M. O'Donnell, Trustee, Irrevocable Trust #1 FBO Francis E. O'Donnell, Jr., Ronald E. Osman, Philip E. Rosensweig, and Valens U.S.

**"2008 Secured Debentures Plan Note"** has the meaning ascribed to such term in Article 5.5.1.1 of the Plan.

**"2008 Secured Debentures Warrants"** means the Common Stock Purchase Warrants for the purchase of shares of Biovest Common Stock, issued to the 2008 Secured Debentures Holders in connection with the issuance of the 2008 Secured Debentures.

**"Accentia"** means Accentia Biopharmaceuticals, Inc., a Florida corporation.

**"Accentia Allowed Class 3 Claim"** has the meaning ascribed to such term in Article 5.4.1 of the Plan.

**"Accentia Bankruptcy Cases"** means, collectively, the jointly administered cases of the Accentia Debtors currently pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, which cases were commenced by the Accentia Debtors on the Petition Date and presently bear Case Nos. 8:08-bk-17795-KRM (Accentia Biopharmaceuticals, Inc.), 8:08-bk-17798-

KRM (Analytica International, Inc.), 8:08-bk-17800-KRM (TEAMM Pharmaceuticals, Inc.), 8:08-bk-17801-KRM (AccentRx, Inc.), and 8:08-bk-17802-KRM (Accentia Specialty Pharmacy, Inc.).

"**Accentia Confirmation Order**" means the order of the Bankruptcy Court in the Bankruptcy Cases confirming the Accentia Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code, as such order may be amended, modified or supplemented.

"**Accentia Debtors**" means, collectively, Accentia, Analytica International, Inc., TEAMM Pharmaceuticals, Inc., AccentRx, Inc., and Accentia Specialty Pharmacy, Inc.

"**Accentia Guaranty**" has the meaning ascribed to such term in Article 5.3.2.5 of the Plan. The form of the Accentia Guaranty is included in Composite Exhibit 1 attached to the Laurus/Valens Compromise Motion.

"**Accentia Plan**" means the Joint Plan of Reorganization of Accentia Biopharmaceuticals, Inc., Analytica International, Inc., TEAMM Pharmaceuticals, Inc., AccentRx, Inc., and Accentia Specialty Pharmacy, Inc. under Chapter 11 of Title 11, United States Code dated as of May _____, 2010, and all exhibits to the Accentia Plan, as the same may be amended, supplemented, modified or amended and restated from time to time in accordance with the provisions of the Accentia Plan and the Bankruptcy Code.

"**Accentia Prepetition Claims**" means any and all Secured Claims and other Claims of Accentia represented by, relating to, or arising under or in connection with the Accentia Prepetition Loan Documents and the Accentia Royalty Agreement.

"**Accentia Prepetition Loan Documents**" means all of the Prepetition documents evidencing the Accentia Prepetition Claims and any and all other documents executed by the Debtors or Accentia in any way relating to the Accentia Prepetition Claims, as any such documents have been amended, modified or supplemented thereafter in accordance with their terms.

"**Accentia Royalty Agreement**" means the Royalty Agreement by and between Biovest and Accentia, dated as of October 31, 2006, as amended by a letter agreement dated February 5, 2008, and as further amended, modified or supplemented thereafter in accordance with its terms.

"**Accentia Royalty Assignment Agreements**" means the four (4) separate Assignment of Rights Under Royalty Agreements, each dated as of June 18, 2008, by and among Accentia, Biovest, Erato Corp., Valens U.S., Valens Offshore I, and PSource, as amended, modified or supplemented thereafter in accordance with their terms.

"**Accentia Royalty Termination Agreement**" means the Royalty Termination Agreement by and between Reorganized Biovest and Accentia, and acknowledged by Laurus/Valens, to be executed on the Closing Date, providing for the termination of the Accentia Royalty Agreement, as it may be amended, modified or supplemented thereafter in accordance with its terms. The form of the Accentia Royalty Termination Agreement is included in Composite Exhibit 1 attached to the Laurus/Valens Compromise Motion.

"**Accentia Term Loan Agreement**" means the Term Loan and Security Agreement, dated as of May _____, 2010, by and among LV, the lenders party thereto, and Accentia, as it may be amended, modified or supplemented thereafter in accordance with its terms.

"**Administrative Expense**" means (a) any cost or expense of administration of the Biovest Bankruptcy Cases under Section 503(b) or 507(a)(1) of the Bankruptcy Code, to the extent the party claiming any such cost or expense files an application, motion, request or other Bankruptcy Court-approved pleading seeking such expense in the Bankruptcy Cases on or before the applicable Administrative Expense Claim Bar Date, including (i) any actual and necessary costs and expenses of preserving the Estates or operating the businesses of the Debtors (including wages, salaries, or commissions for services rendered) incurred on or after the Petition Date, (ii) any Postpetition cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtors in Possession in the ordinary course of their businesses, (iii) any Claim granted administrative priority status by a Final Order of the Bankruptcy Court, (iv) any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtors for any Postpetition tax year or period, and (v) compensation or reimbursement of expenses of Professionals awarded or allowed pursuant to an order of the Bankruptcy Court under Section 330(a) or 331 of the Bankruptcy Code (including any amounts held back pursuant to an order of the Bankruptcy Court); (b) any Superpriority Claim; (c) all fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930; and (d) any and all other costs or expenses of administration of the Biovest Bankruptcy Cases that are allowed by a Final Order of the Bankruptcy Court; provided, however, that, when used in the Plan, the term "Administrative Expense" shall not include the DIP Loan Claims, any Priority Tax Claim, any Cure Claim, any Environmental Claim, any Disallowed Claim, or, unless otherwise expressly provided in the Plan, any of the Claims in Classes 1 through 11. In no event shall any Claim set out in a Proof of Claim be deemed to be an Administrative Expense (except for any Claim by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) due from the Debtors for any Postpetition tax year or period).

"**Administrative Expense Claim**" means any Claim for the payment of an Administrative Expense.

"**Administrative Expense Claim Bar Date**" means the date(s) established by one or more orders of the Bankruptcy Court as the deadline for the filing by any Creditor or other party in interest of an application, motion, request or other Bankruptcy Court-approved pleading for allowance of any Administrative Expense Claim, including as established in the Biovest Disclosure Statement Approval Order; provided, however, that (a) unless otherwise ordered by the Bankruptcy Court, the Administrative Expense Claim Bar Date for the filing by any Professional of an application for any Administrative Expense Claim not yet filed as of the date of the Plan shall be no later than fourteen (14) days after the date of entry of the Biovest Disclosure Statement Approval Order, and (b) to the extent the Bankruptcy Court has entered an order establishing a different and specific deadline for a Creditor or other party in interest to file an Administrative Expense Claim, the date set forth in such order shall be deemed to be the Administrative Expense Claim Bar Date as to such Creditor or other party in interest. Any Holder of an Administrative Expense Claim (including a Holder of a Claim for Postpetition federal, state or local taxes) that does not file an application, motion, request or other Bankruptcy Court-approved pleading by the applicable Administrative Expense Claim Bar Date shall be forever barred, estopped and enjoined from ever asserting such

Administrative Expense Claim against the Debtors, the Reorganized Debtors, any of their respective Properties or Estates, or the Biovest Estate, and such Holder shall not be entitled to participate in any Distribution under the Plan on account of any such Administrative Expense Claim.

**"Affiliate"** means, with respect to any Person, (a) any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with such Person, (b) any other Person that, directly or indirectly, owns or controls, whether beneficially, or as trustee, guardian or other fiduciary, twenty-five percent (25%) or more of the equity interests having ordinary voting power in the election of directors of such Person, or (c) any other Person who is a director, officer, joint venturer or partner (i) of such Person, (ii) of any subsidiary of such Person, or (iii) of any Person described in clause (a) above. For the purposes of this definition, control of a Person shall mean the power (direct or indirect) to direct or cause the direction of the management and policies of such Person whether by contract or otherwise. When used in the Plan as relating to the Debtors, the term "Affiliate" has the meaning ascribed to such term in Section 101(2) of the Bankruptcy Code.

**"Allowed Amount"** means the dollar amount in which a Claim is allowed.

**"Allowed Claim"** means a Claim or that portion of a Claim which is not a Disputed Claim or a Disallowed Claim and (a) as to which a Proof of Claim was filed with the Clerk's Office on or before the Bar Date or the Governmental Unit Bar Date, as applicable, or, by order of the Bankruptcy Court, was not required to be so filed, or (b) as to which no Proof of Claim was filed with the Clerk's Office on or before the Bar Date or the Governmental Unit Bar Date, as applicable, but which has been or hereafter is listed by the Debtors in the Schedules as liquidated in amount and not disputed or contingent, and, in the case of subparagraph (a) and (b) above, as to which either (i) no objection to the allowance of such Claim has been filed within the time allowed for the making of objections as fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court, or (ii) any objection as to the allowance of such Claim has been settled or withdrawn or has been overruled by a Final Order. "Allowed Claim" shall also include a Claim that is allowed by the Bankruptcy Court in a Final Order. "Allowed," when used as an adjective herein (such as Allowed Administrative Expense Claim, Allowed Priority Tax Claim, Allowed Priority Claim, Allowed Secured Claim, and Allowed Unsecured Claim), has a corresponding meaning.

**"Allowed Class ... Claim"** means an Allowed Claim in the particular Class described.

**"Allowed Class ... Equity Interest"** means an Allowed Equity Interest in the particular Class described.

**"Allowed Equity Interest"** means any Equity Interest (a) which is registered as of the Record Date in a stock register that is maintained by Biovest or the Transfer Agent and (b) which either (i) is not a Disputed Equity Interest or (ii) has been Allowed by a Final Order of the Bankruptcy Court.

**"Analytica"** means Analytica International, Inc., a Florida corporation.

"**Assigned Biovest Royalty**" means 4.00% of the royalty of 19.50% granted to Accentia by Biovest pursuant to the Accentia Royalty Agreement, which 4.00% was assigned by Accentia to Laurus/Valens pursuant to the Accentia Royalty Assignment Agreements.

"**Assumed Contracts**" has the meaning ascribed to such term in Article 7.1 of the Plan.

"**Automatic Conversion Amount**" has the meaning ascribed to such term in Article 5.9.2.3 of the Plan.

"**Automatic Conversion Date**" has the meaning ascribed to such term in Article 5.9.2.3 of the Plan.

"**Automatic Conversion VWAP Price**" means the average of the VWAPs for the ten (10) consecutive Trading Days ending on the Trading Day that is immediately preceding the then applicable Automatic Conversion Date.

"**AutovaxID**" means AutovaxID, Inc., a Florida corporation.

"**AutovaxID Instrument**" means the automated cell and biologic production instrument known as AutovaxID™ manufactured by Biovest.

"**AutovaxID Royalty**" means a non-cancelable royalty equal to three percent (3%) of world-wide net sales (i.e., gross receipts from the world-wide sales of AutovaxID Instruments less any rebates, returns and discounts) of AutovaxID Instruments for a period of five (5) years through May 31, 2012, granted to Laurus by Biovest and AutovaxID in a letter agreement dated March 19, 2007. Biovest's royalty payments to Laurus are required to aggregate a minimum of $8,000,000.00, with $500,000.00 of the minimum royalty being payable on December 31, 2007 and the remaining balance, less actual royalties paid, being immediately due at the end of the five (5) year term on May 31, 2012. As of the date of the Plan, the remaining balance of the AutovaxID Royalty is $7,500,000.00.

"**Avoidance Actions**" means any and all actions to avoid or recover a transfer of Property of the Debtors' Estates or an interest of the Debtors in Property, which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Debtors' Estates under Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of Section 542, 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code or under any other similar applicable federal, state or common law, regardless of whether or not such action has been commenced prior to the Effective Date.

"**Ballot**" means the Ballot, accompanying the Disclosure Statement and the Plan, on which (a) Holders of Impaired Claims entitled to vote on the Plan may indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions, (b) certain Holders of Unsecured Claims may make the Convenience Class Opt-In Election or the Convenience Class Opt-Out Election, and (c) Holders of Claims in Classes 4, 6, 7, and 8 may make a Conversion Election.

"**Bankruptcy Cases**" means, collectively, the Accentia Bankruptcy Cases and the Biovest Bankruptcy Cases.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"**Bankruptcy Counsel**" means Stichter, Riedel, Blain & Prosser, P. A.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, or, as the context requires, any other court of competent jurisdiction exercising jurisdiction over the Bankruptcy Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as promulgated under Section 2075 of title 28 of the United States Code, and the Local Rules, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"**Bar Date**" means June 1, 2009, the date set by the Bankruptcy Court in the Bar Date Order as the last day for filing a Proof of Claim against the Debtors in the Biovest Bankruptcy Cases, excluding (a) a Prepetition Claim of a Governmental Unit, for which a Proof of Claim must be filed with the Bankruptcy Court by the Governmental Unit Bar Date, (b) an Administrative Expense Claim, for which a request for payment of an Administrative Expense must be filed with the Bankruptcy Court by the Administrative Expense Claim Bar Date, (c) a Claim for which a bar date may have been otherwise established by a Final Order of the Bankruptcy Court, for which a Proof of Claim must be filed with the Bankruptcy Court by the date set forth in such Final Order, and (d) a Claim with respect to an executory contract or unexpired lease that is assumed or rejected pursuant to the Plan (as to which the bar date shall be as set forth in Article 7.4 or 7.5, respectively, of the Plan) or a Final Order of the Bankruptcy Court (as to which the bar date shall be as set forth in such Final Order).

"**Bar Date Order**" means the Order Granting Debtors' Motion to Set a Bar Date for the Filing of Proofs of Claim and Approving Form of Notice of Bar Date, dated April 8, 2009, entered in the Bankruptcy Cases (Docket No. 257).

"**Biolender**" means Biolender, LLC, a Delaware limited liability company.

"**Biolender II**" means Biolender II, LLC, a Delaware limited liability company.

"**Biovax**" means Biovax, Inc., a Florida corporation.

"**BiovaxID®**" means the personalized, patient-specific therapeutic vaccine, currently in clinical development by Biovest, designed to stimulate the patient's own immune system to recognize and destroy cancerous B-cells for treatment of follicular non-Hodgkin's lymphoma.

**"Biovest"** means Biovest International, Inc., a Delaware corporation.

**"Biovest Bankruptcy Cases"** means, collectively, the jointly administered cases of the Debtors currently pending before the Bankruptcy Court under Chapter 11 of the Bankruptcy Code, which cases were commenced by the Debtors on the Petition Date and presently bear Case Nos. 8:08-bk-17796-KRM (Biovest International, Inc.), 8:08-bk-17803-KRM (Biovax, Inc.), 8:08-bk-17804-KRM (AutovaxID, Inc.), 8:08-bk-17805-KRM (Biolender, LLC), and 8:08-bk-17806-KRM (Biolender II, LLC).

**"Biovest Biologic Products"** means all biopharmaceutical products, including monoclonal antibodies, peptides, infectious disease and cancer vaccines, including BiovaxID®, autologous cancer vaccines such as for non-Hodgkins lymphoma and renal cell carcinoma, cell-based therapies, stem cells, cytokines, and viruses produced by mouse-human heterohybridoma cell culture techniques, which are currently owned, licensed or being developed by Biovest or its Affiliates or which may be subsequently acquired or developed by Reorganized Biovest or its Affiliates during the term of the Biovest Royalty Agreement. Notwithstanding the foregoing, Biovest Biologic Products shall not include (i) any vaccines for respiratory viruses, such as influenza, (ii) any biopharmaceutical products produced under contract for third parties, (iii) any biopharmaceutical products being developed by Biovest or its Affiliates for third parties, or (iv) any products owned, licensed, or developed by the Accentia Debtors; provided that in the cases of clauses (i), (ii) and (iii), no such vaccine for a respiratory virus or biopharmaceutical product shall be based upon or related to BiovaxID® or Biovest's intellectual property (as of the Closing Date) or shall be based on an autologous production process or shall be produced using mouse-human heterohybridoma cell culture techniques.

**"Biovest Common Stock"** means the common stock, par value $.01 per share, of Biovest.

**"Biovest Disclosure Statement Approval Order"** means the Order Approving Disclosure Statement, Fixing Time to File Objections to the Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on Confirmation of the Plan, and Setting Deadlines with Respect to Confirmation Hearing, dated _____, 2010, entered in the Bankruptcy Cases (Docket No. _____).

**"Biovest Estate"** means the Estate of Biovest on and after the Effective Date, and after the Estates of Biovax, AutovaxID, Biolender, and Biolender II have been consolidated with the Estate of Biovest in accordance with the terms of the Substantive Consolidation Motion and as provided in the Confirmation Order.

**"Biovest Royalty Agreement"** means the Royalty Agreement by and between Reorganized Biovest and LV, to be executed on the Closing Date, as it may be amended, modified or supplemented thereafter in accordance with its terms. The form of the Biovest Royalty Agreement is included in Composite Exhibit 1 attached to the Laurus/Valens Compromise Motion.

**"Biovest Stockholder"** means a Holder of Existing Biovest Common Stock.

**"Biovest Stockholder Ballot"** means the Class 12 Ballot to be distributed in the Plan Solicitation Package to each Biovest Stockholder as of the Record Date, on which the Biovest Stockholders may indicate their acceptance or rejection of the Plan in accordance with the Voting Instructions.

**"Biovest Subsidiaries"** means, collectively, Biovax, AutovaxID, Biolender, and Biolender II.

**"Biovest Term Loan Agreement"** means the Term Loan and Security Agreement, dated as of May _____, 2010, by and among LV, the lenders party thereto, Biovest, and the Biovest Subsidiaries, as it may be amended, modified or supplemented thereafter in accordance with its terms.

**"Board of Directors"** means the Board of Directors of Biovest.

**"Business Day"** means any day other than (a) a Saturday, (b) a Sunday, (c) a "legal holiday" (as "legal holiday" is defined in Bankruptcy Rule 9006(a)), or (d) a day on which commercial banks in Tampa, Florida are required or authorized to close by law.

**"Cash"** means cash, cash equivalents and other readily marketable direct obligations of the United States, as determined in accordance with generally accepted accounting principles, including bank deposits, certificates of deposit, checks and similar items. When used in the Plan with respect to a Distribution under the Plan, the term "Cash" means lawful currency of the United States, a certified check, a cashier's check, a wire transfer of immediately available funds from any source, or a check from Reorganized Biovest drawn on a domestic bank.

**"Causes of Action"** means any and all of the Debtors' or the Debtors' Estates actions, claims, demands, rights, defenses, counterclaims, suits and causes of action, whether known or unknown, in law, equity or otherwise, against any Creditor or other third party, including (a) the Avoidance Actions, (b) those matters disclosed on the Schedule of Potential Causes of Action, and (c) any and all other claims or rights or proceedings of any value whatsoever, at law or in equity, including the Rosensweig Adversary Proceeding, turnover actions and claims of the type referred to in the Disclosure Statement or in Article 8.12 of the Plan. The Causes of Action shall vest in Reorganized Biovest on the Effective Date. When used in the Plan, the term "Causes of Action" shall not include any claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities released or waived by the Debtors pursuant to an order of the Bankruptcy Court.

**"Causes of Action Recoveries"** means the proceeds, benefits and other recoveries of any Causes of Action received by Reorganized Biovest.

**"Claim"** has the meaning ascribed to such term in Section 101(5) of the Bankruptcy Code. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Claim" shall be given the broadest possible meaning permitted by applicable law and shall include all manner and type of claim, whenever and wherever such claim may arise, including Administrative

Expense Claims, Environmental Claims, and claims based upon or arising under any federal or state securities laws.

"**Class**" means a category of Claims or Equity Interests classified together as described in Article 4 of the Plan.

"**Class 3 Plan Shares**" has the meaning ascribed to such term in Article 5.4.1.1 of the Plan.

"**Class 4 Plan Shares**" has the meaning ascribed to such term in Article 5.5.1.6 of the Plan.

"**Class 6 Plan Note**" has the meaning ascribed to such term in Article 5.7.1.1 of the Plan.

"**Class 6 Plan Shares**" has the meaning ascribed to such term in Article 5.7.1.3 of the Plan.

"**Class 7 Plan Note**" has the meaning ascribed to such term in Article 5.8.1.1 of the Plan.

"**Class 7 Plan Shares**" has the meaning ascribed to such term in Article 5.8.1.4 of the Plan.

"**Class 8 Interest**" means interest accruing at the rate of five percent (5%) per annum on the Allowed Amount of a Class 8 Unsecured Claim for the period from the Determination Date through and including the Distribution Date.

"**Class 8 Plan Note**" has the meaning ascribed to such term in Article 5.9.2.3 of the Plan.

"**Class 8 Plan Note Maturity Date**" has the meaning ascribed to such term in Article 5.9.2.3 of the Plan.

"**Class 8 Plan Shares**" has the meaning ascribed to such term in Articles 5.9.2.2 and 5.9.2.3 of the Plan.

"**Class 12 Plan Shares**" has the meaning ascribed to such term in Article 5.13 of the Plan.

"**Clerk**" means the Clerk of the Bankruptcy Court.

"**Clerk's Office**" means the Office of the Clerk of the Bankruptcy Court located at the Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, 5th Floor, Tampa, Florida 33602.

**"Closing"** has the meaning ascribed to such term in Article 5.3.1 of the Plan.

**"Closing Date"** means the date of the Closing under the Biovest Term Loan Agreement.

**"Collateral"** means Property in which any of the Estates has (or had) an interest and that secures (or secured), in whole or part, whether by agreement, statute, or judicial decree, the payment of a Claim.

**"Committee"** means the Committee of the Unsecured Creditors appointed by the United States Trustee in the Bankruptcy Cases pursuant to Section 1102 of the Bankruptcy Code on December 1, 2008 (Docket No. 74), as such appointment was amended by the United States Trustee on June 9, 2009 (Docket No. 336), and as the membership of such Committee may hereafter be further amended or modified by the United States Trustee.

**"Confirmation"** or **"Confirmation of the Plan"** means the approval of the Plan by the Bankruptcy Court at the Confirmation Hearing.

**"Confirmation Date"** means the date on which the Confirmation Order is entered on the Docket by the Clerk pursuant to Bankruptcy Rule 5003(a).

**"Confirmation Hearing"** means the hearing which will be held before the Bankruptcy Court to consider Confirmation of the Plan and related matters pursuant to Section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time. The date of the Confirmation Hearing is set forth in the Biovest Disclosure Statement Approval Order.

**"Confirmation Order"** means the order of the Bankruptcy Court in the Bankruptcy Cases confirming the Plan pursuant to Section 1129 and other applicable sections of the Bankruptcy Code, as such order may be amended, modified or supplemented.

**"Convenience Class Opt-In Election"** means the irrevocable election by a Holder of an Unsecured Claim in an amount greater than $5,000.00 to have such Unsecured Claim reduced to $5,000.00 and treated as an Unsecured Convenience Claim under the Plan. The election must be made by the Holder on the Ballot and filed with the Bankruptcy Court on or before the Voting Deadline.

**"Convenience Class Opt-Out Election"** means the irrevocable election by a Holder of an Unsecured Claim in an amount less than or equal to $5,000.00 to have such Unsecured Claim treated as a Class 8 Unsecured Claim under the Plan. The election must be made by the Holder on the Ballot and filed with the Bankruptcy Court on or before the Voting Deadline.

**"Conversion Election"** means the election by a 2008 Secured Debentures Holder, the Holder of a Class 6 Claim, Ronald E. Osman (as the Holder of the Osman Allowed Class 7 Claim), or the Holder of a Class 8 Claim to convert the Allowed Amount of its Claim into shares of Reorganized Biovest Common Stock as provided in the Plan.

"**Creditor**" means the Holder of a Claim, within the meaning of Section 101(10) of the Bankruptcy Code, including Secured Creditors, Unsecured Creditors, and Creditors with Administrative Expense Claims, Priority Tax Claims, Priority Claims, Cure Claims, and Environmental Claims.

"**Cure Claim**" means any Claim of any nature whatsoever, including any Claim for any cure payment, cost or other amount, if any, due and owing by the Debtors pursuant to Section 365(b) of the Bankruptcy Code or otherwise and any Claim for a default (monetary or non-monetary), arising from, relating to or in connection with the assumption by the Debtors of any Assumed Contract (provided such Claim is filed with the Bankruptcy Court by the Cure Claim Submission Deadline). In no event shall any Claim set out in a Proof of Claim be deemed to be a Cure Claim.

"**Cure Claim Submission Deadline**" means, and shall occur on the same day as, the Voting Deadline.

"**D & O Policy**" means any insurance policy in effect at any time on or before the Effective Date (and as such policy may be continued following the Effective Date) under which any Person carrying on an insurance business may be liable to satisfy, or to indemnify or reimburse for payments made to satisfy, part or all of a judgment rendered against, or a settlement made to resolve claims made against, or defense costs incurred by, the Debtors or any past, present or future director, officer, trustee or employee of the Debtors, including the policies issued to Biovest by XL Specialty Insurance Company (Policy Numbers ELU107905-08 and ELU107906-08) and Carolina Casualty Insurance Company (Policy Number 1853099).

"**Debt**" has the meaning ascribed to such term in Section 101(12) of the Bankruptcy Code.

"**Debtors**" means, collectively, Biovest, Biovax, AutovaxID, Biolender and Biolender II.

"**Debtors in Possession**" means, collectively, Biovest, Biovax, AutovaxID, Biolender and Biolender II, as debtors in possession in the Biovest Bankruptcy Cases.

"**Delaware General Corporation Law**" means Title 8 of the Delaware Code, as now in effect or hereafter amended.

"**Determination Date**" means the later of (i) the Effective Date and (ii) the date the order of the Bankruptcy Court allowing a Claim becomes a Final Order (if applicable).

"**DIP Advances**" means the aggregate outstanding Postpetition advances extended to Biovest by the DIP Lender pursuant to the DIP Loan Documents and in accordance with and subject to the terms and conditions of the DIP Financing Order. As of the date of the Plan, the DIP Advances totaled $1,390,000.00 (excluding accrued and unpaid interest). Notwithstanding anything to the contrary contained in the Plan, the DIP Advances shall not exceed the sum of $3,000,000.00.

"**DIP Facility**" has the meaning ascribed to such term in Article 3.3.1 of the Plan.

"**DIP Financing Order**" means, collectively, (a) the Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated December 22, 2008, entered in the Bankruptcy Cases (Docket No. 119), (b) the Second Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated February 6, 2009, entered in the Bankruptcy Cases (Docket No. 164), (c) the Third Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated March 5, 2009, entered in the Bankruptcy Cases (Docket No. 202), (d) the Fourth Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated April 8, 2009, entered in the Bankruptcy Cases (Docket No. 256), (e) the Fifth Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated June 2, 2009, entered in the Bankruptcy Cases (Docket No. 325), (f) the Sixth Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated July 1, 2009, entered in the Bankruptcy Cases (Docket No. 348), (g) the Order Granting Debtor's Emergency Motion for Authority to Obtain Additional Advances under Existing Debtor in Possession Financing Facility with Corps Real, LLC, dated August 5, 2009, entered in the Bankruptcy Cases (Docket No. 381), (h) the Seventh Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated August 6, 2009, entered in the Bankruptcy Cases (Docket No. 384), (i) the Eighth Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated October 23, 2009, entered in the Bankruptcy Cases (Docket No. 423), (j) the Ninth Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated December 3, 2009, entered in the Bankruptcy Cases (Docket No. 457), (k) the Tenth Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated December 16, 2009 (Docket No. 472), (l) the Eleventh Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated January 22, 2010 (Docket No. 494), (m) the Twelfth Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative

Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated March 11, 2010 (Docket No. 559), (n) the Thirteenth Interim Order Granting Debtor's Emergency Motion for Authority to Obtain Postpetition Financing and Grant Senior Liens, Superpriority Administrative Expense Status and Adequate Protection Pursuant to 11 U.S.C. §§ 364(c) and (d) and F.R.B.P. 4001, dated April 20, 2010 (Docket No. 645), and (o) any other orders entered by the Bankruptcy Court in the Bankruptcy Cases prior to or after the date of the Plan authorizing any DIP Advances.

"**DIP Lender**" means Corps Real, LLC, an Illinois limited liability company, in its capacity as lender under the DIP Loan Documents.

"**DIP Lender Allowed Claim**" means the Allowed Claim of the DIP Lender in an amount equal to the outstanding balance of the DIP Loan Claims as of the Effective Date (including any additional advances hereafter made under the DIP Facility pursuant to Article 3.3.1 of the Plan up to a maximum amount of $1,610,000.00) as determined by the terms and provisions of the DIP Loan Documents and the DIP Financing Order plus the DIP Loan Available Balance (to the extent actually advanced by the DIP Lender, whether advanced prior to or after the Effective Date).

"**DIP Lender Plan Note**" has the meaning ascribed to such term in Article 3.3.2.1 of the Plan.

"**DIP Lender Plan Shares**" has the meaning ascribed to such term in Article 3.3.2.5 of the Plan.

"**DIP Lender Subordination Agreement**" means the Subordination Agreement by and between the DIP Lender and LV, to be executed on the Closing Date, as it may be amended, modified or supplemented thereafter in accordance with its terms. The form of the DIP Lender Subordination Agreement is included in Composite Exhibit 1 attached to the Laurus/Valens Compromise Motion.

"**DIP Loan Available Balance**" means an amount equal to the difference between (i) $3,000,000.00 and (ii) the principal amount outstanding under the DIP Facility as of the Effective Date.

"**DIP Loan Claims**" means any and all Claims of the DIP Lender represented by, relating to, or arising under or in connection with the DIP Loan Documents and the DIP Financing Order, whether Administrative Expense Claims or Secured Claims, including the DIP Advances and accrued and unpaid interest.

"**DIP Loan Documents**" means all of the documents evidencing the DIP Loan Claims including those listed in Exhibit A attached to the Plan, and all other documents executed in connection therewith, as any such document has been amended, modified or supplemented thereafter in accordance with its terms.

"**Disallowed Claim**" means any Claim which has been disallowed by an order of the Bankruptcy Court, which order has not been stayed pending appeal.

"**Disclosure Statement**" means the Joint Disclosure Statement for Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC under Chapter 11 of Title 11, United States Code dated as of May _____, 2010, including all Exhibits attached thereto, as submitted and filed by the Debtors pursuant to Section 1125 of the Bankruptcy Code in respect of the Biovest Bankruptcy Cases and approved by the Bankruptcy Court in the Biovest Disclosure Statement Approval Order, and as such Disclosure Statement may be amended, supplemented, modified or amended and restated from time to time.

"**Disputed Claim**" means any Claim or portion thereof (other than a Disallowed Claim) that is not an Allowed Claim and (a) as to which a Proof of Claim has been filed with the Clerk's Office or is deemed filed under applicable law or order of the Bankruptcy Court, or (b) which has been scheduled in the Schedules, and, in the case of subparagraph (a) and (b) above, as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court. In addition to the foregoing, a Disputed Claim shall also mean a Claim that is not an Allowed Claim, whether or not an objection has been or may be timely filed, if (a) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (b) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (c) any corresponding Claim has been scheduled in the Schedules as disputed, contingent or unliquidated, (d) no corresponding Claim has been scheduled in the Schedules, or (e) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof. To the extent an objection relates to the allowance of only a part of a Claim, such Claim shall be a Disputed Claim only to the extent of the amount subject to objection. To the extent that the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, such Claim shall be a Disputed Claim only to the extent of the amount specified in the Proof of Claim which is in excess of the amount of the Claim as scheduled. "Disputed," when used as an adjective herein (such as Disputed Administrative Expense Claim, Disputed Priority Tax Claim, Disputed Priority Claim, Disputed Secured Claim, and Disputed Unsecured Claim), has a corresponding meaning.

"**Disputed Equity Interest**" means any Equity Interest (a) which is not registered as of the Record Date in a stock register that is maintained by Biovest or the Transfer Agent, or (b) as to which an objection has been or may be timely filed or deemed filed under the Plan, the Bankruptcy Code, the Bankruptcy Rules, or an order of the Bankruptcy Court and any such objection has not been (i) withdrawn, (ii) overruled by an order of the Bankruptcy Court, or (iii) sustained by an order of the Bankruptcy Court.

"**Distribution**" means a distribution of Cash or shares of Reorganized Biovest Common Stock, as the context requires, to a Creditor on account of an Allowed Claim pursuant to the terms of the Plan.

"**Distribution Date**" means, when used with respect to an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals), an Allowed Secured Tax Claim in Class 5, or an Allowed Claim in Class 9, the date which is as soon as

reasonably practicable (as determined by Reorganized Biovest) after the Determination Date. "Distribution Date," when used with respect to an Allowed Priority Tax Claim or Allowed Claims in Classes 4, 6, 7, 8, and 11, means the date or dates for any Distribution to Holders of Allowed Priority Tax Claims or Allowed Claims in Classes 4, 6, 7, 8, and 11 as provided in the Plan, unless such date or dates have been otherwise established by an order of the Bankruptcy Court.

**"Docket"** means the docket or dockets in the Bankruptcy Cases maintained by the Clerk.

**"Effective Date"** means, and shall occur on, the first Business Day on which all of the conditions precedent to the occurrence of the Effective Date contained in Article 11.2 of the Plan have been satisfied or waived by the Debtors.

**"Effective Date Notice"** has the meaning ascribed to such term in Article 11.3 of the Plan.

**"Entity"** has the meaning ascribed to such term in Section 101(15) of the Bankruptcy Code.

**"Environmental Claim"** means any Claim or demand now existing or hereafter arising (including all thereof in the nature of or sounding in tort, contract, warranty or under any other theory of law or equity) against the Debtors, their predecessors, successors or assigns, or Affiliates, or their present or former officers, directors or employees, arising out of, or related to, any Environmental Laws, including any Claim or demand: (a) to restrict or enjoin, or recover damages, costs or expenses to remedy, any release, environmental pollution, contamination or nuisance or to require the Debtors to remedy or to reimburse, pay or incur costs to remedy any release, environmental pollution, contamination or nuisance, (b) to remedy, reimburse, compensate or pay any damage, penalty, fine or forfeiture for, or to restrict or enjoin, any violation of or alleged violation of any Environmental Laws, (c) to pay any contractual claim with respect to any Environmental Laws, or (d) to pay or reimburse any Person or Entity for personal injury (including worker's compensation, sickness, disease or death), tangible or intangible property damage or natural resource damage arising out of, or relating to, any release, environmental pollution, contamination or nuisance, whether or not contemplated in subparagraphs (a) through (c) above, or whether or not such Claim or demand is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, or whether or not the facts of or legal basis for such Claim or demand are known or unknown, or whether or not the injury or damage giving rise to such Claim or demand was diagnosable, undiagnosable, detectable or undetectable before the Confirmation of the Plan or before the Final Decree Date. Notwithstanding anything to the contrary contained herein, when used in the Plan, the term "Environmental Claim" shall be broadly construed and shall include (a) claims that may or may not presently constitute "claims" within the meaning of Section 101(5) of the Bankruptcy Code and (b) demands that may or may not presently constitute "demands" within the meaning of Section 524(g)(5) of the Bankruptcy Code.

**"Environmental Laws"** means all federal, state, local and foreign laws, statutes, ordinances, codes, rules, standards and regulations, now or hereafter in effect, and any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree,

or judgment, imposing liability or standards of conduct for or relating to the regulation and protection of human health, safety, the environment and natural resources (including ambient air, surface water, groundwater, wetlands, land surface or subsurface strata, wildlife, aquatic species and vegetation). As used in the Plan, the term "Environmental Laws" shall include (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601, et seq., (b) the Resource Conservation and Recovery Act, as amended by the Hazardous and Solid Waste Amendment of 1984, 42 U.S.C. §§ 6901, et seq., (c) the Clean Air Act, 42 U.S.C. §§ 7401, et seq., (d) the Clean Water Act of 1977, 33 U.S.C. §§ 1251, et seq., (e) the Toxic Substances Control Act, 15 U.S.C. §§ 2601, et seq., (f) the Oil Pollution Act of 1990 (OPA 90), (g) the Hazardous Materials Transportation Authorization Act of 1994, 49 U.S.C. §§ 5101, et seq., (h) the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. §§ 136, et seq., (i) the Solid Waste Disposal Act, 42 U.S.C. §§ 6901, et seq., (j) the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251, et seq., (k) the Occupational Safety and Health Act, 29 U.S.C. §§ 651, et seq., (l) the Safe Drinking Water Act, 42 U.S.C. §§ 300(f), et seq., (m) all other statutes or laws issued or promulgated by any Governmental Unit, as they may be amended from time to time, relating to environmental contamination or pollution, air pollution, water pollution, noise control and/or the handling, transportation, discharge, existence, release, disposal or recovery of on-site or off-site hazardous, toxic or dangerous wastes, substances, chemicals or materials (including petroleum), including any transfer of ownership notification or approval statutes, and (n) the ordinances, rules, regulations, orders, notices of violation, requests, demands and requirements issued or promulgated by any Governmental Unit in connection with such statutes or laws.

**"Equity Interests"** means the interests in Biovest held by all Holders of Existing Biovest Common Stock; provided, however, that, when used in the Plan, the term "Equity Interests" shall not include the Existing Biovest Stock Options or the Existing Biovest Stock Warrants.

**"Estates"** means, collectively, the estates created for the Debtors by Section 541 of the Bankruptcy Code upon the commencement of the Biovest Bankruptcy Cases.

**"Estimation Hearing"** means a hearing for the estimation of Claims under Section 502(c) of the Bankruptcy Code.

**"Exchange Act"** means the Securities Exchange Act of 1934, as it has been or may be amended from time to time, and the rules and regulations promulgated thereunder.

**"Exculpated Parties"** has the meaning ascribed to such term in Article 12.2 of the Plan.

**"Exhibit"** means an exhibit annexed to the Plan or to the Disclosure Statement, as the context requires.

**"Existing Biovest Common Stock"** means the 97,549,783 shares of Biovest Common Stock issued and outstanding on the Petition Date. As used in the Plan, the term "Existing Biovest Common Stock" shall not include any shares of Biovest Common Stock held in treasury by Biovest.

"**Existing Biovest Stock Options**" means any options granted by Biovest to its employees, officers, directors, or consultants, and outstanding on the Effective Date, to purchase shares of Biovest Common Stock, as authorized by the Board of Directors or a duly appointed committee of the Board of Directors.

"**Existing Biovest Stock Warrants**" means any warrants issued by Biovest, and outstanding on the Effective Date, for the purchase of shares of Biovest Common Stock, including the 2008 Secured Debentures Warrants and the Osman Warrants; provided, however, that, when used in the Plan, the term "Existing Biovest Stock Warrants" shall not include the Laurus/Valens Warrants.

"**Exit Financing**" has the meaning ascribed to such term in Article 8.16 of the Plan.

"**Federal Judgment Interest Rate**" means a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the Confirmation Date.

"**Final Decree**" means the final decree for each of the Biovest Bankruptcy Cases entered by the Bankruptcy Court on or after the Effective Date pursuant to Bankruptcy Rule 3022.

"**Final Decree Date**" means the date on which the Final Decree, obtained after a hearing on notice to the Notice Parties and to such other Persons and Entities as the Bankruptcy Court may direct, is entered on the Docket.

"**Final Order**" means (a) an order, judgment, ruling or other decree (or any revision, modification or amendment thereto) issued and entered by the Bankruptcy Court or by any state or other federal court as may have jurisdiction over any proceeding in connection with the Bankruptcy Cases for the purpose of such proceeding, which order, judgment, ruling or other decree has not been reversed, vacated, stayed, modified or amended and as to which (i) no appeal, petition for review, reargument, rehearing, reconsideration or certiorari has been taken and is pending and the time for the filing of any such appeal, petition for review, reargument, rehearing, reconsideration or certiorari has expired, or (ii) such appeal or petition has been heard and dismissed or resolved and the time to further appeal or petition has expired with no further appeal or petition pending; or (b) a stipulation or other agreement entered into which has the effect of any such aforesaid order, judgment, ruling or other decree with like finality.

"**Governmental Unit**" has the meaning ascribed to such term in Section 101(27) of the Bankruptcy Code.

"**Governmental Unit Bar Date**" means May 9, 2009, the date established by Section 502(a)(9) of the Bankruptcy Code as the last day for a Governmental Unit to file a Proof of Claim against the Debtors in the Biovest Bankruptcy Cases.

"**Holder**" means (a) as to any Claim, (i) the owner or holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, or (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or holder of such Claim as such is reflected on the

Schedules or the books and records of the Debtors or as otherwise determined by order of the Bankruptcy Court, or (iii) if the owner or holder of such Claim has assigned or transferred the Claim to a third party and the Debtors or Reorganized Biovest, as the case may be, have received sufficient written evidence of such assignment or transfer, the assignee or transferee; and (b) as to any Equity Interest, the record owner or holder of such Equity Interest as of the Record Date as shown on the stock register that is maintained by Biovest or the Transfer Agent or as otherwise determined by order of the Bankruptcy Court.

"**Impaired**" refers to any Claim or Equity Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code.

"**Indemnification Rights**" means any obligations or rights of any of the Debtors to indemnify, reimburse, advance, or contribute to the losses, liabilities or expenses of an Indemnitee pursuant to such Debtor's articles or certificate of incorporation, articles of organization, bylaws, operating agreement, or policy of providing indemnification, applicable law, or a specific agreement in respect of any claims, demands, suits, causes of action or proceedings against an Indemnitee based upon any act or omission related to an Indemnitee's service with, for, or on behalf of such Debtor.

"**Indemnitee**" means all present and former directors, officers, employees, agents or representatives of the Debtors who are entitled to assert Indemnification Rights.

"**Initial Distribution**" has the meaning ascribed to such term in Article 9.1 of the Plan.

"**Intercompany Claim**" means any Claim which one Debtor holds against another Debtor. A schedule of the Intercompany Claims is set forth in Exhibit B attached to the Plan.

"**Laurus**" means Laurus Master Fund, Ltd. (In Liquidation), a Cayman Islands company, and its successors or assigns.

"**Laurus Prepetition Claims**" means any and all Secured Claims and other Claims of Laurus represented by, relating to, or arising under or in connection with the Laurus Prepetition Loan Documents, including all of the Claims of Laurus described or referenced in the Laurus/Valens Proofs of Claim.

"**Laurus Prepetition Loan Documents**" means all of the Prepetition documents evidencing the Laurus Prepetition Claims and any and all other documents executed by the Debtors or the Accentia Debtors or Laurus/Valens in any way relating to the Laurus Prepetition Claims, as any such documents have been amended, modified or supplemented thereafter in accordance with their terms.

"**Laurus/Valens**" means, collectively, Laurus, Valens, PSource, LV, and each of their respective Affiliates.

"**Laurus/Valens Additional Allowed Secured Claim**" has the meaning ascribed to such term in Article 5.3.2.2 of the Plan.

**"Laurus/Valens Allowed Class 2 Claims"** means, collectively, the Laurus/Valens Allowed Secured Claim and the Laurus/Valens Additional Allowed Secured Claim.

**"Laurus/Valens Allowed Secured Claim"** has the meaning ascribed to such term in Article 5.3.2.1 of the Plan.

**"Laurus/Valens Compromise Motion"** means the Debtors' Motion for Approval of Settlement Between the Debtors and Laurus Master Fund, Ltd. (in Liquidation) and its Affiliates and Assignees, Pursuant to 11 U.S.C. § 105(a) and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (Docket No. 627).

**"Laurus/Valens Compromise Order"** means the Order Granting Debtors' Motion for Approval of Settlement Between the Debtors and Laurus Master Fund, Ltd. (in Liquidation) and its Affiliates and Assignees, Pursuant to 11 U.S.C. § 105(a) and Rule 9019(a) of the Federal Rules of Bankruptcy Procedure, dated May _____, 2010, entered in the Bankruptcy Cases (Docket No. _____).

**"Laurus/Valens Conversion Shares"** has the meaning ascribed to such term in Article 5.3.2.3 of the Plan.

**"Laurus/Valens Plan Shares"** has the meaning ascribed to such term in Article 5.3.2.9 of the Plan.

**"Laurus/Valens Prepetition Claims"** means, collectively, the Laurus Prepetition Claims, the LV Prepetition Claims, the PSource Prepetition Claims, and the Valens Prepetition Claims.

**"Laurus/Valens Prepetition Loan Documents"** means, collectively, the Laurus Prepetition Loan Documents, the LV Prepetition Loan Documents, the PSource Prepetition Loan Documents, and the Valens Prepetition Loan Documents.

**"Laurus/Valens Proofs of Claim"** means, collectively, (a) claim number 47 filed by Laurus/Valens in Case No. 8:08-bk-17796-KRM (Biovest International, Inc.), (b) claim number 4 filed by Laurus/Valens in Case No. 8:08-bk-17803-KRM (Biovax, Inc.), (c) claim number 2 filed by Laurus/Valens in Case No. 8:08-bk-17804-KRM (AutovaxID, Inc.), (d) claim number 2 filed by Laurus/Valens in Case No. 8:08-bk-17805-KRM (Biolender, LLC), and (e) claim number 1 filed by Laurus/Valens in Case No. 8:08-bk-17806-KRM (Biolender II, LLC), each of which asserts an aggregate Secured Claim against the Debtors of $30,154,082.65.

**"Laurus/Valens Royalty"** means, collectively, the Assigned Biovest Royalty and the Valens Royalty.

**"Laurus/Valens Settlement"** has the meaning ascribed to such term in Article 5.3.1 of the Plan.

**"Laurus/Valens Settlement Documents"** has the meaning ascribed to such term in Article 5.3.1 of the Plan. The Laurus/Valens Settlement Documents with respect to the Debtors are included in Composite Exhibit 1 attached to the Laurus/Valens Compromise Motion.

**"Laurus/Valens Term A Notes"** has the meaning ascribed to such term in Article 5.3.2.1 of the Plan. The form of the Laurus/Valens Term A Note is included in Composite Exhibit 1 attached to the Laurus/Valens Compromise Motion.

**"Laurus/Valens Term B Notes"** has the meaning ascribed to such term in Article 5.3.2.2 of the Plan. The form of the Laurus/Valens Term B Note is included in Composite Exhibit 1 attached to the Laurus/Valens Compromise Motion.

**"Laurus/Valens Term Notes"** means, collectively, the Laurus/Valens Term A Notes and the Laurus/Valens Term B Notes.

**"Laurus/Valens Warrants"** means, collectively, (a) the Common Stock Purchase Warrant dated March 31, 2006, issued by Biovest to Laurus, for the purchase of up to 18,087,889 shares of Biovest Common Stock at an exercise price of $0.01 per share, (b) the Common Stock Purchase Warrant dated September 22, 2008, issued by Biovest to Valens U.S., for the purchase of up to 1,015,625 shares of Biovest Common Stock at an exercise price of $0.40 per share, and (c) the Warrant dated October 31, 2006, issued by Accentia to Laurus, for the purchase of up to 10,000,000 shares of Biovest Common Stock owned by Accentia at an exercise price of $0.01 per share.

**"Liabilities"** means any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness of any and every kind and nature whatsoever, whether heretofore, now or hereafter owing, arising, due or payable, direct or indirect, absolute or contingent, liquidated or unliquidated, known or unknown, foreseen or unforeseen, in law, equity or otherwise, of or relating to the Debtors or any predecessor, successor or assign thereof, or otherwise based in whole or in part upon any act or omission, transaction, event or other occurrence taking place prior to the Effective Date in any way relating to the Debtors or any predecessor, successor or assign thereof, any Property of the Debtors, the businesses or operations of the Debtors, the Bankruptcy Cases, or the Plan, including any and all liabilities, obligations, judgments, damages, charges, costs, Debts, and indebtedness based in whole or in part upon any Claim of or relating to successor liability, transferee liability, or other similar theory; provided, however, that, when used in the Plan, the term "Liabilities" shall not include any obligations of the Reorganized Debtors expressly set forth in the Plan.

**"Lien"** means, with respect to any Property, any mortgage, pledge, security interest, lien, right of first refusal, option or other right to acquire, assignment, charge, claim, easement, conditional sale agreement, title retention agreement, defect in title, or other encumbrance or hypothecation or restriction of any nature pertaining to or affecting such Property, whether voluntary or involuntary and whether arising by law, contract or otherwise.

**"Local Rules"** means the Local Rules of the United States Bankruptcy Court for the Middle District of Florida, as in effect on the Petition Date, together with all amendments and modifications thereto that were subsequently made applicable to the Bankruptcy Cases.

"**LV**" means LV Administrative Services, Inc., a Delaware corporation, as administrative and collateral agent for Laurus, Valens, and PSource, and its successors or assigns.

"**LV Prepetition Claims**" means any and all Secured Claims and other Claims of LV represented by, relating to, or arising under or in connection with the LV Prepetition Loan Documents, including all of the Claims of LV described or referenced in the Laurus/Valens Proofs of Claim.

"**LV Prepetition Loan Documents**" means all of the Prepetition documents evidencing the LV Prepetition Claims and any and all other documents executed by the Debtors or the Accentia Debtors or Laurus/Valens in any way relating to the LV Prepetition Claims, as any such documents have been amended, modified or supplemented thereafter in accordance with their terms.

"**Market Price**" means the average of the VWAPs for the ten (10) consecutive Trading Days ending on the Trading Day that is immediately preceding the Effective Date; provided, however, that with respect to Disputed Claims, the term "Market Price" means the average of the VWAPs for the ten (10) consecutive Trading Days ending on the Trading Day that is immediately preceding the date that an order of the Bankruptcy Court determining that such Disputed Claim is an Allowed Claim becomes a Final Order.

"**Master Ballot**" means the Master Ballot to be distributed to brokers, proxy intermediaries, custodian banks or other nominees, on which such parties shall indicate the acceptance or rejection of the Plan by Biovest Stockholders in accordance with the Voting Instructions.

"**Master Service List**" has the meaning ascribed to such term in the Master Service List Order.

"**Master Service List Order**" means the Order Granting Debtors' Emergency Motion to Establish Notice Procedures dated November 19, 2008, entered in the Bankruptcy Cases (Docket No. 44).

"**Notice Parties**" means (a) Reorganized Biovest, (b) Bankruptcy Counsel, (c) counsel to Laurus/Valens, (d) counsel to the Committee (to the extent the Committee is then in existence), (e) the United States Trustee, and (f) all parties then set forth on the Master Service List.

"**Ordinary Course Claims**" has the meaning ascribed to such term in Exhibit F attached to the Plan.

"**Osman Allowed Class 7 Claim**" has the meaning ascribed to such term in Article 5.8.1 of the Plan.

"**Osman Note**" means the Convertible Promissory Note dated May 9, 2008 in the original principal amount of $1,000,000, executed by Biovest in favor of Ronald E. Osman.

"**Osman Warrants**" means the warrants for the purchase of shares of Biovest Common Stock issued by Biovest to Ronald E. Osman in connection with the execution of the Osman Note.

"**Permitted Liens**" has the meaning ascribed to such term in the Biovest Term Loan Agreement.

"**Person**" means any person, individual, corporation, association, partnership, limited liability company, joint venture, trust, organization, business, government, governmental agency or political subdivision thereof, or any other entity or institution of any type whatsoever, including any "person" as such term is defined in Section 101(41) of the Bankruptcy Code.

"**Petition Date**" means November 10, 2008, the date on which the Debtors commenced the Biovest Bankruptcy Cases by filing their voluntary petitions under Chapter 11 of the Bankruptcy Code.

"**Plan**" means the Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC under Chapter 11 of Title 11, United States Code dated as of May 14, 2010, and all Exhibits to the Plan, as the same may be amended, supplemented, modified or amended and restated from time to time in accordance with the provisions of the Plan and the Bankruptcy Code.

"**Plan Documents**" means all documents that aid in effectuating the Plan, including the Plan Notes, the Reorganized Biovest Bylaws, the Reorganized Biovest Charter, and the Security Documents.

"**Plan Notes**" means, collectively, the DIP Lender Plan Note, the Laurus/Valens Term Notes, the 2008 Secured Debentures Plan Notes, the Class 6 Plan Note, the Class 7 Plan Note, and the Class 8 Plan Note.

"**Plan Shares**" means, collectively, the DIP Lender Plan Shares, the Laurus/Valens Plan Shares, the Laurus/Valens Conversion Shares, the Class 3 Plan Shares, the Class 4 Plan Shares, the Class 6 Plan Shares, the Class 7 Plan Shares, the Class 8 Plan Shares, and the Class 12 Plan Shares.

"**Plan Solicitation Package**" means, collectively, the Disclosure Statement, the Plan, the Biovest Disclosure Statement Approval Order, and the Biovest Stockholder Ballot.

"**Plan Supplement**" means the document containing the Plan Documents (to the extent not already on file with the Bankruptcy Court), which shall be filed with the Bankruptcy Court in accordance with Article 15.17 of the Plan.

"**Postpetition**" means arising or accruing on or after the Petition Date and before the Effective Date.

**"Postpetition Interest"** means interest accrued on the Allowed Amount of a Claim for the period from the Petition Date through and including the Confirmation Date.

**"Prepetition"** means arising or accruing prior to the Petition Date.

**"Priority Claim"** means a Claim that is entitled to a priority in payment pursuant to Sections 507(a)(4), (5) and (7) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Tax Claim, a Secured Claim, a Secured Tax Claim or an Unsecured Claim.

**"Priority Tax Claim"** means a Claim of a Governmental Unit that is entitled to a priority in payment pursuant to Section 507(a)(8) of the Bankruptcy Code and that is not an Administrative Expense Claim, a Priority Claim, a Secured Claim, a Secured Tax Claim or an Unsecured Claim.

**"Professional"** means any professional employed in the Bankruptcy Cases pursuant to an order of the Bankruptcy Court, pursuant to Section 327 or 1103 of the Bankruptcy Code.

**"Projections"** means the cash forecast for Reorganized Biovest through _____ _____ 2013, a copy of which is attached as Exhibit 1 to the Disclosure Statement.

**"Proof of Claim"** means a proof of claim filed with the Bankruptcy Court with respect to a Claim against the Debtors pursuant to Bankruptcy Rule 3001, 3002 or 3003.

**"Property"** means any property or asset of any kind, whether real, personal or mixed, tangible or intangible, whether now existing or hereafter acquired or arising, and wherever located, and any interest of any kind therein.

**"PSource"** means PSource Structured Debt Limited, a Guernsey limited liability company, and its successors or assigns.

**"PSource Prepetition Claims"** means any and all Secured Claims and other Claims of PSource represented by, relating to, or arising under or in connection with the PSource Prepetition Loan Documents, including all of the Claims of PSource described or referenced in the Laurus/Valens Proofs of Claim.

**"PSource Prepetition Loan Documents"** means all of the Prepetition documents evidencing the PSource Prepetition Claims and any and all other documents executed by the Debtors or the Accentia Debtors or Laurus/Valens in any way relating to the PSource Prepetition Claims, as any such documents have been amended, modified or supplemented thereafter in accordance with their terms.

**"Record Date"** means _____, 2010, the date established by order of the Bankruptcy Court for determination of the ownership of the Class 12 Equity Interests for the purpose of voting on acceptance or rejection of the Plan by the Holders of the Class 12 Equity Interests.

**"Rejected Contracts"** has the meaning ascribed to such term in Article 7.1 of the Plan. A list of the Rejected Contracts is set forth in Exhibit C attached to the Plan.

**"Released Parties"** has the meaning ascribed to such term in Article 12.3 of the Plan.

**"Reorganized Biovest"** means Biovest on and after the Effective Date as reorganized pursuant to the Plan, including any successor thereto by merger, consolidation or otherwise.

**"Reorganized Biovest Bylaws"** has the meaning ascribed to such term in Article 8.7.2 of the Plan. The form of the Reorganized Biovest Bylaws is attached as Exhibit D to the Plan.

**"Reorganized Biovest Charter"** means the certificate of incorporation of Reorganized Biovest, as amended or amended and restated pursuant to the Plan, the Confirmation Order, the Delaware General Corporation Law or otherwise and filed with the Office of the Secretary of State of the State of Delaware. The form of the Reorganized Biovest Charter is attached as Exhibit E to the Plan.

**"Reorganized Biovest Common Stock"** means the shares of Biovest Common Stock authorized in the Reorganized Biovest Charter to be issued and distributed pursuant to the provisions of the Plan.

**"Reorganized Debtor"** means each of the Debtors on and after the Effective Date as reorganized pursuant to the Plan, including any successor thereto by merger, consolidation or otherwise.

**"Rosensweig Adversary Proceeding"** means the adversary proceeding filed in the Bankruptcy Cases styled as *Biovest International, Inc., Plaintiff, v. Phillip E. Rosensweig, Defendant*, Adv. Pro. No. 8:10-ap-249-KRM.

**"Rule 144"** means Rule 144 of the Rules and Regulations under the Securities Act promulgated by the SEC.

**"Schedule of Potential Causes of Action"** means the schedule attached to the Plan as Exhibit F, as such schedule may be amended or modified from time to time prior to the Confirmation Date.

**"Schedules"** means, collectively, Schedules D, E, F, G, and H filed by the Debtors in the Biovest Bankruptcy Cases pursuant to Bankruptcy Rule 1007, as any of such Schedules has been or may hereafter be amended or supplemented from time to time.

**"SEC"** means the United States Securities and Exchange Commission.

**"Secured Claim"** means any Claim of a Creditor that is (a) secured in whole or in part, as of the Petition Date, by a Lien (i) on Collateral and (ii) which is valid, perfected and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, or (b) subject to setoff under Section 553 of the Bankruptcy Code,

but, with respect to both (a) and (b) above, only to the extent of the value of such Creditor's interest in the Estates' interest in such Collateral or the amount subject to setoff, as the case may be. Except as otherwise provided in the Plan, if the value of a Creditor's interest in the Estates' interest in such Collateral or the amount subject to setoff is less than the amount of the Allowed Claim, then such deficiency shall constitute an Unsecured Claim.

**"Secured Creditor"** means any Creditor holding a Secured Claim.

**"Secured Tax Claim"** means a Secured Claim of a Governmental Unit for Prepetition taxes.

**"Securities Act"** means the Securities Act of 1933, as it has been or may be amended from time to time, and the rules and regulations promulgated thereunder.

**"Security"** has the meaning ascribed to such term in Section 101(49) of the Bankruptcy Code.

**"Security Documents"** means the security agreements and other documents to be executed by Reorganized Biovest as described in Articles 3.3.2.2 and 5.5.1.2 of the Plan.

**"Subordinated Securities Claim"** means any Claim subject to subordination under Section 510(b) of the Bankruptcy Code, including any Claim that arises from the rescission of a purchase or sale of a Security of Biovest (including the Existing Biovest Common Stock), or for damages arising from the purchase or sale of such a Security, or for reimbursement, indemnification, or contribution allowed under Section 502 of the Bankruptcy Code on account of such Claim; provided that, in each such case, such Claim is filed with the Bankruptcy Court by the Bar Date.

**"Subsidiary Equity Interests"** means the equity interests (including common stock and membership interests) issued by any of the Biovest Subsidiaries and held, directly or indirectly, by Biovest.

**"Substantive Consolidation Motion"** has the meaning ascribed to such term in Article 10.1 of the Plan.

**"Superpriority Claim"** means any Claim created by a Final Order of the Bankruptcy Court providing for a priority senior to that provided in Section 507(a)(1) of the Bankruptcy Code, including any such Claims granted under Section 364(c)(1) of the Bankruptcy Code.

**"Trading Day"** means a day on which a Trading Market is open for trading.

**"Trading Market"** means The American Stock Exchange, the NASDAQ Capital Market, the NASDAQ Global Market, the NASDAQ Global Select Market, the New York Stock Exchange, or the OTC Bulletin Board.

**"Transfer Agent"** means StockTrans, Inc. or any successor transfer agent engaged by Biovest.

**"Unimpaired"** refers to a Claim that is not Impaired.

**"United States"** means the United States of America.

**"United States Trustee"** means the Office of the United States Trustee for the Middle District of Florida.

**"Unsecured Claim"** means any Claim which is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, Secured Tax Claim, Secured Claim, Cure Claim, or Intercompany Claim, including (a) any Claim arising from the rejection of an executory contract or unexpired lease under Section 365 of the Bankruptcy Code, (b) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the Estates' interest in the Collateral securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to Section 506(a) of the Bankruptcy Code, (c) any Claim arising from the provision of goods or services to the Debtors prior to the Petition Date, (d) any Unsecured Claim in the Allowed Amount of $5,000.00 or less to the extent the Holder thereof has made the Convenience Class Opt-Out Election, and (e) any Claim designated as an Unsecured Claim elsewhere in the Plan.

**"Unsecured Convenience Claim"** means an Unsecured Claim (a) in an amount less than or equal to $5,000.00 and the Holder of such Claim has not made the Convenience Class Opt-Out Election, or (b) in an amount greater than $5,000.00 and the Holder of such Claim has agreed to reduce the amount of its Claim to $5,000.00 by making the Convenience Class Opt-In Election.

**"Unsecured Creditor"** means any Creditor holding an Unsecured Claim.

**"Valens"** means, collectively, Valens Offshore I, Valens Offshore II, and Valens U.S.

**"Valens Offshore I"** means Valens Offshore SPV I, Ltd., a Delaware limited liability company, and its successors or assigns.

**"Valens Offshore II"** means Valens Offshore SPV II, Corp., a Delaware corporation, and its successors or assigns.

**"Valens Offshore II Royalty"** means a royalty equal to 10.54% of net sales and licensee net sales from any Biovest Biologic Products (as that term is defined in the Valens Offshore II Royalty Agreement).

**"Valens Offshore II Royalty Agreement"** means, collectively, (a) the Royalty Agreement by and between Biovest and Valens Offshore II dated October 30, 2007, and (b) the Royalty Agreement by and between Biovest and Valens Offshore II dated December 10, 2007, as amended by a letter agreement dated May 30, 2008, and as further amended, modified or supplemented thereafter in accordance with their terms.

**"Valens Prepetition Claims"** means any and all Secured Claims and other Claims of Valens represented by, relating to, or arising under or in connection with the Valens Prepetition Loan Documents, including all of the Claims of Valens described or referenced in the Laurus/Valens Proofs of Claim.

**"Valens Prepetition Loan Documents"** means all of the Prepetition documents evidencing the Valens Prepetition Claims and any and all other documents executed by the Debtors or the Accentia Debtors or Laurus/Valens in any way relating to the Valens Prepetition Claims, including the Valens Royalty Agreements, as any such documents have been amended, modified or supplemented thereafter in accordance with their terms.

**"Valens Royalty"** means, collectively, the Valens Offshore II Royalty and the Valens U.S. Royalty.

**"Valens Royalty Agreements"** means, collectively, the Valens Offshore II Royalty Agreement and the Valens U.S. Royalty Agreement.

**"Valens U.S."** means Valens U.S. SPV I, LLC, a Delaware limited liability company, and its successors or assigns.

**"Valens U.S. Royalty"** means a royalty equal to 4.96% of net sales and licensee net sales from any Biovest Biologic Products (as that term is defined in the Valens U.S. Royalty Agreement).

**"Valens U.S. Royalty Agreement"** means, collectively, (a) the Royalty Agreement by and between Biovest and Valens U.S. dated October 30, 2007, and (b) the Royalty Agreement by and between Biovest and Valens U.S. dated December 10, 2007, and as amended, modified or supplemented thereafter in accordance with their terms.

**"Voting Deadline"** means the last day to file a Ballot, Biovest Stockholder Ballot, or Master Ballot accepting or rejecting the Plan as fixed by the Biovest Disclosure Statement Approval Order.

**"Voting Instructions"** means the instructions for voting on the Plan contained in the section of the Disclosure Statement entitled "Voting Instructions" and in the Ballot, the Biovest Stockholder Ballot, or the Master Ballot, as the case may be.

**"VWAP"** means, for any date, the price of the Reorganized Biovest Common Stock determined by the first of the following clauses that applies: (a) if the Reorganized Biovest Common Stock is then listed or quoted on a Trading Market, the volume weighted average price per share of the Reorganized Biovest Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Reorganized Biovest Common Stock is then listed or quoted for trading as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. (New York City time) to 4:02 p.m. (New York City time); (b) if the OTC Bulletin Board is not a Trading Market, the volume weighted average price per share of the Reorganized Biovest Common Stock for such date (or the nearest preceding date) on the OTC Bulletin Board; or (c) if the Reorganized Biovest Common Stock

is not then quoted for trading on the OTC Bulletin Board and if prices for the Reorganized Biovest Common Stock are then reported in the "Pink Sheets" published by Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices), the volume weighted average price per share of the Reorganized Biovest Common Stock so reported for such date.

2.1.2        Any capitalized term used in the Plan that is not defined in the Plan but that is defined in the Bankruptcy Code or in the Bankruptcy Rules shall have the meaning ascribed to that term in the Bankruptcy Code or in the Bankruptcy Rules, as the case may be (with the Bankruptcy Code or the Bankruptcy Rules, as the case may be, controlling in the case of a conflict or ambiguity).

## 2.2   **Rules of Construction.**

For purposes of the Plan: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such contract, instrument, release, indenture or other agreement or document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been or may be amended, modified or supplemented; (d) if the Plan's description of the terms of an Exhibit is inconsistent with the terms of the Exhibit, the terms of the Exhibit shall control; (e) unless otherwise specified, all references in the Plan to Articles and Exhibits are references to Articles and Exhibits of or to the Plan; (f) unless the context requires otherwise, the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular Article or section or subsection of the Plan; (g) any phrase containing the term "include" or "including" shall mean including without limitation; (h) all of the Exhibits referred to in the Plan shall be deemed incorporated herein by any such reference and made a part hereof for all purposes; (i) any reference to an Entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; and (j) the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply in the construction of the Plan, to the extent such rules are not inconsistent with any other provision in this Article 2.2.

## ARTICLE 3
## TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS, AND DIP LOAN CLAIMS

In accordance with Section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and the DIP Loan Claims have not been classified in the Plan. The treatment accorded to Administrative Expense Claims, Priority Tax Claims, and the DIP Loan Claims is set forth below in this Article 3.

## 3.1   **Administrative Expense Claims.**

3.1.1    Except as otherwise provided in Articles 3.1.2 and 3.1.3 below, each Holder of an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of Professionals) shall be paid (a) on the Distribution Date, an amount, in Cash, by Reorganized Biovest

equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or Reorganized Biovest, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

3.1.2    All unpaid fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930, for any calendar quarter ending prior to the Effective Date shall be paid to the United States Trustee by Reorganized Biovest by no later than thirty (30) days following the Effective Date. At the time of such payment, Reorganized Biovest shall provide to the United States Trustee an affidavit indicating the disbursements made by the Debtors for the relevant periods, if requested by the United States Trustee. Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Biovest Bankruptcy Cases shall be paid by Reorganized Biovest, until the earlier of (i) the closing of the Biovest Bankruptcy Cases by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Biovest Bankruptcy Cases or converting the Biovest Bankruptcy Cases to another chapter under the Bankruptcy Code. Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6). At the time of each such payment, Reorganized Biovest shall provide to the United States Trustee an affidavit indicating the disbursements for the relevant period, if requested by the United States Trustee.

3.1.3    All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Biovest Bankruptcy Cases shall be paid by Reorganized Biovest (a) in the ordinary course of business in accordance with contract terms, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or Reorganized Biovest, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

## 3.2    **Priority Tax Claims.**

Each Holder of an Allowed Priority Tax Claim shall receive from Reorganized Biovest, on account of such Allowed Priority Tax Claim, regular installment payments in Cash on the Distribution Date in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Biovest, as the case may be.

## 3.3    **DIP Loan Claims.**

3.3.1    Pursuant to the terms of the DIP Financing Order, the Bankruptcy Court has approved a $3,000,000.00 Postpetition line of credit facility (the "DIP Facility") from the DIP Lender to Biovest, secured by a first Lien in favor of the DIP Lender on substantially all of the Property of Biovest. As of the date of the Plan, the DIP Advances totaled $1,390,000.00 (excluding accrued and unpaid interest) and an additional $250,000.00 has been authorized in the DIP Financing Order to be advanced by the DIP Lender to Biovest. The DIP Advances may increase by another $1,610,000.00

(which includes the previously authorized amount of $250,000.00) to a total of $3,000,000.00, prior to or after the Effective Date, with the consent of the DIP Lender. Any request for additional advances above the $1,640,000.00 previously authorized by the Bankruptcy Court will be pursuant to a motion filed by Biovest with the Bankruptcy Court, with notice to all of the Notice Parties. As set forth in the Laurus/Valens Compromise Motion, Laurus/Valens has agreed to support any request by Biovest seeking such additional advances, whether prior to or after the Effective Date, up to a maximum principal amount of $3,000,000.00 outstanding under the DIP Facility.

3.3.2    Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the DIP Lender is entitled to receive on the Effective Date, in full and final satisfaction, settlement, release, extinguishment, and discharge of the DIP Lender Allowed Claim, Cash equal to the amount of the DIP Lender Allowed Claim. In addition, pursuant to the terms of the DIP Loan Documents, the DIP Lender Allowed Claim is due and payable in full on the Effective Date. Subject to and pursuant to the terms of the Plan, the DIP Lender has agreed that the DIP Lender Allowed Claim shall not constitute an Administrative Expense Claim under the Plan and has further agreed to extend the maturity date set forth in the DIP Loan Documents in consideration for the treatment of the DIP Lender Allowed Claim as set forth below in this Article 3.3.2. Accordingly, the DIP Lender shall receive the following treatment in full and final satisfaction, settlement, release, extinguishment and discharge of the DIP Lender Allowed Claim:

3.3.2.1    On the Effective Date, Reorganized Biovest shall execute and deliver in favor of the DIP Lender a new promissory note (the "DIP Lender Plan Note") in an original principal amount equal to the DIP Lender Allowed Claim. The DIP Lender Plan Note shall be in substantially the same form as the secured promissory note executed by Biovest in favor of the DIP Lender pursuant to the DIP Financing Order (as listed on Exhibit A attached hereto), and shall contain the following terms: (a) a maturity date of two (2) years following the Effective Date, (b) interest will accrue and be payable on the outstanding principal at a fixed rate of sixteen percent (16%) per annum, calculated based on a 360 day year, with interest in the amount of ten percent (10%) to be paid monthly and interest in the amount of six percent (6%) to accrue and be paid at the maturity date, (c) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, (d) Reorganized Biovest may prepay the DIP Lender Plan Note in full, without penalty, at any time (provided that Reorganized Biovest must provide ten (10) days advance written notice to the DIP Lender of the date for any such prepayment), and (e) any additional advances made after the Effective Date (up to a maximum principal amount of $3,000,000.00 outstanding under the DIP Facility) shall be added to the principal amount of the DIP Lender Plan Note and be included in the DIP Lender Allowed Claim.

3.3.2.2    The DIP Lender Plan Note shall be secured by a first priority Lien on all of the Property of Reorganized Biovest (as described in the DIP Financing Order), and, on the Effective Date, Reorganized Biovest shall execute and deliver in favor of the DIP Lender a new security agreement and other customary security documents evidencing such Lien.

3.3.2.3    On the Closing Date, the DIP Lender and LV shall enter into the DIP Lender Subordination Agreement, pursuant to which LV shall subordinate the payment of the Laurus/Valens Allowed Class 2 Claims to the payment of the DIP Lender Allowed Claim.

3.3.2.4　　As of the Effective Date, without any further action by any party, subject to the Lien to be granted to the DIP Lender in Article 3.3.2.2, the Liens that secure the DIP Loan Claims shall be deemed to be extinguished, satisfied and released. To the extent that any Liens to secure the DIP Loan Claims have been filed or recorded publicly, if requested by Reorganized Biovest, the DIP Lender shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens.

3.3.2.5　　At the option of the DIP Lender, at any time prior to the earlier to occur of (a) the date of the prepayment of the DIP Lender Plan Note in full or (b) the maturity date of the DIP Lender Plan Note, the DIP Lender, in its discretion, may convert all or a portion of the outstanding balance of the DIP Lender Plan Note (including any accrued and unpaid interest comprising part of the DIP Loan Claims and added to the original principal balance of the DIP Lender Plan Note and any interest accrued after the Effective Date) into shares of Reorganized Biovest Common Stock (the "DIP Lender Plan Shares") at a conversion rate of $0.75 per share of Reorganized Biovest Common Stock (i.e., the DIP Lender will receive that number of shares of Reorganized Biovest Common Stock determined by dividing such outstanding principal and interest being converted by $0.75). The DIP Lender Plan Shares shall be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the following provisions: (i) any restrictions or limitations under Rule 144(e), (ii) a limit on the sale of the DIP Lender Plan Shares in any ninety (90) day period to that number of the DIP Lender Plan Shares equal to one percent (1%) of the issued and outstanding shares of Reorganized Biovest Common Stock, (iii) a prohibition on the sale of any DIP Lender Plan Shares for a period of one hundred twenty (120) days following any debt or equity raise by Reorganized Biovest of less than $10,000,000.00, (iv) a prohibition on the sale of any DIP Lender Plan Shares for a period of one hundred eighty (180) days following any debt or equity raise by Reorganized Biovest of $10,000,000.00 or more, and (v) in the event the DIP Lender Plan Shares are issued pursuant to subparagraph (a) above, such shares may not be sold or transferred until after the 12 Month Anniversary Date (provided, however, that this prohibition on transfer shall not prohibit the transfer of any such shares to a family member or to an Entity for the benefit of or controlled by a family member provided that the family member or Entity agrees to be bound by the provisions of this Article 3.3.2.5).

## ARTICLE 4
## DESIGNATION OF CLASSES OF CLAIMS AND EQUITY INTERESTS

Pursuant to Section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Equity Interests. A Claim or Equity Interest (a) is classified in a particular Class only to the extent the Claim or Equity Interest qualifies within the description of that Class and (b) is classified in a different Class to the extent the Claim or Equity Interest qualifies within the description of that different Class. Unless otherwise expressly stated, the Classes of Claims set forth below include Claims against each of the Debtors that qualify within the description of that Class. For purposes of the Plan, the Claims and Equity Interests are classified as follows:

4.1     **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.

4.2     **Class 2:  Secured Claims and Other Claims of Laurus/Valens.**

Class 2 consists of all of the Laurus/Valens Prepetition Claims.

4.3     **Class 3: Secured Claims and Other Claims of Accentia.**

Class 3 consists of all of the Accentia Prepetition Claims.

4.4     **Class 4:  Secured Claims and Other Claims of the 2008 Secured Debentures Holders.**

Class 4 consists of all of the 2008 Secured Debentures Claims.

4.5     **Class 5: Secured Tax Claims of Governmental Units.**

Class 5 consists of all Secured Tax Claims of Governmental Units.

4.6     **Class 6: Other Secured Claims.**

Class 6 consists of all Secured Claims not otherwise specifically classified in the Plan.   In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 6.

4.7     **Class 7: Unsecured Claims of Ronald E. Osman under the Osman Note.**

Class 7 consists of all Unsecured Claims of Ronald E. Osman represented by, relating to, or arising under or in connection with the Osman Note.

4.8     **Class 8:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

Class 8 consists of all Unsecured Claims not otherwise classified in the Plan.

4.9     **Class 9:  Unsecured Convenience Claims.**

Class 9 consists of all Unsecured Convenience Claims.

4.10   **Class 10: Intercompany Claims.**

Class 10 consists of all Intercompany Claims.

4.11   **Class 11: Subordinated Securities Claims.**

Class 11 consists of all Subordinated Securities Claims.

4.12   **Class 12:  Equity Interests.**

Class 12 consists of all Equity Interests.

4.13   **Class 13: Subsidiary Equity Interests.**

Class 13 consists of all Subsidiary Equity Interests.


## ARTICLE 5
## TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

Claims and Equity Interests shall be treated under the Plan in the manner set forth in this Article 5.  Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

5.1   **Unclassified Claims.**

Holders of Allowed Administrative Expense Claims and Allowed Priority Tax Claims and the DIP Lender (with respect to the DIP Lender Allowed Claim) shall receive the treatment set forth in Article 3 of the Plan.

5.2   **Class 1:  Priority Claims.**

Class 1 consists of all Priority Claims.  Each Holder of an Allowed Priority Claim shall receive from Reorganized Biovest a deferred Cash payment, on the 6 Month Anniversary Date, of a value, as of the Effective Date, equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(i) of the Bankruptcy Code; provided, however, that if Class 1 has not accepted the Plan (as provided in Section 1126(c) of the Bankruptcy Code), each Holder of an Allowed Priority Claim shall be paid, on the Determination Date, an amount, in Cash, by Reorganized Biovest equal to the Allowed Amount of its Priority Claim in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code.  Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the Debtors or Reorganized Biovest, as the case may be.

Class 1 is Impaired by the Plan. Each Holder of a Priority Claim in Class 1 is entitled to vote to accept or reject the Plan.

**5.3     Class 2:  Secured Claims and Other Claims of Laurus/Valens.**

5.3.1    Class 2 consists of all of the Laurus/Valens Prepetition Claims.  Following extensive negotiations, the Debtors, the Accentia Debtors, and Laurus/Valens reached a compromise as to all disputes with respect to the Laurus/Valens Prepetition Claims and all disputes between Laurus/Valens and the Accentia Debtors (the "Laurus/Valens Settlement").  On April 16, 2010, the Debtors filed the Laurus/Valens Compromise Motion with the Bankruptcy Court, which sets forth the principal terms of the Laurus/Valens Settlement and includes substantially all of the documents to be executed by the Debtors, the Accentia Debtors, Laurus/Valens and certain other parties in order to consummate the Laurus/Valens Settlement (collectively, the "Laurus/Valens Settlement Documents").    On May ___, 2010, after notice and a hearing, the Bankruptcy Court entered the Laurus/Valens Compromise Order, which approved all of the terms of the Laurus/Valens Settlement. The closing of the Laurus/Valens Settlement (the "Closing") for both the Debtors and the Accentia Debtors must occur concurrently and will occur upon the Effective Date of the Plan and the effective date of the Accentia Plan and the satisfaction or waiver of the other conditions to Closing set forth in the Biovest Term Loan Agreement and in the Accentia Term Loan Agreement.

5.3.2    The pertinent terms and conditions of the Laurus/Valens Settlement with the Debtors are summarized below.  This summary is qualified in its entirety by the Laurus/Valens Settlement Documents and, to the extent of any inconsistencies between this summary and the Laurus/Valens Settlement Documents, the Laurus/Valens Settlement Documents shall control.  In addition, unless otherwise defined in the Plan, capitalized terms used in this Article 5.3.2 shall have the meanings ascribed thereto in the Laurus/Valens Settlement Documents.

5.3.2.1    Laurus/Valens will have an Allowed Secured Claim against Reorganized Biovest in the amount of $24,900,000.00 (the "Laurus/Valens Allowed Secured Claim") in full and final satisfaction of all principal asserted by Laurus/Valens against Biovest and the Biovest Subsidiaries in the Laurus/Valens Proofs of Claim.  The Laurus/Valens Allowed Secured Claim will be evidenced by one or more term notes (the "Laurus/Valens Term A Notes"), which will be executed and delivered by Reorganized Biovest on the Closing Date. The Laurus/Valens Term A Notes will contain the following terms: (a) a maturity date of two (2) years following the Closing Date, (b) interest will accrue at the rate of eight percent (8%) per annum, calculated based on a 365 day year, and will be payable at the time of any principal payment or prepayment of principal, (c) a default rate of interest of twelve percent (12%) per annum, (d) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, (e) Reorganized Biovest may prepay the Laurus/Valens Term A Notes, without penalty, at any time, and (f) Reorganized Biovest is required to make mandatory prepayments under the Laurus/Valens Term A Notes as follows: (i) a prepayment equal to thirty percent (30%) of the Net Proceeds (i.e., the gross proceeds received less any investment banking or similar fees and commissions and legal costs and expenses incurred by Reorganized Biovest) of any Capital Raise (excluding (x) any additional loans to Reorganized Biovest from either the DIP Lender or Accentia up to a maximum amount equal to the difference between $3,000,000.00 and the outstanding

balance of the DIP Facility as of the Closing Date, and (y) the first $1,500,000.00 of Net Proceeds received by Reorganized Biovest after the Closing Date, and (z) cash proceeds received by Reorganized Biovest from the exercise of stock options or stock purchase warrants if the stock option or stock purchase warrant was issued prior to the Closing Date or issued pursuant to the Plan), but only up to the then outstanding principal and accrued interest under the Laurus/Valens Term A Notes, and (ii) from any intercompany funding by Accentia to Reorganized Biovest, provided that thirty percent (30%) of such intercompany funding shall first be used by Accentia to prepay the Accentia Term Notes and, if the Accentia Term Notes have been paid in full, the balance of such thirty percent (30%) of the intercompany funding shall then be used to prepay the Laurus/Valens Term A Notes, and (iii) a prepayment equal to fifty percent (50%) of positive Net Cash Flow of Reorganized Biovest for each fiscal quarter after the Closing Date, less the amount of Biologic Products Capital Expenditures made during such fiscal quarter or during any prior fiscal quarter ending after the Closing Date (excluding any such expenditures that have previously been taken into account in calculating the prepayment amount for any prior fiscal quarter). The term "Biologic Products Capital Expenditures" shall mean capital expenditures of the Reorganized Debtors directly related to the development and production of the Biovest Biologic Products, including any capital expenditures incurred by the Reorganized Debtors in modifying or expanding their biologics manufacturing facilities, but shall not include any allocation for corporate overhead or other general and administrative expenses. Any mandatory prepayment will be applied, pro rata, as a reduction of principal on the then outstanding balance of the Laurus/Valens Term A Notes and interest accrued on such paid principal amount through the date of payment.

5.3.2.2 Laurus/Valens will have an additional Allowed Secured Claim against Reorganized Biovest in the amount of $4,160,000.00 (the "Laurus/Valens Additional Allowed Secured Claim") in full and final satisfaction of the interest, penalties, fees, and default interest in the amount of $7,332,987.49 asserted by Laurus/Valens against Biovest and the Biovest Subsidiaries in the Laurus/Valens Proofs of Claim. The Laurus/Valens Additional Allowed Secured Claim will be evidenced by one or more term notes (the "Laurus/Valens Term B Notes"), which will be executed and delivered by Reorganized Biovest on the Closing Date. The Laurus/Valens Term B Notes will contain the following terms: (a) a maturity date of three (3) years following the Closing Date, (b) interest will accrue at the rate of eight percent (8%) per annum, calculated based on a 365 day year, and will be payable at the time of any principal payment or prepayment of principal, (c) a default rate of interest of twelve percent (12%) per annum, (d) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, (e) Reorganized Biovest may prepay the Laurus/Valens Term B Notes, without penalty, at any time, and (f) provided that the Laurus/Valens Term A Notes have been paid in full, Reorganized Biovest is required to make mandatory prepayments under the Laurus/Valens Term B Notes from any intercompany funding by Accentia to Reorganized Biovest (excluding any additional loans to Reorganized Biovest from Accentia up to a maximum amount equal to the difference between $3,000,000.00 and the outstanding balance of the DIP Facility as of the Closing Date), provided that thirty percent (30%) of such intercompany funding shall first be used by Accentia to prepay the Accentia Term Notes and, if the Accentia Term Notes have been paid in full, the balance of such thirty percent (30%) of the

intercompany funding shall be used to prepay the Laurus/Valens Term B Notes, but only up to the outstanding principal and accrued interest under the Laurus/Valens Term B Notes. Any mandatory prepayment will be applied, pro rata, as a reduction of principal on the then outstanding balance of the Laurus/Valens Term B Notes and interest accrued on such paid principal amount through the date of payment.

5.3.2.3    On notice to and with the prior written consent of Laurus/Valens, Reorganized Biovest may convert all or any portion of the outstanding principal and accrued interest under either the Laurus/Valens Term A Notes or the Laurus/Valens Term B Notes into shares of Reorganized Biovest Common Stock. The number of shares of Reorganized Biovest Common Stock issuable on a conversion (the "Laurus/Valens Conversion Shares") shall be equal to (i) an amount equal to the aggregate portion of the principal and accrued and unpaid interest thereon outstanding under the Laurus/Valens Term Note being converted, divided by (ii) ninety percent (90%) of the average closing price publicly reported for the Reorganized Biovest Common Stock for the ten (10) Trading Days (if the Reorganized Biovest Common Stock is not on a Trading Market, then as reported in the "Pink Sheets" published by Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices)) immediately preceding the date of the notice of conversion. The Laurus/Valens Conversion Shares shall be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but sales of any such shares by Laurus/Valens will be subject to the limitations on the number of shares of Reorganized Biovest Common Stock that may be sold from time to time contained in Rule 144(e), without regard to whether or not Laurus/Valens is considered an "Affiliate" of Reorganized Biovest for purposes of Rule 144(e).

5.3.2.4    The Laurus/Valens Term Notes will be secured by a first Lien in (i) all of the assets of Reorganized Biovest (including all intellectual property), junior only to the Lien granted by the Bankruptcy Court to the DIP Lender in the DIP Financing Order (which DIP Facility as of the Closing Date cannot exceed $3,000,000.00) and to Permitted Liens, and (ii) all of the assets of the Biovest Subsidiaries, which will secure Guaranties (as to the entire indebtedness under the Laurus/Valens Term Notes) to be executed by the Biovest Subsidiaries in favor of Laurus/Valens.

5.3.2.5    The Laurus/Valens Term Notes will also be guaranteed by Accentia (the "Accentia Guaranty"), up to a maximum amount of $4,991,360.00. The Accentia Guaranty will be secured by a pledge by Accentia of 20,115,818 shares of Reorganized Biovest Common Stock owned by Accentia.

5.3.2.6    Analytica will execute a security agreement, a separate grant of a security interest in its intellectual property, and a guaranty in favor of Laurus/Valens to secure the obligations of Accentia under the Accentia Guaranty and under the Accentia Term Notes. The foregoing documents, insofar as they relate to the Accentia Guaranty, are also limited to a maximum amount of $4,991,360.00.

5.3.2.7    Accentia will enter into a subordination agreement with Laurus/Valens, pursuant to which Accentia will agree to subordinate any indebtedness owing, and liens granted, to it by the Reorganized Debtors to any indebtedness owing, and liens granted, to Laurus/Valens under the Laurus/Valens Settlement Documents; provided that, (i) Accentia may convert the Accentia Allowed Class 3 Claim into shares of Reorganized Biovest Common Stock as described in Article 5.4.1.1, and (ii) Reorganized Biovest will be permitted to make certain payments to Accentia related to the sharing of expenses and shared administrative and overhead costs between the companies and the repayment of any future loans made by Accentia to Biovest in lieu of any additional advances from the DIP Lender.

5.3.2.8    All of the Laurus/Valens Warrants will be terminated and cancelled as of the Closing.  Laurus/Valens will not have any rejection damages or other Claims against Biovest or Accentia in connection with the termination and cancellation of the Laurus/Valens Warrants.

5.3.2.9    In consideration for the cancellation of the Laurus/Valens Warrants, on the Closing Date, Laurus/Valens will receive that number of shares of Reorganized Biovest Common Stock equal to 9.99% of the fully diluted issued and outstanding shares of Reorganized Biovest Common Stock as of the Closing Date (after taking into account any shares of Reorganized Biovest Common Stock to be issued to Creditors under the Plan and any shares of Reorganized Biovest Common Stock subject to issuance under the Existing Biovest Stock Warrants, but excluding any shares of Reorganized Biovest Common Stock subject to issuance pursuant to the Existing Biovest Stock Options) (the "Laurus/Valens Plan Shares").  Except for the Laurus/Valens Plan Shares and the Laurus/Valens Conversion Shares, Laurus/Valens will not be entitled to receive any shares of Reorganized Biovest Common Stock under the Biovest Term Loan Agreement or the Accentia Term Loan Agreement.  The Laurus/Valens Plan Shares will be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the following provisions: (a) any restrictions or limitations under Rule 144(e), and (b) Laurus/Valens will agree that they will not offer, sell, contract to sell, hypothecate, pledge or otherwise dispose of any of the Laurus/Valens Plan Shares (i) during the six (6) month period following the closing of each of the first two (2) common equity offerings of Reorganized Biovest (whether in a registered public offering or in a private placement transaction), with gross proceeds of $10,000,000 or more, and (ii) during the three (3) month period following the closing of a common equity offering of Reorganized Biovest (whether in a registered public offering or in a private placement transaction) that closes within three (3) months after the Closing Date, with gross proceeds of between and including $5,000,000 and $10,000,000.

5.3.2.10    In full and final satisfaction of the Laurus/Valens Royalty, Laurus/Valens will receive a new perpetual royalty equal to 6.25% of the gross revenues from the sale, license or other disposition of the Biovest Biologic Products received by Reorganized Biovest or its sublicensees or transferees.

5.3.2.11  At the Closing, Reorganized Biovest, Accentia and Laurus/Valens will enter into several agreements terminating the Laurus/Valens Royalty in its entirety.

5.3.2.12  The AutovaxID Royalty (including the guaranteed minimum amount of $7,500,000.00) will be terminated as of the Closing Date.

5.3.2.13  Biovest will amend and restate its bylaws and certificate of incorporation to incorporate provisions (i) required by the Plan, the Confirmation Order, and/or the Bankruptcy Code, and (ii) granting Laurus/Valens the right, upon an Event of Default under Section 20(a) of the Biovest Term Loan Agreement (after giving effect to any applicable grace period provided therein), to appoint and maintain one-third (1/3) of the total number of directors of Reorganized Biovest. Thereafter, such right to appoint directors will continue notwithstanding Reorganized Biovest's cure of any such Event of Default until the Laurus/Valens Term Notes have been paid in full. The Reorganized Biovest Bylaws and the Reorganized Biovest Charter are attached as Exhibit D and Exhibit E to the Plan, respectively, and will become effective on the Effective Date.

5.3.2.14  As stated in Article 3.3.2.3 above, on the Closing Date, the DIP Lender and LV will enter into the DIP Lender Subordination Agreement, pursuant to which LV will agree to subordinate the Laurus/Valens Allowed Class 2 Claims owing, and liens granted, to Laurus/Valens by Reorganized Biovest to any indebtedness owing (up to a maximum amount of $3,000,000.00), and liens granted, to the DIP Lender under the DIP Financing Order and the Plan; provided that, the DIP Lender Subordination Agreement will not prohibit any mandatory prepayments, or the issuance of the Laurus/Valens Conversion Shares, to Laurus/Valens under the Laurus/Valens Term Notes.

5.3.2.15  On the Closing Date, Accentia and Reorganized Biovest will enter into the Accentia Royalty Termination Agreement.

5.3.2.16  Except as to any obligations under the Laurus/Valens Settlement Documents or the Plan, the Debtors and Laurus/Valens and their respective officers, directors, employees, agents, and attorneys will be deemed to have released each other, as of the Closing Date, from any and all claims of any nature whatsoever. The release provisions are included in the Laurus/Valens Compromise Order.

5.3.2.17  All of the Laurus/Valens Settlement Documents (except for the DIP Lender Subordination Agreement) will be governed by the laws of the State of New York. Until the Closing Date, the Bankruptcy Court will have and retain exclusive jurisdiction over the Laurus/Valens Settlement and any disputes arising thereunder. Following the Closing Date, the state and/or federal courts in the State of New York will have jurisdiction over the Laurus/Valens Settlement Documents.

5.3.2.18  On the Closing Date, Laurus/Valens will withdraw the Laurus/Valens Proofs of Claim with prejudice.

5.3.2.19    Effective as of the Closing Date, any and all of the Laurus/Valens Prepetition Loan Documents shall be deemed cancelled and void and of no further force and effect.

Class 2 is Impaired by the Plan.  Laurus/Valens, as the Holder of the Class 2 Claims, is entitled to vote to accept or reject the Plan.

## 5.4    **Class 3:  Secured Claims and Other Claims of Accentia.**

5.4.1    Class 3 consists of all of the Accentia Prepetition Claims.  The Class 3 Claims of Accentia are secured by a Lien on all assets of Biovest, junior only to the Liens in favor of (a) the DIP Lender granted in the DIP Financing Order, (b) Laurus/Valens as described in the Laurus/Valens Compromise Motion, and (c) the 2008 Secured Debentures Holders as described in Article 5.5.1. Under the Plan, the Class 3 Claims of Accentia will be allowed in the amount of $11,991,510.00 plus Postpetition Interest at the rate of six percent (6%) per annum (the "Accentia Allowed Class 3 Claim").  Under the Plan, the following shall occur with respect to the Accentia Allowed Class 3 Claim:

5.4.1.1    On the Effective Date, Accentia will convert the entire amount of the Accentia Allowed Class 3 Claim into shares of Reorganized Biovest Common Stock (the "Class 3 Plan Shares") at a conversion rate of $0.75 per share of Reorganized Biovest Common Stock (i.e., Accentia will receive that number of shares of Reorganized Biovest Common Stock determined by dividing the Accentia Allowed Class 3 Claim by $0.75). Based on an estimated amount of $13,195,918.00 for the Accentia Allowed Class 3 Claim (assuming a Confirmation Date of July 13, 2010), Accentia will receive approximately 17,594,557 shares of Reorganized Biovest Common Stock under this Article 5.4.1.1.  The Class 3 Plan Shares shall be issued on the Effective Date pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the following provisions: (a) any restrictions or limitations under Rule 144(e), (b) a limit on the sale of the Class 3 Plan Shares in any ninety (90) day period to that number of the Class 3 Plan Shares equal to one percent (1%) of the issued and outstanding shares of Reorganized Biovest Common Stock, (c) a prohibition on the sale of any Class 3 Plan Shares for a period of one hundred twenty (120) days following any debt or equity raise by Reorganized Biovest of less than $10,000,000.00, and (d) a prohibition on the sale of any Class 3 Plan Shares for a period of one hundred eighty (180) days following any debt or equity raise by Reorganized Biovest of $10,000,000.00 or more.

5.4.1.2    As of the Effective Date, without any further action by any party, the Liens that secure the Class 3 Claims of Accentia shall be deemed to be extinguished, satisfied and released.  To the extent that any Liens to secure the Class 3 Claims have been filed or recorded publicly, if requested by Reorganized Biovest, Accentia shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens.

5.4.1.3    On the Closing Date, Accentia and Reorganized Biovest shall enter into the Accentia Royalty Termination Agreement.

Class 3 is Impaired by the Plan. Accentia, as the Holder of the Class 3 Claims, is entitled to vote to accept or reject the Plan.

## 5.5    Class 4: Secured Claims and Other Claims of the 2008 Secured Debentures Holders.

5.5.1    Class 4 consists of all of the 2008 Secured Debentures Claims. The Class 4 Claims of the 2008 Secured Debentures Holders are secured by a Lien on all assets of Biovest, junior only to the Liens in favor of (a) the DIP Lender granted in the DIP Financing Order, and (b) Laurus/Valens as described in the Laurus/Valens Compromise Motion. Under the Plan, subject to Article 5.5.1.7, the Class 4 Claims of each of the 2008 Secured Debentures Holders will be allowed in an amount equal to the outstanding principal and accrued and unpaid interest as of the Petition Date under its 2008 Secured Debentures (each, a "2008 Secured Debentures Allowed Class 4 Claim"). Under the Plan, the following shall occur with respect to the 2008 Secured Debentures Allowed Class 4 Claims:

5.5.1.1    On the Effective Date, in the event a 2008 Secured Debentures Holder does not make the Conversion Election described in Article 5.5.1.6, Reorganized Biovest shall execute and deliver in favor of such 2008 Secured Debentures Holder a new promissory note (the "2008 Secured Debentures Plan Note") in an original principal amount equal to the amount of its 2008 Secured Debentures Allowed Class 4 Claim. Each of the 2008 Secured Debentures Plan Notes shall contain the following terms: (a) a maturity date of forty (40) months following the Effective Date, (b) interest will accrue and be payable on the outstanding principal at a fixed rate of eight percent (8%) per annum, calculated based on a 365 day year, (c) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, (d) Reorganized Biovest may prepay all or any portion of the 2008 Secured Debentures Plan Note, without penalty, at any time, and (e) a subordination of the Lien granted hereunder in favor of the 2008 Secured Debentures Holder to the Liens in favor of (i) the DIP Lender granted in the DIP Financing Order, and (ii) Laurus/Valens as described in the Laurus/Valens Compromise Motion. The 2008 Secured Debentures Plan Notes shall not contain any conversion or redemption rights.

5.5.1.2    Each of the 2008 Secured Debentures Plan Notes shall be secured by a Lien on all of the Property of Reorganized Biovest securing the 2008 Secured Debentures, to the same extent, validity and priority as existed in favor of the 2008 Secured Debentures Holders as of the Petition Date; provided, however, that such Lien shall be junior to the Liens in favor of (i) the DIP Lender granted in the DIP Financing Order, and (ii) Laurus/Valens as described in the Laurus/Valens Compromise Motion. Reorganized Biovest shall execute and deliver in favor of the 2008 Secured Debentures Holders a new security agreement and other customary security documents evidencing such Lien.

5.5.1.3    As of the Effective Date, without any further action by any party, subject to the Lien to be granted to each of the 2008 Secured Debentures Holders in Article 5.5.1.2, the Liens that secure the 2008 Secured Debentures Claims shall be deemed to be extinguished, satisfied and released. To the extent that any Liens to secure the 2008 Secured Debentures Claims have been filed or recorded publicly, if requested by Reorganized

Biovest, each of the 2008 Secured Debentures Holders shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens.

5.5.1.4     As of the Effective Date, any and all of the 2008 Secured Debentures Documents (excluding the 2008 Secured Debentures Warrants) shall be deemed cancelled and void and of no further force and effect.

5.5.1.5     Except as provided in Article 7.9, the 2008 Secured Debentures Holders shall retain unaltered all of the legal, equitable and contractual rights under the 2008 Secured Debentures Warrants.

5.5.1.6     At the option of a 2008 Secured Debentures Holder, at any time prior to the Voting Deadline, such 2008 Secured Debentures Holder may convert all of its 2008 Secured Debentures Allowed Class 4 Claim into shares of Reorganized Biovest Common Stock (the "Class 4 Plan Shares") at a conversion rate equal to the Market Price per share of Reorganized Biovest Common Stock (i.e., such 2008 Secured Debentures Holder will receive that number of shares of Reorganized Biovest Common Stock determined by dividing its 2008 Secured Debentures Allowed Class 4 Claim by the Market Price). The Class 4 Plan Shares shall be issued on the Effective Date pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12. Any Conversion Election shall be made by a 2008 Secured Debentures Holder on the Ballot filed with the Bankruptcy Court or in a separate writing delivered to Biovest, in each such case prior to the Voting Deadline. In the event a 2008 Secured Debentures Holder makes a Conversion Election, the provisions of Articles 5.5.1.1 and 5.5.1.2 shall not be applicable.

5.5.1.7     Notwithstanding anything to the contrary contained in this Article 5.5.1, (a) the treatment of the 2008 Secured Debentures Claims of Valens U.S. shall be determined as set forth in the Laurus/Valens Settlement, and (b) the treatment of the 2008 Secured Debentures Claims of Philip E. Rosensweig shall be determined as set forth in a Final Order of the Bankruptcy Court that resolves the Rosensweig Adversary Proceeding.

Class 4 is Impaired by the Plan. The 2008 Secured Debentures Holders, as the Holders of the Class 4 Claims, are entitled to vote to accept or reject the Plan.

## 5.6    **Class 5: Secured Tax Claims of Governmental Units.**

Class 5 consists of all Secured Tax Claims of Governmental Units. On the Distribution Date, Reorganized Biovest shall pay to a Governmental Unit, in Cash, the Allowed Amount of its Secured Tax Claim. Notwithstanding the foregoing, if Reorganized Biovest does not have sufficient Cash to pay an Allowed Class 5 Claim in full on the Distribution Date, such Allowed Class 5 Claim shall be paid under such other terms as may be agreed upon by both the Holder of such Allowed Class 5 Claim and the Debtors or Reorganized Biovest, as the case may be, or as otherwise ordered by a Final Order of the Bankruptcy Court. Class 5 is Unimpaired by the Plan. Each Holder of a Class 5

Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

5.7    **Class 6: Other Secured Claims.**

5.7.1    Class 6 consists of all Secured Claims not otherwise specifically classified in the Plan. In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 6. Under the Plan, the following shall occur with respect to the Allowed Class 6 Claims:

5.7.1.1    On the Determination Date, in the event a Holder of a Class 6 Claim does not make the Conversion Election described in Article 5.7.1.3, Reorganized Biovest shall execute and deliver in favor of such Holder a new promissory note (the "Class 6 Plan Note") in an original principal amount equal to the amount of such Holder's Allowed Class 6 Claim. The Class 6 Plan Note shall contain the following terms: (a) a maturity date of forty (40) months following the Effective Date, (b) interest will accrue and be payable on the outstanding principal at a fixed rate of eight percent (8%) per annum, calculated based on a 365 day year, (c) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, and (d) Reorganized Biovest may prepay all or any portion of the Class 6 Plan Note, without penalty, at any time. Notwithstanding the foregoing, Reorganized Biovest, in its discretion, may return to the Secured Creditor any Property securing its Secured Claim in full and final satisfaction of the Secured Claim.

5.7.1.2    Any deficiency owing to a Secured Creditor with respect to a Class 6 Claim shall be classified and treated as a Class 8 Unsecured Claim to the extent Allowed by a Final Order of the Bankruptcy Court.

5.7.1.3    At the option of a Holder of a Class 6 Claim, at any time prior to the Voting Deadline, such Holder may convert all of its Allowed Class 6 Claim into shares of Reorganized Biovest Common Stock (the "Class 6 Plan Shares") at a conversion rate equal to the Market Price per share of Reorganized Biovest Common Stock (i.e., such Holder will receive that number of shares of Reorganized Biovest Common Stock determined by dividing its Allowed Class 6 Claim by the Market Price). The Class 6 Plan Shares shall be issued as soon as reasonably practicable following the Determination Date (but in no event more than five (5) Business Days following the Determination Date) pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12. Any Conversion Election shall be made by a Holder of a Class 6 Claim on the Ballot filed with the Bankruptcy Court prior to the Voting Deadline. In the event a Holder of a Class 6 Claim makes a Conversion Election, the provisions of Articles 5.7.1.1 and 5.7.1.2 shall not be applicable.

Class 6 is Impaired by the Plan. Each Holder of a Class 6 Claim is entitled to vote to accept or reject the Plan.

5.8    **Class 7: Unsecured Claims of Ronald E. Osman under the Osman Note.**

5.8.1    Class 7 consists of all Unsecured Claims of Ronald E. Osman represented by, relating to, or arising under or in connection with the Osman Note. Under the Plan, the Class 7 Claims of Ronald E. Osman will be allowed in the amount of $1,011,233.00, which is the amount of the outstanding principal and accrued and unpaid interest as of the Petition Date under the Osman Note (the "Osman Allowed Class 7 Claim"). Under the Plan, the following shall occur with respect to the Osman Allowed Class 7 Claim:

5.8.1.1    On the Effective Date, in the event Ronald E. Osman does not make the Conversion Election described in Article 5.8.1.4, Reorganized Biovest shall execute and deliver in favor of Ronald E. Osman a new promissory note (the "Class 7 Plan Note") in an original principal amount equal to the amount of the Osman Allowed Class 7 Claim. The Class 7 Plan Note shall contain the following terms: (a) a maturity date of forty (40) months following the Effective Date, (b) interest will accrue and be payable on the outstanding principal at a fixed rate of eight percent (8%) per annum, calculated based on a 365 day year, (c) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, and (d) Reorganized Biovest may prepay all or any portion of the Class 7 Plan Note, without penalty, at any time. The Class 7 Plan Note shall not contain any conversion or redemption rights.

5.8.1.2    As of the Effective Date, the Osman Note shall be deemed cancelled and void and of no further force and effect.

5.8.1.3    Except as provided in Article 7.9, Ronald E. Osman and his assignees shall retain unaltered all of the legal, equitable and contractual rights under the Osman Warrants.

5.8.1.4    At the option of Ronald E. Osman, at any time prior to the Voting Deadline, Ronald E. Osman may convert all of the Osman Allowed Class 7 Claim into shares of Reorganized Biovest Common Stock (the "Class 7 Plan Shares") at a conversion rate equal to the Market Price per share of Reorganized Biovest Common Stock (i.e., Ronald E. Osman will receive that number of shares of Reorganized Biovest Common Stock determined by dividing the Osman Allowed Class 7 Claim by the Market Price). The Class 7 Plan Shares shall be issued on the Effective Date pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12. Any Conversion Election shall be made by Ronald E. Osman on the Ballot filed with the Bankruptcy Court or in a separate writing delivered to Biovest, in each such case prior to the Voting Deadline. In the event Ronald E. Osman makes a Conversion Election, the provisions of Article 5.8.1.1 shall not be applicable.

Class 7 is Impaired by the Plan. Ronald E. Osman, as the Holder of the Class 7 Claims, is entitled to vote to accept or reject the Plan.

5.9    **Class 8:  Unsecured Claims (Unsecured Claims Not Otherwise Classified).**

5.9.1    Class 8 consists of all Unsecured Claims not otherwise classified in the Plan.

5.9.2    Under the Plan, each Holder of an Unsecured Claim in Class 8 shall have the option to select one of the treatments set forth below designated as Option A, Option B and Option C:

5.9.2.1    <u>Option A</u>.  Under Option A, the Holder of an Allowed Unsecured Claim in Class 8 will receive a Distribution, in Cash, in an amount equal to the sum of one hundred percent (100%) of such Holder's Allowed Class 8 Unsecured Claim plus (i) Postpetition Interest at the Federal Judgment Interest Rate and (ii) Class 8 Interest.  Such Distribution will be made to such Holder by Reorganized Biovest at the end of the 40th month following the Effective Date.

5.9.2.2    <u>Option B</u>.  Under Option B, the Holder of an Allowed Unsecured Claim in Class 8 will convert all of its Allowed Class 8 Unsecured Claim (plus Postpetition Interest at the Federal Judgment Interest Rate) into shares of Reorganized Biovest Common Stock (the "<u>Class 8 Plan Shares</u>") at a conversion rate equal to the Market Price per share of Reorganized Biovest Common Stock (i.e., such Holder will receive that number of shares of Reorganized Biovest Common Stock determined by dividing its Allowed Class 8 Unsecured Claim by the Market Price).  The Class 8 Plan Shares shall be issued as soon as reasonably practicable following the Determination Date (but in no event more than five (5) Business Days following the Determination Date) pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12.

5.9.2.3    <u>Option C</u>.    Under Option C, the Holder of an Allowed Unsecured Claim in Class 8 will receive, as soon as reasonably practicable following the Determination Date (but in no event more than five (5) Business Days following the Determination Date), a new convertible promissory note (the "<u>Class 8 Plan Note</u>") executed by Reorganized Biovest in an original principal amount equal to its Allowed Class 8 Unsecured Claim (plus Postpetition Interest at the Federal Judgment Interest Rate).  The Class 8 Plan Note shall contain the following terms: (a) a maturity date of twenty-four (24) months following the Determination Date (the "<u>Class 8 Plan Note Maturity Date</u>"), (b) no interest will accrue on the outstanding principal balance of the Class 8 Plan Note, (c) on the Determination Date and on each of the following seven (7) quarterly anniversaries of the Determination Date (each, an "<u>Automatic Conversion Date</u>"), and provided that the Automatic Conversion VWAP Price is at least $1.00 per share, one-eighth (1/8th) of the original principal balance of the Class 8 Plan Note (the "<u>Automatic Conversion Amount</u>") will be automatically converted into shares of Reorganized Biovest Common Stock (the "<u>Class 8 Plan Shares</u>") at a conversion rate equal to the Automatic Conversion VWAP Price per share of Reorganized Biovest Common Stock (i.e., the Holder of the Class 8 Plan Note will receive that number of shares of Reorganized Biovest Common Stock determined by dividing the Automatic Conversion Amount by the Automatic Conversion VWAP Price), (d) if, on any Automatic Conversion Date, the Automatic Conversion VWAP Price is less than $1.00 per share, the Automatic Conversion Amount will not convert and will instead become payable at the Class 8 Plan Note Maturity Date unless the Holder of a Class 8 Plan Note, upon written notice to Reorganized Biovest, elects to convert the Automatic Conversion Amount into shares of Reorganized Biovest Common Stock (also, the "<u>Class 8 Plan Shares</u>") at a conversion rate equal to $1.00 per share

of Reorganized Biovest Common Stock (i.e., the Holder of the Class 8 Plan Note will receive that number of shares of Reorganized Biovest Common Stock determined by dividing the Automatic Conversion Amount by $1.00), (e) on each Automatic Conversion Date for which the Automatic Conversion VWAP Price is $1.00 or greater or on which the Holder of a Class 8 Plan Note makes an optional conversion under subparagraph (d) above, the outstanding principal balance of the Class 8 Plan Note shall be reduced by the Automatic Conversion Amount, (f) any principal amount outstanding under the Class 8 Plan Note at the Class 8 Plan Note Maturity Date will be due and payable in full, at the election of Reorganized Biovest, in either Cash or in shares of Reorganized Biovest Common Stock at a conversion rate equal to the average of the VWAPs for the ten (10) consecutive Trading Days ending on the Trading Day that is immediately preceding the Class 8 Plan Note Maturity Date, (g) if, at any time during the term of the Class 8 Plan Note, the VWAP is at least $1.50 per share for ten (10) consecutive Trading Days, the Holder of a Class 8 Plan Note, at its option, may upon written notice to Reorganized Biovest convert any or all of the then outstanding principal balance of its Class 8 Plan Note into shares of Reorganized Biovest Common Stock at a conversion rate equal to the Automatic Conversion VWAP Price used for the initial conversion on the Determination Date, (h) if, at any time during the term of the Class 8 Plan Notes, the VWAP is at least $1.88 per share for thirty (30) consecutive Trading Days, Reorganized Biovest, at its option, may upon written notice to the Holders of the Class 8 Plan Notes require the conversion of up to $3,000,000.00 of the then aggregate outstanding principal balance of the Class 8 Plan Notes at a conversion rate equal to the Automatic Conversion VWAP Price used for the initial conversion on the Determination Date (such conversion right by Reorganized Biovest shall reset for subsequent periods during the term of the Class 8 Plan Notes), with any such conversion to be pro rata based on each Holder's percentage interest in the then aggregate outstanding principal balance of the Class 8 Plan Notes, and (i) the Class 8 Plan Shares shall be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12.

5.9.3    The election of Option A, Option B or Option C must be made on the Ballot submitted by the Holder of a Class 8 Unsecured Claim and filed with the Bankruptcy Court by the Voting Deadline; provided, however, that the Debtors, in their discretion, may accept any written election of Option B or Option C by the Holder of a Class 8 Unsecured Claim that is delivered to the Debtors on or prior to the Confirmation Date. In the event that a Holder of a Class 8 Unsecured Claim does not make an election of Option A, Option B or Option C on its Ballot or does not file a Ballot with the Bankruptcy Court, such Holder shall be deemed to have elected Option A.

Class 8 is Impaired by the Plan. Each Holder of an Unsecured Claim in Class 8 is entitled to vote to accept or reject the Plan.

## 5.10    **Class 9:  Unsecured Convenience Claims.**

5.10.1   Class 9 consists of all Unsecured Convenience Claims. Notwithstanding anything to the contrary contained in the Plan, each Holder of a Class 8 Unsecured Claim (a) in an amount greater than $5,000.00 may have its Unsecured Claim treated as an Unsecured Convenience Claim

under the Plan by making the Convenience Class Opt-In Election, or (b) in an amount less than or equal to $5,000.00 may have its Unsecured Claim treated as a Class 8 Unsecured Claim under the Plan by making the Convenience Class Opt-Out Election. The Convenience Class Opt-In Election or the Convenience Class Opt-Out Election is irrevocable and must be made by such Holder on its Ballot and filed with the Bankruptcy Court on or before the Voting Deadline.

5.10.2 On the Distribution Date, the Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Biovest in an amount equal to (a) twenty percent (20%) of the amount of such Allowed Claim if the amount of such Allowed Claim is less than or equal to $5,000.00, or (b) $1,000.00 if the amount of such Allowed Claim is greater than $5,000.00 and the Holder of such Allowed Claim has agreed to reduce the Allowed Amount of its Claim to $5,000.00 by making the Convenience Class Opt-In Election. Notwithstanding the foregoing, if Reorganized Biovest does not have sufficient Cash available to make the payment required to the Holder of an Allowed Class 9 Claim on the Distribution Date, such Allowed Class 9 Claim shall be paid on the 6 Month Anniversary Date or as otherwise ordered by a Final Order of the Bankruptcy Court.

Class 9 is Impaired by the Plan. Each Holder of an Unsecured Convenience Claim in Class 9 is entitled to vote to accept or reject the Plan.

5.11 **Class 10: Intercompany Claims.**

Class 10 consists of all Intercompany Claims. On the Effective Date, upon the substantive consolidation of the Debtors, all of the Intercompany Claims shall be deemed cancelled, annulled and extinguished without any further action by any party and shall be of no further force and effect. The Holders of the Class 10 Intercompany Claims will not receive or retain any Property under the Plan on account of such Intercompany Claims. Accordingly, Reorganized Biovest will not make any Distribution or establish any reserve under the Plan for the Intercompany Claims. Class 10 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 10 is deemed not to have accepted the Plan and, thus, Holders of the Class 10 Intercompany Claims are not entitled to vote to accept or reject the Plan.

5.12 **Class 11: Subordinated Securities Claims.**

5.12.1 Class 11 consists of all Subordinated Securities Claims. Pursuant to Section 510(b) of the Bankruptcy Code, each Allowed Class 11 Claim, if any, shall be subordinated to all Claims (including Class 8 Unsecured Claims) or Equity Interests that are senior to or equal to the Claim or Equity Interest represented by the Security of Biovest in question; provided, however, that if such Security is Existing Biovest Common Stock, such Allowed Class 11 Claim shall have the same priority as Class 12 Equity Interests.

5.12.2 Under the Plan, each Holder of an Allowed Class 11 Claim will receive a Distribution, in Cash, in an amount equal to the sum of one hundred percent (100%) of such Holder's Allowed Class 11 Claim plus Postpetition Interest at the Federal Judgment Interest Rate. Such Distribution will be made to such Holder by Reorganized Biovest at the end of the 48th month following the Effective Date; provided, however, that no Distribution shall be made to the Holders of Allowed Class 11 Claims until all Distributions have been made to all Holders of Allowed Class 8 Unsecured Claims who have elected Option A under Article 5.9.2.1.

Class 11 is Impaired by the Plan. Each Holder of a Subordinated Securities Claim in Class 11 is entitled to vote to accept or reject the Plan.

## 5.13    **Class 12:  Equity Interests.**

Class 12 consists of all Equity Interests.  On the Effective Date or as soon thereafter as is reasonably practicable (as determined by Reorganized Biovest), each Holder of an Allowed Class 12 Equity Interest on the Effective Date shall receive one (1) share of Reorganized Biovest Common Stock for each share of Existing Biovest Common Stock held by such Holder as of the Effective Date (the "Class 12 Plan Shares"), subject to dilution of such Holder's percentage ownership interest in Reorganized Biovest as a result of the issuance of the other Plan Shares (including the Laurus/Valens Plan Shares).  Each such Holder of a stock certificate for shares of Existing Biovest Common Stock shall receive, upon surrender of such certificate to the Transfer Agent, a new certificate representing the Class 12 Plan Shares.  The Class 12 Plan Shares shall be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws.  Upon the issuance of the Class 12 Plan Shares, the Class 12 Equity Interests shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect.  Class 12 is Impaired by the Plan.  Each Holder of a Class 12 Equity Interest is entitled to vote to accept or reject the Plan.

## 5.14    **Class 13: Subsidiary Equity Interests.**

Class 13 consists of all Subsidiary Equity Interests.  On the Effective Date, upon the substantive consolidation of the Debtors, all of the Subsidiary Equity Interests shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect.  Biovest, as the Holder of the Class 13 Subsidiary Equity Interests, will not receive or retain any Property or equity interest under the Plan on account of the Class 13 Subsidiary Equity Interests.  Accordingly, Reorganized Biovest will not make any Distribution or establish any reserve under the Plan for the Class 13 Subsidiary Equity Interests.  Class 13 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 13 is deemed not to have accepted the Plan and, thus, Biovest, as the Holder of the Class 13 Subsidiary Equity Interests, is not entitled to vote to accept or reject the Plan.

## ARTICLE 6
## ACCEPTANCE OR REJECTION OF THE PLAN

6.1     **Each Impaired Class Entitled to Vote Separately.**

Except as otherwise provided in Article 6.4, the Holders of Claims or Equity Interests in each Impaired Class of Claims or Impaired Class of Equity Interests shall be entitled to vote separately to accept or reject the Plan.

6.2     **Acceptance by Impaired Classes.**

6.2.1    Classes 1, 2, 3, 4, 6, 7, 8, 9, and 11 are Impaired under the Plan, and Holders of Claims in such Classes are entitled to vote to accept or reject the Plan. Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan.

6.2.2    Class 12 is also Impaired under the Plan. Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

6.3     **Presumed Acceptance of Plan by Unimpaired Classes.**

Class 5 is Unimpaired under the Plan. Pursuant to Section 1126(f) of the Bankruptcy Code, such Class and the Holders of Claims in such Class are conclusively presumed to have accepted the Plan and, thus, are not entitled to vote on the Plan. Accordingly, votes of Holders of Claims in Class 5 are not being solicited by the Debtors. Except as otherwise expressly provided in the Plan, nothing contained herein or otherwise shall affect the rights and legal and equitable claims or defenses of the Debtors or Reorganized Biovest in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to setoffs or recoupments against Unimpaired Claims.

6.4     **Deemed Non-Acceptance of Plan.**

Holders of Class 10 Intercompany Claims and Class 13 Subsidiary Equity Interests will not receive or retain any Property or equity interest under the Plan on account of such Intercompany Claims and Subsidiary Equity Interests and, therefore, Classes 10 and 13 are deemed not to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code. Accordingly, votes of Holders of Class 10 Intercompany Claims and Class 13 Subsidiary Equity Interests are not being solicited by the Debtors.

6.5     **Impairment Controversies.**

If a controversy arises as to whether any Claim or Equity Interest, or any Class of Claims or Class of Equity Interests, is Impaired under the Plan, such Claim, Equity Interest or Class shall be treated as specified in the Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest, or a particular Class of Claims or Class of Equity Interests, under the Plan.


# ARTICLE 7
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     **Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that currently exist between any of the Debtors and another Person or Entity and not listed on Exhibit C attached hereto shall be deemed assumed by the applicable Debtor as of the Effective Date (collectively, the "Assumed Contracts"); provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Exhibit C to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be rejected (if added) or assumed (if deleted). The Debtors shall provide notice of any amendments to Exhibit C to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Exhibit C shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder. Any executory contract or unexpired lease that exists between the Debtors and another Person or Entity and that is listed on Exhibit C attached to the Plan shall be deemed rejected by the Debtors as of the Confirmation Date (collectively, the "Rejected Contracts"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtors shall be deemed to be executory contracts and Assumed Contracts, and (ii) except as provided in Article 7.7, all non-compete agreements, confidentiality or non-disclosure agreements, indemnification agreements and guaranties executed by any of the Debtors for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts (even if not listed on Exhibit C).

7.2     **Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.**

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 hereof, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.1 hereof, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject any unexpired lease of nonresidential real property

through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease. The assumption by any of the Debtors of an Assumed Contract shall be binding upon any and all parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by Reorganized Biovest in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

7.3  **Inclusiveness.**

Unless otherwise specified on Exhibit C, each executory contract and unexpired lease listed or to be listed on Exhibit C shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on Exhibit C.

7.4  **Cure of Defaults.**

Any lessor or other party to an Assumed Contract (except those lessors or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.1, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtors or Reorganized Biovest. Reorganized Biovest shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than the 6 Month Anniversary Date, Reorganized Biovest shall cure any and all undisputed Cure Claims. All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto or as may otherwise be agreed to by the parties. As of the date of the Plan, the Debtors do not believe there will be any Cure Claims.

7.5  **Claims under Rejected Executory Contracts and Unexpired Leases.**

7.5.1   Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtors or Reorganized Biovest. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith.

7.5.2    All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 8.  Any such Claims that become Disputed Claims shall be Disputed Claims in Class 8 for purposes of administration of Distributions under the Plan to Holders of Allowed Unsecured Claims in Class 8.

## 7.6    **Insurance Policies.**

All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or Reorganized Biovest may hold against any Person or Entity, including the insurers under any of the Debtors' insurance policies or under the D&O Policy.

## 7.7    **Indemnification Rights.**

Except for those indemnification agreements listed in <u>Exhibit C</u> attached to the Plan, all Claims for Indemnification Rights against the Debtors by an Indemnitee for defense and indemnification shall be reinstated against Reorganized Biovest and rendered Unimpaired to the extent that such Indemnitee is entitled to defense or indemnification under applicable law, agreement or past policy of the Debtors, but only to the extent that any such reinstated Claim for defense and indemnification in response to a claim against such Indemnitee is covered under any of the Debtors' insurance policies, including the D&O Policy.  The reinstated Claim against Reorganized Biovest, and Reorganized Biovest's corresponding defense and indemnification obligation, shall not be for any deductible or self-insured retention amount and shall not exceed the amount of available insurance coverage.

## 7.8    **Existing Biovest Stock Options.**

7.8.1    All of the grants of the Existing Biovest Stock Options and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan.  All of the holders of the Existing Biovest Stock Options shall retain unaltered all of their legal, equitable and contractual rights thereunder, subject to the provisions set forth in Articles 7.8.2-7.8.4 below.

7.8.2    Any Existing Biovest Stock Option granted Prepetition shall be exercisable in accordance with the terms of the original grant, but may not be exercised until after the 4 Month Anniversary Date.  The sale of any shares of Reorganized Biovest Common Stock received upon the exercise of any such option shall be subject to any restrictions or limitations under Rule 144(e) and Biovest's insider trading restrictions and policies.

7.8.3    Any Existing Biovest Stock Option granted Postpetition may not be exercised until after the 12 Month Anniversary Date.  Following the 12 Month Anniversary Date, such options shall be exercisable in accordance with the terms of the original grant provided that one of the following conditions has been satisfied following the Effective Date: (i) an aggregate of 8,000,000 shares of Reorganized Biovest Common Stock have traded at a price equal to or greater than $1.00 per share,

or (ii) for a period of ninety (90) consecutive Trading Days, the VWAP equals or exceeds $1.50 per share.  If either of the conditions in subparagraph (i) or (ii) has not been satisfied by the 12 Month Anniversary Date, then any such option shall not be exercisable thereafter until the first to occur of the following: (a) the satisfaction of either of the conditions in subparagraph (i) or (ii) above, or (b) the holder of any such option pays an exercise price to Reorganized Biovest in an amount equal to the sum of (x) the exercise price stated in such option plus (y) an amount equal to the difference between $1.00 per share and the exercise price stated in such option.

7.8.4.  Notwithstanding the provisions of Article 7.8.3, the holder of an Existing Biovest Stock Option granted Postpetition may exercise such option provided that the shares of Reorganized Biovest Common Stock issued upon such exercise are deposited into an escrow account controlled by Reorganized Biovest and cannot be sold or transferred until such time that such option would have otherwise become exercisable under Article 7.8.3; provided, however, that this prohibition on transfer shall not prohibit the transfer of any such shares to a family member or to an Entity for the benefit of or controlled by a family member as permitted by the terms of the applicable incentive stock option plan, provided that the family member or Entity agrees to be bound by the provisions of Article 7.8.3.

7.9     **Existing Biovest Stock Warrants.**

All of the Existing Biovest Stock Warrants are treated as executory contracts under the Plan. All of the holders of Existing Biovest Stock Warrants shall retain unaltered all of their legal, equitable and contractual rights thereunder, except that any shares of Reorganized Biovest Common Stock issued to the holder upon the exercise of an Existing Biovest Stock Warrant may not be sold or transferred until after the 12 Month Anniversary Date (provided, however, that this prohibition on transfer shall not prohibit the transfer of any such shares to a family member or to an Entity for the benefit of or controlled by a family member provided that the family member or Entity agrees to be bound by the provisions of this Article 7.9).


# ARTICLE 8
## MEANS OF IMPLEMENTATION OF THE PLAN

8.1     **General Overview of the Plan.**

The Plan provides for the continued operation of the Debtors as Reorganized Debtors.  If the Substantive Consolidation Motion is granted and the Plan is confirmed by the Bankruptcy Court, then, on the Effective Date of the Plan, (a) the Properties of all of the Debtors' Estates will be consolidated into one estate to be thereafter known as the Biovest Estate, (b) all of the Class 13 Subsidiary Equity Interests will be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and will be of no further force and effect, and (c) Reorganized Biovest will thereafter manage the Biovest Estate and implement the terms of the Plan, including making Distributions of Cash to Holders of Allowed Claims and issuing the Plan Shares.

The Plan provides for Cash payments to Holders of Allowed Claims and, in certain instances, the issuance of designated amounts of the Reorganized Biovest Common Stock to certain Holders of

Allowed Claims, all as more particularly described in Articles 3 and 5 of the Plan. In addition, each Holder of an Allowed Class 12 Equity Interest on the Effective Date will receive one (1) share of Reorganized Biovest Common Stock for each share of Existing Biovest Common Stock held by such Holder as of the Effective Date, subject to dilution of such Holder's percentage ownership interest in Reorganized Biovest as a result of the issuance of the other Plan Shares.

The Plan shall be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Cash of Reorganized Biovest, including funds to be received from the Exit Financing. At the present time, the Debtors believe that Reorganized Biovest will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Secured Claims in Class 5, and Allowed Unsecured Convenience Claims in Class 9. Cash payments to be made under the Plan after the Effective Date to the Holders of Allowed Priority Tax Claims and Allowed Claims in Classes 1, 2, 4, 6, 7, 8, and 11 will be derived from the operations of Reorganized Biovest or from any new capital or financing raised by Reorganized Biovest, in each case as shown in the Projections.

## 8.2    **Effective Date Actions.**

8.2.1    Subject to the approval of the Bankruptcy Court and the satisfaction or waiver of the conditions precedent to the occurrence of the Effective Date contained in Article 11.2 of the Plan, on or as of the Effective Date, the Plan shall be implemented, the substantive consolidation of the Liabilities and Properties of each of the Debtors shall occur on the terms set forth in Article 10.2 of the Plan, and the following actions shall thereafter immediately occur:

8.2.1.1    the Closing shall occur under the Laurus/Valens Settlement Documents;

8.2.1.2    Reorganized Biovest shall make the Initial Distribution as provided in Article 9.1 of the Plan;

8.2.1.3    Reorganized Biovest shall execute and deliver the Plan Notes and the Security Documents in accordance with the provisions of the Plan;

8.2.1.4    All of the Class 10 Intercompany Claims and the Class 13 Subsidiary Equity Interests shall automatically be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect;

8.2.1.5    The Reorganized Biovest Charter shall be filed with the Office of the Secretary of State of the State of Delaware;

8.2.1.6    Subject to Article 8.2.1.5, Reorganized Biovest shall issue and distribute the Plan Shares in accordance with the provisions of the Plan;

8.2.1.7    The Biovest Estate shall be automatically substituted for the Debtors as a party to all contested matters, adversary proceedings, administrative proceedings and lawsuits, both within and outside of the Bankruptcy Court,

involving the Debtors' Properties, Claims against the Debtors, the Causes of Action, and the resolution of Disputed Claims; and

8.2.1.8    Reorganized Biovest shall carry out its other Effective Date responsibilities under the Plan, including the execution and delivery of all documentation contemplated by the Plan and the Plan Documents.

## 8.3    <u>Vesting of Property of the Estates in Reorganized Biovest</u>.

On the Effective Date, after giving effect to substantive consolidation as provided in Article 10.2 of the Plan, and except as otherwise expressly provided in the Plan, all Property of the Estates (including the Causes of Action and any net operating losses) shall vest in Reorganized Biovest free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide. The Reorganized Debtors intend to preserve net operating losses to the maximum extent permitted under applicable law. As of the Effective Date, Reorganized Biovest may operate its businesses and use, acquire, and dispose of its Properties, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. All privileges with respect to the Property of the Debtors' Estates, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, Reorganized Biovest.

## 8.4    <u>Continued Corporate Existence; Dissolution</u>.

8.4.1    Biovest will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a corporation under the Delaware General Corporation Law and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organizational documents are amended or amended and restated as provided in the Plan or the Confirmation Order, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date.

8.4.2    By no later than the 6 Month Anniversary Date, Reorganized Biovest shall file articles or certificates of dissolution of Biovax, AutovaxID, Biolender, and Biolender II, and shall take all other actions necessary or appropriate to effect the dissolution of Biovax and AutovaxID as corporations under the laws of the State of Florida and the dissolution of Biolender and Biolender II as limited liability companies under the laws of the State of Delaware. All applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the Biovest Subsidiaries as provided herein, without the payment of any fee, tax or charge and without the need for the filing of reports or certificates. The Confirmation Order shall contain appropriate language authorizing or incorporating this dissolution procedure.

8.5     **Corporate Action.**

All matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate action to be taken by or required of the Debtors or the Reorganized Debtors, including all action taken to approve the Reorganized Biovest Charter and the Reorganized Biovest Bylaws, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

8.6     **Boards of Directors and Executive Officers of the Reorganized Debtors.**

8.6.1     Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the executive officers and directors of the Debtors immediately prior to the Effective Date shall be deemed to be the executive officers and directors of the Reorganized Debtors without any further action by any party. Pursuant to Section 1129(a)(5) of the Bankruptcy Code, the Debtors have disclosed, in the Disclosure Statement, the identity and affiliation of any individual proposed to serve as an initial director or executive officer of the Reorganized Debtors and, to the extent such individual is an insider other than by virtue of being a director, the nature of any compensation for such individual.

8.6.2.     On and after the Effective Date, the operations of each of the Reorganized Debtors shall continue to be the responsibility of its Board of Directors. Each director of each of the Reorganized Debtors shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable articles or certificate of incorporation and bylaws or other organizational documents of such Reorganized Debtor. Each executive officer of each of the Reorganized Debtors shall serve from and after the Effective Date until his or her successor is duly appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable articles or certificate of incorporation and bylaws or other organizational documents of such Reorganized Debtor.

8.6.3     From and after the Confirmation Date, the Board of Directors and executive officers of each of the Debtors and the Reorganized Debtors, as the case may be, shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

8.6.4     To the extent that, as of the Effective Date, any of the Debtors has in place employment, indemnification and other agreements with its directors, officers and employees who will continue in such capacities after the Effective Date, such agreements shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, except as otherwise provided in the Plan. Such agreements may include equity, bonus and other incentive plans in which directors, officers and other employees of the Reorganized Debtors may be eligible to participate, including the Existing Biovest Stock Options.

8.7     **Amendment and Restatement of Certificate of Incorporation and Bylaws of Biovest.**

8.7.1     The Board of Directors of Biovest shall take such action as may be necessary to cause the certificate of incorporation of Biovest to be amended and restated (a) if applicable, to authorize a sufficient number of shares of Reorganized Biovest Common Stock necessary to meet (i) the requirements set forth in the Plan as to the issuance of the Plan Shares, and (ii) the obligations of Reorganized Biovest under the Existing Biovest Stock Options and the Existing Biovest Stock Warrants, (b) to contain any provisions as may be required in order that such certificate of incorporation is consistent with the provisions of the Plan, the Bankruptcy Code, the Confirmation Order, and the Laurus/Valens Settlement Documents, and (c) to provide, pursuant to Section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Section 1123(a)(6).

8.7.2     The bylaws of Biovest shall be amended and restated as necessary to satisfy the provisions of the Plan and the Laurus/Valens Settlement Documents (as amended and restated, the "Reorganized Biovest Bylaws").

8.7.3     To the extent necessary, the Confirmation Order shall include appropriate language approving the Reorganized Biovest Charter and the Reorganized Biovest Bylaws. The Reorganized Biovest Charter and the Reorganized Biovest Bylaws shall be the charter and bylaws governing Reorganized Biovest on and after the Effective Date, subject to any right to amend the foregoing as permitted by applicable law as such right may be limited by the terms of the Reorganized Biovest Charter and the Reorganized Biovest Bylaws.

8.8     **Issuance of Reorganized Biovest Common Stock.**

Reorganized Biovest shall issue and distribute, in accordance with the provisions of the Plan, shares of Reorganized Biovest Common Stock to those Entities entitled to receive the Plan Shares hereunder. Exhibit G attached hereto sets forth a pro forma recapitalization of Reorganized Biovest after giving effect to the maximum possible issuance of shares of Reorganized Biovest Common Stock under the terms of the Plan as of the Effective Date (excluding the DIP Lender Plan Shares), the Laurus/Valens Settlement Documents, the Existing Biovest Stock Options and the Existing Biovest Stock Warrants.

On the Effective Date, Biovest shall be a public company subject to the reporting requirements under the Exchange Act. Reorganized Biovest will use its best efforts to list, as promptly as practicable after the Effective Date, the Reorganized Biovest Common Stock on a Trading Market, but will have no liability if it is unable to do so.

8.9     **Exemptions from Securities Laws.**

***General.*** Pursuant to Section 1125(e) of the Bankruptcy Code, any Person that solicits the acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a Security, offered or sold under the plan, of the debtor, is not liable, on account of such solicitation or participation, for

violation of any applicable law, rule, or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of Securities.

***Issuance of Reorganized Biovest Common Stock under the Plan.*** Section 1145(a) of the Bankruptcy Code exempts from registration under the Securities Act and under equivalent state securities or "blue sky" laws (a) the offer or sale under a plan of reorganization of a Security of a debtor if such offer or sale is either (i) in exchange for a claim against, an interest in, or a claim for an administrative expense in the bankruptcy case concerning, the debtor, or (ii) "principally in such exchange and partly for cash or property", or (b) the offer of a Security of a debtor through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in subparagraph (a) above, or the sale of a Security upon the exercise of such a warrant, option, right to subscribe, or conversion privilege. The Debtors believe that the offer and issuance of the Plan Notes and the Plan Shares in exchange for Claims and Equity Interests under the Plan satisfy the requirements of Section 1145(a) of the Bankruptcy Code and that such transactions, therefore, are exempt from registration under federal and state securities laws. The Confirmation Order will include a finding and conclusion, binding on all parties to the Bankruptcy Cases, the Debtors, the Reorganized Debtors, the SEC and all other federal, state, and local regulatory agencies, to the effect that such offer and issuance fall within the exemptions from registration under the Securities Act and state and local securities laws pursuant to Section 1145 of the Bankruptcy Code.

***Subsequent Transfers of Plan Shares.***

***Plan Shares Issued Pursuant to Section 1145 Exemption.*** The Plan Shares may be freely transferred by most recipients thereof, and all resales of and subsequent transactions for the Plan Shares are exempt from registration under federal and state securities laws, unless the holder is an "underwriter" with respect to the Plan Shares. Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters":

(i)     an Entity that purchases a claim against, an interest in, or a claim for an administrative expense in the bankruptcy case concerning, the debtor, if such purchase is with a view to distribution of any Security received or to be received in exchange for such a claim or interest;

(ii)     an Entity that offers to sell Securities offered or sold under a bankruptcy plan for the holders of such Securities;

(iii)     an Entity that offers to buy Securities offered or sold under a bankruptcy plan from the holders of such Securities, if the offer to buy is (x) with a view to distribution of such Securities, and (y) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of Securities under the plan; and

(iv)     an Entity that is an "issuer" with respect to such Securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common

control with the issuer. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its affiliate or successor) under a plan of reorganization may be deemed to "control" such debtor (and therefore be an underwriter for purposes of Section 1145), particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or affiliate's or successor's) voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that Persons deemed to be "underwriters" receive Plan Shares pursuant to the Plan, resales of such Plan Shares by such Persons would not be exempted by Section 1145(a) of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters, however, may be able to sell such Plan Shares without registration subject to the provisions of Rule 144 under the Securities Act as discussed below.

***Plan Shares Held by Underwriters.*** Holders of Plan Shares who are deemed to be "underwriters" within the meaning of Section 1145(b)(1) of the Bankruptcy Code or who may otherwise be deemed to be "affiliates" of, or to exercise "control" over, Reorganized Biovest within the meaning of Rule 405 of Regulation C under the Securities Act, may, in addition to any other exemptions that may be available under federal and state securities laws, under certain circumstances, be able to sell their Plan Shares pursuant to the more limited safe harbor resale provisions of Rule 144 under the Securities Act. Generally, Rule 144 provides that, if certain conditions are met (e.g., volume limitations, manner of sale, availability of current information about the issuer, etc.), specified persons who resell such securities and are "affiliates" of the issuer of the securities sought to be resold will not be deemed to be "underwriters" as defined in Section 2(11) of the Securities Act.

The foregoing summary discussion regarding Section 1145 of the Bankruptcy Code is general in nature and has been included in the Plan solely for informational purposes. Although the Plan Shares will become freely tradable by most recipients thereof as described above, it should be noted that there can be no assurance that Reorganized Biovest will be able to effect the listing of the Reorganized Biovest Common Stock or, if listed, that an active trading market for the Reorganized Biovest Common Stock will develop or, if developed, that it will continue. Accordingly, no assurance can be given concerning the actual market for the Plan Shares or a Person's ability to sell the Plan Shares at any particular time. The Debtors do not make any representations concerning, and do not provide any opinion or advice with respect to, the securities law and bankruptcy law matters described above. In view of the uncertainty concerning the availability of exemptions from the registration requirements of the Securities Act and equivalent state securities or "blue sky" laws to a recipient of Plan Shares who may be deemed to be an "underwriter" (within the meaning of Section 1145(b)(1) of the Bankruptcy Code) and/or an "affiliate" of, or a person who exercises "control" over, Reorganized Biovest under applicable federal and state securities laws, the Debtors encourage each Person who is to receive Plan Shares pursuant to the Plan to consider carefully and consult with its own legal advisor(s) with respect to such (and any related) matters.

8.10 **Delinquency in Filing SEC Reports.**

The Biovest Common Stock is registered under the Exchange Act. Section 13(a) of the Exchange Act requires that Biovest file with the SEC annual reports on Form 10-K and quarterly reports on Form 10-Q. At present, Biovest is delinquent in several of its periodic filing obligations, including not having filed its annual reports on Form 10-K for the 2008 and 2009 fiscal years and its quarterly reports on Form 10-Q for the 2009 fiscal year and the first quarter of the 2010 fiscal year. After Biovest filed for bankruptcy, Biovest sought, but did not receive, a waiver from the SEC of its periodic filing obligations during the course of the Bankruptcy Cases. Biovest is currently using its best efforts to prepare the delinquent annual and quarterly reports under the Exchange Act and presently anticipates that such reports (including all required financial statements) will be filed with the SEC prior to the Confirmation Date.

8.11 **Section 1146 Exemption.**

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any Security (including the Reorganized Biovest Common Stock), or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document or the Laurus/Valens Settlement Documents, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtors or their Estates or Reorganized Biovest pursuant to, in implementation of or as contemplated by the Plan or any Plan Document or the Laurus/Valens Settlement Documents, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

8.12 **Pursuit of Causes of Action.**

8.12.1 On the Effective Date, the Causes of Action shall be vested in Reorganized Biovest, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by an order of the Bankruptcy Court. Reorganized Biovest will have the right, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in Article 8.13. The Debtors are currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtors state that any party in interest that engaged in business or other transactions with the Debtors Prepetition or that received payments from the Debtors Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. Reorganized Biovest will fund the costs and expenses (including legal fees) to pursue the Causes of Action.

8.12.2 No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF REORGANIZED BIOVEST. Creditors are advised that legal rights, claims and rights of action the Debtors may have against them, if they exist, are retained under the Plan for prosecution unless a specific order of the Bankruptcy Court authorizes the Debtors to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtors or Reorganized Biovest do not possess or do not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtors, whether now known or unknown, for the benefit of Reorganized Biovest. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall Reorganized Biovest, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action.

8.12.3 The Debtors do not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that Reorganized Biovest will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

8.12.4 At this time, the Debtors believe the Causes of Action consist primarily of (i) avoidance actions relating to preferential transfers and possible fraudulent transfers under various provisions of the Bankruptcy Code against various trade Creditors and other Prepetition Creditors, and (ii) the Rosensweig Adversary Proceeding. A more detailed description of the Causes of Action is set forth in the Disclosure Statement and on the Schedule of Potential Causes of Action attached as Exhibit F to the Plan.

8.12.5 The Debtors and Reorganized Biovest reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims.

8.12.6 The Biovest Estate shall remain open, even if the Biovest Bankruptcy Cases shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have

been fully administered and the Causes of Action Recoveries have been received by Reorganized Biovest.

### 8.13    **Prosecution and Settlement of Claims and Causes of Action.**

Reorganized Biovest (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtors had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, Reorganized Biovest shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $50,000.00, then Reorganized Biovest may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the United States Trustee and counsel to Laurus/Valens of the terms of the settlement agreement; provided, however, that if the United States Trustee or counsel to Laurus/Valens indicates its approval or does not provide Reorganized Biovest with an objection to the proposed settlement within ten (10) days after it receives notice of such settlement in writing, then Reorganized Biovest shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the United States Trustee or counsel to Laurus/Valens to the proposed settlement, then the settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $50,000.00, then Reorganized Biovest shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties.

### 8.14    **Effectuating Documents; Further Transactions.**

Prior to the Effective Date, each of the chief executive officer, president, or chief financial officer of the Debtors (and, on and after the Effective Date, each of the chief executive officer, president, or chief financial officer of Reorganized Biovest) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, mortgages, and other agreements or documents, including the Laurus/Valens Settlement Documents, the Plan Notes and the Security Documents, and take such actions as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of the Plan or to otherwise comply with applicable law.

### 8.15    **Cancellation of Existing Loan Documents and Agreements.**

On the Effective Date, except as otherwise expressly provided in the Plan, (a) all notes, bonds, indentures, debentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors with respect to Claims in Classes 1 through 11 shall be deemed cancelled, and (b) the obligations of the Debtors under any such notes, bonds, indentures,

debentures or other instruments or documents evidencing or creating any indebtedness or obligations of the Debtors with respect to Claims in Classes 1 through 11 shall be discharged.

8.16 **Exit Financing.**

On or as soon as reasonably practicable following the Effective Date, Reorganized Biovest will obtain new financing (the "Exit Financing"). Subject to any mandatory prepayment requirements under the Laurus/Valens Term A Notes, Reorganized Biovest intends to utilize the proceeds of the Exit Financing to provide additional working capital to conduct its operations following the Effective Date and to fund, to the extent necessary, the Initial Distribution. The precise structure and terms of the Exit Financing have not yet been determined, but the Debtors contemplate that the Exit Financing may include a rights offering, an equity offering, convertible debt securities (with or without grant of Liens), another form of financing, the advance of all or a portion of the DIP Loan Available Balance under the DIP Facility (either by the DIP Lender or Accentia as permitted by the Laurus/Valens Settlement Documents), or some combination of the foregoing.

8.17 **Exclusivity Period.**

The Debtors will retain the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to or modifications of the Plan, through and until the Effective Date.

8.18 **Dissolution of the Committee.**

The Committee shall continue in existence until the 1 Month Anniversary Date. Upon the 1 Month Anniversary Date, the Committee shall be deemed dissolved and the members of the Committee shall be deemed released and discharged from all rights, duties and liabilities arising from, or related to, the Bankruptcy Cases.


# ARTICLE 9
# PROVISIONS GOVERNING DISTRIBUTIONS

9.1 **Initial Distribution.**

As soon as reasonably practicable (as determined by Reorganized Biovest) after the Effective Date, Reorganized Biovest shall make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Classes 5 and 9 (collectively, the "Initial Distribution"). Thereafter, Reorganized Biovest shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan.

9.2 **Execution and Delivery of Plan Notes and Security Documents.**

On the Effective Date or the Determination Date, as the case may be, Reorganized Biovest shall execute and deliver the Plan Notes and the Security Documents.

9.3    **Determination of Claims.**

9.3.1    From and after the Effective Date, Reorganized Biovest shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Debtors or Reorganized Biovest), and the Confirmation Order shall contain appropriate language to that effect. Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims. If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 8 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after Reorganized Biovest receives actual notice of the filing of such Claim.

9.3.2    Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or Reorganized Biovest, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Cases on behalf of the Holder of a Claim.

9.3.3    Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtors or Reorganized Biovest may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Biovest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized Biovest may elect to pursue any supplemental proceedings to object to any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for

discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

## 9.4 Distributions as to Allowed Claims in Classes 8 and 11.

9.4.1 Each Holder of an Allowed Unsecured Claim in Class 8 who elects Option A and each Holder of an Allowed Claim in Class 11 shall receive a Cash Distribution, on the applicable Distribution Date, in the amount provided for in Article 5 of the Plan.

9.4.2 Notwithstanding any provision herein to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 8 or in Class 11 unless and until such Disputed Claim becomes an Allowed Claim. At such time that such Disputed Claim becomes an Allowed Class 8 Claim or an Allowed Class 11 Claim, the Holder of such Allowed Class 8 Claim or Allowed Class 11 Claim shall receive the Distribution to which such Holder is then entitled under the Plan.

9.4.3 Notwithstanding any provision herein to the contrary, if, on any applicable Distribution Date, the Holder of a Class 8 Claim or a Class 11 Claim is subject to a proceeding against it by Reorganized Biovest under Section 502(d) of the Bankruptcy Code, then Reorganized Biovest (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding.

9.4.4 Distributions to a Holder of an Allowed Claim in Class 8 or Class 11 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtors or Reorganized Biovest at the time of the Distribution, unless Reorganized Biovest has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. Reorganized Biovest shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided herein.

## 9.5 Unclaimed Distributions.

9.5.1 If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then Reorganized Biovest shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

9.5.2 If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to Reorganized Biovest due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to Reorganized Biovest as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and

such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim.

9.5.3    Any unclaimed Distribution as described above sent by Reorganized Biovest shall become the property of Reorganized Biovest.

9.5.4    If a stock certificate for Reorganized Biovest Common Stock distributed pursuant to the Plan is returned to Reorganized Biovest or the Transfer Agent due to an incorrect or incomplete address for the recipient, and no claim is made in writing to Reorganized Biovest or the Transfer Agent as to such stock certificate within ninety (90) days of the date such stock certificate was distributed, then the number of shares of Reorganized Biovest Common Stock evidenced by such stock certificate shall be deemed to be unclaimed and such recipient shall be deemed to have no further rights in respect of such stock certificate or the shares of Reorganized Biovest Common Stock evidenced thereby.

## 9.6    **Transfer of Claim.**

In the event that the Holder of any Claim shall transfer such Claim on and after the Effective Date, such Holder shall immediately advise Reorganized Biovest in writing of such transfer and provide sufficient written evidence of such transfer.  Reorganized Biovest shall be entitled to assume that no transfer of any Claim has been made by any Holder unless and until Reorganized Biovest shall have received written notice to the contrary.  Each transferee of any Claim shall take such Claim subject to the provisions of the Plan and to any request made, waiver or consent given or other action taken hereunder and, except as otherwise expressly provided in such notice, Reorganized Biovest shall be entitled to assume conclusively that the transferee named in such notice shall thereafter be vested with all rights and powers of the transferor under the Plan.

## 9.7    **One Distribution Per Holder.**

If the Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of Distribution hereunder, and only one Distribution shall be made with respect to the single aggregated Claim.

## 9.8    **Effect of Pre-Confirmation Distributions.**

Nothing in the Plan shall be deemed to entitle the Holder of a Claim that received, prior to the Effective Date, full or partial payment of such Holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to the Plan; and all such full or partial payments shall be deemed to be payments made under the Plan for purposes of satisfying the obligations of the Debtors or Reorganized Biovest to such Holder under the Plan.

## 9.9    **No Interest on Claims.**

Except as expressly stated in the Plan or otherwise Allowed by a Final Order of the Bankruptcy Court, no Holder of an Allowed Claim shall be entitled to the accrual of Postpetition

Interest or the payment of Postpetition Interest, penalties, or late charges on account of such Allowed Claim for any purpose. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a Disputed Claim becomes an Allowed Claim.

9.10    **Determination of Voting and Distribution Rights of Holders of Equity Interests.**

      9.10.1    All proofs of Equity Interests filed by Holders of Equity Interests to evidence Equity Interests shall be deemed disallowed, and the stock register that is maintained by the Transfer Agent shall be deemed to constitute good and sufficient evidence of the existence, amount, and Holders of Equity Interests.

      9.10.2    At the close of business on the Record Date, the Transfer Agent's stock transfer ledgers regarding the Equity Interests shall close for the purpose of voting on the Plan. The Debtors shall not have any obligation to recognize any transfers of Equity Interests occurring during the period from the Record Date until the Voting Deadline, but shall be entitled instead to recognize and deal with, for purposes of voting on the Plan, only those Holders of Equity Interests reflected on the books of the Transfer Agent as of the close of business on the Record Date.

      9.10.3    At the close of business on the Effective Date, the Transfer Agent's stock transfer ledgers regarding the Equity Interests shall close for the purpose of issuance of the Class 12 Plan Shares under the Plan.

      9.10.4.    In the event that a dispute with respect to the voting or distribution rights of the Holder of any Equity Interest exists as of the Record Date or as of the Effective Date, the Debtors or any other party in interest may apply to the Bankruptcy Court for a determination of such dispute.

9.11    **Fractional Shares.**

      The Distribution of shares of Reorganized Biovest Common Stock as provided in the Plan may mathematically entitle the recipient to a fractional share of Reorganized Biovest Common Stock. Notwithstanding any provision in the Plan to the contrary, payments of fractions of shares of Reorganized Biovest Common Stock shall not be made and shall be deemed to be zero. No consideration (Cash or otherwise) shall be provided in lieu of fractional shares that are deemed to be zero.

9.12    **Certain Restrictions on Stock Transfers.**

      Any shares of Reorganized Biovest Common Stock issued to the Holder of an Allowed Claim in Classes 4, 6, 7, and 8, who is also a holder of at least five percent (5%) of the issued and outstanding shares of Reorganized Biovest Common Stock, shall be subject to the following provisions: (a) any restrictions or limitations under Rule 144(e), (b) a limit on the sale of such shares in any ninety (90) day period to that number of such shares equal to one percent (1%) of the issued and outstanding shares of Reorganized Biovest Common Stock, (c) a prohibition on the sale of any such shares for a period of one hundred twenty (120) days following any debt or equity raise by Reorganized Biovest of less than $10,000,000.00, and (d) a prohibition on the sale of any such shares

for a period of one hundred eighty (180) days following any debt or equity raise by Reorganized Biovest of $10,000,000.00 or more.

## 9.13 **Compliance with Tax Requirements.**

In connection with the Plan, Reorganized Biovest shall comply with all tax withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all Distributions hereunder shall be subject to such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim that is to receive a Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Distribution.

## ARTICLE 10
## SUBSTANTIVE CONSOLIDATION OF THE DEBTORS' ESTATES

## 10.1 **Request for Substantive Consolidation.**

The Plan will serve as, and will be deemed to be, a motion by the Debtors for the entry of an order approving the substantive consolidation (the "Substantive Consolidation Motion") of the Liabilities and Properties of each of the Debtors, subject to the occurrence of the Effective Date. Confirmation of the Plan shall constitute approval of the Substantive Consolidation Motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions providing for substantive consolidation of the Debtors on the terms set forth in Article 10.2 below.

## 10.2 **Effect of Substantive Consolidation.**

As a result of the substantive consolidation of the Liabilities and Properties of each of the Debtors, (a) the Biovest Bankruptcy Cases shall be consolidated into the Bankruptcy Case of Biovest as a single consolidated case; (b) all Property of the Estate of each Debtor shall be deemed to be Property of the Biovest Estate; (c) all Claims against each Estate shall be deemed to be Claims against the Biovest Estate, any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single Claim filed against the Biovest Estate, all duplicate Proofs of Claim for the same Claim filed against more than one Debtor shall be deemed expunged, and all duplicate Claims for the same Claim scheduled against more than one Debtor shall be deemed expunged; (d) all Intercompany Claims shall be deemed cancelled, annulled and extinguished, and no Distributions under the Plan shall be made on account of the Intercompany Claims; (e) all guarantees by one Debtor of the obligations of any other Debtor shall be deemed cancelled, annulled and extinguished, and no Distributions under the Plan shall be made on account of Claims based upon such guarantees; and (f) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, each of the Debtors shall be treated as one consolidated entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to one Debtor may be set off against the debts of the other Debtor. Substantive consolidation shall not merge or otherwise affect the separate legal existence of each Debtor, other than with respect to Distribution rights under the Plan; substantive consolidation shall have no effect on valid, enforceable and unavoidable Liens,

except for Liens that secure a Claim that is eliminated by virtue of substantive consolidation and Liens against Collateral that are extinguished by virtue of substantive consolidation; and substantive consolidation shall not have the effect of creating a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation.

## ARTICLE 11
## CONDITIONS PRECEDENT TO CONFIRMATION
## OF THE PLAN AND THE EFFECTIVE DATE

11.1    **Conditions Precedent to Confirmation of the Plan.**

The following are conditions precedent to Confirmation of the Plan, each of which may be waived by the Debtors:

11.1.1    The Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan.

11.1.2    The Bankruptcy Court shall have made such findings and determinations regarding the Accentia Plan as shall enable the entry of the Accentia Confirmation Order in a manner consistent with the provisions of the Accentia Plan.

11.1.3    The Bankruptcy Court shall have agreed to enter an order granting the Substantive Consolidation Motion and providing for the substantive consolidation of the Debtors' Estates as of the Effective Date in accordance with Article 10.2 of the Plan (such order may be the Confirmation Order).

11.1.4    The Bankruptcy Court shall have entered the Laurus/Valens Compromise Order on the Docket, and the Laurus/Valens Compromise Order shall be a Final Order.

11.2    **Conditions Precedent to the Effective Date.**

The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtors:

11.2.1    The Confirmation Order shall be a Final Order.

11.2.2    The Accentia Confirmation Order shall be a Final Order and all of the conditions precedent to the effective date of the Accentia Plan shall have been satisfied or waived by the Accentia Debtors.

11.2.3    All conditions precedent to the Closing under the Laurus/Valens Settlement Documents shall have been satisfied or waived in accordance with the terms thereof.

11.2.4     All conditions precedent to the closing of the Exit Financing shall have been satisfied or waived in accordance with the terms thereof.

11.2.5     Biovest and Accentia shall have filed with the SEC, and be current as to, all quarterly reports on Form 10-Q and all annual reports on Form 10-K required to be filed by Biovest and Accentia under the Exchange Act for any period prior to the Effective Date.

11.2.6     Each Plan Document shall be in form and substance reasonably acceptable to the Debtors.

## 11.3     **Notice of the Effective Date.**

Promptly following the satisfaction, or the waiver by the Debtors, of all of the conditions set forth in Article 11.2, the Debtors shall file a notice (the "Effective Date Notice") with the Bankruptcy Court designating the Effective Date. The Debtors shall serve the Effective Date Notice on all of the Notice Parties.

## ARTICLE 12
## DISCHARGE, EXCULPATION FROM LIABILITY, RELEASE,
## AND GENERAL INJUNCTION

## 12.1     **Discharge of Claims and Termination of Equity Interests.**

Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtors and their Estates and the Reorganized Debtors from any and all Debts of, Claims of any nature whatsoever against, and Equity Interests in the Debtors that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtors and their Estates and the Reorganized Debtors, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtors or their Estates or the Reorganized Debtors, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, Liabilities or Equity Interests based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the

Plan, including any action or proceeding which may be brought pursuant to the Securities Act or the Exchange Act, and the Confirmation Order shall contain appropriate injunctive language to that effect. As of the Effective Date, Holders of Equity Interests shall have no rights arising from or relating to such Equity Interests, except as otherwise expressly provided in the Plan. In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against, or Equity Interests in, the Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtors, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, Debt or Equity Interest. Notwithstanding the foregoing, Reorganized Biovest shall remain obligated to make payments to Holders of Allowed Claims and issue shares of Reorganized Biovest Common Stock as required pursuant to the Plan.

12.2   **Exculpation from Liability.**

The Debtors and their respective Postpetition directors and officers, the Professionals for the Debtors (acting in such capacity), the Committee and its members, the Professionals for the Committee (acting in such capacity), and the DIP Lender (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or related to the formulation, preparation, dissemination, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, any Plan Document, the Exit Financing, the Laurus/Valens Settlement, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Cases, in each case for the period on and after the Petition Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. The rights granted under this Article 12.2 are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 12.2 shall not release any of the Causes of Action.

12.3   **Release**.

On the Effective Date, the Debtors, the Reorganized Debtors, the Committee, the DIP Lender, and any and all Holders of Claims and Equity Interests shall release unconditionally and hereby are deemed to release unconditionally the Debtors' Postpetition directors and officers, the members of the Committee, and the Professionals (collectively, the "Released Parties") from any and all claims, obligations, suits, judgments, damages, losses, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtors, the Bankruptcy Cases, any Property of the Debtors, the business or operations of the Debtors, the Exit Financing, any Plan Documents, the Plan, the

Laurus/Valens Settlement, or any of the transactions contemplated thereby; provided, however, that this release provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exclusion from this release provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Released Parties, except as otherwise provided in the Plan or in the Confirmation Order. Each of the Released Parties shall have the right to independently seek enforcement of this release provision. This release provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 12.3 shall not release any of the Causes of Action.

## 12.4  **General Injunction.**

Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, Liability or Equity Interest that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, Liabilities, or Equity Interests, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents:  (a) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors or the Reorganized Debtors or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtors or the Reorganized Debtors under the Plan and the Plan Documents and the other documents executed in connection therewith.  The Debtors and the Reorganized Debtors shall have the right to independently seek enforcement of this general injunction provision.  This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein, the provisions of this Article 12.4 shall not release any of the Causes of Action.

## 12.5  **Term of Certain Injunctions and Automatic Stay.**

12.5.1    All injunctions or automatic stays for the benefit of the Debtors pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for

in the Bankruptcy Cases, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court.

12.5.2    With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtors' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtors affirmatively elect to have the Debtors' liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtors affirmatively elect to have the automatic stay lifted and to have the Debtors' liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtors as provided herein.

## 12.6    No Liability for Tax Claims.

Unless a taxing Governmental Unit has asserted a Claim against the Debtors before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtors, the Reorganized Debtors or their respective directors, officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors, any of their Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

## 12.7    Regulatory or Enforcement Actions.

Nothing in this Plan shall restrict any federal government regulatory agency from pursuing any regulatory or police enforcement action against the Debtors, the Reorganized Debtors, or their respective successors or assigns, but only to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Section 524 or 1141(d) of the Bankruptcy Code.


## ARTICLE 13
## RETENTION OF JURISDICTION

## 13.1    General Retention.

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, until the Biovest Bankruptcy Cases are closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction of the Biovest Bankruptcy Cases that is permitted by applicable law, including that necessary to ensure that the purposes and intent of the Plan are carried out provided, however, that notwithstanding anything to the contrary contained in this Article 13, following the

Closing Date, the state and/or federal courts in the State of New York will have jurisdiction over the Laurus/Valens Settlement Documents.

13.2 **Specific Purposes.**

In addition to the general retention of jurisdiction set forth in Article 13.1, after Confirmation of the Plan and until the Biovest Bankruptcy Cases are closed, the Bankruptcy Court shall retain jurisdiction of the Biovest Bankruptcy Cases for the following specific purposes.

13.2.1    to allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any application for an Administrative Expense Claim, and to determine any and all objections to the allowance or priority of Claims or Equity Interests;

13.2.2    to determine any and all cases, controversies, suits or disputes arising under or relating to the Biovest Bankruptcy Cases, the Plan or the Confirmation Order (including regarding the effect of any release, exculpation, discharge, limitation of liability, or injunction provisions provided for herein or affected hereby and regarding whether the conditions precedent to the consummation and/or Effective Date of the Plan have been satisfied);

13.2.3    to determine any and all applications for allowance of compensation of Professionals and reimbursement of expenses under Section 330, 331 or 503(b) of the Bankruptcy Code arising out of or relating to the Biovest Bankruptcy Cases; provided, however, that this retention of jurisdiction shall not require prior Bankruptcy Court approval of the payment of fees and reimbursement of expenses of Professionals incurred after the Effective Date unless an objection to such fees and expenses has been made by Reorganized Biovest;

13.2.4    to determine any and all motions pending as of the date of the Confirmation Hearing (including pursuant to the Plan) for the rejection, assumption, or assignment of executory contracts or unexpired leases to which the Debtors are a party or with respect to which the Debtors may be liable, and to determine the allowance of any Claims resulting from the rejection thereof or any Cure Claims;

13.2.5    to determine any and all motions, applications, adversary proceedings (including the Rosensweig Adversary Proceeding), contested or litigated matters, Causes of Action, and any other matters involving the Debtors or Reorganized Biovest commenced in connection with, or arising during, the Biovest Bankruptcy Cases and pending on the Effective Date, including approval of proposed settlements thereof;

13.2.6    to enforce, interpret and administer the terms and provisions of the Plan and the Plan Documents;

13.2.7    to modify any provisions of the Plan to the fullest extent permitted by the Bankruptcy Code and the Bankruptcy Rules;

13.2.8    to consider and act on the compromise and settlement of any Claim against or Equity Interest in the Debtors or their respective Estates;

13.2.9    to assure the performance by Reorganized Biovest of its obligations under the Plan;

13.2.10    to correct any defect, cure any omission, reconcile any inconsistency or make any other necessary changes or modifications in or to the Disclosure Statement, the Plan, the Plan Documents, the Confirmation Order, or any exhibits or schedules to the foregoing, as may be necessary or appropriate to carry out the purposes and intent of the Plan, including the adjustment of the date(s) of performance under the Plan in the event the Effective Date does not occur as provided herein so that the intended effect of the Plan may be substantially realized thereby;

13.2.11    to resolve any disputes concerning any release or exculpation of, or limitation of liability as to, a non-debtor (including any Professional) hereunder or the injunction against acts, employment of process or actions against such non-debtor (including any Professional) arising hereunder;

13.2.12    to enforce all orders, judgments, injunctions and rulings entered in connection with the Biovest Bankruptcy Cases;

13.2.13    to enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, including the Plan Documents;

13.2.14    to review and approve any sale or transfer of assets or Property by the Debtors or the Reorganized Debtors, including prior to or after the date of the Plan, and to determine all questions and disputes regarding such sales or transfers;

13.2.15    to determine all questions and disputes regarding title to the assets or Property of the Debtors, the Estates, the Biovest Estate, or the Reorganized Debtors;

13.2.16    to determine any and all matters, disputes and proceedings relating to the Causes of Action, whether arising before or after the Effective Date;

13.2.17    to determine any motions or contested matters involving taxes, tax refunds, tax attributes, tax benefits and similar or related matters with respect to the Debtors arising on or prior to the Effective Date or arising on account of transactions contemplated by the Plan;

13.2.18    to resolve any determinations which may be requested by the Debtors or Reorganized Biovest of any unpaid or potential tax liability or any matters relating thereto under Sections 505 and 1146 of the Bankruptcy Code, including tax liability or such related matters for any taxable year or portion thereof ending on or before the Effective Date;

13.2.19    to issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

13.2.20    to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

13.2.21    to determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order or the Plan Documents;

13.2.22    to enter such orders as are necessary to implement and enforce the injunctions described herein;

13.2.23    to enforce the obligations of any purchaser of any Property of the Debtors;

13.2.24    to enter an order on the Substantive Consolidation Motion or any other motion filed by the Debtors to seek substantive consolidation of some or all of the Debtors;

13.2.25    to adjudicate any and all disputes or issues arising from or relating to the distribution of the Reorganized Biovest Common Stock, including any dispute or issue regarding the application of Section 1145 of the Bankruptcy Code;

13.2.26    to determine such other matters and for such other purposes as may be provided for in the Confirmation Order or as may from time to time be authorized under the provisions of the Bankruptcy Code or any other applicable law; and

13.2.27    to enter an order concluding and terminating the Biovest Bankruptcy Cases.

13.3    **Closing of the Biovest Bankruptcy Cases.**

In addition to the retention of jurisdiction set forth in Articles 13.1 and 13.2, the Bankruptcy Court shall retain jurisdiction of the Biovest Bankruptcy Cases to enter an order reopening the Biovest Bankruptcy Cases after they have been closed.


# ARTICLE 14
# MODIFICATION OF PLAN AND CONFIRMATION OVER OBJECTIONS

14.1    **Modification of Plan.**

14.1.1    The Debtors may modify the Plan at any time prior to the entry of the Confirmation Order provided that the Plan, as modified, and the Disclosure Statement meet applicable Bankruptcy Code and Bankruptcy Rules requirements.

14.1.2    After the entry of the Confirmation Order, the Debtors (prior to the Effective Date) or Reorganized Biovest (on and after the Effective Date) may modify the Plan to remedy any

defect or omission herein, or to reconcile any inconsistencies between the Plan and the Confirmation Order, as may be necessary to carry out the purposes and effects of the Plan, provided that (a) the Debtors or Reorganized Biovest (as the case may be) obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and a hearing, and (b) such modification does not materially adversely affect the interests, rights, or treatment of any Class of Claims or Equity Interests under the Plan.

14.1.3    After the entry of the Confirmation Order and before substantial consummation of the Plan, the Debtors (prior to the Effective Date) or Reorganized Biovest (on and after the Effective Date) may modify the Plan in a way that materially adversely affects the interests, rights, or treatment of a Class of Claims or Equity Interests, provided that (a) the Plan, as modified, meets applicable Bankruptcy Code requirements, (b) the Debtors or Reorganized Biovest (as the case may be) obtain Bankruptcy Court approval for such modification, after notice to the Notice Parties and the Class of Claims or Equity Interests materially adversely affected and a hearing, (c) such modification is accepted by (i) at least two-thirds in dollar amount, and more than one-half in number, of the Allowed Claims actually voting in each Class of Claims adversely affected by such modification or (ii) at least two-thirds in amount of Allowed Equity Interests actually voting in each Class of Equity Interests adversely affected by such modification, and (d) the Debtors or Reorganized Biovest (as the case may be) comply with Section 1125 of the Bankruptcy Code with respect to the Plan, as modified.

14.1.4    Notwithstanding anything to the contrary contained in this Article 14.1 or elsewhere in the Plan, the Plan may not be altered, amended or modified without the written consent of the Debtors (prior to the Effective Date) or Reorganized Biovest (on and after the Effective Date) and Laurus/Valens.

## 14.2    **Confirmation Over Objections.**

In the event any Impaired Class of Claims or Equity Interests votes against the Plan, and the Plan is not revoked or withdrawn in accordance with Article 15.2, the Debtors hereby request, and shall be allowed, to modify the terms of the Plan to effect a "cramdown" on such dissenting Class by (a) restructuring the treatment of any Class on terms consistent with Section 1129(b)(2)(B) of the Bankruptcy Code, or (b) deleting distributions to all Classes at or below the level of the objecting Class, or reallocating such distributions, until such impaired senior Classes are paid in accordance with the absolute priority rule of Section 1129(b) of the Bankruptcy Code. The Debtors may make such modifications or amendments to the Plan and such modifications or amendments shall be filed with the Bankruptcy Court and served on all parties in interest entitled to receive notice prior to the Confirmation Hearing. No such modifications shall require any resolicitation of acceptances as to the Plan by any Class of Claims or Equity Interests unless the Bankruptcy Court shall require otherwise. Notwithstanding any provision of the Plan to the contrary, the Debtors reserve any and all rights they may have to challenge the validity, perfection, priority, scope and extent of any Liens in respect to any Secured Claims and the amount of any Secured Claims, the Holders of which have not accepted the Plan.

# ARTICLE 15
## MISCELLANEOUS PROVISIONS

### 15.1   No Admissions.

The Plan provides for the resolution, settlement and compromise of Claims against and Equity Interests in the Debtors.  Nothing herein shall be construed to be an admission of any fact or otherwise binding upon the Debtors in any manner prior to the Effective Date.

### 15.2   Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation of the Plan does not occur, then the Plan shall be deemed null and void in all respects and nothing contained in the Plan shall be deemed to (a) constitute a waiver or release of any Claims against, or Equity Interests in, the Debtors or any other Person, or (b) prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

### 15.3   Standard for Approval of the Bankruptcy Court.

In the event any of the matters described herein are brought for approval before the Bankruptcy Court, then any such approval shall mean the entry of an order by the Bankruptcy Court approving the matter using the standards for approval of similar matters by a Chapter 11 debtor in possession.

### 15.4   Further Assurances.

Each of the Debtors and Reorganized Biovest agree, and are hereby authorized, to execute and deliver any and all papers, documents, contracts, agreements and instruments which may be necessary to carry out and implement the terms and conditions of the Plan.

### 15.5   Headings.

The headings and table of contents used in the Plan are for convenience and reference only and shall not constitute a part of the Plan for any other purpose or in any manner affect the construction of the provisions of the Plan.

### 15.6   Notices.

All notices, requests or other communications in connection with, or required to be served by, the Plan shall be in writing and shall be sent by United States first class mail, postage prepaid, or by overnight delivery by a recognized courier service, and addressed as follows: (i) if to the Debtors or Reorganized Biovest, Biovest International, Inc., Attn: Samuel S. Duffey, 324 South Hyde Park Avenue, Suite 350, Tampa, Florida 33606, with a copy to Charles A. Postler, Esq., Stichter, Riedel, Blain & Prosser, P.A., 110 East Madison Street, Suite 200, Tampa, Florida 33602, (ii) if to Laurus/Valens, c/o Stuart Komrower, Esq., Cole, Schotz, Meisel, Forman & Leonard, P.A., 25 Main

Street, Hackensack, New Jersey 07601 and Robert B. Glenn, Glenn Rasmussen Fogarty & Hooker, P.A., 100 S. Ashley Drive, Suite 1300, Tampa, Florida 33602, and (iii) if to the Committee, c/o Adam H. Friedman, Esq., Olshan Grundman Frome Rosenzwieg & Wolosky, LLP, Park Avenue Tower, 65 East 55th Street, New York, New York 10022 and Paul J. Battista, Esq., Genovese Joblove & Battista, P.A., 100 S.E. Second Street, 44th Floor, Miami, Florida 33131. Copies of all notices under the Plan to any party shall be given to each of the parties listed above contemporaneously with the giving of such notice. Any of the parties listed above may change the person or address to whom or to which notices are to be given hereunder by filing a written instrument to that effect with the Bankruptcy Court. Notwithstanding anything to the contrary contained in the Plan, no notice shall be required hereunder to the Committee if it is no longer in existence.

## 15.7 **Governing Law.**

Except to the extent that federal law (including the Bankruptcy Code or the Bankruptcy Rules) is applicable, or where the Plan or the provision of any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan provides otherwise, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Florida, without giving effect to the principles of conflicts of law thereof. Notwithstanding anything to the contrary contained in the Plan, all of the Laurus/Valens Settlement Documents (except for the DIP Lender Subordination Agreement) will be governed by the laws of the State of New York.

## 15.8 **Limitation on Allowance.**

No attorneys' fees, punitive damages, penalties, exemplary damages, or interest shall be paid with respect to any Claim or Equity Interest except as otherwise expressly provided in the Plan or as Allowed by a Final Order of the Bankruptcy Court.

## 15.9 **Estimated Claims.**

To the extent any Claim is estimated for any purpose other than for voting on the Plan, then in no event shall such Claim be Allowed in an amount greater than the estimated amount.

## 15.10 **Consent to Jurisdiction.**

Upon any default under the Plan, the Debtors and Reorganized Biovest consent to the jurisdiction of the Bankruptcy Court and agree that the Bankruptcy Court shall be the preferred forum for all proceedings relating to any such default.

By accepting any Distribution under or in connection with the Plan, by filing any Proof of Claim, by filing any Administrative Expense Claim or Cure Claim, by voting on the Plan, by reason of being served with notice of the filing of the Bankruptcy Cases or the Confirmation Hearing, or by entering an appearance in the Bankruptcy Cases, Creditors, Holders of Equity Interests and other parties in interest, including foreign Creditors and foreign parties in interest, have consented, and shall be deemed to have expressly consented, to the jurisdiction of the Bankruptcy Court for all purposes with respect to any and all matters relating to, arising under or in connection with the

Debtors, the Plan or the Bankruptcy Cases, including the matters and purposes set forth in Article 13 of the Plan. The Bankruptcy Court shall maintain jurisdiction to the fullest extent allowed under applicable law over all matters set forth in Article 13 of the Plan.

### 15.11 **Setoffs.**

Subject to the limitations provided in Section 553 of the Bankruptcy Code, Reorganized Biovest may, but shall not be required to, set off against any Claim and any Distribution to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever the Debtors or Reorganized Biovest may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by Reorganized Biovest of any such claim that the Debtors or Reorganized Biovest may have against the Holder of such Claim.

### 15.12 **Successors and Assigns.**

The rights, benefits, duties and obligations of any Person or Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Person or Entity.

### 15.13 **Modification of Payment Terms.**

Reorganized Biovest reserves the right to modify the treatment of any Allowed Claim, as provided in Section 1123(a)(4) of the Bankruptcy Code, at any time after the Effective Date, upon the consent of the Holder of such Allowed Claim.

### 15.14 **Entire Agreement.**

The Plan and the Plan Documents set forth the entire agreement and undertakings relating to the subject matter thereof and supersede all prior discussions and documents. No Person or Entity shall be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter thereof, other than as expressly provided for therein or as may hereafter be agreed to by such Person or Entity in writing.

### 15.15 **Severability of Plan Provisions.**

If, prior to Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter or interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term or provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable.

15.16 **Controlling Document.**

To the extent the Confirmation Order or the Plan is inconsistent with the Disclosure Statement or any agreement entered into between the Debtors or Reorganized Biovest and any third party, unless otherwise expressly provided in the Plan or the Confirmation Order or the Laurus/Valens Settlement Documents, the Confirmation Order and the Plan shall control over the Disclosure Statement and any such agreement. The Confirmation Order (and any other Final Orders of the Bankruptcy Court) shall be construed together and consistent with the terms of the Plan; provided, however, to the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control over the Plan.

15.17 **Plan Supplement.**

The Plan Supplement shall be filed with the Bankruptcy Court and posted at www.srbp.com at least ten (10) days prior to the Voting Deadline; provided, however, that the Debtors may amend the Plan Supplement through and including the Confirmation Date. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected at the Clerk's Office during normal business hours, may be obtained from the Bankruptcy Court's copying service upon the payment of the appropriate charges, or may be obtained from Bankruptcy Counsel's website at www.srbp.com.

15.18 **Computation of Time.**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

15.19 **Substantial Consummation.**

The Plan shall be deemed to be substantially consummated within the meaning of Section 1101 of the Bankruptcy Code upon commencement by Reorganized Biovest of the Initial Distribution described in Article 9.1 of the Plan.

Dated as of May 14, 2010

Respectfully submitted,

BIOVEST INTERNATIONAL, INC.

By: _____
Alan M. Pearce, Chief Financial Officer

BIOVAX, INC.

By: _____
Alan M. Pearce, Chief Financial Officer

AUTOVAXID, INC.

By: _____
Alan M. Pearce, Chief Financial Officer

BIOLENDER, LLC

By: _____
Alan M. Pearce, Chief Financial Officer of
Biovest International, Inc., Member

BIOLENDER II, LLC

By: _____
Alan M. Pearce, Chief Financial Officer of
Biovest International, Inc., Member

_____
Charles A. Postler (Florida Bar No. 455318)
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Email: cpostler@srbp.com
Counsel for Debtors and Debtors in Possession

83

## EXHIBIT A

### DIP Loan Documents

1.  $3,000,000 Secured Promissory Note dated December 22, 2008, executed by Biovest International, Inc. in favor of Corps Real, LLC

2.  Security Agreement dated December 22, 2008, executed by Biovest International, Inc. in favor of Corps Real, LLC

3.  UCC-1 filed with the State of Florida on January 27, 2009, Filing No. 200909923114 (Biovest International, Inc., debtor/Corps Real, LLC, secured party)

4.  UCC-1 filed with the State of Minnesota on January 27, 2009, Filing No. 200914723788 (Biovest International, Inc., debtor/Corps Real, LLC, secured party)

5.  UCC-1 filed with the State of Delaware on December 24, 2008, Filing No. 2008 4277149 (Biovest International, Inc., debtor/Corps Real, LLC, secured party)

# EXHIBIT B

## Schedule of Intercompany Claims
### (Biovest International, Inc. and Biovest Subsidiaries)

| CREDITOR | DEBTOR | AMOUNT |
|---|---|---|
| Biovax, Inc. | AutovaxID, Inc. | $ 4,726.28 |
| Biolender II, LLC | AutovaxID, Inc. | 472,256.63 |
| Biovest International, Inc. | AutovaxID, Inc. | 127,760.60 |
| Biolender, LLC | Biovax, Inc. | 50,738.26 |
| Biolender, LLC | Biovest International, Inc. | 77,641.74 |
| Biovest International, Inc. | Biolender II, LLC | 633.99 |
| Biovest International, Inc. | Biovax, Inc. | 6,878,333.34 |

# EXHIBIT C

## Rejected Contracts

| Debtor | Third Party to Contract | Date of Contract | Title of Contract |
|--------|------------------------|------------------|-------------------|
| Biovest | AutovaxID, Inc. | 02/20/2007 | Non-Refundable Deposit Agreement |
| Biovest | AutovaxID, Inc. | 02/23/2007 | Addendum to Non-Refundable Deposit Agreement |
| Biovest | Dr. Walter Urba – Robert Franz Cancer Ctr | 04/22/2003 | General Contract Services Agreement |
| Biovest | ClinStar LLC | 09/07/2006 | Clinical Trial Management Contract |
| Biovax | Copiers Etc | | Service Agreement |
| Biovest | META Associates, LLC | 11/16/2006 | Data Monitoring Committee Agreement |
| Biovest | Maxim Group | 05/13/2008 | Letter Agreement for private placement agent services |
| Biovest | Pfizer, Inc. | 08/03/2007 | |
| Biovest | PPD Development, LP | 09/30/2004 | Master Services Agreement |
| Biovest | PPD Development, LP | 06/09/2005 | Consulting Agreement |
| Biovest | Rodman & Renshaw, LLc | 06/25/2007 | Letter Agreement for private placement agent services |
| Biovest | SPRI International, LLC | 08/10/2006 | Agreement for Clinical Services |
| Biovest | Dennis Ryll, M.D. | 04/25/06 | Indemnity Agreement – NMTC I |
| Biovest | Donald Ferguson | 04/25/06 | Indemnity Agreement – NMTC I |
| Biovest | Francis E. O'Donnell, Jr., M.D. | 04/25/06 | Indemnity Agreement – NMTC I |
| Biovest | Ronald E. Osman | 04/25/06 | Indemnity Agreement – NMTC I |
| Biovest | Steven Stogel | 04/25/06 | Indemnity Agreement – NMTC I |
| Biovest | Dennis Ryll, M.D. | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | Donald Ferguson | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | Francis E. O'Donnell, Jr., M.D. | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | Hopkins Capital Group II, LLC | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | O'Donnell Irrevocable Trust | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | Ronald E. Osman | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | Steven Stogel | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | Steven R. Arikian, M.D. | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | Alan M. Pearce | 12/2006 | Indemnity Agreement – NMTC II |
| Biovest | Dennis Ryll, M.D. | 09/05/06 | Indemnity Agreement – Pulaski Bank |
| Biovest | Donald Ferguson | 09/05/06 | Indemnity Agreement – Pulaski Bank |
| Biovest | Hopkins Capital Group II, LLC | 09/05/06 | Indemnity Agreement – Pulaski Bank |
| Biovest | Ronald E. Osman | 09/05/06 | Indemnity Agreement – Pulaski Bank |
| Biovest | Steven Stogel | 09/05/06 | Indemnity Agreement – Pulaski Bank |
| Biovest | Alan M. Pearce | 09/05/06 | Indemnity Agreement – Pulaski Bank |
| Biovest | Dennis Ryll, M.D. | 01/11/07 | Indemnity Agreement – Pulaski Bank |
| Biovest | Donald Ferguson | 01/11/07 | Indemnity Agreement – Pulaski Bank |
| Biovest | Hopkins Capital Group II, LLC | 01/11/07 | Indemnity Agreement – Pulaski Bank |
| Biovest | Ronald E. Osman | 01/11/07 | Indemnity Agreement – Pulaski Bank |
| Biovest | Alan M. Pearce | 01/11/07 | Indemnity Agreement – Pulaski Bank |
| Biovest | Ronald E. Osman | 03/22/07 | Indemnity Agreement – Pulaski Bank |
| Biovest | Catherine & Peter J. Pappas, Sr. | 01/11/07 | Indemnity Agreement – Pulaski Bank |
| Biovest | John Sitilides | 01/11/07 | Indemnity Agreement – Pulaski Bank |
| Biovest | Alan M. Pearce | 06/26/07 | Indemnity Agreement – Southwest Bank |

# EXHIBIT D

## Reorganized Biovest Bylaws

See Attached

# AMENDED AND RESTATED BYLAWS

## OF

## BIOVEST INTERNATIONAL, INC.

---

**WHEREAS**, pursuant to the Joint Plan of Reorganization of Biovest International, Inc. (the "Corporation"), Biovax, Inc., AutovaxID, Inc., Biolender, LLC and Biolender II, LLC under Chapter 11 of Title 11, United States Code dated as of May __, 2010 (as amended, the "Plan") filed in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Bankruptcy Court"), with respect to Case Numbers 8:08-bk-17796-KRM, 8:08-bk-17803-KRM, 8:08-bk-17804-KRM, 8:08-bk-17805-KRM and 8:08-bk-17806-KRM, which Plan was confirmed by the Order Confirming Biovest Debtors' Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code entered by the Bankruptcy Court on _____, 2010, the Corporation shall amend and restate its ByLaws as set forth herein;

**WHEREAS**, the Corporation desires to amend and restate its ByLaws in accordance with the Plan; and

**WHEREAS**, the ByLaws are being amended and restated as set forth herein, in a manner consistent with Section 109 and Section 303 of the General Corporation Law of the State of Delaware.

**NOW, THEREFORE**, it is agreed that the ByLaws of the Corporation be, and hereby are, amended and restated as follows:

## ARTICLE 1

## OFFICES

Section 1.1 <u>Registered Office</u>. The registered office of the Corporation shall be located in the City of Wilmington, County of New Castle, State of Delaware.

Section 1.2 <u>Other Offices</u>. The Corporation may also have offices at such other places both within and without the State of Delaware as the Board of Directors may from time to time determine or the business of the Corporation may require.

# ARTICLE 2

## STOCKHOLDERS

Section 2.1    Place of Meeting. All meetings of the stockholders for the election of directors shall be held at such place as may be fixed from time to time by the Board of Directors, or at such other place either within or without the State of Delaware as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting. Meetings of stockholders for any other purpose may be held at such time and place, within or without the State of Delaware, as shall be stated in the notice of the meeting or in a duly executed waiver of notice thereof.

Section 2.2    Annual Meeting. Annual meetings of stockholders shall be held at such date and time as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting. At each annual meeting, the entire Board of Directors shall be chosen for a term of one year and the stockholders shall transact such other business as may properly be brought before the meeting. Written notice of the annual meeting stating the place, date and hour of the meeting shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the meeting.

Section 2.3    Special Meetings. Special meetings of stockholders for any purpose or purposes may be held at any time upon call of the Board of Directors. A special meeting of the stockholders of the Corporation shall be called by the President or the Secretary upon the written request of the stockholders who together own of record 25% of the outstanding stock of all classes entitled to vote at such meeting. The request shall state the date, time, and place by which stockholders and proxy holders may be deemed to be present and vote at such meeting and purpose or purposes of the proposed meeting. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.4    Notice of Meetings. Written notice of stockholders' meetings, stating the place, date, and hour thereof, and, in the case of a special meeting, the purpose or purposes for which the meeting is called, shall be given by or at whose direction the notice is being issued. A copy of the notice of any meeting shall be delivered personally or shall be mailed, not less than ten days but not more than sixty days before the date of such meeting, unless a different period is prescribed by law. If mailed, the notice shall be deemed given when deposited in the United States mail, postage prepaid, directed to each stockholder at such stockholder's address as it appears on the records of the Corporation, unless such stockholder shall have filed with the Secretary of the Corporation a written request that such notice be mailed to some other address, in which case it shall be directed to such other address. Notice of any meeting of stockholders need not be given to any stockholder who shall attend the meeting, other

2

than for the express purpose of objecting at the beginning thereof to the transaction of any business because the meeting is not lawfully called or convened, or who shall submit, either before or after the time stated therein, a written waiver of notice. Unless the Board of Directors, after an adjournment is taken, shall fix a new record date for an adjourned meeting or unless the adjournment is for more than thirty days, notice of an adjourned meeting need not be given if the place, date and time to which the meeting shall be adjourned are announced at a meeting at which the adjournment is taken.

Without limiting the manner by which notice otherwise may be given effectively to stockholders, unless excepted under Sections 164, 296, 311, 312, or 324 of the Delaware General Corporation Law, any notice to stockholders given by the Corporation under any provision of these Bylaws or the Amended and Restated Certificate of Incorporation shall be effective if given by a form of electronic transmission consented to by the stockholder to whom the notice is given. Any such consent shall be revocable by the stockholder by written notice to the Corporation. Any such consent shall be deemed revoked if (1) the Corporation is unable to deliver by electronic transmission two consecutive notices given by the Corporation in accordance with such consent and (2) such inability becomes known to the Secretary or an Assistant Secretary of the Corporation or to the transfer agent, or other person responsible for the giving of notice; provided, however, the inadvertent failure to treat such inability as a revocation shall not invalidate any meeting or other action.

Notice given by a form of electronic transmission shall be deemed given: (1) if by facsimile telecommunication, when directed to a number at which the stockholder has consented to receive notice; (2) if by electronic mail, when directed to an electronic mail address at which the stockholder has consented to receive notice; (3) if by a posting on an electronic network together with separate notice to the stockholder of such specific posting, upon the later of (A) such posting and (B) the giving of such separate notice; and (4) if by any other form of electronic transmission, when directed to the stockholder. An affidavit of the Secretary or an Assistant Secretary or of the transfer agent or other agent of the Corporation that the notice has been given by a form of electronic transmission shall, in the absence of fraud, be prima facie evidence of the facts stated therein.

Electronic transmission includes any form of communication not directly involving the physical transmission of paper, that creates a record that may be retained, retrieved and reviewed by a recipient thereof, and that may be directly reproduced in paper form by such a recipient through an automated process.

Whenever any notice is required to be given under the provisions of any law, or under the provisions of the Amended and Restated Certificate of Incorporation of the Corporation or these Bylaws, a waiver thereof in writing, or a waiver by electronic transmission, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

3

Section 2.5    Quorum.  Except as otherwise provided by law or in the Amended and Restated Certificate of Incorporation of the Corporation or these Bylaws, at any meeting of stockholders, the holders of a majority of the outstanding shares of each class of stock entitled to vote thereat shall be present or represented by proxy in order to constitute a quorum for the transaction of any business.  In the absence of a quorum, a majority in interest of the stockholders present or the chairman of the meeting may adjourn the meeting from time to time in the manner provided for in this Section 2.5 until a quorum shall attend.

In case a quorum shall not be present at any meeting, a majority in interest of the stockholders entitled to vote thereat, present in person or by proxy, shall have the power to adjourn the meeting from time to time, without notice other than announcement at the meeting of the time, place, if any, thereof by which stockholders and proxyholders may be deemed to be present in person and vote at such adjourned meeting, until the requisite amount of stock entitled to vote shall be present.  At any such adjourned meeting at which the requisite amount of stock entitled to vote shall be represented, any business may be transacted which might have been transacted at the meeting as originally noticed; but only those stockholders entitled to vote at the meeting as originally noticed shall be entitled to vote at any adjournment or adjournments thereof.

Section 2.6    Conduct of Meeting.  The Chairman of the Board of Directors, if any, or, in his absence, the Chief Executive Officer, or in his absence, the President, or in their absence, any Vice President, shall call to order meetings of stockholders and shall act as chairman of such meetings.  If none of the forgoing is present, the stockholders entitled to vote and who are present in person or represented by proxy at the meeting shall appoint any person to act as chairman of the meeting.  The Secretary of the Corporation shall act as secretary of all meetings of stockholders, but, in the absence of the Secretary, the chairman of the meeting may appoint any other person to act as secretary of the meeting.  The order of business at all meetings of the stockholders shall be as determined by the chairman of the meeting.

At any meeting of the stockholders, only such business shall be conducted as shall have been brought before the meeting (a) pursuant to the corporation's notice of meeting, (b) by or at the direction of the Board of Directors or (c) by any stockholder of the corporation who is a stockholder of record at the time of giving of the notice provided for in this Bylaw, who shall be entitled to vote at such meeting and who complies with the notice procedures set forth in this Bylaw; provided, however, that business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

For business to be properly brought before any meeting by a stockholder pursuant to clause (c) above of this Section 2.6, the stockholder must have given timely notice thereof in writing to the secretary of the Corporation.  To be timely, a stockholder's

4

notice must be delivered to or mailed and received at the principal executive offices of the corporation not less than one hundred twenty (120) days prior to the date of the meeting. A stockholder's notice to the secretary shall set forth as to each matter the stockholder proposes to bring before the meeting (a) a brief description of the business desired to be brought before the meeting and the reasons for conducting such business at the meeting, (b) the name and address, as they appear on the corporation's books, of the stockholder proposing such business, and the name and address of the beneficial owner, if any, on whose behalf the proposal is made, (c) the class and number of shares of the corporation which are owned beneficially and of record by such stockholder of record and by the beneficial owner, if any, on whose behalf of the proposal is made, and (d) any material interest of such stockholder of record and the beneficial owner, if any, on whose behalf the proposal is made in such business.

Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at a meeting except in accordance with the procedures set forth in this Section 2.6. The presiding officer of the meeting shall, if the facts warrant, determine and declare to the meeting that business was not properly brought before the meeting and in accordance with the procedures prescribed by this Section 2.6, and if such person should so determine, such person shall so declare to the meeting and any such business not properly brought before the meeting shall not be transacted. Notwithstanding the foregoing provisions of this Section 2.6, a stockholder shall also comply with all applicable requirements of the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder with respect to the matters set forth in this Section 12.

Section 2.7    Voting.  Except as otherwise provided by law or in the Amended and Restated Certificate of Incorporation of the Corporation or these Bylaws, any corporate action to be taken by a vote of the stockholders, other than for the election of directors, at any meeting duly called and held at which a quorum is present, shall be authorized by the affirmative vote of a majority of the shares present or represented by proxy at the meeting and entitled to vote on the subject matter.  At any meeting of the stockholders duly called and held for the election of directors at which a quorum is present, those persons receiving a plurality of the votes cast whether in person or represented by proxy and entitled to vote for the election of directors shall be elected.

Section 2.8    Stockholder List.  A complete list of the stockholders entitled to vote at the ensuing election, arranged in alphabetical order, with the address of each, and the number of shares held by each, shall be open to the examination of any stockholder for any purpose germane to the meeting for a period of at least 10 days prior to the meeting: (1) on a reasonably accessible electronic network, provided that the information required to gain access to such list is provided with the notice of the meeting, or (2) during ordinary business hours, at the principal place of business of the Corporation.  The Corporation shall not be required to include electronic mail addresses or other electronic contact information on such list.  In the event that the Corporation

determines to make the list available on an electronic network, the Corporation may take reasonable steps to ensure that such information is available only to stockholders of the Corporation. If the meeting is to be held at a place, then the list shall be produced and kept at the place of the meeting during the whole time thereof and may be inspected by any stockholder who is present.

Section 2.9    Written Consent of Stockholders in Lieu of Meeting.  Unless otherwise provided in the Amended and Restated Certificate of Incorporation of the Corporation, any action required to be taken or which may be taken at any annual or special meeting of stockholders may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed, in person or by proxy, by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted in person or by proxy and shall be delivered to the Corporation as required by law. An electronic transmission consenting to an action to be taken and transmitted by a stockholder or proxyholder, or by a person or persons authorized to act for a stockholder or proxyholder, shall be deemed to be written, signed, and dated for the purposes of this section, provided that any such electronic transmission sets forth or is delivered with information from which the Corporation can determine (1) that the electronic transmission was transmitted by the stockholder or proxyholder, or by a person or persons authorized to act for the stockholder or proxyholder and (2) the date on which such stockholder or proxyholder or authorized person or persons transmitted such electronic transmission. Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those stockholders who have not consented in writing.

## ARTICLE 3

## BOARD OF DIRECTORS

Section 3.1    Function.  The business and affairs of the Corporation shall be managed by, or under the direction of, the Board of Directors, which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the Amended and Restated Certificate of Incorporation or by these Bylaws directed or required to be exercised or done by the stockholders.

Section 3.2    Number, Term of Office and Election.  (a) Except as otherwise provided in the Amended and Restated Certificate of Incorporation of the Corporation, until such time as the Board of Directors determines otherwise, the number of directors shall initially be seven (7). Each director shall hold office until his or her successors are elected and qualified, or until such director's earlier death, resignation or removal as hereinafter provided.  At each annual meeting of the stockholders, the stockholders shall elect the entire Board of Directors, who shall each serve a term

6

expiring at the next annual meeting of the stockholders. The number of directors may be reduced or increased from time to time by action of a majority of the directors then in office; provided, however, that no decrease in the number of directors shall affect the term of any director then in office. (b) Notwithstanding anything to the contrary herein, upon the occurrence of an Event of Default (the "Triggering Event") under Section 20(a) (after giving effect to any applicable grace period provided therein) of the Term Loan and Security Agreement, dated _____, 2010, by and among LV Administrative Services, Inc., as Administrative and Collateral Agent (the "Agent"), the Lenders from time to time party thereto, the Corporation and each subsidiary of the Corporation named therein (as such may be amended, modified, substituted or replaced from time to time, the Agent shall be entitled to designate members of the Board of Directors in accordance with Article VIII of the Amended and Restated Certificate of Incorporation of the Corporation.

Section 3.3    Chairman of the Board.  The directors may elect one of their members to be Chairman of the Board of Directors.  The Chairman of the Board of Directors shall be subject to the control of, and may be removed by, the Board of Directors.  He shall perform such duties as may from time to time be assigned to him by the Board of Directors.

Section 3.4    Meetings.  The annual meeting of the Board of Directors shall be held either without notice immediately after the annual meeting of stockholders and in the same place, if any, or at such time and place, if any, as shall be fixed by the vote of the stockholders at the annual meeting or as soon as practicable after the annual meeting of stockholders on such date and at such time and place if any, as the Board of Directors determines from time to time.

The Board of Directors of the corporation may hold meetings, both regular and special, either within or without the State of Delaware.  Regular and special meetings of the Board of Directors shall be held at such time and place if any, as shall be designated in the notice of the meeting whenever called by the Chairman of the Board of Directors, if any, or the Chief Executive Officer, and shall be called by the Chief Executive Officer or Secretary upon the written request of a majority of the directors then in office.  The request shall state the date, time, place, and purpose or purposes of the proposed meeting.

Section 3.5    Notice of Meetings.  Regular meetings of the Board of Directors may be held without notice at such time and at such place as shall from time to time be determined by the Board.  Special meetings of the Board may be called by the Chairman of the Board or the Chief Executive Officer on twenty-four (24) hours' notice to each director either personally or by telephone, facsimile, or electronic mail; special meetings shall be called by the Chief Executive Officer or Secretary in like manner and on like notice on the written request of a majority of the Board unless the Board consists of only one director, in which case special meetings shall be called by the Chairman of

7

the Board, the Chief Executive Officer, or Secretary in like manner and on like notice on the written request of the sole director. A written waiver of notice, signed by the person entitled thereto, whether before or after the time of the meeting stated therein, shall be deemed equivalent to notice.

Section 3.6 <u>Quorum and Conduct of Meetings</u>. Except as otherwise provided in these Bylaws or by statute, a majority of the Board shall constitute a quorum for the transaction of business, but, if at any meeting of the Board of Directors (whether or not adjourned from a previous meeting) there shall be less than a quorum present, a majority of those present may adjourn the meeting to another time and place, and the meeting may be held as adjourned without further notice or waiver.

Except as otherwise provided by law or in the Amended and Restated Certificate of Incorporation of the Corporation or these Bylaws, a majority of the directors present at any meeting at which a quorum is present may decide any question brought before such meeting. Meetings shall be presided over by the Chairman of the Board of Directors, if any, or in his absence, by the Chief Executive Officer, or in the absence of both, by such other person as the directors may select. The Secretary of the Corporation shall act as secretary of the meeting, but in his absence the chairman of the meeting may appoint any person to act as secretary of the meeting. The order of all business at all meetings of the Board of Directors shall be determined by the person presiding over the meeting.

Section 3.7 <u>Committees</u>. The Board of Directors may, by resolution adopted by a majority of the Board, designate one or more committees, each committee to consist of one or more of the directors of the Corporation. The Board of Directors may designate one or more directors as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee. In the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in place of any such absent or disqualified member. Any such committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business, property, and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have power or authority in reference to amending the Amended and Restated Certificate of Incorporation of the Corporation (except that a committee may, to the extent authorized in the resolution or resolutions providing for the issuance of shares of stock adopted by the Board of Directors pursuant to authority expressly granted to the Board of Directors by the Amended and Restated Certificate of Incorporation of the Corporation and the General Corporation Law, fix the designation and any of the preferences or rights of such shares relating to dividends, redemption, dissolution, any distribution of the assets of the

8

Corporation, or the conversion into, or the exchange of such shares for, shares of any other class or classes or any other series of the same or any other class or classes of stock of the Corporation or fix the number of shares of any series of stock or authorize the increase or decrease of the shares of any series), adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease, or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of dissolution, or amending these Bylaws; and, unless such resolution or resolutions expressly so provides, no such committee shall have the power or authority to declare a dividend, to authorize the issuance of stock, or to adopt a certificate of ownership and merger pursuant to Section 253 of the General Corporation Law. Each committee which has been established by the Board of Directors pursuant to these Bylaws may fix its own rules and procedures; provided that a majority of all the members of a committee shall constitute a quorum for the transaction of business, and the vote a majority of all the members of a committee present at a meeting at which a quorum is present shall be the act of the committee. Notice of meetings of committees, other than of regular meetings provided for by committee rules, shall be given to committee members. All action taken by committees shall be recorded in minutes of the meetings.

Section 3.8  <u>Action Without Meeting</u>. Unless otherwise prohibited by law or the Amended and Restated Certificate of Incorporation of the Corporation, the Board of Directors or any committee thereof may take any action required or permitted to be taken by them without a meeting if all of the members of the Board of Directors or committee, as the case may be, consent in writing or by means of electronic transmissions, and such written consent or electric transmission is filed with the minutes of proceedings of the Board of Directors or committee. Such filing shall be in paper form if the minutes are maintained in paper form and shall be in electronic form if the minutes are maintained in electronic form.

Section 3.9  <u>Telephonic Meetings</u>. Members of the Board of Directors, or any committee thereof, may participate in a meeting of the Board of Directors or committee, as the case may be, by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and such participation shall constitute presence in person at the meeting.

Section 3.10  <u>Removal</u>. A director may be removed at any time, with or without cause, by the holders of a majority of the shares then entitled to vote at an election of directors.

Section 3.11  <u>Compensation</u>. Unless otherwise restricted by the Amended and Restated Certificate of Incorporation or these Bylaws, the Board of Directors shall have the authority to fix the compensation of directors. The directors may be paid their expenses, if any, of attendance at each meeting of the Board of Directors and may be paid

9

a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

Section 3.12 <u>Resignations</u>. Any director may resign at any time by giving written notice or by electronic transmission of his resignation to the Corporation. A resignation shall take effect at the time specified therein or, if the time when it shall become effective shall not be specified therein, immediately upon its receipt.

Section 3.13 <u>Vacancies</u>. Except as otherwise provided in the Amended and Restated Certificate of Incorporation of the Corporation, any vacancy in the Board of Directors arising from an increase in the number of directors or otherwise may be filled by the vote of a majority of the directors then in office, even if less than a quorum, or by sole remaining director, and the directors so chosen shall hold office until the next election of the class for which such directors were chosen and until their successors are duly elected and qualified or until earlier resignation or removal. If there are no directors in office, then an election of directors may be held in the manner provided by statute.

# ARTICLE 4

# OFFICERS

Section 4.1 <u>Executive Officers</u>. The executive officers of the Corporation shall be a Chief Executive Officer, a President and a Chief Financial Officer, each of whom shall be appointed by the Board of Directors. The Board of Directors also may elect or appoint such other officers (including, without limitation, a Secretary, Treasurer, one or more Vice Presidents, and one or more Assistant Treasurers and Assistant Secretaries) as it may deem necessary or desirable for the conduct of business of the Corporation, and each of whom shall have such powers and duties as the Board of Directors determines. Each officer shall hold office for such term as may be prescribed by the Board of Directors from time to time. Any person may hold at one time two or more offices.

Section 4.2 <u>Powers and Duties</u>.

(a) <u>Chairman of the Board</u>. The Chairman of the Board, if such an officer is elected, shall exercise and perform such powers and duties as may be from time to time assigned to him by the Board of Directors or prescribed by the Bylaws.

(b) <u>Chief Executive Officer</u>. Subject to such supervisory powers, if any, as may be given by the Board of Directors to the Chairman of the Board, if there be such an officer, the Chief Executive Officer shall be the Chief Executive Officer of the Corporation and shall, subject to the control of the Board of Directors, have general

supervision, direction, and control of the business and the officers of the Corporation. He shall preside at all meetings of the stockholders. He shall have the general powers and duties of management usually vested in the office of the Chief Executive Officer of a corporation, and shall have such other powers and duties as may be prescribed by the Board of Directors or the Bylaws.

(c)     _President_. In the absence or disability of the Chief Executive Officer, the President shall perform all the duties of the Chief Executive Officer, and when so acting shall have all of the powers of, and be subject to all the restrictions upon, the Chief Executive Officer. The President shall have such other powers and perform such other duties as from time to time may be prescribed by the Board of Directors or the Bylaws or the Chief Executive Officer or the Chairman of the Board.

(d)     _Chief Financial Officer_. The Chief Financial Officer shall have care and custody of the corporate funds and shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of accounts of the properties and business transaction of the corporation, including accounts of its assets, liabilities, receipts, disbursements, gains, losses, capital, retained earnings, and shares. The books of account shall at all reasonable times be open to inspection by any Director. The Chief Financial Officer shall render to the Chief Executive Officer and the Board, whenever they request it, an account of all of his transactions as Chief Financial Officer and of the financial condition of the corporation, and shall have other power and perform such other duties as may be prescribed by the Board of Directors of the Bylaws.

(e)     _Secretary_. The Secretary shall keep or cause to be kept, at the principal executive office or such other place as the Board of Directors may direct, a book of minutes of all meetings and actions of Directors, committees or Directors, and stockholders, with the time and place of holding, whether regular or special, and, if special, how authorized, the notice given, the names of those present at the Directors' meetings or committee meetings, the number of shares present or represented at stockholders' meetings, and the proceedings.

The Secretary shall keep, or cause to be kept, at the principal executive office or at the office of the corporation's transfer agent or registrar, as determined by resolution of the Board of Directors a share register, or a duplicate share register, showing the names of all stockholders and their addresses, the number and classes of shares held by each, the number and date of certificates issued for the same, and the number and date of cancellation of every certificate surrendered for cancellation.

The secretary shall give, or cause to be given, notice of all meetings of the stockholders and of the Board of Directors required by the Bylaws or Bylaw to be given, and he shall keep the seal of the corporation if one be adopted, in safe custody, and shall have such other powers and perform such other duties as may be prescribed by the Board of Directors or by the Bylaws.

11

Section 4.3    Resignations. Any officer may resign at any time by giving written notice of his resignation to the Corporation. A resignation shall take effect at the time specified therein, or if the time when it shall become effective shall not be specified therein, immediately upon its receipt.

Section 4.4    Vacancies and Term. If an office becomes vacant for any reason, the Board of Directors may fill the vacancy, and such officer so elected or appointed shall serve for the remainder of his predecessor's term and until his successor shall have been elected or appointed and shall have qualified. The officers of the corporation shall hold office until their successors are chosen and qualify. Any officer elected or appointed by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors.

## ARTICLE 5

## CAPITAL STOCK

Section 5.1    Stock Certificates. The certificates representing shares of the capital stock of the Corporation shall be in such form as shall be prescribed by law and approved, from time to time, by the Board of Directors. Each certificate shall be signed in the name of the Corporation by the President or any Vice President and by the Secretary, any Treasurer, any Assistant Secretary or any Assistant Treasurer. Any or all of the signatures on a certificate may be a facsimile. In case any officer who shall have signed or whose facsimile signature shall have been placed on any certificate shall have ceased to be such officer before the certificate shall be issued, the certificate may be issued by the Corporation with the same effect as if he were such officer, at the date of issue.

Section 5.2    Transfer of Shares. Transfers of shares shall be registered on the books of the Corporation maintained for that purpose after due presentation of the stock certificates therefor, appropriately endorsed or accompanied by proper evidence of succession, assignment or authority to transfer.

Section 5.3    Fixing Record Date. For purposes of determining the stockholders entitled to notice of or to vote at any meeting of stockholders or any adjournment thereof or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion, or exchange of stock, or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record date is adopted by the Board of Directors, and which record date shall not be more than sixty nor less than ten days before the date of such meeting, nor more than sixty days prior to any other action.

43520/0054-6377529v3

Section 5.4   Lost Certificates.  The Board of Directors or any transfer agent of the Corporation may direct a new certificate or certificates representing stock of the Corporation to be issued in place of any certificate or certificates theretofore issued by the Corporation, alleged to have been lost, stolen, or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate to be lost, stolen, or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors (or any transfer agent of the Corporation authorized to do so by a resolution of the Board of Directors) may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen, or destroyed certificate or certificates, or his legal representative, to give the Corporation a bond in such sum as the Board of Directors (or any transfer agent so authorized) shall direct to indemnify the Corporation against any claim that may be made against the Corporation with respect to the certificate or certificates alleged to have been lost, stolen, or destroyed or the issuance of such new certificate or certificates, and such requirement may be general or confined to specific instances.

Section 5.5   Regulations.  The Board of Directors shall have power and authority to make all such rules and regulations as it may deem expedient concerning the issue, transfer, registration, cancellation, and replacement of certificates representing stock of the Corporation.

# ARTICLE 6

# INDEMNIFICATION

Section 6.1   Indemnification.  The Corporation shall, to the fullest extent permitted by Section 145 of the General Corporation Law or any successor provision or statute, as the same may be amended from time to time, indemnify any director, officer, employee or agent of the Corporation or any person serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise.

Section 6.2   Advancement of Expenses.  Expenses (including attorneys' fees) incurred by any person in his capacity as a director or an officer of the Corporation in defending a civil, criminal, administrative or investigative action, suit or proceeding of the type contemplated by Section 145 of the General Corporation Law, or any successor provision or statute, as the same may be amended from time to time, shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of the director or officer to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized in this Article 6.

Section 6.3   Other Rights and Remedies.  The indemnification provided by this Article 6 shall not be deemed exclusive of any other rights to which those seeking

43520/0054-6377529v3

indemnification may be entitled under any Bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in such person's official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such person.

Section 6.4    Insurance.  Upon resolution passed by the Board of Directors, the Corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such, whether or not the Corporation would have the power to indemnify such person against such liability under the provisions of this Article 6.

## ARTICLE 7

## MISCELLANEOUS

Section 7.1    Corporate Seal.  The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization, and the words "Corporate Seal" and "Delaware."

Section 7.2    Fiscal Year.  The fiscal year of the Corporation shall end on September 30 or such date as otherwise determined by the Board of Directors.

Section 7.3    Stock of Other Corporations or Other Interests.  Unless otherwise ordered by the Board of Directors, the President, the Secretary, and such attorneys or agents of the Corporation as may be, from time to time, authorized by the Board of Directors or the President shall have full power and authority on behalf of the Corporation to attend and to act and vote in person or by proxy at any meeting of the holders of securities of any corporation or other entity in which the Corporation may own or hold shares or other securities, and at such meetings shall possess and may exercise all the rights and powers incident to the ownership of such shares or other securities which the Corporation, as the owner or holder thereof, might have possessed and exercised if present.  The President, Secretary, or such attorneys or agents may also execute and deliver on behalf of the Corporation powers of attorney, proxies, consents, waivers, and other instruments relating to the shares or securities owned or held by the Corporation.

Section 7.4    Variations in Pronouns.  All pronouns and any variations thereof refer to the masculine, feminine or neuter, singular or plural, as the context requires.

14

# ARTICLE 8

## AMENDMENTS

These Bylaws may be altered, amended or repealed or new Bylaws may be adopted by the affirmative vote of holders of at least a majority of the outstanding voting stock of the corporation. These Bylaws may also be altered, amended or repealed or new Bylaws may be adopted by the Board of Directors, when such power is conferred upon the Board of Directors by the Amended and Restated Certificate of Incorporation. The foregoing may occur at any regular meeting of the stockholders or of the Board of Directors or at any special meeting of the stockholders or of the Board of Directors if notice of such alteration, amendment, repeal, or adoption of new Bylaws be contained in the notice of such special meeting. If the power to adopt, amend or repeal Bylaws is conferred upon the Board of Directors by the Amended and Restated Certificate of Incorporation, it shall not divest or limit the power of the stockholders to adopt, amend, or repeal Bylaws.

# ARTICLE 9

## AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

These Bylaws shall be subject to the Amended and Restated Certificate of Incorporation of the Corporation. All references in these Bylaws to the Amended and Restated Certificate of Incorporation of the Corporation shall be construed to mean the Amended and Restated Certificate of Incorporation of the Corporation and any Certificate of Designation to the Amended and Restated Certificate of Incorporation of the Corporation, as the same may be amended from time to time.

43520/0054-6377529v3

## CERTIFICATE OF ADOPTION BY THE SECRETARY OF
## BIOVEST INTERNATIONAL, INC.

The undersigned, _____, hereby certifies that he is the duly elected and acting Secretary of Biovest International, Inc., a Delaware corporation (the "Corporation"), and that the Amended and Restated Bylaws attached hereto constitute the Bylaws of said Corporation as duly adopted by the Board of Directors and the Stockholders of the Corporation and as in effect on the date hereof.

IN WITNESS WHEREOF, the undersigned Secretary has executed this Certificate on April ___, 2010.

_____
[         ], Secretary

16

# EXHIBIT E

## Reorganized Biovest Charter

See Attached

# AMENDED AND RESTATED

# CERTIFICATE OF INCORPORATION

## OF

# BIOVEST INTERNATIONAL, INC.

Biovest International, Inc., a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "DGCL"),

DOES HEREBY CERTIFY:

FIRST:  That the name of this corporation is Biovest International, Inc. (the "Corporation") and the Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on March 2, 2001, under the name Biovest International, Inc., and was amended pursuant to an Amendment to Certificate of Incorporation filed with the Secretary of State of the State of Delaware on November 30, 2004 (collectively, the "Certificate of Incorporation").

SECOND:  That pursuant to the Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC and Biolender II, LLC under Chapter 11 of Title 11, United States Code dated as of May __, 2010 (as amended, the "Plan") filed in the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Bankruptcy Court"), with respect to Case Numbers 8:08-bk-17796-KRM, 8:08-bk-17803-KRM, 8:08-bk-17804-KRM, 8:08-bk-17805-KRM and 8:08-bk-17806-KRM, which Plan was confirmed by the Order Confirming Biovest Debtors' Joint Plan of Reorganization under Chapter 11 of the United States Bankruptcy Code entered by the Bankruptcy Court on _____, 2010, the Corporation is hereby amending and restating its Certificate of Incorporation in accordance with the Plan (the "Amended and Restated Certificate of Incorporation").

THIRD:  That the Amended and Restated Certificate of Incorporation has been duly adopted in accordance with the provisions of Section 242 and Section 303 of the General Corporation Law of the State of Delaware.

FOURTH:  That the effective date of the Amended and Restated Certificate of Incorporation shall be the date it is filed with the Secretary of State of Delaware.

FIFTH:  That the Certificate of Incorporation has been amended and restated as follows:

## ARTICLE I

The name of the corporation is Biovest International, Inc. (the "Corporation").

## ARTICLE II

The address of the Corporation's registered office in the State of Delaware is 1201 Orange Street, Suite 600, in the City of Wilmington, County of New Castle 19899. The name of the Corporation's registered agent at such address is Incorp Services, Inc.

## ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law, as the same may be amended or supplemented from time to time (the "DGCL").

## ARTICLE IV

The Corporation shall have authority to issue Three Hundred Fifty Million (350,000,000) shares of capital stock, consisting of Three Hundred Million (300,000,000) shares of Common Stock, $0.01 par value per share, and Fifty Million (50,000,000) shares of Preferred Stock, $0.01 par value per share. The Preferred Stock authorized by the Certificate of Incorporation may be issued from time to time in one or more series. The Board of Directors is hereby authorized to fix or alter the rights, preferences, privileges and restrictions granted to or imposed upon any series of Preferred Stock, and the number of shares constituting any such series and the designation thereof, or of any of them.

## ARTICLE V

To the fullest extent permitted by the DGCL, no director of the Corporation shall be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL or (iv) for any transaction from which the director derived an improper personal benefit. If the DGCL is amended after the effective date of this Certificate of Incorporation to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended.

The Corporation shall indemnify to the fullest extent permitted by the DGCL (including, without limitation, Section 145 thereof), as the same may be amended and supplemented from time to time, any and all persons whom it shall have power to indemnify under the DGCL. The indemnification provided for herein shall not be exclusive of any other rights to which those seeking indemnification may be entitled as a matter of law under any Bylaw, agreement, vote of stockholders or disinterested directors of the Corporation, or otherwise, both as to action in such indemnified person's official capacity and as to action in another capacity while serving as a director, officer, employee, or agent of the Corporation, and shall continue as to a person who has ceased to be a director, officer, employee, or agent of the Corporation, and shall inure to the benefit of the heirs, executors and administrators of such person.

Any repeal or modification of this Article V or amendment to the DGCL shall not adversely affect any right or protection of a director, officer, agent, or other person existing at the time of, or increase the liability of any director of the Corporation with respect to any acts or omissions of such director, officer, or agent occurring prior to, such repeal, modification, or amendment.

## ARTICLE VI

The Board of Directors shall have the power to adopt, amend, or repeal Bylaws of the Corporation, subject to the right of the stockholders of the Corporation to adopt, amend, or repeal any Bylaw. In addition, the Bylaws may be amended by the affirmative vote of holders of majority of the outstanding shares of voting stock of the Corporation entitled to vote at an election of directors.

## ARTICLE VII

The number of directors of the Corporation shall be determined by resolution of the Board of Directors. Elections of directors need not be by written ballot, unless the Bylaws of the Corporation shall so provide.

Advance notice of stockholder nominations for the election of directors and of any other business to be brought before any meeting of the stockholders shall be given in the manner provided in the Bylaws of the Corporation. Directors shall be elected to one-year terms. At each annual meeting of stockholders, all directors shall be chosen for a one-year term to succeed those whose terms expire; except that if any such election shall not be so held, such election shall take place at a stockholders' meeting called and held in accordance with the DGCL.

Vacancies occurring on the Board of Directors for any reason may be filled by vote of a majority of the remaining members of the Board of Directors, even if less than a quorum, at any meeting of the Board of Directors. A person so elected by the Board of Directors to fill a vacancy shall hold office for the remainder of the full term of the director for which the vacancy was created or occurred and until such director's successor shall have been duly elected and qualified.

## ARTICLE VIII

Notwithstanding anything to the contrary herein, upon the occurrence of an Event of Default (the "Triggering Event") under Section 20(a) (after giving effect to any applicable grace period provided therein) of the Term Loan and Security Agreement, dated _____, 2010, by and among LV Administrative Services, Inc., as Administrative and Collateral Agent (the "Agent"), the Lenders from time to time party thereto, the Corporation and each subsidiary of the Corporation named therein (as such may be amended, modified, substituted or replaced from time to time, the "Loan Agreement"), and upon delivery of written notice from the Agent to the Secretary, any Assistant Secretary or other officer of the Corporation (a "Designated Director Notice"), the Agent shall be entitled to appoint one-third (1/3) of the number of directors of the Corporation (the "Designated Directors"). The Agent shall have the sole right to appoint and to remove any person appointed as a Designated Director and to appoint another person to fill any vacancy should a Designated Director resign. Such right to appoint Designated Directors shall continue until such time as all principal and interest due and payable under the BVTI Term Notes (as defined in the Loan Agreement) have been indefeasibly paid in full (a "Full Payment"). Following a Triggering Event, the Board of Directors shall not take any action until the Agent shall have appointed the Designated Directors, except that the Board of Directors shall, as promptly as practicable, take such action to permit compliance with the provisions of this Article VIII, including, without limitation, increasing the size of the Board of Directors to permit the Agent to appoint the Designated Directors and/or removal of existing directors. Prior to a Full Payment, this Article VIII (or any other provision of this

Certificate of Incorporation which may affect the interpretation of this Article VIII) may not be amended or modified without the prior written approval of the Agent. Each Designated Director shall serve until the next annual meeting of the Corporation or until his or her successor shall be elected, subject to removal by the Agent. Subject to this Article VIII, the holders of Common Stock and any other class of stock of the Corporation, to the extent they shall have the right to vote, shall retain the right to elect and remove all members of the Board of Directors, other than the Designated Directors, in accordance with and subject to the conditions set forth in this Certificate of Incorporation and the By-Laws of the Corporation. The Agent shall not be entitled to any other voting rights as a stockholder with respect to the Corporation by virtue of this Article VIII, except as expressly provided herein.

## ARTICLE IX

The Corporation reserves the right to amend, alter, change, or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon stockholders herein are granted subject to this reservation.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, this Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of the Corporation on April [ ], 2010.

/s/ _____

[ ],

# EXHIBIT F

## Schedule of Potential Causes of Action

The following is a nonexclusive list of potential or actual parties against whom the Debtors or Reorganized Biovest could assert or have asserted a Cause of Action. The Debtors and Reorganized Biovest reserve the right to modify this list to amend parties or otherwise update this list, but disclaim any obligation to do so. In addition to possible Causes of Action against Persons or Entities listed herein, the Debtors may have, in the ordinary course of business, numerous Causes of Action against vendors and customers or others with whom they dealt with in the ordinary course of business (the "Ordinary Course Claims"). The Debtors and Reorganized Biovest reserve the right to enforce, sue on, settle or compromise (or decline to do any of the foregoing) the Ordinary Course Claims, as well as Causes of Action against the parties listed below:

[LIST TO BE FILED BY SUPPLEMENT]

ALL OF THE ABOVE PERSONS OR ENTITIES INCLUDE THEIR AGENTS, PROFESSIONALS, REPRESENTATIVES, SUCCESSORS, AFFILIATES AND ASSIGNS. THE DEBTORS AND REORGANIZED BIOVEST EXPRESSLY RESERVE ALL RIGHTS, DEFENSES AND COUNTERCLAIMS AGAINST ANY PERSON OR ENTITY THAT HAS ASSERTED OR COULD ASSERT A CLAIM AGAINST THE DEBTORS. FURTHER, THE DEBTORS AND REORGANIZED BIOVEST EXPRESSLY RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS LIST AT ANY TIME.

# EXHIBIT G

## Pro Forma Recapitalization of Reorganized Biovest

See Attached

## Biovest International, Inc.
## Pro Forma Re-capitalization Chart

|  |  | Forecasted as of Plan Effective Date |
| --- | --- | --- |
| Total common shares outstanding prior to Plan effective date |  | 97,549,783 |
| Accentia Class 3 Allowed Secured Claim | (1) | 17,594,557 |
| Class 4, 6, 7 and 8 Plan Shares | (2) | 3,987,131 |
| **Outstanding shares on the Plan Effective Date** |  | **119,131,471** |
| Outstanding warrants | (3) | 18,677,172 |
| ISO Options |  | 26,732,486 |
| **Fully diluted shares prior to Laurus issuance** |  | **164,541,129** |
|  |  |  |
| Shares issued to Laurus/Valens under settlement agreement | (4) | 13,767,084 |
| **Fully diluted shares** |  | **178,308,213** |
|  |  |  |
| **Shares authorized** |  | **300,000,000** |

(1) Based on $11,991,510 principal plus 6% per annum post petition interest at an estimated Effective Date of 07/13/10 converting at $.75 per share.

(2) Classes 4, 6, 7 and 8 have the option to convert to Biovest common shares at market price. The capitalization chart assumes conversion at $2.00 per share.

(3) Includes issuance of 1 million warrants to Minneapolis landlord for building improvements for vaccine production at market price on contract date

(4) Laurus is entitled to receive 9.99% of fully diluted shares on the Plan effective date (excluding ISO options).