# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:

**Chapter 11**

**ACCENTIA BIOPHARMACEUTICALS, INC., et al.,**

Case No. 8:08-bk-17795-KRM

**(Jointly Administered)**

Debtors.

_____/

### NOTICE OF FILING OF FIRST AMENDED JOINT DISCLOSURE STATEMENT OF BIOVEST INTERNATIONAL, INC., BIOVAX, INC., AUTOVAXID, INC., BIOLENDER, LLC AND BIOLENDER II, LLC

Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC and Biolender II, LLC, as debtors and debtors in possession (hereinafter collectively referred to as the "**Debtors**"), by and through their undersigned attorneys, pursuant to the Order Scheduling Hearing on Disclosure Statement, Establishing Disclosure Statement Hearing Procedures, Setting Time to File Fee Applications, and Establishing Administrative Claims Bar Date dated July 12, 2010 [Doc. No. 761], hereby state as follows::

1.  Attached hereto as <u>Exhibit A</u> is the First Amended Joint Disclosure Statement for First Amended Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC under Chapter 11 of Title 11, United States Code (the "**First Amended Disclosure Statement**"). The First Amended Disclosure Statement has been blacklined to show changes made to the Joint Disclosure Statement for Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC Under Chapter 11 of Title 11, United States Code dated as of June 30, 2010 [Doc. No. 753].

Dated: August 9, 2010

/s/ Charles A. Postler
Charles A. Postler (Florida Bar No. 455318)
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
PH     (813) 229-0144
FAX   (813) 229-1811
Attorneys for Debtors

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing **Notice of Filing of First Amended Joint Disclosure Statement of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC and Biolender II, LLC** has been furnished on this 9th day of August, 2010, (i) by **CM/ECF Transmission** or **Electronic Mail Transmission** (with attached Exhibit A) to the United States Trustee, 501 East Polk Street, Suite 1200, Tampa, Florida 33602, Securities and Exchange Commission, c/o Susan R. Sherrill-Beard, 3475 Lenox Road, N.E., Suite 1000, Atlanta, GA 30326-1232 (Sherrill-BeardS@sec.gov), Stuart Komrower, Esq., Cole, Schotz, Meisel, et al., Court Plaza North, 25 Main Street, Hackensack, New Jersey 07601, Paul J. Battista, Esq., Genovese Joblove & Battista, P.A., Bank of America Tower, 100 SE 2nd Street, 44th Floor, Miami, Florida 33131, and Adam H. Friedman, Esq., Olshan Grundman Frome, et al., Park Avenue Tower, 65 East 55th Street, New York, New York 10022 (afriedman@olshanlaw.com) and (ii) by **U.S. Mail or CM/ECF Transmission** (without attached Exhibit A, unless received by the following parties by CM/ECF Transmission) to all parties set forth on the Master Service List for these cases attached hereto as Schedule 1.

/s/ Charles A. Postler
Charles A. Postler

H:\User\Accentia\Notices\filing of 1st amd - Biovest DS.doc

2

# EXHIBIT A

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                              **Chapter 11**

**BIOVEST INTERNATIONAL, INC.,**              **Case No. 8:08-bk-17796-KRM**

**BIOVAX, INC.,**                             **Case No. 8:08-bk-17803-KRM**

**AUTOVAXID, INC.,**                          **Case No. 8:08-bk-17804-KRM**

**BIOLENDER, LLC,**                           **Case No. 8:08-bk-17805-KRM**

**BIOLENDER II, LLC,**                        **Case No. 8:08-bk-17806-KRM**

Debtors.

_____/

## FIRST AMENDED JOINT DISCLOSURE STATEMENT FOR FIRST AMENDED JOINT PLAN OF REORGANIZATION OF BIOVEST INTERNATIONAL, INC., BIOVAX, INC., AUTOVAXID, INC., BIOLENDER, LLC, AND BIOLENDER II, LLC UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE

STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
Charles A. Postler (Florida Bar No. 455318)
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone:      (813) 229-0144
Facsimile:      (813) 229-1811
Email:          cpostler@srbp.com
Counsel for Debtors and Debtors in Possession

Tampa, Florida
Dated as of ~~June 30,~~ August 9, 2010

THIS FIRST AMENDED JOINT DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF TITLE 11, UNITED STATES CODE DATED AS OF ~~MAY 14,~~ AUGUST 9, 2010 (AS AMENDED FROM TIME TO TIME, THE "PLAN"), AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE ADVICE ON THE TAX OR SECURITIES LAWS OR OTHER LEGAL EFFECTS OF THE PLAN ON HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS. ANY CREDITOR OR OTHER PARTY BUYING OR SELLING A CLAIM BASED ON THE INFORMATION CONTAINED HEREIN, INCLUDING ON EXHIBIT 1, DOES SO AT ITS OWN RISK.

ALL CREDITORS AND HOLDERS OF EQUITY INTERESTS THAT ARE ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT FURNISHED TO THEM AND THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT, PRIOR TO SUBMITTING A BALLOT OR A BIOVEST STOCKHOLDER BALLOT, RESPECTIVELY, PURSUANT TO THIS SOLICITATION. THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED AS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN ITSELF. EACH CREDITOR AND HOLDER OF AN EQUITY INTEREST SHOULD READ, CONSIDER AND CAREFULLY ANALYZE THE TERMS AND PROVISIONS OF THE PLAN.

**THE PLAN PROPOSES EXCULPATION FROM LIABILITY AS TO THE DEBTORS AND VARIOUS NON-DEBTOR PARTIES AND RELEASES AS TO VARIOUS NON-DEBTOR PARTIES FOR CERTAIN POSTPETITION ACTIONS IN CONNECTION WITH THE BANKRUPTCY CASES, WHICH PROVISIONS WOULD ENJOIN THE DEBTORS, HOLDERS OF CLAIMS, AND HOLDERS OF EQUITY INTERESTS FROM PURSUING CERTAIN ACTIONS AGAINST SUCH PARTIES EXCEPT AS OTHERWISE PROVIDED IN THE PLAN. ALL CREDITORS, HOLDERS OF EQUITY INTERESTS AND OTHER PARTIES IN INTEREST ARE URGED TO READ CAREFULLY ARTICLE 12.2 OF THE PLAN ON EXCULPATION FROM LIABILITY AND ARTICLE 12.3 OF THE PLAN ON RELEASES.**

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION NOR HAS THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. IN ADDITION, THE DISCLOSURE STATEMENT AND THE PLAN HAVE NOT BEEN REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF ACCENTIA BIOPHARMACEUTICALS, INC. OR BIOVEST INTERNATIONAL, INC. SHOULD EVALUATE THE DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

NO PERSON IS AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE

DEBTORS. SUCH ADDITIONAL REPRESENTATIONS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTORS, WHO IN TURN SHALL DELIVER SUCH INFORMATION TO THE BANKRUPTCY COURT FOR ACTION AS MAY BE DEEMED APPROPRIATE. THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT UNDER ANY CIRCUMSTANCES IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE HEREOF. THIS DISCLOSURE STATEMENT IS DATED AS OF ~~JUNE 30,~~AUGUST 9, 2010, AND CREDITORS AND HOLDERS OF EQUITY INTERESTS ARE ENCOURAGED TO REVIEW THE DOCKET IN THE BANKRUPTCY CASES IN ORDER TO APPRISE THEMSELVES OF EVENTS WHICH OCCUR BETWEEN THE DATE OF THIS DISCLOSURE STATEMENT AND THE DATE OF THE CONFIRMATION HEARING.

NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, UNLESS OTHERWISE STATED, ALL STATEMENTS IN THIS DISCLOSURE STATEMENT AND IN THE PLAN CONCERNING THE DEBTORS' BUSINESSES, THE PAST OR PRESENT FINANCIAL CONDITION OF THE DEBTORS, THE PROJECTIONS FOR THE FUTURE OPERATIONS OF THE DEBTORS, TRANSACTIONS TO WHICH THE DEBTORS WERE OR ARE PARTY, OR THE EFFECT OF CONFIRMATION OF THE PLAN ON HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS ARE ATTRIBUTABLE EXCLUSIVELY TO THE DEBTORS AND NOT TO ANY OTHER PARTY. NONE OF THE ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS RETAINED BY THE DEBTORS OR THE COMMITTEE MAKES ANY REPRESENTATIONS CONCERNING SUCH INFORMATION.

THE DEBTORS HAVE ATTEMPTED TO PRESENT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT ACCURATELY AND FAIRLY. THE ASSUMPTIONS UNDERLYING THE ANTICIPATION OF FUTURE EVENTS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT AN ESTIMATE BY THE DEBTORS, BUT BECAUSE THESE ARE ONLY ASSUMPTIONS OR PREDICTIONS OF FUTURE EVENTS (MOST OF WHICH ARE BEYOND THE DEBTORS' CONTROL), THERE CAN BE NO ASSURANCE THAT THE EVENTS WILL OCCUR.

IN THE EVENT THAT ANY IMPAIRED CLASS OF CLAIMS OR EQUITY INTERESTS VOTES TO REJECT THE PLAN, (1) THE DEBTORS MAY ALSO SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN WITH RESPECT TO THAT CLASS UNDER THE BANKRUPTCY CODE'S "CRAMDOWN" PROVISIONS AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO SUCH REQUIREMENTS, OR (2) THE PLAN MAY BE OTHERWISE MODIFIED OR WITHDRAWN.

THE REQUIREMENTS FOR CONFIRMATION, INCLUDING THE VOTE OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS TO ACCEPT THE PLAN AND CERTAIN OF THE STATUTORY FINDINGS THAT MUST BE MADE BY THE BANKRUPTCY COURT, ARE SET FORTH IN THE SECTION OF THIS DISCLOSURE STATEMENT TITLED "VOTING ON AND CONFIRMATION OF THE PLAN."

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1
PURPOSE OF THIS DISCLOSURE STATEMENT ............................................. 2̶3
VOTING INSTRUCTIONS ........................................................................................ 3
    Who May Vote ....................................................................................................... 3
    How to Vote .......................................................................................................... 3
        *I. Voting on the Plan by the Holder of a Claim* .......................................... 3
                *Convenience Class Opt-In Election and Convenience Class Opt-Out*
                *Election* . ........................................................................................ 4
                *Conversion Election for Holders of Class 4, 6, 7 and 8 Claims.* ............... 4
        *II. Voting on the Plan by the Biovest Stockholders* ................................... 4
    Acceptance of Plan and Vote Required for Class Acceptance ............................ 5
    Confirmation Hearing and Objections to Confirmation ................................. 5̶6

SUMMARY OF THE PLAN ....................................................................................... 6
    Introduction ........................................................................................................... 6
    General Overview of the Plan ............................................................................... 7
    Classification of Claims and Equity Interests ..................................................... 8
    Summary of Plan Distributions ............................................................................ 9
        *Administrative Expense Claims.* ............................................................... 9
        *Priority Tax Claims.* ............................................................................... 10
        *DIP Loan Claims.* .............................................................................. 1̶011
        *Class 1: Priority Claims* .................................................................... 1̶213
        *Class 2: Secured Claims and Other Claims of Laurus/Valens* ............. 13
        *Class 3: Secured Claims and Other Claims of Accentia.* ..................... 18
        *Class 4: Secured Claims and Other Claims of the 2008 Secured Debentures*
                *Holders* ......................................................................................... 19
        *Class 5: Secured Tax Claims of Governmental Units.* .................. 2̶021
        *Class 6: Other Secured Claims.* ........................................................ 2̶122
        *Class 7: Unsecured Claims of Ronald E. Osman under the Osman Note* ....... 2̶223
        *Class 8: Unsecured Claims (Unsecured Claims Not Otherwise Classified)* ... 2̶324
        *Class 9: Unsecured Convenience Claims* ........................................ 2̶526
        *Class 10: Intercompany Claims* ....................................................... 2̶527
        *Class 11: Subordinated Securities Claims.* ..................................... 2̶627
        *Class 12: Equity Interests* ................................................................ 2̶627
        *Class 13: Subsidiary Equity Interests* ............................................. 2̶628
    Substantive Consolidation of the Debtors' Estates ....................................... 2̶628
        *Request for Substantive Consolidation* ........................................... 2̶728
        *Effect of Substantive Consolidation.* ................................................ 2̶728
    Conditions Precedent to Confirmation of the Plan and the Effective Date ............. 2̶729
        *Conditions Precedent to Confirmation of the Plan.* ........................ 2̶729
        *Conditions Precedent to the Effective Date.* .................................. 2̶829
        *Notice of the Effective Date.* ............................................................ 2̶829
    Exit Financing .................................................................................................. 2̶829
    Treatment of Executory Contracts and Unexpired Leases ........................... 2̶930

*Assumption or Rejection of Executory Contracts and Unexpired Leases.* ....... 2931

*Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases* ............................................................................................... 2931

*Inclusiveness.* ........................................................................................... 3031

*Cure of Defaults* ...................................................................................... 3031

*Claims under Rejected Executory Contracts and Unexpired Leases.* .............. 3032

*Insurance Policies.* ................................................................................... 3132

*Indemnification Rights.* ............................................................................ 3132

*Existing Biovest Stock Options*

3113

3

*Existing Biovest Stock Warrants.* ............................................................... 3234

Vesting of Property of the Estates in Reorganized Biovest ........................................ 3234

Continued Corporate Existence; Dissolution .................................................................. 3335

Amendment and Restatement of Certificate of Incorporation and Bylaws of Biovest ............................................................................................................................... 3335

Board of Directors and Executive Officers of the Reorganized Debtors .................. 3435

Discharge, Exculpation from Liability, Release and Injunction Provisions under the Plan .............................................................................................................................. 3537

*Discharge of Claims and Termination of Equity Interests.* ............................ 3537

*Exculpation from Liability.* ....................................................................... 3638

*Release* .................................................................................................... 3739

*General Injunction* ................................................................................... 3740

*Term of Certain Injunctions and Automatic Stay* ......................................... 3840

*No Liability for Tax Claims.* ...................................................................... 3841

*Regulatory or Enforcement Actions.* ........................................................... 3841

Distributions under the Plan .......................................................................................... 3841

*Initial Distributions.* ................................................................................. 3841

*Execution and Delivery of Plan Notes and Security Documents.* ..................... 3941

*Determination of Claims* ........................................................................... 3941

*Distributions as to Allowed Claims in Classes 8 and 11.* ............................... 4043

*Unclaimed Distributions.* ........................................................................... 4043

Determination of Voting and Distribution Rights of Holders of Equity Interests ..... 4143

Issuance of Reorganized Biovest Common Stock ........................................................ 4144

Exemptions from Securities Laws ................................................................................. 4144

*General.* ................................................................................................... 4144

*Issuance of Reorganized Biovest Common Stock under the Plan.* .................... 4244

*Subsequent Transfers of Plan Shares.* ........................................................ 4245

*Plan Shares Issued Pursuant to Section 1145 Exemption* .............................. 4245

*Plan Shares Held by Underwriters.* ............................................................. 4346

Fractional Shares ............................................................................................................ 4446

Certain Restrictions on Stock Transfers ....................................................................... 4447

Delinquency in Filing Public Reports ........................................................................... 4447

Corporate Action ........................................................................................................... 4447

Section 1146 Exemption ................................................................................................ 4547

Pursuit of Causes of Action ........................................................................................... 4548

Prosecution and Settlement of Claims and Causes of Action ...................................... 4749

Dissolution of the Committee ............................................................... ~~47~~50
Retention of Jurisdiction .................................................................... ~~47~~50

EVENTS LEADING TO THE CHAPTER 11 FILINGS ..................................... ~~48~~50

BUSINESS OF BIOVEST .......................................................................... ~~48~~51
  Introduction ....................................................................................... ~~49~~51
  Overview of Businesses ..................................................................... ~~49~~52
  Therapeutic Cancer Vaccine -- BiovaxID® .......................................... ~~50~~53
    *The Human Immune System.* ........................................................ ~~50~~53
    *Non-Hodgkin's Lymphoma.* .......................................................... ~~52~~55
    *Follicular Lymphoma.* .................................................................. ~~52~~55
    *Mantle Cell Lymphoma.* ............................................................... ~~53~~56
  Development Status of BiovaxID® ...................................................... ~~54~~58
    *Introduction.* ................................................................................ ~~54~~58
    *Regulatory.* ................................................................................... ~~55~~58
    *Phase 2 Clinical Trial—Follicular Lymphoma.* ............................. ~~56~~59
    *Phase 2 Clinical Trial--Mantle Cell Lymphoma.* .......................... ~~56~~60
  Phase 3 Clinical Trial (BV301) of BiovaxID® for Treatment of Follicular Lymphoma
  ............................................................................................................. ~~57~~60
    *Overview and Objectives.* .............................................................. ~~57~~60
    *Biopsy, Chemotherapy, and Immune Recovery.* ............................ ~~58~~61
    *Randomization to Immune Recovery Followed By BiovaxID® or Control.* ~~58~~61
    *Trial Enrollment and The Use of Rituximab-Containing Induction Chemotherapy .*
    ............................................................................................................. ~~58~~62
    *Results.* ......................................................................................... ~~59~~62
  BiovaxID® Manufacturing Process and Manufacturing Facility ........... ~~60~~63
    *Manufacturing Process* .................................................................. ~~60~~63
    *Manufacturing Facility.* ................................................................. ~~61~~64
  Instruments and Disposables ............................................................... ~~61~~65
    *AutovaxID™.* ................................................................................ ~~61~~65
    *Primer HF®.* ................................................................................. ~~62~~65
    *MiniMax®.* .................................................................................... ~~62~~65
    *Maximizer®.* .................................................................................. ~~62~~65
    *XCellerator™.* ............................................................................... ~~62~~65
  Cell Culture Products and Services ...................................................... ~~63~~66
  Competition for BiovaxID® ................................................................ ~~64~~67
  Patents, Trademarks and Protection of Proprietary Technology ............ ~~65~~68
  Government Regulation ....................................................................... ~~66~~69
  Insurance ............................................................................................ ~~68~~71
  Employees ........................................................................................... ~~68~~71
  Properties ............................................................................................ ~~68~~71
  Prepetition Secured Obligations .......................................................... ~~69~~73
    *Laurus/Valens.* .............................................................................. ~~69~~73
    *Accentia.* ....................................................................................... ~~70~~73
    *2008 Secured Debentures.* ............................................................ ~~70~~74
  Financial Projections ........................................................................... ~~71~~74

CERTAIN RISK FACTORS TO BE CONSIDERED ........................................................ ~~71~~75

SIGNIFICANT EVENTS IN THE CHAPTER 11 BANKRUPTCY CASES ........................ ~~90~~94
    Introduction.................................................................................................. ~~90~~94
    Joint Administration...................................................................................... ~~91~~94
    Payment of Prepetition Employee Obligations.............................................. ~~91~~94
    Master Service List ....................................................................................... ~~91~~95
    Adequate Assurance as to Utility Companies................................................. ~~91~~95
    Rejection of Prepetition Employment Agreement with Steven Arikian, M.D........... ~~92~~95
    Retention of Professionals by the Debtors..................................................... ~~92~~96
    Appointment of Unsecured Creditors Committee ........................................... ~~92~~96
    Retention of Professionals by the Committee................................................. ~~93~~96
    Schedules and Statements of Financial Affairs ............................................. ~~93~~97
    Section 341 Meetings of Creditors ................................................................ ~~93~~97
    List of Equity Security Holders ..................................................................... ~~93~~97
    Non-Appointment of Equity Security Holders Committee ............................. ~~93~~97
    Use of Cash Collateral .................................................................................. ~~93~~97
    Debtor in Possession Financing for Biovest ................................................. ~~94~~97
    Bar Dates....................................................................................................... ~~95~~98
    Amendment of Lease for Corporate Offices in Tampa, Florida ..................... ~~95~~99
    New Sublease for Analytica Offices in New York, New York ....................... ~~95~~99
    New Sublease for Analytica Offices in Lorrach, Germany ............................ ~~96~~100
    Insurance Premium Finance Agreements........................................................ ~~96~~100
    Settlement with Laurus/Valens ..................................................................... ~~97~~100
    Settlement with BioDelivery Sciences International, Inc. and Arius Pharmaceuticals,
        Inc. ........................................................................................................ ~~97~~101
    Disputes with Collegium Pharmaceutical, Inc.; Collegium Adversary Proceeding ~~98~~101
    Disputes with Phillip Rosensweig; Rosensweig Adversary Proceeding................. ~~99~~103
    Motion for Adequate Protection Filed by Cranshire Capital, L.P........................ ~~100~~103
    Requests for Administrative Expense Claims.................................................... ~~100~~103
    Rejection of Unexpired Leases of Nonresidential Real Property ......................... ~~100~~104
    Rejection of Executory Contracts ................................................................... ~~101~~104
    Motion for Turnover of Stock Records ........................................................... ~~101~~104
    Extension of Exclusivity Periods .................................................................... ~~101~~105
    Claims Objections........................................................................................... ~~101~~107

CERTAIN FEDERAL INCOME TAX CONSEQUENCES...................................... ~~102~~107
    General.......................................................................................................... ~~102~~107
    General Federal Income Tax Consequences to Holders ................................... ~~102~~108
        *In General* ............................................................................................ ~~102~~108
        *Tax Consequences to Holders of Claims and Equity Interests:*.................... ~~102~~108
    Certain Federal Income Tax Consequences to the Debtors ............................... ~~103~~108
        *Reduction of Tax Attributes and Cancellation of Debt*............................... ~~103~~108
        *Limitation on NOL Carryforwards and Other Tax Attributes.*..................... ~~104~~109

VOTING ON AND CONFIRMATION OF THE PLAN.......................................... ~~105~~110

Confirmation and Acceptance by All Impaired Classes .................................... ~~105~~110
    *Feasibility.* ................................................................................... ~~105~~111
    *Best Interests Standard* ................................................................. ~~105~~111
Confirmation Without Acceptance by All Impaired Classes .................... ~~106~~111
    *Discriminate Unfairly..* ................................................................. ~~106~~111
    *Fair and Equitable Standard..* ....................................................... ~~106~~111
Absolute Priority Rule ....................................................................... ~~107~~112
Non-Confirmation of the Plan ........................................................... ~~107~~112

ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..... ~~107~~113
Alternative Plans of Reorganization ................................................... ~~107~~113
Liquidation under Chapter 7 or Chapter 11 ........................................ ~~108~~113

SUMMARY, RECOMMENDATION AND CONCLUSION ............................. ~~108~~114

**INDEX TO EXHIBITS**

Exhibit 1 –   Cash Flow Projections for Reorganized Biovest for the Fiscal Quarters Ended ~~September 30,~~December 31, 2010 through ~~December~~March 31, ~~2013~~2014

Exhibit 2 –   Liquidation Analysis as of ~~June 30,~~July 31, 2010

ix

# FIRST AMENDED JOINT DISCLOSURE STATEMENT
## PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE

## INTRODUCTION

Biovest International, Inc. and its wholly-owned subsidiaries, Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC, as debtors and debtors in possession in the Biovest Bankruptcy Cases (collectively, the "Debtors"), have filed with the United States Bankruptcy Court for the Middle District of Florida, Tampa Division (the "Bankruptcy Court"), their First Amended Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC under Chapter 11 of Title 11, United States Code dated as of ~~May 14,~~ August 9, 2010 (as amended from time to time, the "Plan"). This First Amended Joint Disclosure Statement for First Amended Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC under Chapter 11 of Title 11, United States Code dated as of ~~June 30,~~ August 9, 2010 (the "Disclosure Statement"), is submitted pursuant to Section 1125 of the Bankruptcy Code, 11 U.S.C. §§ 101, et. seq. (the "Bankruptcy Code"), in connection with the solicitation of votes on the Plan from Holders of Impaired Claims against, and Impaired Equity Interests in, the Debtors. The hearing on Confirmation of the Plan is scheduled for ~~_____, 2010, at _____ _____.m.~~ September _, 2010, at _____.m. This Disclosure Statement shall amend, restate and replace in its entirety the Joint Disclosure Statement for Joint Plan of Reorganization of Biovest International, Inc., Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC under Chapter 11 of Title 11, United States Code dated as of June 30, 2010 (Docket No. 753).

This Disclosure Statement has been approved by the Bankruptcy Court in accordance with Section 1125(b) of the Bankruptcy Code as containing information of a kind and in sufficient detail adequate to enable a hypothetical reasonable investor typical of Holders of Claims and Equity Interests in the relevant Voting Classes (as defined below) to make an informed judgment whether to accept or reject the Plan. Such approval of this Disclosure Statement by the Bankruptcy Court and the transmittal of this Disclosure Statement do not, however, constitute a determination by the Bankruptcy Court as to the fairness or merits of the Plan and should not be interpreted as being a recommendation by the Bankruptcy Court either to accept or reject the Plan.

In summary, but subject to more specific details provided herein and in the Plan, the Plan provides for the reorganization of the Debtors and the payment in full of all of the Allowed Claims against the Debtors and the retention by the Biovest Stockholders of their Equity Interests in Biovest subject to dilution as provided in the Plan. Although the Debtors' Estates are presently being jointly administered for procedural purposes, the Debtors and their Estates have not yet been substantively consolidated. Article 10 of the Plan constitutes a motion by the Debtors seeking the substantive consolidation of the Debtors' Estates. If such motion is granted and the Plan is confirmed by the Bankruptcy Court, then, on the Effective Date of the Plan, the Properties of all of the Debtors' Estates will be consolidated into one estate to be thereafter known as the Biovest Estate. The Biovest Estate and the implementation of the Plan will be managed by the Board of Directors of Biovest.

THE PLAN HAS BEEN APPROVED BY THE BOARD OF DIRECTORS OF BIOVEST. IN THE OPINION OF THE DEBTORS, THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN CONTEMPLATES A GREATER RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES FOR THE REORGANIZATION OR LIQUIDATION OF THE DEBTORS. ACCORDINGLY, THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF CREDITORS AND HOLDERS OF EQUITY INTERESTS, AND THE DEBTORS RECOMMEND THAT CREDITORS AND HOLDERS OF EQUITY INTERESTS VOTE TO ACCEPT THE PLAN.

[IN ADDITION, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE DEBTORS BELIEVES THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF UNSECURED CREDITORS AND RECOMMENDS THAT UNSECURED CREDITORS VOTE TO ACCEPT THE PLAN. UNSECURED CREDITORS ARE ENCOURAGED TO READ THE COMMITTEE SUPPORT LETTER INCLUDED WITH THE DISCLOSURE STATEMENT AND THE PLAN.]

Accompanying or included as Exhibits to this Disclosure Statement are copies of the following documents:

(a) the Plan, including all Exhibits thereto;

(b) Cash Flow Projections for Reorganized Biovest for the Fiscal Quarters Ended ~~September 30,~~December 31, 2010 through ~~December~~March 31, ~~2013,~~2014, included as Exhibit 1 to this Disclosure Statement;

(c) Liquidation Analysis as of ~~June 30,~~July 31, 2010, included as Exhibit 2 to this Disclosure Statement;

(d) the Bankruptcy Court's Order Approving Disclosure Statement, Fixing Time to File Objections to the Disclosure Statement, Fixing Time to File Applications for Administrative Expenses, Setting Hearing on Confirmation of the Plan, and Setting Deadlines with Respect to Confirmation Hearing, dated August _____, 2010, entered in the Bankruptcy Cases (Docket No. _____) (the "Disclosure Statement Approval Order");

(e) in the case of Impaired Classes of Claims entitled to vote on the Plan (Classes 1, 2, 3, 4, 6, 7, 8, 9, and 11) (each, a "Voting Class"), a Ballot for acceptance or rejection of the Plan; ~~and~~

(f) in the case of Impaired Classes of Equity Interests entitled to vote on the Plan (Class 12) (also, a "Voting Class"), a Biovest Stockholder Ballot for acceptance or rejection of the Plan.~~.~~; and

(g) [a letter from the Committee to Unsecured Creditors dated August 9, 2010, recommending that Unsecured Creditors vote to accept the Plan.]

# PURPOSE OF THIS DISCLOSURE STATEMENT

The purpose of this Disclosure Statement is to provide the Holders of Claims and Equity Interests with adequate information to make an informed judgment about the Plan. This information includes, among other things, (a) the procedures for voting on the Plan, (b) a summary of the Plan and an explanation of how the Plan will function, including the means of implementing and funding the Plan (including the securities of Biovest to be issued under the Plan), (c) the events leading to the filing of the Bankruptcy Cases, (d) general information about the businesses, properties, and operations of the Debtors, (e) projections for the Debtors' future operations, and (f) a summary of significant events which have occurred to date in the Bankruptcy Cases.

This Disclosure Statement contains important information about the Plan and considerations pertinent to a vote for or against the Confirmation of the Plan. All Holders of Claims and Equity Interests are encouraged to review carefully this Disclosure Statement.

Unless otherwise defined herein, all capitalized terms used in this Disclosure Statement have the meanings ascribed to them in the Plan. Any term used in the Plan or herein that is not defined in the Plan or herein and that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be. If there is any conflict between the definitions contained in this Disclosure Statement and the definitions contained in the Plan, the definitions contained in the Plan shall control.

# VOTING INSTRUCTIONS

## Who May Vote

Only the Holders of Claims and Equity Interests which are "Impaired" under the terms and provisions of the Plan are permitted to vote to accept or reject the Plan. Holders of Class 10 Intercompany Claims and Class 13 Subsidiary Equity Interests will not receive or retain any Property or equity interest under the Plan on account of such Intercompany Claims and Subsidiary Equity Interests and, therefore, Classes 10 and 13 are deemed not to have accepted the Plan and are not entitled to vote. For purposes of the Plan, only the Holders of Claims and Equity Interests in the Voting Classes (Classes 1, 2, 3, 4, 6, 7, 8, 9, 11 and 12) are Impaired under the Plan and thus may vote to accept or reject the Plan. ACCORDINGLY, A BALLOT (OR A BIOVEST STOCKHOLDER BALLOT) FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO MEMBERS OF THE VOTING CLASSES.

## How to Vote

### *I. Voting on the Plan by the Holder of a Claim*

Each Holder of a Claim in a Voting Class should read the Disclosure Statement, together with the Plan and any Exhibits thereto, in their entirety. After carefully reviewing the Plan and

this Disclosure Statement and any Exhibits thereto, please complete the enclosed Ballot, including marking your vote with respect to the Plan, and return it as provided below. If you have an Impaired Claim in more than one Class, you should receive a separate Ballot for each such Claim. If you receive more than one Ballot, you should assume that each Ballot is for a separate Impaired Claim and you should complete and return all of them.

If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Charles A. Postler, counsel to the Debtors, by telephone at (813) 229-0144 or by electronic transmission at cpostler@srbp.com.

**YOU SHOULD COMPLETE AND SIGN EACH ENCLOSED BALLOT AND RETURN IT TO THE ADDRESS FOR THE BANKRUPTCY COURT PROVIDED BELOW. IN ORDER TO BE COUNTED, BALLOTS MUST BE DULY COMPLETED AND EXECUTED AND RECEIVED BY THE CLERK OF THE BANKRUPTCY COURT BY NO LATER THAN SEPTEMBER _____, 2010 (THE "VOTING DEADLINE").**

All Ballots should be returned either by regular mail, hand delivery or overnight delivery to:

> Clerk, United States Bankruptcy Court
> Sam M. Gibbons United States Courthouse
> 801 N. Florida Avenue, 5th Floor
> Tampa, Florida 33602-3826

*Convenience Class Opt-In Election and Convenience Class Opt-Out Election.* As further outlined in the Plan, each Holder of an Unsecured Claim (i) in an amount greater than $5,000.00 may have its Unsecured Claim treated as a Class 9 Unsecured Convenience Claim under the Plan by making the Convenience Class Opt-In Election, or (ii) in an amount less than or equal to $5,000.00 may have its Unsecured Claim treated as a Class 8 Unsecured Claim under the Plan by making the Convenience Class Opt-Out Election. For treatment of Class 8 Claims and Class 9 Claims, please review Articles 5.9 and 5.10, respectively, of the Plan. The Convenience Class Opt-In Election and the Convenience Class Opt-Out Election are irrevocable and must be made by such Holder on the Ballot and filed with the Bankruptcy Court on or before the Voting Deadline.

*Conversion Election for Holders of Class 4, 6, 7 and 8 Claims.* As further outlined in the Plan, each Holder of a Claim in Classes 4, 6, 7 and 8 may elect to convert the Allowed Amount of its Claim into shares of Reorganized Biovest Common Stock. For treatment of Claims in Classes 4, 6, 7 and 8, please review Articles 5.5, 5.7, 5.8 and 5.9, respectively, of the Plan. The Conversion Election is irrevocable and must be made by such Holder on the Ballot and filed with the Bankruptcy Court on or before the Voting Deadline.

## II. *Voting on the Plan by the Biovest Stockholders*

The Biovest Stockholders have the right to vote on the Plan in Class 12 with regard to the Class 12 Equity Interests. Biovest Stockholders who are owners of the Class 12 Equity Interests as of the Record Date (i.e., August _____, 2010) are entitled to vote in Class 12 to accept or

reject the Plan, and all such Biovest Stockholders should receive the ~~complete~~ Plan Solicitation Package from the Balloting Agent, which includes a Biovest Stockholder Ballot. Each Biovest Stockholder should read the Disclosure Statement, together with the Plan and any Exhibits thereto, in their entirety. After carefully reviewing the Plan and this Disclosure Statement and any Exhibits thereto, each Biovest Stockholder should complete the enclosed Biovest Stockholder Ballot, including marking your vote with respect to the Plan, and return it to the Balloting Agent pursuant to, and by the deadline provided in, the instructions contained in the Biovest Stockholder Ballot.

If a Biovest Stockholder does not receive the complete Plan Solicitation Package, such Biovest Stockholder should contact ~~the Balloting Agent at:~~ Charles A. Postler, counsel to the Debtors, by telephone at (813) 229-0144 or by electronic transmission at cpostler@srbp.com.

## Acceptance of Plan and Vote Required for Class Acceptance

As the Holder of a Claim or an Equity Interest in one of the Voting Classes, your vote on the Plan is extremely important. The Debtors are soliciting acceptances of the Plan only from Holders of Claims in Classes 1, 2, 3, 4, 6, 7, 8, 9, and 11 and Holders of Equity Interests in Class 12, which are the only Classes entitled to vote on the Plan. You may be contacted by the Debtors or their agent with regard to your vote on the Plan.

Pursuant to Section 1126(c) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in dollar amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. If a Holder of a Claim holds more than one Claim in any one Class, all Claims of such Holder in such Class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims in such Class voting on the Plan. Pursuant to Section 1126(d) of the Bankruptcy Code, an Impaired Class of Equity Interests shall have accepted the Plan if the Holders (other than any Holder designated pursuant to Section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Equity Interests actually voting in such Class have voted to accept the Plan.

To meet the requirement for confirmation of the Plan under the "cram-down" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims or Equity Interests which votes to reject, or is deemed to have rejected, the Plan (a "Rejecting Class"), the Debtors would have to show that all Classes junior to the Rejecting Class will not receive or retain any Property under the Plan unless all Holders of Claims or Equity Interests in the Rejecting Class receive or retain under the Plan Property having a value equal to the full amount of their Allowed Claims or Allowed Equity Interests. For a more complete description of the implementation of the "cram down" provisions of the Bankruptcy Code pursuant to the Plan, see "VOTING ON AND CONFIRMATION OF THE PLAN -- Confirmation Without Acceptance by All Impaired Classes."

**Confirmation Hearing and Objections to Confirmation**

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan for September _____, 2010, at _____.m. of said day (the "Confirmation Hearing"), at the United States Bankruptcy Court, Sam M. Gibbons United States Courthouse, 801 N. Florida Avenue, Courtroom 9B, Tampa, Florida 33602, which may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.

Any objection to Confirmation of the Plan must be filed and served in accordance with the Disclosure Statement Approval Order. Pursuant to the Disclosure Statement Approval Order, any such objection must be filed with the Bankruptcy Court by no later than September _____ _____, 2010.

## SUMMARY OF THE PLAN

**Introduction**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize and/or liquidate its business for the benefit of itself and its creditors and stockholders. The formulation of a plan is the principal objective of a Chapter 11 case. In general, a Chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the property that each class is to receive under such plan, and (iii) contains other provisions necessary to the reorganization and/or liquidation of the debtor. Chapter 11 does not require each holder of a claim or equity interest to vote in favor of the plan in order for the bankruptcy court to confirm the plan. However, a plan must be accepted by the holders of at least one impaired class of claims (unless there are no impaired classes) without considering the votes of "insiders" within the meaning of the Bankruptcy Code.

The summary of the Plan contained herein addresses only certain provisions of the Plan. As a summary, it is qualified in its entirety by reference to the Plan itself (including the Plan Supplement and the Plan Documents which are referred to therein). The Plan (including the Plan Supplement and the Plan Documents) shall control and, upon Confirmation and the Effective Date, bind the Debtors, the Reorganized Debtors, all of the Debtors' Creditors, Holders of Equity Interests and other parties in interest except as expressly set forth in the Plan. TO THE EXTENT THAT THE TERMS OF THIS DISCLOSURE STATEMENT VARY OR CONFLICT WITH THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL CONTROL.

The Plan Documents (i.e., all documents that aid in effectuating the Plan, including the Laurus/Valens Settlement Documents, the Plan Notes, the Reorganized Biovest Bylaws, the Reorganized Biovest Charter, and the Security Documents) will be contained in the Plan Supplement (unless already on file with the Bankruptcy Court) and filed with the Bankruptcy Court and posted at www.srbp.com at least ten (10) days prior to the Voting Deadline; provided, however, that the Debtors may amend the Plan Supplement through and including the Confirmation Date. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the Clerk's Office during normal business hours, may be obtained from the

Bankruptcy Court's copying service upon the payment of the appropriate charges, or may be obtained from the Debtors' Bankruptcy Counsel's website at www.srbp.com.

By way of background, the Bankruptcy Cases were commenced on November 10, 2008. Since that time, the Debtors have operated their businesses and/or maintained their Properties as Debtors in Possession. At the time of the filing of the Bankruptcy Cases, Biovax, Inc., AutovaxID, Inc., Biolender, LLC, and Biolender II, LLC, each of which is a wholly-owned subsidiary of Biovest, had no business operations. Since the filing of the Bankruptcy Cases, Biovest has restructured and streamlined its business operations, while continuing to focus on the development of its BiovaxID® anti-cancer vaccine as described in more detail below in "BUSINESS OF BIOVEST."

At the time of the filing of the Bankruptcy Cases, substantially all of the assets of the Debtors were subject to first priority Liens in favor of Laurus/Valens. The total amount of secured debt asserted against the Debtors by Laurus/Valens at the Petition Date was approximately $30.2 million. In addition, Laurus/Valens asserted a right to a 19.50% royalty in the BiovaxID® anti-cancer vaccine and an equity interest of approximately 20% in the Biovest Common Stock. It became apparent during the course of the Bankruptcy Cases that the value of the Debtors' collective assets subject to the Liens in favor of Laurus/Valens was significantly less than the amount of the secured debt owed to Laurus/Valens. Consequently, it also became clear during the course of the Bankruptcy Cases that, absent a settlement with or significant concessions from Laurus/Valens, there would be little or no recovery on the part of Unsecured Creditors. In June 2010, after lengthy and extensive negotiations between the Debtors and Laurus/Valens, the Bankruptcy Court approved a settlement between the Debtors and Laurus/Valens, the terms of which are incorporated into the Plan. See "SIGNIFICANT EVENTS IN THE CHAPTER 11 BANKRUPTCY CASES—Settlement with Laurus/Valens" below and Article 5.3 of the Plan. As a result of that settlement, the Debtors are now in a position to propose a plan of reorganization that provides for payment in full of all Allowed Claims of Creditors.

**General Overview of the Plan**

The Plan provides for the continued operation of the Debtors as Reorganized Debtors. If the Substantive Consolidation Motion is granted and the Plan is confirmed by the Bankruptcy Court, then, on the Effective Date of the Plan, (a) the Properties of all of the Debtors' Estates will be consolidated into one estate to be thereafter known as the Biovest Estate, (b) all of the Class 13 Subsidiary Equity Interests will be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and will be of no further force and effect, and (c) Reorganized Biovest will thereafter manage the Biovest Estate and implement the terms of the Plan, including making Distributions of Cash to Holders of Allowed Claims and issuing the Plan Shares to certain Holders of Allowed Claims and Holders of Allowed Equity Interests.

The Plan represents the culmination of Biovest's efforts to restructure its business operations and concentrate on the continued development of its BiovaxID® anti-cancer vaccine and emerge from Chapter 11 as a viable business entity. The Debtors believe that the going concern value of Biovest's business is greater than the liquidation value of its assets, that only through continued operations will Creditors receive any distribution on account of their Claims,

that many trade creditors will benefit from Biovest's continued business operations through ongoing transactions with Reorganized Biovest, and that the filing for Chapter 11 has preserved jobs for the Debtors' employees.

The Plan is conditioned upon ~~the Debtors~~Biovest's ability to obtain the Exit Financing. Subject to any mandatory prepayment requirements under the Laurus/Valens Term A Notes, Reorganized Biovest intends to utilize the proceeds of the Exit Financing to provide additional working capital to conduct its operations following the Effective Date and to fund, to the extent necessary, certain Cash payments required to be made under the Plan on or shortly after the Effective Date. ~~At the present time, Biovest is negotiating with several parties with respect to the Exit Financing.~~ See "Exit Financing" below for a more detailed discussion of the ~~terms for~~structure and status of the Exit Financing.

The Plan provides for Cash payments to Holders of Allowed Claims and, in certain instances, the issuance of designated amounts of the Reorganized Biovest Common Stock to certain Holders of Allowed Claims, all as more particularly described below and in Articles 3 and 5 of the Plan. In addition, each Holder of an Allowed Class 12 Equity Interest on the Effective Date will be deemed to receive one (1) share of Reorganized Biovest Common Stock for each share of Existing Biovest Common Stock held by such Holder as of the Effective Date, subject to dilution of such Holder's percentage ownership interest in Reorganized Biovest as a result of the issuance of the other Plan Shares.

The Plan will be implemented on the Effective Date, and the primary source of the funds necessary to implement the Plan initially will be the Cash of Reorganized Biovest, including funds to be received from the Exit Financing. At the present time, the Debtors believe that Reorganized Biovest will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Secured Tax Claims in Class 5, and Allowed Unsecured Convenience Claims in Class 9. Cash payments to be made under the Plan after the Effective Date to the Holders of Allowed Priority Tax Claims and Allowed Claims in Classes 1, 2, 4, 6, 7, 8, and 11 will be derived from the operations of Reorganized Biovest or from any new capital or financing raised by Reorganized Biovest, in each case as shown in the Projections attached hereto as <u>Exhibit 1</u>.

**Classification of Claims and Equity Interests**

Section 1123 of the Bankruptcy Code provides that a plan of reorganization shall classify the claims of a debtor's creditors and interests of a debtor's equity holders. The Plan divides the Claims and Equity Interests into thirteen (13) Classes.

Section 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured," or a "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, disputed, undisputed, secured or unsecured." The Debtors are required under Section 1122 of the Bankruptcy Code to classify the Claims and Equity Interests into separate Classes

which contain Claims and Equity Interests that are substantially similar to the other Claims and Equity Interests within such Class.

The Debtors believe that they have classified all Claims and Equity Interests in compliance with the provisions of Section 1122 of the Bankruptcy Code. However, it is possible that a Holder of a Claim or another interested party may challenge the classification of Claims and Equity Interests contained in the Plan and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed. In such event, it is the present intent of the Debtors, to the extent permitted by the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to provide for whatever classification might be required by the Bankruptcy Court for Confirmation and to use the Plan acceptances received in this solicitation for the purpose of obtaining the approval of the Class or Classes of which the accepting Holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. A reclassification of Claims after approval of the Disclosure Statement might necessitate a resolicitation of acceptances or rejections of the Plan.

**Summary of Plan Distributions**

Set forth below is a summary of each Class of Claims and Equity Interests and the expected Distributions under the Plan to Holders of Allowed Claims against and Allowed Equity Interests in the Debtors. Any estimates of Claims set forth in this Disclosure Statement are approximate and are based on amounts scheduled by the Debtors and amounts asserted by Creditors as of the date of this Disclosure Statement. Except as otherwise specifically provided in the Plan, the treatment of, and the consideration to be received by, Holders of Allowed Claims and Holders of Allowed Equity Interests pursuant to the Plan shall be in full and final satisfaction, settlement, release, extinguishment and discharge of their respective Allowed Claims (of any nature whatsoever) and Allowed Equity Interests.

*Administrative Expense Claims.* The Holders of Administrative Expense Claims are entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. The Administrative Expense Claims will consist primarily of Postpetition operating expenses incurred by the Debtors (including unpaid wages and employee benefits), fees and costs of Professionals, fees required to be paid to the United States Trustee, the costs of solicitation of votes on the Plan (including photocopying and postage charges and the fees and costs of the Balloting Agent), and any Administrative Expense Claims filed with the Bankruptcy Court by the deadline set forth in the Disclosure Statement Approval Order. The Debtors estimate that, as of the date of this Disclosure Statement, the Administrative Expense Claims for the unpaid fees and costs of Professionals (including amounts held back pursuant to an order of the Bankruptcy Court) in the Bankruptcy Cases were approximately $650,000.00. As of the date of this Disclosure Statement, there are no pending requests for Administrative Expense Claims against the Debtors on file with the Bankruptcy Court, except for fee applications filed by Professionals.

The Plan provides that, except as otherwise provided below, each Holder of an Allowed Administrative Expense Claim (including Allowed Administrative Expense Claims of

Professionals) shall be paid (a) on the Distribution Date, an amount, in Cash, by Reorganized Biovest equal to the Allowed Amount of its Administrative Expense Claim, in accordance with Section 1129(a)(9)(A) of the Bankruptcy Code, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or Reorganized Biovest, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

The fees required to be paid to the United States Trustee pursuant to 28 U.S.C. §1930(a)(6) for the periods prior to the Effective Date also constitute Administrative Expense Claims. The Plan provides that all unpaid fees and charges assessed against the Estates under Chapter 123 of title 28, United States Code, 28 U.S.C. §§ 1911-1930, for any calendar quarter ending prior to the Effective Date shall be paid to the United States Trustee by Reorganized Biovest by no later than thirty (30) days following the Effective Date. At the time of such payment, Reorganized Biovest shall provide to the United States Trustee an affidavit indicating the disbursements made by the Debtors for the relevant periods, if requested by the United States Trustee. Following the Effective Date, any fees required to be paid to the United States Trustee, pursuant to 28 U.S.C. §1930(a)(6), with respect to the Biovest Bankruptcy Cases shall be paid by Reorganized Biovest until the earlier of (i) the closing of the Biovest Bankruptcy Cases by the issuance of a Final Decree by the Bankruptcy Court, or (ii) the entry of an order by the Bankruptcy Court dismissing the Biovest Bankruptcy Cases or converting the Biovest Bankruptcy Cases to another chapter under the Bankruptcy Code. Any such payment to the United States Trustee shall be in the appropriate sum required pursuant to 28 U.S.C. §1930(a)(6) based upon the applicable disbursements for the relevant period and shall be made within the time period set forth in 28 U.S.C. §1930(a)(6). At the time of each such payment, Reorganized Biovest shall provide to the United States Trustee an affidavit indicating the disbursements for the relevant period, if requested by the United States Trustee.

All Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Biovest Bankruptcy Cases shall be paid by Reorganized Biovest (a) in the ordinary course of business in accordance with contract terms, or (b) under such other terms as may be agreed upon by both the Holder of such Allowed Administrative Expense Claim and the Debtors or Reorganized Biovest, as the case may be, or (c) as otherwise ordered by a Final Order of the Bankruptcy Court.

*Priority Tax Claims.* The Holders of Priority Tax Claims are also entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. As of the date of this Disclosure Statement, the total amount of filed and/or scheduled Priority Tax Claims in the Biovest Bankruptcy Cases is approximately $89,500.00. The Debtors deny any liability as to any of those Priority Tax Claims, and. The Debtors have filed written objections to all of those Claims with the Bankruptcy Court, and no responses to the objections were filed by the required deadline.

The Plan provides that each Holder of an Allowed Priority Tax Claim shall receive from Reorganized Biovest, on account of such Allowed Priority Tax Claim, regular installment payments in Cash on the Distribution Date in accordance with Section 1129(a)(9)(C) of the Bankruptcy Code. Notwithstanding the above, each Holder of an Allowed Priority Tax Claim

may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Tax Claim and the Debtors or Reorganized Biovest, as the case may be.

*DIP Loan Claims.* Pursuant to the terms of the DIP Financing Order, the Bankruptcy Court has approved a $3,000,000.00 Postpetition line of credit facility (the "DIP Facility") from the DIP Lender to Biovest, secured by a first Lien in favor of the DIP Lender on substantially all of the Property of Biovest. As of the date of this Disclosure Statement, the DIP Advances totaled $~~1,390,000.00 (excluding accrued and unpaid interest) and an additional $250,000.00 has been authorized in the DIP Financing Order to be advanced by the DIP Lender to Biovest.~~1,640,000.00. The DIP Advances may increase by another $~~1,610,000.00 (which includes the previously authorized amount of $250,000.00)~~1,360,000.00 to a total of $3,000,000.00, prior to or after the Effective Date, with the consent of the DIP Lender. Any request for additional advances above the $1,640,000.00 previously authorized by the Bankruptcy Court will be pursuant to a motion filed by Biovest with the Bankruptcy Court, with notice to all of the Notice Parties. <u>As of the date of the Disclosure Statement, Biovest anticipates that it will file a motion with the Bankruptcy Court in the near future to request an additional advance of $250,000.00 under the DIP Facility during the month of August 2010.</u> As set forth in the Laurus/Valens Compromise Motion, Laurus/Valens has agreed to support any request by Biovest seeking such additional advances, whether prior to or after the Effective Date, up to a maximum principal amount of $3,000,000.00 outstanding under the DIP Facility.

Pursuant to Section 1129(a)(9)(A) of the Bankruptcy Code, the DIP Lender is entitled to receive on the Effective Date, in full and final satisfaction, settlement, release, extinguishment, and discharge of the DIP Lender Allowed Claim, Cash equal to the amount of the DIP Lender Allowed Claim. In addition, pursuant to the terms of the DIP Loan Documents, the DIP Lender Allowed Claim is due and payable in full on the Effective Date. Subject to and pursuant to the terms of the Plan, the DIP Lender has agreed that the DIP Lender Allowed Claim shall not constitute an Administrative Expense Claim under the Plan and has further agreed to extend the maturity date set forth in the DIP Loan Documents in consideration for the treatment of the DIP Lender Allowed Claim as set forth below.

Under the Plan, the DIP Lender shall receive the following treatment in full and final satisfaction, settlement, release, extinguishment and discharge of the DIP Lender Allowed Claim:

(i) On the Effective Date, Reorganized Biovest shall execute and deliver in favor of the DIP Lender a ~~new~~ promissory note (the "DIP Lender Plan Note") in an original principal amount equal to the DIP Lender Allowed Claim. The DIP Lender Plan Note shall ~~be in substantially the same form as~~<u>amend and restate</u> the secured promissory note executed by Biovest in favor of the DIP Lender pursuant to the DIP Financing Order (as listed on Exhibit A attached to the Plan), and shall contain the following terms: (a) a maturity date of two (2) years following the Effective Date, (b) interest will accrue and be payable on the outstanding principal at a fixed rate of sixteen percent (16%) per annum, calculated based on a 360 day year, with interest in the amount of ten percent (10%) to be paid monthly and interest in the amount of six percent (6%) to accrue and be paid at the maturity date, (c) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, (d) Reorganized Biovest may prepay the DIP Lender Plan Note in full, without penalty, at any time (provided that Reorganized

Biovest must provide ten (10) days advance written notice to the DIP Lender of the date for any such prepayment), and (e) any additional advances made after the Effective Date (up to a maximum principal amount of $3,000,000.00 outstanding under the DIP Facility) shall be added to the principal amount of the DIP Lender Plan Note and be included in the DIP Lender Allowed Claim.

(ii) The DIP Lender Plan Note shall be secured by a first priority Lien on all of the Property of Reorganized Biovest (as described in the DIP Financing Order), and, on the Effective Date, Reorganized Biovest shall execute and deliver in favor of the DIP Lender ~~a new security agreement~~ an amended and restated security agreement (which shall amend and restate the security agreement executed by Biovest in favor of the DIP Lender pursuant to the DIP Financing Order as listed on Exhibit A attached to the Plan) and other customary security documents evidencing such Lien.

(iii) On the Closing Date, the DIP Lender and LV shall enter into the DIP Lender Subordination Agreement, pursuant to which LV shall subordinate the payment of the Laurus/Valens Allowed Class 2 Claims to the payment of the DIP Lender Allowed Claim.

~~(iv) As of the Effective Date, without any further action by any party, subject to the Lien to be granted to the DIP Lender as described in subparagraph (ii) above, the Liens that secure the DIP Loan Claims shall be deemed to be extinguished, satisfied and released. To the extent that any Liens to secure the DIP Loan Claims have been filed or recorded publicly, if requested by Reorganized Biovest, the DIP Lender shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens.~~

(iv) ~~(v)~~ At the option of the DIP Lender, at any time prior to the earlier to occur of (a) the date of the prepayment of the DIP Lender Plan Note in full or (b) the maturity date of the DIP Lender Plan Note, the DIP Lender, in its discretion, may convert all or a portion of the outstanding balance of the DIP Lender Plan Note (including any accrued and unpaid interest comprising part of the DIP Loan Claims and added to the original principal balance of the DIP Lender Plan Note and any accrued and unpaid interest ~~accrued~~ after the Effective Date) into shares of Reorganized Biovest Common Stock (the "DIP Lender Plan Shares") at a conversion rate of $0.75 per share of Reorganized Biovest Common Stock (i.e., the DIP Lender will receive that number of shares of Reorganized Biovest Common Stock determined by dividing such outstanding principal and interest being converted by $0.75). The DIP Lender Plan Shares shall be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the following provisions: (i) any restrictions or limitations under Rule 144(e), (ii) a limit on the sale of the DIP Lender Plan Shares in any ninety (90) day period to that number of the DIP Lender Plan Shares equal to one percent (1%) of the issued and outstanding shares of Reorganized Biovest Common Stock, (iii) a prohibition on the sale of any DIP Lender Plan Shares for a period of one hundred twenty (120) days following any debt or equity raise by Reorganized Biovest of less than $10,000,000.00, (iv) a

prohibition on the sale of any DIP Lender Plan Shares for a period of one hundred eighty (180) days following any debt or equity raise by Reorganized Biovest of $10,000,000.00 or more, and (v) in the event the DIP Lender Plan Shares are issued pursuant to subparagraph (a) above, such shares may not be sold or transferred until after the 12 Month Anniversary Date (provided, however, that this prohibition on transfer shall not prohibit the transfer of any such shares to a family member or to an Entity for the benefit of or controlled by a family member provided that the family member or Entity agrees to be bound by the provisions in ~~subparagraphs (i)-(iv) above~~this subparagraph (iv). <u>Any certificate for the DIP Lender Plan Shares shall contain a legend thereon setting forth the foregoing provisions and restrictions. In addition, the transfer or resale of the DIP Lender Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters)</u>.

*Class 1: Priority Claims.* Class 1 consists of all Priority Claims. The Holders of Priority Claims are also entitled to be paid in full under a plan of reorganization pursuant to the Bankruptcy Code. Based on an analysis of the Proofs of Claim filed to date in the Biovest Bankruptcy Cases as well as the Claims scheduled by the Debtors, the Debtors believe ~~the~~<u>there will be no</u> Allowed ~~Amount of~~ Priority Claims ~~will be approximately $75,000.00.~~<u>in this Class.</u>

The Plan provides that each Holder of an Allowed Priority Claim shall receive from Reorganized Biovest a deferred Cash payment, on the 6 Month Anniversary Date, of a value, as of the Effective Date, equal to the Allowed Amount of its Priority Claim, in accordance with Section 1129(a)(9)(B)(i) of the Bankruptcy Code; provided, however, that if Class 1 has not accepted the Plan (as provided in Section 1126(c) of the Bankruptcy Code), each Holder of an Allowed Priority Claim shall be paid, on the Determination Date, an amount, in Cash, by Reorganized Biovest equal to the Allowed Amount of its Priority Claim in accordance with Section 1129(a)(9)(B)(ii) of the Bankruptcy Code. Notwithstanding the foregoing, each Holder of an Allowed Priority Claim may be paid under such other terms as may be agreed upon by both the Holder of such Allowed Priority Claim and the Debtors or Reorganized Biovest, as the case may be. Class 1 is Impaired by the Plan. Each Holder of a Priority Claim in Class 1 is entitled to vote to accept or reject the Plan.

*Class 2: Secured Claims and Other Claims of Laurus/Valens.* Class 2 consists of all of the Laurus/Valens Prepetition Claims. Following extensive negotiations, the Debtors, the Accentia Debtors, and Laurus/Valens reached a compromise as to all disputes with respect to the Laurus/Valens Prepetition Claims and all disputes between Laurus/Valens and the Accentia Debtors (the "Laurus/Valens Settlement"). On April 16, 2010, the Debtors filed the Laurus/Valens Compromise Motion with the Bankruptcy Court, which sets forth the principal terms of the Laurus/Valens Settlement and includes substantially all of the documents to be executed by the Debtors, the Accentia Debtors, Laurus/Valens and certain other parties in order to consummate the Laurus/Valens Settlement (collectively, the "Laurus/Valens Settlement Documents"). On June 8, 2010, after notice and a hearing, the Bankruptcy Court entered the Laurus/Valens Compromise Order, which approved all of the terms of the Laurus/Valens Settlement. The closing of the Laurus/Valens Settlement (the "Closing") for both the Debtors and the Accentia Debtors must occur concurrently and will occur upon the Effective Date of the Plan and the effective date of the Accentia Plan and the satisfaction or waiver of the other

conditions to Closing set forth in the Biovest Term Loan Agreement and in the Accentia Term Loan Agreement.

The pertinent terms and conditions of the Laurus/Valens Settlement with the Debtors are summarized below. This summary is qualified in its entirety by the Laurus/Valens Settlement Documents and, to the extent of any inconsistencies between this summary and the Laurus/Valens Settlement Documents, the Laurus/Valens Settlement Documents shall control. ~~In addition, unless~~As stated in the Plan, the Laurus/Valens Settlement Documents with respect to the Debtors are included in Composite Exhibit 1 attached to the Laurus/Valens Compromise Motion and, thus, are on file with the Bankruptcy Court and available for review. Copies of the Laurus/Valens Settlement Documents may also be obtained upon written request to Bankruptcy Counsel (to the attention of Charles A. Postler, Esquire). Unless otherwise defined in the Plan, capitalized terms used in subparagraphs (i) – (xix) below shall have the meanings ascribed thereto in the Laurus/Valens Settlement Documents.

(i)     Laurus/Valens will have an Allowed Secured Claim against Reorganized Biovest in the amount of $24,900,000.00 (the "Laurus/Valens Allowed Secured Claim") in full and final satisfaction of all principal asserted by Laurus/Valens against Biovest and the Biovest Subsidiaries in the Laurus/Valens Proofs of Claim. The Laurus/Valens Allowed Secured Claim will be evidenced by one or more term notes (the "Laurus/Valens Term A Notes"), which will be executed and delivered by Reorganized Biovest on the Closing Date. The Laurus/Valens Term A Notes will contain the following terms: (a) a maturity date of two (2) years following the Closing Date, (b) interest will accrue at the rate of eight percent (8%) per annum, calculated based on a 365 day year, and will be payable at the time of any principal payment or prepayment of principal, (c) a default rate of interest of twelve percent (12%) per annum, (d) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, (e) Reorganized Biovest may prepay the Laurus/Valens Term A Notes, without penalty, at any time, and (f) Reorganized Biovest is required to make mandatory prepayments under the Laurus/Valens Term A Notes as follows: (i) a prepayment equal to thirty percent (30%) of the Net Proceeds (i.e., the gross proceeds received less any investment banking or similar fees and commissions and legal costs and expenses incurred by Reorganized Biovest) of any Capital Raise (excluding (x) any additional loans to Reorganized Biovest from either the DIP Lender or Accentia up to a maximum amount equal to the difference between $3,000,000.00 and the outstanding balance of the DIP Facility as of the Closing Date, and (y) the first $1,500,000.00 of Net Proceeds received by Reorganized Biovest after the Closing Date, and (z) cash proceeds received by Reorganized Biovest from the exercise of stock options or stock purchase warrants if the stock option or stock purchase warrant was issued prior to the Closing Date or issued pursuant to the Plan), but only up to the then outstanding principal and accrued interest under the Laurus/Valens Term A Notes, and (ii) from any intercompany funding by Accentia to Reorganized Biovest, provided that thirty percent (30%) of such intercompany funding shall first be used by Accentia to prepay the Accentia Term Notes and, if the Accentia Term Notes have been paid in full, the balance of such thirty percent (30%) of the intercompany funding shall then be used to prepay the Laurus/Valens Term A Notes, and (iii) a prepayment equal to fifty percent (50%) of positive Net Cash Flow of Reorganized Biovest for each fiscal quarter after the Closing Date, less the amount of

Biologic Products Capital Expenditures made during such fiscal quarter or during any prior fiscal quarter ending after the Closing Date (excluding any such expenditures that have previously been taken into account in calculating the prepayment amount for any prior fiscal quarter). The term "Biologic Products Capital Expenditures" shall mean capital expenditures of the Reorganized Debtors directly related to the development and production of the Biovest Biologic Products, including any capital expenditures incurred by the Reorganized Debtors in modifying or expanding their biologics manufacturing facilities, but shall not include any allocation for corporate overhead or other general and administrative expenses. Any mandatory prepayment will be applied, pro rata, as a reduction of principal on the then outstanding balance of the Laurus/Valens Term A Notes and interest accrued on such paid principal amount through the date of payment.

(ii)     Laurus/Valens will have an additional Allowed Secured Claim against Reorganized Biovest in the amount of $4,160,000.00 (the "Laurus/Valens Additional Allowed Secured Claim") in full and final satisfaction of the interest, penalties, fees, and default interest in the amount of $7,332,987.49 asserted by Laurus/Valens against Biovest and the Biovest Subsidiaries in the Laurus/Valens Proofs of Claim. The Laurus/Valens Additional Allowed Secured Claim will be evidenced by one or more term notes (the "Laurus/Valens Term B Notes"), which will be executed and delivered by Reorganized Biovest on the Closing Date. The Laurus/Valens Term B Notes will contain the following terms: (a) a maturity date of three (3) years following the Closing Date, (b) interest will accrue at the rate of eight percent (8%) per annum, calculated based on a 365 day year, and will be payable at the time of any principal payment or prepayment of principal, (c) a default rate of interest of twelve percent (12%) per annum, (d) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, (e) Reorganized Biovest may prepay the Laurus/Valens Term B Notes, without penalty, at any time, and (f) provided that the Laurus/Valens Term A Notes have been paid in full, Reorganized Biovest is required to make mandatory prepayments under the Laurus/Valens Term B Notes from any intercompany funding by Accentia to Reorganized Biovest (excluding any additional loans to Reorganized Biovest from Accentia up to a maximum amount equal to the difference between $3,000,000.00 and the outstanding balance of the DIP Facility as of the Closing Date), provided that thirty percent (30%) of such intercompany funding shall first be used by Accentia to prepay the Accentia Term Notes and, if the Accentia Term Notes have been paid in full, the balance of such thirty percent (30%) of the intercompany funding shall be used to prepay the Laurus/Valens Term B Notes, but only up to the outstanding principal and accrued interest under the Laurus/Valens Term B Notes. Any mandatory prepayment will be applied, pro rata, as a reduction of principal on the then outstanding balance of the Laurus/Valens Term B Notes and interest accrued on such paid principal amount through the date of payment.

(iii)     On notice to and with the prior written consent of Laurus/Valens, Reorganized Biovest may convert all or any portion of the outstanding principal and accrued interest under either the Laurus/Valens Term A Notes or the Laurus/Valens Term B Notes into shares of Reorganized Biovest Common Stock. The number of shares of Reorganized Biovest Common Stock issuable on a conversion (the "Laurus/Valens Conversion Shares") shall be equal to (i) an amount equal to the aggregate portion of the

principal and accrued and unpaid interest thereon outstanding under the Laurus/Valens Term Note being converted, divided by (ii) ninety percent (90%) of the average closing price publicly reported for the Reorganized Biovest Common Stock for the ten (10) Trading Days (if the Reorganized Biovest Common Stock is not on a Trading Market, then as reported in the "Pink Sheets" published by Pink Sheets, LLC (or a similar organization or agency succeeding to its functions of reporting prices)) immediately preceding the date of the notice of conversion. The Laurus/Valens Conversion Shares shall be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but sales of any such shares by Laurus/Valens will be subject to the limitations on the number of shares of Reorganized Biovest Common Stock that may be sold from time to time contained in Rule 144(e), without regard to whether or not Laurus/Valens is considered an "Affiliate" of Reorganized Biovest for purposes of Rule 144(e). In addition, the transfer or resale of the Laurus/Valens Conversion Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters).

(iv)     The Laurus/Valens Term Notes will be secured by a first Lien in (i) all of the assets of Reorganized Biovest (including all intellectual property), junior only to the Lien granted by the Bankruptcy Court to the DIP Lender in the DIP Financing Order (which DIP Facility as of the Closing Date cannot exceed $3,000,000.00) and to Permitted Liens, and (ii) all of the assets of the Biovest Subsidiaries, which will secure Guaranties (as to the entire indebtedness under the Laurus/Valens Term Notes) to be executed by the Biovest Subsidiaries in favor of Laurus/Valens.

(v)     The Laurus/Valens Term Notes will also be guaranteed by Accentia (the "Accentia Guaranty"), up to a maximum amount of $4,991,360.00. The Accentia Guaranty will be secured by a pledge by Accentia of 20,115,818 shares of Reorganized Biovest Common Stock owned by Accentia.

(vi)     Analytica will execute a security agreement, a separate grant of a security interest in its intellectual property, and a guaranty in favor of Laurus/Valens to secure the obligations of Accentia under the Accentia Guaranty and under the Accentia Term Notes. The foregoing documents, insofar as they relate to the Accentia Guaranty, are also limited to a maximum amount of $4,991,360.00.

(vii)     Accentia will enter into a subordination agreement with Laurus/Valens, pursuant to which Accentia will agree to subordinate any indebtedness owing, and liens granted, to it by the Reorganized Debtors to any indebtedness owing, and liens granted, to Laurus/Valens under the Laurus/Valens Settlement Documents; provided that, (i) Accentia may convert the Accentia Allowed Class 3 Claim into shares of Reorganized Biovest Common Stock as described in Article 5.4.1.1 of the Plan, and (ii) Reorganized Biovest will be permitted to make certain payments to Accentia related to the sharing of expenses and shared administrative and overhead costs between the companies and the repayment of any future loans made by Accentia to Biovest in lieu of any additional advances from the DIP Lender.

(viii)  All of the Laurus/Valens Warrants will be terminated and cancelled as of the Closing.  Laurus/Valens will not have any rejection damages or other Claims against Biovest or Accentia in connection with the termination and cancellation of the Laurus/Valens Warrants.

(ix)  In consideration for the cancellation of the Laurus/Valens Warrants, on the Closing Date, Laurus/Valens will receive that number of shares of Reorganized Biovest Common Stock equal to 9.99% of the fully diluted issued and outstanding shares of Reorganized Biovest Common Stock as of the Closing Date (after taking into account any shares of Reorganized Biovest Common Stock to be issued to Creditors under the Plan and any shares of Reorganized Biovest Common Stock subject to issuance under the Existing Biovest Stock Warrants, but excluding any shares of Reorganized Biovest Common Stock subject to issuance pursuant to the Existing Biovest Stock Options) (the "Laurus/Valens Plan Shares").  Except for the Laurus/Valens Plan Shares and the Laurus/Valens Conversion Shares, Laurus/Valens will not be entitled to receive any shares of Reorganized Biovest Common Stock under the Biovest Term Loan Agreement or the Accentia Term Loan Agreement.  The Laurus/Valens Plan Shares will be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the following provisions: (a) any restrictions or limitations under Rule 144(e), and (b) Laurus/Valens will agree that they will not offer, sell, contract to sell, hypothecate, pledge or otherwise dispose of any of the Laurus/Valens Plan Shares (i) during the six (6) month period following the closing of each of the first two (2) common equity offerings of Reorganized Biovest (whether in a registered public offering or in a private placement transaction), with gross proceeds of $10,000,000 or more, and (ii) during the three (3) month period following the closing of a common equity offering of Reorganized Biovest (whether in a registered public offering or in a private placement transaction) that closes within three (3) months after the Closing Date, with gross proceeds of between and including $5,000,000 and $10,000,000. Any certificate for the Laurus/Valens Plan Shares shall contain a legend thereon setting forth the foregoing provisions and restrictions. In addition, the transfer or resale of the Laurus/Valens Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters).

(x)  In full and final satisfaction of the Laurus/Valens Royalty, Laurus/Valens will receive a new perpetual royalty equal to 6.25% of the gross revenues from the sale, license or other disposition of the Biovest Biologic Products received by Reorganized Biovest or its sublicensees or transferees.

(xi)  At the Closing, Reorganized Biovest, Accentia and Laurus/Valens will enter into several agreements terminating the Laurus/Valens Royalty in its entirety.

(xii)  The AutovaxID Royalty (including the guaranteed minimum amount of $7,500,000.00) will be terminated as of the Closing Date.

(xiii)   Biovest will amend and restate its bylaws and certificate of incorporation as of the Effective Date to incorporate provisions (i) required by the Plan, the Confirmation Order, and/or the Bankruptcy Code, and (ii) granting Laurus/Valens the right, upon an Event of Default under Section 20(a) of the Biovest Term Loan Agreement (after giving effect to any applicable grace period provided therein), to appoint and maintain one-third (1/3) of the total number of directors of Reorganized Biovest. Thereafter, such right to appoint directors will continue notwithstanding Reorganized Biovest's cure of any such Event of Default until the Laurus/Valens Term Notes have been paid in full. ~~The Reorganized Biovest Bylaws and the Reorganized Biovest Charter are attached as Exhibit D and Exhibit E to the Plan, respectively, and will become effective on the Effective Date.~~

(xiv)   On the Closing Date, the DIP Lender and LV will enter into the DIP Lender Subordination Agreement, pursuant to which LV will agree to subordinate the Laurus/Valens Allowed Class 2 Claims owing, and liens granted, to Laurus/Valens by Reorganized Biovest to any indebtedness owing (up to a maximum amount of $3,000,000.00), and liens granted, to the DIP Lender under the DIP Financing Order and the Plan; provided that, the DIP Lender Subordination Agreement will not prohibit any mandatory prepayments, or the issuance of the Laurus/Valens Conversion Shares, to Laurus/Valens under the Laurus/Valens Term Notes.

(xv)   On the Closing Date, Accentia and Reorganized Biovest will enter into the Accentia Royalty Termination Agreement.

(xvi)   Except as to any obligations under the Laurus/Valens Settlement Documents or the Plan, the Debtors and Laurus/Valens and their respective officers, directors, employees, agents, and attorneys will be deemed to have released each other, as of the Closing Date, from any and all claims of any nature whatsoever, as set forth in the Laurus/Valens Compromise Order.

(xvii)   All of the Laurus/Valens Settlement Documents (except for the DIP Lender Subordination Agreement) will be governed by the laws of the State of New York.   Until the Closing Date, the Bankruptcy Court will have and retain exclusive jurisdiction over the Laurus/Valens Settlement and any disputes arising thereunder. Following the Closing Date, the state and/or federal courts in the State of New York will have jurisdiction over the Laurus/Valens Settlement Documents.

(xviii)  On the Closing Date, Laurus/Valens will withdraw the Laurus/Valens Proofs of Claim with prejudice.

(xix)   Effective as of the Closing Date, any and all of the Laurus/Valens Prepetition Loan Documents shall be deemed cancelled and void and of no further force and effect.

Class 2 is Impaired by the Plan. Laurus/Valens, as the Holder of the Class 2 Claims, is entitled to vote to accept or reject the Plan.

*Class 3: Secured Claims and Other Claims of Accentia.* Class 3 consists of all of the Accentia Prepetition Claims. The Class 3 Claims of Accentia are secured by a Lien on all assets of Biovest, junior only to the Liens in favor of (a) the DIP Lender granted in the DIP Financing Order, (b) Laurus/Valens as described in the Laurus/Valens Compromise Motion, and (c) the 2008 Secured Debentures Holders as described in Article 5.5.1 of the Plan. Under the Plan, the Class 3 Claims of Accentia will be allowed in the amount of $11,991,510.00 plus Postpetition Interest at the rate of six percent (6%) per annum (the "Accentia Allowed Class 3 Claim").

Under the Plan, the following shall occur with respect to the Accentia Allowed Class 3 Claim:

(i) On the Effective Date, Accentia will convert the entire amount of the Accentia Allowed Class 3 Claim into shares of Reorganized Biovest Common Stock (the "Class 3 Plan Shares") at a conversion rate of $0.75 per share of Reorganized Biovest Common Stock (i.e., Accentia will receive that number of shares of Reorganized Biovest Common Stock determined by dividing the Accentia Allowed Class 3 Claim by $0.75). Based on an estimated amount of $13,351,643.00 for the Accentia Allowed Class 3 Claim (assuming a Confirmationan Effective Date of August 31,September 30, 2010), Accentia will receive approximately 17,802,191 shares of Reorganized Biovest Common Stock. The Class 3 Plan Shares shall be issued onas soon as reasonably practicable following the Effective Date (but in no event more than five (5) Business Days following the Effective Date, subject to the procedures followed by the Transfer Agent) pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the following provisions: (a) any restrictions or limitations under Rule 144(e), (b) a limit on the sale of the Class 3 Plan Shares in any ninety (90) day period to that number of the Class 3 Plan Shares equal to one percent (1%) of the issued and outstanding shares of Reorganized Biovest Common Stock, (c) a prohibition on the sale of any Class 3 Plan Shares for a period of one hundred twenty (120) days following any debt or equity raise by Reorganized Biovest of less than $10,000,000.00, and (d) a prohibition on the sale of any Class 3 Plan Shares for a period of one hundred eighty (180) days following any debt or equity raise by Reorganized Biovest of $10,000,000.00 or more. Any certificate for the Class 3 Plan Shares shall contain a legend thereon setting forth the foregoing provisions and restrictions. In addition, the transfer or resale of the Class 3 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters).

(ii) As of the Effective Date, without any further action by any party, the Liens that secure the Class 3 Claims of Accentia shall be deemed to be extinguished, satisfied and released. To the extent that any Liens to secure the Class 3 Claims have been filed or recorded publicly, if requested by Reorganized Biovest, Accentia shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens.

(iii)   On the Closing Date, Accentia and Reorganized Biovest shall enter into the Accentia Royalty Termination Agreement.

Class 3 is Impaired by the Plan. Accentia, as the Holder of the Class 3 Claims, is entitled to vote to accept or reject the Plan.

*Class 4: Secured Claims and Other Claims of the 2008 Secured Debentures Holders.* Class 4 consists of all of the 2008 Secured Debentures Claims. The total amount of the Claims in Class 4 is approximately $1,519,300.00 (including the Claim of Laurus/Valens in the amount of approximately $665,000.00 and the Claim of Phillip Rosensweig in the amount of approximately $300,000.00, which Biovest is currently challenging in a pending adversary proceeding). The Class 4 Claims of the 2008 Secured Debentures Holders are secured by a Lien on all assets of Biovest, junior only to the Liens in favor of (a) the DIP Lender granted in the DIP Financing Order, and (b) Laurus/Valens as described in the Laurus/Valens Compromise Motion. Under the Plan, subject to subparagraph (vii) below, the Class 4 Claims of each of the 2008 Secured Debentures Holders will be allowed in an amount equal to the outstanding principal and accrued and unpaid interest as of the Petition Date under its 2008 Secured Debentures (each, a "2008 Secured Debentures Allowed Class 4 Claim").

Under the Plan, the following shall occur with respect to the 2008 Secured Debentures Allowed Class 4 Claims:

(i)   On the Effective Date, in the event a 2008 Secured Debentures Holder does not make the Conversion Election described in subparagraph (vi) below, Reorganized Biovest shall execute and deliver in favor of such 2008 Secured Debentures Holder a ~~new~~ promissory note (the "2008 Secured Debentures Plan Note") in an original principal amount equal to the amount of its 2008 Secured Debentures Allowed Class 4 Claim. Each of the 2008 Secured Debentures Plan Notes shall contain the following terms: (a) a maturity date of forty (40) months following the Effective Date, (b) interest will accrue and be payable on the outstanding principal at a fixed rate of eight percent (8%) per annum, calculated based on a 365 day year, (c) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, (d) Reorganized Biovest may prepay all or any portion of the 2008 Secured Debentures Plan Note, without penalty, at any time, and (e) a subordination of the Lien granted under the Plan in favor of the 2008 Secured Debentures Holder to the Liens in favor of (i) the DIP Lender granted in the DIP Financing Order, and (ii) Laurus/Valens ~~as described~~granted in the Laurus/Valens ~~Compromise Motion~~Settlement Documents. The 2008 Secured Debentures Plan Notes shall not contain any conversion or redemption rights.

(ii)   Each of the 2008 Secured Debentures Plan Notes shall be secured by a Lien on all of the Property of Reorganized Biovest securing the 2008 Secured Debentures, to the same extent, validity and priority as existed in favor of the 2008 Secured Debentures Holders as of the Petition Date; provided, however, that such Lien shall be junior to the Liens in favor of (i) the DIP Lender granted in the DIP Financing Order, and (ii) Laurus/Valens ~~as described~~granted in the Laurus/Valens ~~Compromise~~

~~Motion~~Settlement Documents. Reorganized Biovest shall execute and deliver in favor of the 2008 Secured Debentures Holders a ~~new~~ security agreement and other customary security documents evidencing such Lien.

(iii)    As of the Effective Date, without any further action by any party, subject to the Lien to be granted to each of the 2008 Secured Debentures Holders in subparagraph (ii) above, the Liens that secure the 2008 Secured Debentures Claims shall be deemed to be extinguished, satisfied and released.  To the extent that any Liens to secure the 2008 Secured Debentures Claims have been filed or recorded publicly, if requested by Reorganized Biovest, each of the 2008 Secured Debentures Holders shall take any commercially reasonable steps that are necessary to cancel, terminate and/or extinguish such Liens.

(iv)    As of the Effective Date, any and all of the 2008 Secured Debentures Documents (excluding the 2008 Secured Debentures Warrants) shall be deemed cancelled and void and of no further force and effect.

(v)    Except as provided in Article 7.9 of the Plan, the 2008 Secured Debentures Holders shall retain unaltered all of the legal, equitable and contractual rights under the 2008 Secured Debentures Warrants.

(vi)    At the option of a 2008 Secured Debentures Holder, ~~at any time prior to the Voting Deadline,~~ such 2008 Secured Debentures Holder may elect (in lieu of the treatment described in subparagraph (i) above) to convert all of its 2008 Secured Debentures Allowed Class 4 Claim into shares of Reorganized Biovest Common Stock (the "Class 4 Plan Shares") at a conversion rate equal to the Market Price per share of Reorganized Biovest Common Stock (i.e., such 2008 Secured Debentures Holder will receive that number of shares of Reorganized Biovest Common Stock determined by dividing its 2008 Secured Debentures Allowed Class 4 Claim by the Market Price).  The Class 4 Plan Shares shall be issued ~~on~~as soon as reasonably practicable following the Effective Date (but in no event more than five (5) Business Days following the Effective Date, subject to the procedures followed by the Transfer Agent) pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12 of the Plan (see "Certain Restrictions on Stock Transfers" below).  The transfer or resale of the Class 4 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters).  Any Conversion Election shall be made by a 2008 Secured Debentures Holder on the Ballot filed with the Bankruptcy Court or in a separate writing delivered to Biovest, in each such case prior to the Voting Deadline.  In the event a 2008 Secured Debentures Holder makes a Conversion Election, the provisions of subparagraphs (i) and (ii) above shall not be applicable to such 2008 Secured Debentures Holder.

(vii)    Notwithstanding anything to the contrary contained above, (a) the treatment of the 2008 Secured Debentures Claims of Valens U.S. shall be determined as set forth in the Laurus/Valens Settlement, and (b) the treatment of the 2008 Secured

Debentures Claims of Phillip E. Rosensweig shall be determined as set forth in a Final Order of the Bankruptcy Court that resolves the Rosensweig Adversary Proceeding.

Class 4 is Impaired by the Plan. The 2008 Secured Debentures Holders, as the Holders of the Class 4 Claims, are entitled to vote to accept or reject the Plan. For purposes of Section 1126(c) of the Bankruptcy Code, the amount of the 2008 Secured Debentures Claims of Valens U.S. shall be counted under Class 4 with respect to any Ballot cast by Laurus/Valens as to the Plan.

*Class 5: Secured Tax Claims of Governmental Units.* Class 5 consists of all Secured Tax Claims of Governmental Units. Based on an analysis of the Proofs of Claim filed to date in the Biovest Bankruptcy Cases as well as the Claims scheduled by the Debtors, the Debtors believe there will be no Allowed Secured Tax Claims of Governmental Units in this Class.

The Plan provides that, on the Distribution Date, Reorganized Biovest shall pay to a Governmental Unit, in Cash, the Allowed Amount of its Secured Tax Claim. Notwithstanding the foregoing, if Reorganized Biovest does not have sufficient Cash to pay an Allowed Class 5 Claim in full on the Distribution Date, such Allowed Class 5 Claim shall be paid under such other terms as may be agreed upon by both the Holder of such Allowed Class 5 Claim and the Debtors or Reorganized Biovest, as the case may be, or as otherwise ordered by a Final Order of the Bankruptcy Court. Class 5 is Unimpaired by the Plan. Each Holder of a Class 5 Claim conclusively is presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

*Class 6: Other Secured Claims.* Class 6 consists of all Secured Claims not otherwise specifically classified in the Plan. In the event there is more than one Secured Claim in this Class, such Secured Claims shall be separated into subclasses in Class 6. As of the date of this Disclosure Statement, the total amount of filed and/or scheduled Secured Claims in this Class is approximately $109,000.00. The Debtors deny any liability as to any of those Claims, and ~~intend to file~~have filed written objections to those Claims with the Bankruptcy Court.

Under the Plan, the following shall occur with respect to the Allowed Class 6 Claims:

(i) ~~On the Determination Date, in~~In the event a Holder of a Class 6 Claim does not make the Conversion Election described in subparagraph (~~iii~~ii) below, ~~Reorganized Biovest shall execute and deliver in favor of such Holder a new promissory note (the "Class 6 Plan Note") in an original principal~~such Holder will receive a Distribution, in Cash, in an amount equal to the ~~amount~~sum of (a) one hundred percent (100%) of such Holder's Allowed Class 6 Claim. ~~The Class 6 Plan Note shall contain the following terms: (a) a maturity date of forty (40) months following the Effective Date, (b) interest will accrue and be payable on the outstanding principal at a fixed~~ plus (b) interest accruing at the rate of eight percent (8%) per annum~~, calculated based on a 365 day year, (c) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, and (d) Reorganized Biovest may prepay all or any portion of the Class 6 Plan Note, without penalty, at any time. Notwithstanding the foregoing, Reorganized Biovest, in its discretion, may return to the Secured Creditor any Property securing its Secured Claim in full and final satisfaction of the Secured Claim.~~ on the Allowed Amount of such Class 6 Claim for the period from the Effective Date

through and including the Distribution Date. Such Distribution will be made to such Holder by Reorganized Biovest at the end of the 40th month following the Effective Date.

(ii) ~~Any deficiency owing to a Secured Creditor with respect to a Class 6 Claim shall be classified and treated as a Class 8 Unsecured Claim to the extent Allowed by a Final Order of the Bankruptcy Court.(iii)~~ At the option of a Holder of a Class 6 Claim, ~~at any time prior to the Voting Deadline,~~ such Holder may elect (in lieu of the treatment described in subparagraph (i) above) to convert all of its Allowed Class 6 Claim into shares of Reorganized Biovest Common Stock (the "Class 6 Plan Shares") at a conversion rate equal to the Market Price per share of Reorganized Biovest Common Stock (i.e., such Holder will receive that number of shares of Reorganized Biovest Common Stock determined by dividing its Allowed Class 6 Claim by the Market Price). The Class 6 Plan Shares shall be issued as soon as reasonably practicable following the Determination Date (but in no event more than five (5) Business Days following the Determination Date, subject to the procedures followed by the Transfer Agent) pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12 of the Plan (see "Certain Restrictions on Stock Transfers" below). The transfer or resale of the Class 6 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters). Any Conversion Election shall be made by a Holder of a Class 6 Claim on the Ballot filed with the Bankruptcy Court or in a separate writing delivered to Biovest, in each such case prior to the Voting Deadline. In the event a Holder of a Class 6 Claim makes a Conversion Election, the under this subparagraph (ii), the provisions of subparagraph (i) shall not be applicable to such Holder.

(iii) Notwithstanding the foregoing provisions of subparagraphs (i) and (ii) ~~above shall not be applicable.~~, Reorganized Biovest, in its sole discretion, may return to the Secured Creditor any Property securing its Secured Claim in full and final satisfaction of the Secured Claim.

(iv) Any deficiency owing to a Secured Creditor with respect to a Class 6 Claim shall be classified and treated as a Class 8 Unsecured Claim to the extent Allowed by a Final Order of the Bankruptcy Court.

Class 6 is Impaired by the Plan. Each Holder of a Class 6 Claim is entitled to vote to accept or reject the Plan.

*Class 7: Unsecured Claims of Ronald E. Osman under the Osman Note.* Class 7 consists of all Unsecured Claims of Ronald E. Osman represented by, relating to, or arising under or in connection with the Osman Note. Under the Plan, the Class 7 Claims of Ronald E. Osman will be allowed in the amount of $1,011,233.00, which is the amount of the outstanding principal and accrued and unpaid interest as of the Petition Date under the Osman Note (the "Osman Allowed Class 7 Claim").

Under the Plan, the following shall occur with respect to the Osman Allowed Class 7 Claim:

(i)     On the Effective Date, in the event Ronald E. Osman does not make the Conversion Election described in subparagraph (iv~~iii~~ii) below, Reorganized Biovest shall execute and deliver in favor of Ronald E. Osman a ~~new~~ promissory note (the "Class 7 Plan Note") in an original principal amount equal to the amount of the Osman Allowed Class 7 Claim. The Class 7 Plan Note shall amend and restate the Osman Note and shall contain the following terms: (a) a maturity date of forty (40) months following the Effective Date, (b) interest will accrue and be payable on the outstanding principal at a fixed rate of eight percent (8%) per annum, calculated based on a 365 day year, (c) the outstanding principal together with all accrued and unpaid interest will be due and payable in full on the maturity date, and (d) Reorganized Biovest may prepay all or any portion of the Class 7 Plan Note, without penalty, at any time. The Class 7 Plan Note shall not contain any conversion or redemption rights.

(ii)    ~~As of the Effective Date, the Osman Note shall be deemed cancelled and void and of no further force and effect.~~

(iii)    ~~Except as provided in Article 7.9 of the Plan, Ronald E. Osman and his assignees shall retain unaltered all of the legal, equitable and contractual rights under the Osman Warrants.~~ (iv)    ~~At the option of Ronald E. Osman, at any time prior to the Voting Deadline,~~ Ronald E. Osman may elect (in lieu of the treatment described in subparagraph (i) above) to convert all of the Osman Allowed Class 7 Claim into shares of Reorganized Biovest Common Stock (the "Class 7 Plan Shares") at a conversion rate equal to the Market Price per share of Reorganized Biovest Common Stock (i.e., Ronald E. Osman will receive that number of shares of Reorganized Biovest Common Stock determined by dividing the Osman Allowed Class 7 Claim by the Market Price). The Class 7 Plan Shares shall be issued ~~on~~as soon as reasonably practicable following the Effective Date (but in no event more than five (5) Business Days following the Effective Date, subject to the procedures followed by the Transfer Agent) pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12 of the Plan (see "Certain Restrictions on Stock Transfers" below). The transfer or resale of the Class 7 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters). Any Conversion Election shall be made by Ronald E. Osman on the Ballot filed with the Bankruptcy Court or in a separate writing delivered to Biovest, in each such case prior to the Voting Deadline. In the event Ronald E. Osman makes a Conversion Election, the provisions of subparagraph (i) ~~above~~ shall not be applicable to Ronald E. Osman.

(iii)    Except as provided in Article 7.9 of the Plan, Ronald E. Osman and his assignees shall retain unaltered all of the legal, equitable and contractual rights under the Osman Warrants.

Class 7 is Impaired by the Plan. Ronald E. Osman, as the Holder of the Class 7 Claims, is entitled to vote to accept or reject the Plan.

*Class 8: Unsecured Claims (Unsecured Claims Not Otherwise Classified).* Class 8 consists of all Unsecured Claims not otherwise classified in the Plan. As of the date of this Disclosure Statement, the total amount of filed and/or scheduled Unsecured Claims in the Biovest Bankruptcy Cases is approximately $~~26~~28 million, but the Debtors anticipate that the total amount of Allowed Unsecured Claims in Class 8 will be approximately $9 million.

Under the Plan, each Holder of an Unsecured Claim in Class 8 shall have the option to select one of the treatments set forth below designated as Option A, Option B and Option C:

 (i) Option A. Under Option A, the Holder of an Allowed Unsecured Claim in Class 8 will receive a Distribution, in Cash, in an amount equal to the sum of (a) one hundred percent (100%) of such Holder's Allowed Class 8 Unsecured Claim ~~plus (i)~~(including Postpetition Interest at the ~~Federal Judgment Interest Rate and (ii) Class 8 Interest~~rate of three percent (3%) per annum) plus (b) interest accruing at the rate of five percent (5%) per annum on the Allowed Amount of such Class 8 Claim for the period from the Effective Date through and including the Distribution Date. Such Distribution will be made ~~in a lump sum payment~~ to such Holder by Reorganized Biovest at the end of the 40th month following the Effective Date.

 (ii) Option B. Under Option B, the Holder of an Allowed Unsecured Claim in Class 8 will convert all of its Allowed Class 8 Unsecured Claim (~~plus~~including Postpetition Interest at the ~~Federal Judgment Interest Rate~~rate of three percent (3%) per annum) into shares of Reorganized Biovest Common Stock (the "Class 8 Plan Shares") at a conversion rate equal to the Market Price per share of Reorganized Biovest Common Stock (i.e., such Holder will receive that number of shares of Reorganized Biovest Common Stock determined by dividing its Allowed Class 8 Unsecured Claim by the Market Price). The Class 8 Plan Shares shall be issued as soon as reasonably practicable following the Determination Date (but in no event more than five (5) Business Days following the Determination Date, subject to the procedures followed by the Transfer Agent) pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12 of the Plan (see "Certain Restrictions on Stock Transfers" below). The transfer or resale of the Class 8 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters).

 (iii) Option C. Under Option C, the Holder of an Allowed Unsecured Claim in Class 8 electing Option C (an "Option C Holder") will receive~~, as soon as reasonably practicable following the Determination Date (but in no event more than five (5) Business Days following the Determination Date), a new convertible promissory note (the "Class 8 Plan Note") executed by Reorganized Biovest in an original principal amount equal to its~~ a Distribution, in accordance with the provisions of this subparagraph (iii), in an amount equal to the sum of (a) one hundred percent (100%) of such Option C

Holder's Allowed Class 8 Unsecured Claim (~~plus~~including Postpetition Interest at the ~~Federal Judgment Interest Rate). The Class 8 Plan Note shall contain the following terms: (a) a maturity date of~~rate of three percent (3%) per annum) plus (b) interest accruing at the rate of seven percent (7%) per annum on the outstanding balance of the Allowed Amount of such Class 8 Claim from time to time for the period from the Effective Date through and including that date which is twenty-four (24) months following the Determination Date (the "~~Class 8 Plan Note Maturity Date"), (b) no interest will accrue on the outstanding principal balance of the Class 8 Plan Note, (c) on~~Option C Maturity Date"). For purposes of this subparagraph (iii), the Allowed Amount of a Class 8 Unsecured Claim from time to time for an Option C Holder (which shall include accrued and unpaid interest under subparagraph (b) above) shall be hereinafter referred to as the "Option C Allowed Claim Amount." On the Determination Date and on each of the following seven (7) quarterly anniversaries of the Determination Date (each, an "Automatic Conversion Date"), and provided that the Automatic Conversion VWAP Price is at least $1.00 per share, one-eighth (1/8th) of the ~~original principal balance of the Class 8 Plan Note~~Option C Allowed Claim Amount for an Option C Holder (the "Automatic Conversion Amount") will be automatically converted into shares of Reorganized Biovest Common Stock (the "Class 8 Plan Shares") at a conversion rate equal to the Automatic Conversion VWAP Price per share of Reorganized Biovest Common Stock (i.e., ~~the~~such Option C Holder ~~of the Class 8 Plan Note~~ will receive that number of shares of Reorganized Biovest Common Stock determined by dividing the Automatic Conversion Amount by the Automatic Conversion VWAP Price)~~, (d) if~~. If, on any Automatic Conversion Date, the Automatic Conversion VWAP Price is less than $1.00 per share, the Automatic Conversion Amount for that Automatic Conversion Date will not ~~automatically~~ convert ~~and~~into shares of Reorganized Biovest Common Stock, but will instead become payable at the ~~Class 8 Plan Note~~Option C Maturity Date (as described below), unless the Option C Holder ~~of a Class 8 Plan Note~~, upon written notice to Reorganized Biovest, elects to convert the Automatic Conversion Amount into shares of Reorganized Biovest Common Stock (also, the "Class 8 Plan Shares") at a conversion rate equal to $1.00 per share of Reorganized Biovest Common Stock (i.e., ~~the~~such Option C Holder ~~of the Class 8 Plan Note~~ will receive that number of shares of Reorganized Biovest Common Stock determined by dividing the Automatic Conversion Amount by $1.00)~~, (e) on~~. On each Automatic Conversion Date for which the Automatic Conversion VWAP Price is $1.00 or greater or on which the Option C Holder ~~of a Class 8 Plan Note makes~~elects an optional conversion ~~under subparagraph (d) above, the outstanding principal balance of the Class 8 Plan Note~~as described in the immediately preceding sentence, the Option C Allowed Claim Amount shall be reduced by the Automatic Conversion Amount~~, (f) any principal amount~~. Any portion of the Option C Allowed Claim Amount that is outstanding ~~under the Class 8 Plan Note~~at the ~~Class 8 Plan Note~~Option C Maturity Date will be due and payable in full, at the election of Reorganized Biovest, in either Cash or in shares of Reorganized Biovest Common Stock at a conversion rate equal to the average of the VWAPs for the ten (10) consecutive Trading Days ending on the Trading Day that is immediately preceding the ~~Class 8 Plan Note~~Option C Maturity Date~~, (g) if~~. If, at any time ~~during the term of the Class 8 Plan Note~~prior to the Option C Maturity Date, the VWAP is at least $1.50 per share for ten (10) consecutive Trading Days, ~~the~~an Option C Holder ~~of a Class 8 Plan Note~~, at its option, may upon written notice to Reorganized Biovest convert any or all of the ~~then~~

~~outstanding principal balance of its Class 8 Plan Note~~Option C Allowed Claim Amount into shares of Reorganized Biovest Common Stock at a conversion rate equal to the Automatic Conversion VWAP Price used for the initial conversion on the Determination Date. In addition, ~~(h)~~if, at any time ~~during the term of the Class 8 Plan Notes~~prior to the Option C Maturity Date, the VWAP is at least $1.88 per share for thirty (30) consecutive Trading Days, Reorganized Biovest, at its option, may upon written notice to the Option C Holders ~~of the Class 8 Plan Notes~~ require the conversion of up to $3,000,000.00 of the then aggregate outstanding ~~principal~~balance of the ~~Class 8 Plan Notes~~Option C Allowed Claim Amount at a conversion rate equal to the Automatic Conversion VWAP Price used for the initial conversion on the Determination Date (such conversion right by Reorganized Biovest shall reset for subsequent periods ~~during the term of the Class 8 Plan Notes~~until the Option C Maturity Date), with any such conversion to be pro rata based on each Option C Holder's percentage interest in the then aggregate outstanding ~~principal~~balance of the ~~Class 8 Plan Notes, and (i) the~~Option C Allowed Claim Amount. The Class 8 Plan Shares shall be issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws, but the transfer thereof shall be subject to the provisions of Article 9.12 of the Plan (see "Certain Restrictions on Stock Transfers" below). The transfer or resale of the Class 8 Plan Shares by any recipient thereof would not be exempted under Section 1145 of the Bankruptcy Code if such recipient is deemed to be an underwriter (see Article 8.9 of the Plan for a further discussion of the securities law issues relating to underwriters).

The election of Option A, Option B or Option C must be made on the Ballot submitted by the Holder of a Class 8 Unsecured Claim and filed with the Bankruptcy Court by the Voting Deadline; provided, however, that the Debtors, in their sole discretion, may accept any written election of Option B or Option C by the Holder of a Class 8 Unsecured Claim that is delivered to the Debtors ~~on or~~ prior to the ~~Confirmation~~Effective Date. In the event that a Holder of a Class 8 Unsecured Claim does not make an election of Option A, Option B or Option C on its Ballot or does not file a Ballot with the Bankruptcy Court, such Holder shall be deemed to have elected Option A. Class 8 is Impaired by the Plan. Each Holder of an Unsecured Claim in Class 8 is entitled to vote to accept or reject the Plan.

*Class 9:  Unsecured Convenience Claims.*  Class 9 consists of all Unsecured Convenience Claims. Notwithstanding anything to the contrary contained in the Plan, each Holder of a Class 8 Unsecured Claim (a) in an amount greater than $5,000.00 may have its Unsecured Claim treated as an Unsecured Convenience Claim under the Plan by making the Convenience Class Opt-In Election, or (b) in an amount less than or equal to $5,000.00 may have its Unsecured Claim treated as a Class 8 Unsecured Claim under the Plan by making the Convenience Class Opt-Out Election.  The Convenience Class Opt-In Election or the Convenience Class Opt-Out Election is irrevocable and must be made by such Holder on its Ballot and filed with the Bankruptcy Court on or before the Voting Deadline.  Based on the Proofs of Claim filed to date in the Biovest Bankruptcy Cases and the Claims scheduled by the Debtors, the Debtors estimate that the total ~~amount~~Allowed Amount of Claims in this Class will be approximately $~~150,000.00.~~225,000.00.

On the Distribution Date, the Holder of an Allowed Unsecured Convenience Claim shall receive Cash from Reorganized Biovest in an amount equal to (a) twenty percent (20%) of the amount of such Allowed Claim if the amount of such Allowed Claim is less than or equal to $5,000.00, or (b) $1,000.00 if the amount of such Allowed Claim is greater than $5,000.00 and the Holder of such Allowed Claim has agreed to reduce the Allowed Amount of its Claim to $5,000.00 by making the Convenience Class Opt-In Election. Notwithstanding the foregoing, if Reorganized Biovest does not have sufficient Cash available to make the payment required to the Holder of an Allowed Class 9 Claim on the Distribution Date, such Allowed Class 9 Claim shall be paid on the 6 Month Anniversary Date or as otherwise ordered by a Final Order of the Bankruptcy Court. Class 9 is Impaired by the Plan. Each Holder of an Unsecured Convenience Claim in Class 9 is entitled to vote to accept or reject the Plan.

*Class 10: Intercompany Claims.* Class 10 consists of all Intercompany Claims. On the Effective Date, upon the substantive consolidation of the Debtors, all of the Intercompany Claims shall be deemed cancelled, annulled and extinguished without any further action by any party and shall be of no further force and effect. The Holders of the Class 10 Intercompany Claims will not receive or retain any Property under the Plan on account of such Intercompany Claims. Accordingly, Reorganized Biovest will not make any Distribution or establish any reserve under the Plan for the Intercompany Claims. Class 10 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 10 is deemed not to have accepted the Plan and, thus, Holders of the Class 10 Intercompany Claims are not entitled to vote to accept or reject the Plan.

*Class 11: Subordinated Securities Claims.* Class 11 consists of all Subordinated Securities Claims. Based on an analysis of the Proofs of Claim filed to date in the Biovest Bankruptcy Cases as well as the Claims scheduled by the Debtors, the Debtors believe there will be no Allowed Class 11 Claims. Pursuant to Section 510(b) of the Bankruptcy Code, each Allowed Class 11 Claim, if any, shall be subordinated to all Claims (including Class 8 Unsecured Claims) or Equity Interests that are senior to or equal to the Claim or Equity Interest represented by the Security of Biovest in question; provided, however, that if such Security is Existing Biovest Common Stock, such Allowed Class 11 Claim shall have the same priority as Class 12 Equity Interests. Under the Plan, each Holder of an Allowed Class 11 Claim will receive a Distribution, in Cash, in an amount equal to the sum of one hundred percent (100%) of such Holder's Allowed Class 11 Claim plus Postpetition Interest at the Federal Judgment Interest Rate. Such Distribution will be made to such Holder by Reorganized Biovest at the end of the 48th month following the Effective Date; provided, however, that no Distribution shall be made to the Holders of Allowed Class 11 Claims until all Distributions have been made to all Holders of Allowed Class 8 Unsecured Claims who have elected Option A under Article 5.9.2.1 of the Plan. Class 11 is Impaired by the Plan. Each Holder of a Subordinated Securities Claim in Class 11 is entitled to vote to accept or reject the Plan.

*Class 12: Equity Interests.* Class 12 consists of all Equity Interests. On the Effective Date or as soon thereafter as is reasonably practicable (as determined by Reorganized Biovest)Under the Plan, each Holder of an Allowed Class 12 Equity Interest on the Effective Date shall be deemed to receive one (1) share of Reorganized Biovest Common Stock for each share of Existing Biovest Common Stock held by such Holder as of the Effective Date (the "Class 12 Plan Shares"), subject to dilution of such Holder's percentage ownership interest in

Reorganized Biovest as a result of the issuance of the other Plan Shares under the Plan (including the Laurus/Valens Plan Shares). ~~Each such Holder~~ To the extent requested by the Holder of an Allowed Class 12 Equity Interest, such Holder shall receive, upon surrender to the Transfer Agent of a stock certificate ~~for~~ evidencing shares of Existing Biovest Common Stock ~~shall receive, upon surrender of such certificate to the Transfer Agent~~, a new certificate representing the Class 12 Plan Shares. The Class 12 Plan Shares shall be deemed issued pursuant to Section 1145 of the Bankruptcy Code and shall not have any legend restricting the sale thereof under federal securities laws. ~~Upon the issuance of the Class 12 Plan Shares, the~~ The Debtors do not believe that the Holders of Class 12 Equity Interests ~~shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. Class 12 is Impaired by the Plan. Each~~ are Impaired by the Plan, since their shares of Existing Biovest Common Stock were subject to significant dilution as of the Petition Date. However, out of an abundance of caution, the Debtors are treating Class 12 as Impaired by the Plan and, thus, each Holder of a Class 12 Equity Interest is entitled to vote to accept or reject the Plan.

*Class 13: Subsidiary Equity Interests.* Class 13 consists of all Subsidiary Equity Interests. On the Effective Date, upon the substantive consolidation of the Debtors, all of the Subsidiary Equity Interests shall be deemed cancelled, annulled, extinguished and surrendered without any further action by any party and shall be of no further force and effect. Biovest, as the Holder of the Class 13 Subsidiary Equity Interests, will not receive or retain any Property or equity interest under the Plan on account of the Class 13 Subsidiary Equity Interests. Accordingly, Reorganized Biovest will not make any Distribution or establish any reserve under the Plan for the Class 13 Subsidiary Equity Interests. Class 13 is Impaired by the Plan. Pursuant to Section 1126(g) of the Bankruptcy Code, Class 13 is deemed not to have accepted the Plan and, thus, Biovest, as the Holder of the Class 13 Subsidiary Equity Interests, is not entitled to vote to accept or reject the Plan.

**Substantive Consolidation of the Debtors' Estates**

*Request for Substantive Consolidation.* The Plan will serve as, and will be deemed to be, a motion by the Debtors for the entry of an order approving the substantive consolidation (the "Substantive Consolidation Motion") of the Liabilities and Properties of each of the Debtors, subject to the occurrence of the Effective Date. Confirmation of the Plan shall constitute approval of the Substantive Consolidation Motion by the Bankruptcy Court, and the Confirmation Order shall contain findings supporting and conclusions providing for substantive consolidation of the Debtors on the terms set forth in Article 10.2 of the Plan.

*Effect of Substantive Consolidation.* As a result of the substantive consolidation of the Liabilities and Properties of each of the Debtors, (a) the Biovest Bankruptcy Cases shall be consolidated into the Bankruptcy Case of Biovest as a single consolidated case; (b) all Property of the Estate of each Debtor shall be deemed to be Property of the Biovest Estate; (c) all Claims against each Estate shall be deemed to be Claims against the Biovest Estate, any Proof of Claim filed against one or more of the Debtors shall be deemed to be a single Claim filed against the Biovest Estate, all duplicate Proofs of Claim for the same Claim filed against more than one Debtor shall be deemed expunged, and all duplicate Claims for the same Claim scheduled against more than one Debtor shall be deemed expunged; (d) all Intercompany Claims shall be

deemed cancelled, annulled and extinguished, and no Distributions under the Plan shall be made on account of the Intercompany Claims; (e) all guarantees by one Debtor of the obligations of any other Debtor shall be deemed cancelled, annulled and extinguished, and no Distributions under the Plan shall be made on account of Claims based upon such guarantees; and (f) for purposes of determining the availability of the right of setoff under Section 553 of the Bankruptcy Code, each of the Debtors shall be treated as one consolidated entity so that, subject to the other provisions of Section 553 of the Bankruptcy Code, debts due to one Debtor may be set off against the debts of the other Debtor. Substantive consolidation shall not merge or otherwise affect the separate legal existence of each Debtor, other than with respect to Distribution rights under the Plan; substantive consolidation shall have no effect on valid, enforceable and unavoidable Liens, except for Liens that secure a Claim that is eliminated by virtue of substantive consolidation and Liens against Collateral that are extinguished by virtue of substantive consolidation; and substantive consolidation shall not have the effect of creating a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation.

## Conditions Precedent to Confirmation of the Plan and the Effective Date

*Conditions Precedent to Confirmation of the Plan.* The following are conditions precedent to Confirmation of the Plan, each of which may be waived by the Debtors: (i) the Bankruptcy Court shall have made such findings and determinations regarding the Plan as shall enable the entry of the Confirmation Order in a manner consistent with the provisions of the Plan; (ii) the Bankruptcy Court shall have made such findings and determinations regarding the Accentia Plan as shall enable the entry of the Accentia Confirmation Order in a manner consistent with the provisions of the Accentia Plan; and (iii) the Bankruptcy Court shall have agreed to enter an order granting the Substantive Consolidation Motion and providing for the substantive consolidation of the Debtors' Estates as of the Effective Date in accordance with Article 10.2 of the Plan (such order may be the Confirmation Order); and (iv) the Bankruptcy Court shall have entered the Laurus/Valens Compromise Order on the Docket, and the Laurus/Valens Compromise Order shall be a Final Order.

*Conditions Precedent to the Effective Date.* The Plan shall not be consummated and the Effective Date shall not occur unless each of the following conditions has been satisfied following the Confirmation Date or waived by the Debtors: (i) the Confirmation Order shall be a Final Order; (ii) the Accentia Confirmation Order shall be a Final Order and all of the conditions precedent to the effective date of the Accentia Plan shall have been satisfied or waived by the Accentia Debtors; (iii) all conditions precedent to the Closing under the Laurus/Valens Settlement Documents shall have been satisfied or waived in accordance with the terms thereof; (iv) all conditions precedent to the closing of the Exit Financing shall have been satisfied or waived in accordance with the terms thereof; (v) Biovest and Accentia shall have filed with the SEC, and be current as to, all quarterly reports on Form 10-Q and all annual reports on Form 10-K required to be filed by Biovest and Accentia under the Exchange Act for any period prior to the Effective Date; and (vi and (v) each Plan Document shall be in form and substance reasonably acceptable to the Debtors.

*Notice of the Effective Date.* The Effective Date shall occur on the first Business Day on which all of the foregoing conditions have been satisfied or waived by the Debtors. Promptly

following the satisfaction, or the waiver by the Debtors, of all of the conditions precedent to the Effective Date, the Debtors shall file a notice (the "Effective Date Notice") with the Bankruptcy Court designating the Effective Date. The Debtors shall serve the Effective Date Notice on all of the Notice Parties.

**Exit Financing**

Biovest is currently seeking exit financing (the "Exit Financing") in an amount ranging from $3 million to $15 million. Subject to any mandatory prepayment requirements under the Laurus/Valens Term A Notes, Reorganized Biovest intends to utilize the proceeds of the Exit Financing to provide additional working capital to conduct its operations following the Effective Date and to fund, to the extent necessary, certain Cash payments required to be made under the Plan on or shortly after the Effective Date.

To facilitate the Exit Financing, Biovest has engaged ROTH Capital Partners, LLC ("ROTH") as its exclusive investment banker to introduce Biovest to potential and suitable institutional investors and to assist Biovest in negotiations as to the terms of the Exit Financing. ROTH is actively in the process of introducing Biovest to suitable investors. ROTH is a privately-owned investment banking firm dedicated to the small-cap public market. Since its inception in 1984, ROTH has been an innovator in this market. In the 1990's, ROTH participated in underwriting initial public offerings for small-cap companies. As this market changed, ROTH helped develop the PIPE (private investment in public equity) financing structure. ROTH has raised over $10.6 billion for small-cap public companies and completed over 150 merger, acquisition, and advisory assignments. ROTH received top 20 IPO aftermarket performance rankings for six consecutive years from 1994 to 1999. Since 2000, ROTH has been a leading placement agent for a number of PIPE transactions, raising over $3 billion for its clients. In addition, ROTH has an experienced healthcare investment banking team, including in the biotechnology field. For more information regarding ROTH and its investment banking services, please see www.roth.com.

The Exit Financing will be structured as a private placement equity offering through the sale to institutional and/or accredited investors of Reorganized Biovest Common Stock combined with warrants to purchase Reorganized Biovest Common Stock. The Reorganized Biovest Common Stock sold in the private placement will be priced at an agreed upon discount to the market price, presently estimated to be approximately 12% from the closing bid market price of the Reorganized Biovest Common Stock on the date of the closing of the private placement. The warrants will entitle the investors to purchase additional shares of Reorganized Biovest Common Stock ranging from 25% to 50% of the Reorganized Biovest Common Stock purchased in the private placement at an established price, likely to be at a premium to the price paid for the Reorganized Biovest Common Stock in the private placement. Final warrant coverage and any potential premium pricing for those warrants will be determined based on various factors that may affect the total cost of capital, including, but not limited to, market liquidity, registration obligations, conversion features, and exercise restrictions, and based on such conditions and circumstances, the ultimate terms of the Exit Financing could be higher than that estimated.

The Exit Financing will be formalized through a binding subscription agreement with the investors, subject to customary closing conditions. The subscription agreement will be filed with the Bankruptcy Court prior to the Confirmation Date and the transaction will close immediately following the Effective Date. Reorganized Biovest may enter into all documents necessary and appropriate in connection with the Exit Financing. In the Confirmation Order, the Bankruptcy Court shall approve the terms of the Exit Financing in substantially the form filed with the Bankruptcy Court, and authorize Reorganized Biovest to execute the subscription agreement together with such other documents as Reorganized Biovest and the investors may reasonably require in order to effectuate the treatment afforded to such parties under the Exit Financing.

## Treatment of Executory Contracts and Unexpired Leases

*Assumption or Rejection of Executory Contracts and Unexpired Leases.* Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that currently exist between any of the Debtors and another Person or Entity and not listed on Exhibit C attached to the Plan shall be deemed assumed by the applicable Debtor as of the Effective Date (collectively, the "Assumed Contracts"); provided, however, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend Exhibit C to add any executory contract or unexpired lease thereto or to delete any executory contract or unexpired lease therefrom, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be rejected (if added) or assumed (if deleted). The Debtors shall provide notice of any amendments to Exhibit C to the parties to the executory contracts and unexpired leases affected thereby. The listing of a document on Exhibit C shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the Debtors have any liability thereunder. Any executory contract or unexpired lease that exists between the Debtors and another Person or Entity and that is listed on Exhibit C attached to the Plan shall be deemed rejected by the Debtors as of the Confirmation Date (collectively, the "Rejected Contracts"), unless there is pending before the Bankruptcy Court on the Confirmation Date a motion to assume such executory contract or unexpired lease. For purposes of the Plan, (i) all non-compete agreements, confidentiality or non-disclosure agreements and indemnification agreements executed for the benefit of the Debtors shall be deemed to be executory contracts and Assumed Contracts, and (ii) except as provided in Article 7.7 of the Plan, all non-compete agreements, confidentiality or non-disclosure agreements, indemnification agreements and guaranties executed by any of the Debtors for the benefit of a third party shall be deemed to be executory contracts and Rejected Contracts (even if not listed on Exhibit C).

*Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.* Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed pursuant to Article 7.1 of the Plan, (ii) the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to Article 7.1 of the Plan, and (iii) the extension of time, pursuant to Section 365(d)(4) of the Bankruptcy Code, within which the Debtors may assume, assume and assign, or reject any unexpired lease of nonresidential real property through the date of entry of an order approving the assumption, assumption and assignment, or rejection of such unexpired lease. The assumption by any of the Debtors of an Assumed Contract shall be binding upon any and all

parties to such Assumed Contract as a matter of law, and each such Assumed Contract shall be fully enforceable by Reorganized Biovest in accordance with its terms, except as modified by the provisions of the Plan or an order of the Bankruptcy Court.

*Inclusiveness.* Unless otherwise specified on <u>Exhibit C</u> attached to the Plan, each executory contract and unexpired lease listed or to be listed on <u>Exhibit C</u> shall include all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affect such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on <u>Exhibit C</u>.

*Cure of Defaults.* Any lessor or other party to an Assumed Contract (except those lessors or other parties whose unexpired leases or executory contracts have been previously assumed by a Final Order of the Bankruptcy Court) asserting a Cure Claim in connection with the assumption of any unexpired lease or executory contract under Article 7.1 of the Plan, as contemplated by Section 365(b) of the Bankruptcy Code, must file such Cure Claim with the Bankruptcy Court on or before the Cure Claim Submission Deadline asserting all alleged amounts accrued or alleged defaults through the Effective Date. Any lessor or other party to an Assumed Contract failing to file a Cure Claim by the Cure Claim Submission Deadline shall be forever barred from asserting, collecting or seeking to collect any amounts or defaults relating thereto against the Debtors or Reorganized Biovest. Reorganized Biovest shall have ninety (90) days from the Effective Date to file an objection to any Cure Claim. Any disputed Cure Claims shall be resolved either consensually or by the Bankruptcy Court. Except as may otherwise be agreed to by the parties, by no later than the 6 Month Anniversary Date, Reorganized Biovest shall cure any and all undisputed Cure Claims. All disputed Cure Claims shall be cured either within one hundred twenty (120) days after the entry of a Final Order determining the amount, if any, of the Debtors' liability with respect thereto or as may otherwise be agreed to by the parties. As of the date of this Disclosure Statement, the Debtors do not believe there will be any Cure Claims.

*Claims under Rejected Executory Contracts and Unexpired Leases.* Unless otherwise ordered by the Bankruptcy Court, any Claim for damages arising by reason of the rejection of any executory contract or unexpired lease must be filed with the Bankruptcy Court on or before the Bar Date for rejection damage Claims in respect of such rejected executory contract or unexpired lease or such Claim shall be forever barred and unenforceable against the Debtors or Reorganized Biovest. With respect to the Rejected Contracts, the Bar Date for filing rejection damage and other Claims with the Bankruptcy Court shall be thirty (30) days after the Confirmation Date. The Plan and any other order of the Bankruptcy Court providing for the rejection of an executory contract or unexpired lease shall constitute adequate and sufficient notice to Persons or Entities which may assert a Claim for damages from the rejection of an executory contract or unexpired lease of the Bar Date for filing a Claim in connection therewith. All Claims for damages from the rejection of an executory contract or unexpired lease, once fixed and liquidated by the Bankruptcy Court and determined to be Allowed Claims, shall be Allowed Unsecured Claims in Class 8. ~~Any such Claims that become Disputed Claims shall be Disputed Claims in Class 8 for purposes of administration of Distributions under the Plan to Holders of Allowed Unsecured Claims in Class 8.~~

*Insurance Policies.* All of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or Reorganized Biovest may hold against any Person or Entity, including the insurers under any of the Debtors' insurance policies or under the D&O Policy.

*Indemnification Rights.* Except for those indemnification agreements listed in Exhibit C attached to the Plan, all Claims for Indemnification Rights against the Debtors by an Indemnitee for defense and indemnification shall be reinstated against Reorganized Biovest and rendered Unimpaired to the extent that such Indemnitee is entitled to defense or indemnification under applicable law, agreement or past policy of the Debtors, but only to the extent that any such reinstated Claim for defense and indemnification in response to a claim against such Indemnitee is covered under any of the Debtors' insurance policies, including the D&O Policy. The reinstated Claim against Reorganized Biovest, and Reorganized Biovest's corresponding defense and indemnification obligation, shall not be for any deductible or self-insured retention amount and shall not exceed the amount of available insurance coverage.

*Existing Biovest Stock Options.* Biovest's 2000 Stock Option Plan (the "2000 Plan"), approved by its stockholders and Board of Directors effective July 19, 2000, authorizes awards of incentive stock options or non-qualified stock options to employees, directors, and consultants of Biovest, its subsidiaries and affiliates. A total of 7 million shares of Biovest Common Stock may be granted under the 2000 Plan. On November 2, 2006, the Board of Directors adopted the 2006 Biovest Equity Incentive Plan (the "2006 Plan"), which was approved by the stockholders by submission to majority shareholder action on October 4, 2007, and under which the number of shares of Biovest Common Stock available for grant under the 2000 Plan and the 2006 Plan was increased to a total of 27 million shares. The 2000 Plan and the 2006 Plan (collectively, the "Stock Option Plans") are administered by the Board of Directors. The purposes of the Stock Option Plans are to encourage and enable employees, directors, and consultants to acquire a proprietary interest in the growth and performance of Biovest, to generate an increased incentive for key employees and directors to contribute to Biovest's future success and prosperity, thus enhancing the value of Biovest for the benefit of its stockholders, and to enhance the ability of Biovest to attract and retain key employees and directors who are essential to progress, growth, and profitability. The administrator establishes the option exercise price which, in the case of incentive stock options, must be at least the market price (as such term is defined in the Stock Option Plans) of the Biovest Common Stock on the date of the grant or, with respect to optionees who own at least ten percent (10%) of the total combined voting power of all classes of Biovest's capital stock, 110% of the market price of the Biovest Common Stock on the date of the grant. Incentive stock options may not vest for the first time with respect to any optionee in a calendar year with a market price exceeding $0.1 million. Any option grants that exceed that amount shall be automatically treated as non-qualified stock options. For a more detailed description of the Stock Option Plans and the Existing Biovest Stock Options, Holders of Claims and Equity Interests are encouraged to review (i) Biovest International, Inc.'s Form 10-K Annual Report for the fiscal year ended September 30, 2009 filed with the SEC on July ~8, 2010, and (ii) Biovest International, Inc.'s Form 10-Q Quarterly Report for the fiscal quarter ended March 31, 2010 filed with the SEC on July ~8, 2010. Each of the above-referenced Reports can be accessed on the Internet at www.sec.gov, or on Biovest's website at www.biovest.com.

All of the grants of the Existing Biovest Stock Options and any agreements, documents, or instruments relating thereto are treated as executory contracts under the Plan. All of the holders of the Existing Biovest Stock Options shall retain unaltered all of their legal, equitable and contractual rights thereunder, subject to the provisions set forth in the paragraphs below.

Any Existing Biovest Stock Option granted Prepetition shall be exercisable by the holder thereof in accordance with the terms of the original grant, but may not be exercised until after the 4 Month Anniversary Date. The sale of any shares of Reorganized Biovest Common Stock received upon the exercise of any such option shall be subject to any restrictions or limitations under Rule 144(e) and Biovest's insider trading restrictions and policies.

Any Existing Biovest Stock Option granted Postpetition may not be exercised by the holder thereof until after the 12 Month Anniversary Date. Following the 12 Month Anniversary Date, any such ~~options~~option shall be exercisable in accordance with the terms of the original grant provided that one of the following conditions has been satisfied following the Effective Date: (i) an aggregate of 8,000,000 shares of Reorganized Biovest Common Stock have traded at a price equal to or greater than $1.00 per share, or (ii) for a period of ninety (90) consecutive Trading Days, the VWAP equals or exceeds $1.50 per share. If either of the conditions in subparagraph (i) or (ii) has not been satisfied by the 12 Month Anniversary Date, then any such option shall not be exercisable thereafter until the first to occur of the following: (a) the satisfaction of either of the conditions in subparagraph (i) or (ii) above, or (b) the holder of any such option pays an exercise price to Reorganized Biovest in an amount equal to the sum of (x) the exercise price stated in such option plus (y) an amount equal to the difference between $1.00 per share and the exercise price stated in such option.

Notwithstanding the foregoing provisions in the two preceding paragraphs, the holder of an Existing Biovest Stock Option ~~granted Postpetition~~ may exercise such option provided that the shares of Reorganized Biovest Common Stock issued upon such exercise are deposited into an escrow account controlled by Reorganized Biovest and cannot be sold or transferred until such time that such option would have otherwise become exercisable under the provisions above; provided, however, that this prohibition on transfer shall not prohibit the transfer of any such shares to a family member or to an Entity for the benefit of or controlled by a family member as permitted by the terms of the applicable incentive stock option plan~~,~~ (provided that the family member or Entity agrees to be bound by the provisions above).

*Existing Biovest Stock Warrants.* All of the Existing Biovest Stock Warrants are treated as executory contracts under the Plan. All of the holders of Existing Biovest Stock Warrants shall retain unaltered all of their legal, equitable and contractual rights thereunder, ~~except that any~~subject to the provisions set forth below in this paragraph. Any shares of Reorganized Biovest Common Stock issued, upon exercise, to the holder ~~upon the exercise~~ of an Existing Biovest Stock Warrant may not be sold or transferred until after the 12 Month Anniversary Date; (provided, however, that this prohibition on transfer shall not prohibit the transfer of any such shares to a family member or to an Entity for the benefit of or controlled by a family member (provided that the family member or Entity agrees to be bound by the provisions ~~above in this paragraph)~~of Article 7.9.2 of the Plan). Each Existing Biovest Stock Warrant shall be deemed amended to eliminate any provisions that provide for a recalculation of the exercise price based on any subsequent sale or offering of Biovest Common Stock.

**Vesting of Property of the Estates in Reorganized Biovest**

On the Effective Date, after giving effect to substantive consolidation as provided in Article 10.2 of the Plan, and except as otherwise expressly provided in the Plan, all Property of the Estates (including the Causes of Action and any net operating losses) shall vest in Reorganized Biovest free and clear of any and all Liens, Debts, obligations, Claims, Cure Claims, Liabilities, Equity Interests, and all other interests of every kind and nature except the Permitted Liens, and the Confirmation Order shall so provide. The Reorganized Debtors intend to preserve net operating losses to the maximum extent permitted under applicable law. As of the Effective Date, Reorganized Biovest may operate its businesses and use, acquire, and dispose of its Properties, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order. All privileges with respect to the Property of the Debtors' Estates, including the attorney/client privilege, to which the Debtors are entitled shall automatically vest in, and may be asserted by or waived on behalf of, Reorganized Biovest.

**Continued Corporate Existence; Dissolution**

Biovest will continue to exist after the Effective Date as a separate corporate entity, with all of the powers of a corporation under the Delaware General Corporation Law and pursuant to its certificate of incorporation and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organizational documents are amended or amended and restated as provided in the Plan or the Confirmation Order, without prejudice to any right to terminate such existence (whether by merger, dissolution or otherwise) under applicable law after the Effective Date. By no later than the 6 Month Anniversary Date, Reorganized Biovest shall file articles or certificates of dissolution of Biovax, AutovaxID, Biolender, and Biolender II, and shall take all other actions necessary or appropriate to effect the dissolution of Biovax and AutovaxID as corporations under the laws of the State of Florida and the dissolution of Biolender and Biolender II as limited liability companies under the laws of the State of Delaware. All applicable regulatory or governmental agencies shall take all steps necessary to allow and effect the prompt dissolution of the Biovest Subsidiaries as provided in the Plan, without the payment of any fee, tax or charge and without the need for the filing of reports or certificates. The Confirmation Order shall contain appropriate language authorizing or incorporating this dissolution procedure.

**Amendment and Restatement of Certificate of Incorporation and Bylaws of Biovest**

The Board of Directors of Biovest shall take such action as may be necessary to cause the certificate of incorporation of Biovest to be amended and restated (a) if applicable, to authorize a sufficient number of shares of Reorganized Biovest Common Stock necessary to meet (i) the requirements set forth in the Plan as to the issuance of the Plan Shares, and (ii) the obligations of Reorganized Biovest under the Existing Biovest Stock Options and the Existing Biovest Stock Warrants, (b) to contain any provisions as may be required in order that such certificate of incorporation is consistent with the provisions of the Plan, the Bankruptcy Code, the Confirmation Order, and the Laurus/Valens Settlement Documents, and (c) to provide, pursuant to Section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-

voting equity securities, but only to the extent required by Section 1123(a)(6). The bylaws of Biovest shall be amended and restated as necessary to satisfy the provisions of the Plan and the Laurus/Valens Settlement Documents (as amended and restated, the "Reorganized Biovest Bylaws"). To the extent necessary, the Confirmation Order shall include appropriate language approving the Reorganized Biovest Charter and the Reorganized Biovest Bylaws. The Reorganized Biovest Charter and the Reorganized Biovest Bylaws shall be the charter and bylaws governing Reorganized Biovest on and after the Effective Date, subject to any right to amend the foregoing as permitted by applicable law as such right may be limited by the terms of the Reorganized Biovest Charter and the Reorganized Biovest Bylaws.

## Board of Directors and Executive Officers of the Reorganized Debtors

Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, as of the Effective Date, the executive officers and directors of the Debtors immediately prior to the Effective Date shall be deemed to be the executive officers and directors of the Reorganized Debtors without any further action by any party.

On and after the Effective Date, the operations of each of the Reorganized Debtors shall continue to be the responsibility of its Board of Directors. Each director of each of the Reorganized Debtors shall serve from and after the Effective Date until his or her successor is duly elected or appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable articles or certificate of incorporation and bylaws or other organizational documents of such Reorganized Debtor. Subject to any requirement of Bankruptcy Court approval pursuant to Section 1129(a)(5) of the Bankruptcy Code, the initial Board of Directors of Reorganized Biovest shall consist of eight (8) members as follows: Francis E. O'Donnell, Jr., M.D. (Chairman), Ronald E. Osman, Peter J. Pappas, Sr., Raphael J. Mannino, Ph.D., John Sitilides, Jeffrey A. Scott, M.D., Christopher C. Chapman, M.D., and Edmund C. King.

Each executive officer of each of the Reorganized Debtors shall serve from and after the Effective Date until his or her successor is duly appointed and qualified or until his or her earlier death, resignation or removal in accordance with the applicable articles or certificate of incorporation and bylaws or other organizational documents of such Reorganized Debtor. The initial executive officers of Reorganized Biovest will be Francis E. O'Donnell, Jr., M.D., Chairman and Chief Executive Officer, Samuel S. Duffey, President and General Counsel, and Alan M. Pearce, Chief Financial Officer.

Francis E. O'Donnell, Jr., M.D. has been a Director and Vice-Chairman (non-executive) of Biovest since June 2003. On February 24, 2009, Dr. O'Donnell was appointed to Chief Executive Officer and Chairman (non-executive). Dr. O'Donnell is the non-executive Chairman, Chief Executive Officer and a director of Accentia. He is also the Chairman and a Director of BioDelivery Sciences International, Inc. Dr. O'Donnell was the founder and for more than the last five years has served as managing director of The Hopkins Capital Group ("HCG"), an affiliation of limited liability companies which engage in business development and venture activities for disruptive healthcare technologies. HCG entities are significant stockholders in Accentia and BioDelivery Sciences International, Inc. Dr. O'Donnell is a 1975, summa cum laude graduate of the

Johns Hopkins School of Medicine. He received his specialty training at the Wilmer Ophthalmological Institute, Johns Hopkins Hospital. He is the former Professor and Chairman, Department of Ophthalmology, St Louis University School of Medicine. Dr. O'Donnell has published over 30 peer-reviewed scientific articles and he has been awarded over 34 United States patents. He is the recipient of the 2000 Jules Stein Award from Retinitis Pigmentosa International. He is also a Trustee for St. Louis University.

Samuel S. Duffey was appointed President and General Counsel of Biovest on February 24, 2009. Mr. Duffey has been General Counsel of Accentia since April 2003 and on December 2, 2008 was also appointed President of Accentia. Prior to that, Mr. Duffey practiced business law with Duffey and Dolan, P.A. beginning in 1992. From February 2000 to September 2003, Mr. Duffey served as the non-executive chairman and as a member of the Board of Directors of Invisia, Inc., a small publicly held safety company. From October 2001 to May 2004, Mr. Duffey also served as the non-executive chairman and as a member of the Board of Directors of FlashPoint International, Inc., a publicly held automotive parts company which is currently named Navitrak International Corporation. Mr. Duffey received his B.A. and J.D. degrees from Drake University.

Alan M. Pearce has been Chief Financial Officer of Biovest since December 31, 2007. Mr. Pearce has served as a director and Chief Financial Officer of Accentia since August 2004. Prior to serving as Accentia's Chief Financial Officer, Mr. Pearce served as Senior Vice President, Financial Services for McKesson Corporation, a large publicly traded healthcare company, from April 1999 to March 2004. Mr. Pearce also currently serves on the advisory board of HCG. He also previously served as a director and a member of the finance committee of XL Insurance Company. From September 2002 to September 2005, Mr. Pearce served as a director of BioDelivery Sciences International, Inc. Mr. Pearce is a graduate of Georgia Tech, where he earned a B.S. degree in Industrial Management, and the University of Texas, where he earned an MBA degree in finance.

From and after the Confirmation Date, the Board of Directors and executive officers of each of the Debtors and the Reorganized Debtors, as the case may be, shall have all powers accorded by law to put into effect and carry out the Plan and the Confirmation Order.

To the extent that, as of the Effective Date, any of the Debtors has in place employment, indemnification and other agreements with its directors, officers and employees who will continue in such capacities after the Effective Date, such agreements shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, except as otherwise provided in the Plan. Such agreements may include equity, bonus and other incentive plans in which directors, officers and other employees of the Reorganized Debtors may be eligible to participate, including the Existing Biovest Stock Options.

**Discharge, Exculpation from Liability, Release and Injunction Provisions under the Plan**

Article 12 of the Plan contains detailed discharge, exculpation from liability, release and injunction provisions for the benefit of the Debtors, the Reorganized Debtors and other parties. In addition, the Plan provides for the complete and unconditional discharge, to the fullest extent permitted by law, of any and all Debts and Claims of any nature whatsoever against and Equity

~~Interests in~~ the Debtors or the Reorganized Debtors that arose on or before the Effective Date. Each holder of a Claim against or Equity Interest in the Debtors is encouraged to read Article 12 of the Plan in its entirety. Set forth below is a summary of these provisions.

*Discharge of Claims ~~and Termination of Equity Interests~~.* Except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall operate as a discharge, pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent permitted by applicable law, as of the Effective Date, of the Debtors and their Estates and the Reorganized Debtors from any and all Debts of~~,~~ and Claims of any nature whatsoever against~~, and Equity Interests in~~ the Debtors that arose at any time prior to the Effective Date, including any and all Claims for principal and interest, whether accrued before, on or after the Petition Date. Except as otherwise expressly provided in the Plan or in the Confirmation Order, but without limiting the generality of the foregoing, on the Effective Date, the Debtors and their Estates and the Reorganized Debtors, and their respective successors or assigns, shall be discharged, to the fullest extent permitted by applicable law, from any Claim or Debt that arose prior to the Effective Date and from any and all Debts of the kind specified in Section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such Debt was filed pursuant to Section 501 of the Bankruptcy Code, (b) a Claim based on such Debt is an Allowed Claim pursuant to Section 502 of the Bankruptcy Code, or (c) the Holder of a Claim based on such Debt has voted to accept the Plan. As of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons and Entities, including all Holders of Claims or Equity Interests, shall be forever precluded and permanently enjoined to the fullest extent permitted by applicable law from asserting directly or indirectly against the Debtors or their Estates or the Reorganized Debtors, or any of their respective successors and assigns, or the assets or Properties of any of them, any other or further Claims, Debts, rights, causes of action, remedies, or Liabilities ~~or Equity Interests~~ based upon any act, omission, document, instrument, transaction, event, or other activity of any kind or nature that occurred prior to the Effective Date or that occurs in connection with implementation of the Plan, including any action or proceeding which may be brought pursuant to the Securities Act or the Exchange Act, and the Confirmation Order shall contain appropriate injunctive language to that effect. As of the Effective Date, Holders of Equity Interests shall have no rights arising from or relating to such Equity Interests, except as otherwise expressly provided in the Plan. In accordance with the foregoing, except as otherwise expressly provided in the Plan or in the Confirmation Order, the Confirmation Order shall be a judicial determination of the discharge or termination of all such Claims and other Debts and Liabilities against~~, or Equity Interests in,~~ the Debtors, pursuant to Sections 524 and 1141 of the Bankruptcy Code, to the fullest extent permitted by applicable law, and such discharge shall void any judgment obtained against the Debtors, at any time, to the extent that such judgment relates to a discharged or terminated Claim, Liability, or Debt ~~or Equity Interest~~. Notwithstanding the foregoing, Reorganized Biovest shall remain obligated to make payments to Holders of Allowed Claims and issue shares of Reorganized Biovest Common Stock as required pursuant to the Plan.

*Exculpation from Liability.* The Debtors and their respective Postpetition directors and officers, the Professionals for the Debtors (acting in such capacity), the Committee and its members, the Professionals for the Committee (acting in such capacity), and the DIP Lender (collectively, the "Exculpated Parties") shall neither have nor incur any liability whatsoever to any Person or Entity for any act taken or omitted to be taken in good faith in connection with or

related to the formulation, preparation, dissemination, ~~implementation,~~or confirmation~~, or consummation~~ of the Plan, the Disclosure Statement, any Plan Document, the Exit Financing, the Laurus/Valens Settlement, or any contract, instrument, release, or other agreement or document created or entered into, or any other act taken or omitted to be taken, in connection with the Plan or the Bankruptcy Cases, in each case for the period on and after the Petition Date and through the Effective Date; provided, however, that this exculpation from liability provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exculpation from liability provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The rights granted under Article 12.2 of the Plan are cumulative with (and not restrictive of) any and all rights, remedies, and benefits that the Exculpated Parties have or obtain pursuant to any provision of the Bankruptcy Code or other applicable law. In furtherance of the foregoing, the Exculpated Parties shall have the fullest protection afforded under Section 1125(e) of the Bankruptcy Code and all applicable law from liability for violation of any applicable law, rule or regulation governing the solicitation of acceptance or rejection of a plan or the offer, issuance, sale or purchase or securities, including the Plan Notes and the Plan Shares. This exculpation from liability provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein or in the Plan, this exculpation from liability provision shall not release, or be deemed a release of, any of the Causes of Action.

The Debtors believe that the foregoing exculpation from liability language is consistent with the provisions that are routinely approved by bankruptcy courts, including this Bankruptcy Court. The Debtors believe that exculpation from liability is fair and reasonable in that it encompasses ordinary negligence claims, provides for relief only through the Effective Date of the Plan, and excludes claims for gross negligence and willful misconduct.

*Release*. On the Effective Date, the Debtors, the Reorganized Debtors, the Committee, the DIP Lender, and any and all Holders of Claims and Equity Interests shall release unconditionally and hereby are deemed to release unconditionally the Debtors' Postpetition directors and officers, the members of the Committee, and the Professionals (collectively, the "Released Parties") from any and all claims, obligations, suits, judgments, damages, losses, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence taking place between the Petition Date and the Effective Date, which is in any way relating to the Debtors, the Bankruptcy Cases, any Property of the Debtors, the business or operations of the Debtors, the Exit Financing, any Plan Documents, the Plan, the Laurus/Valens Settlement, or any of the transactions contemplated thereby; provided, however, that this release provision shall not be applicable to any liability found by a court of competent jurisdiction to have resulted from fraud or the willful misconduct or gross negligence of any such party. With respect to Professionals, the foregoing exclusion from this release provision shall also include claims of professional negligence arising from the services provided by such Professionals during the Bankruptcy Cases. Any such claims shall be governed by the standard of care otherwise applicable to the standard of negligence claims outside of bankruptcy. The

Confirmation Order shall enjoin the prosecution by any Person or Entity, whether directly, derivatively or otherwise, of any such claim, obligation, suit, judgment, damage, loss, right, remedy, cause of action, charge, cost, debt, indebtedness, or liability which arose or accrued during such period or was or could have been asserted against any of the Released Parties, except as otherwise provided in the Plan or in the Confirmation Order. Each of the Released Parties shall have the right to independently seek enforcement of this release provision. This release provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein or in the Plan, this release provision shall not release, or be deemed a release of, any of the Causes of Action.

The Debtors believe that the the foregoing release provision is supported by the law and the facts and circumstances of the Bankruptcy Cases for a number of reasons. First, Creditors in the Bankruptcy Cases will be paid in full, including interest for Creditors. Second, the Debtors have conducted a review of the potential claims which could be brought on behalf of the Debtors and have determined that there are no valid claims. The releases set forth in the Plan will allow the Reorganized Debtors to avoid the time and expense of dealing with claims which, based on the Debtors' review, have no merit. Third, Creditors will benefit from the releases. The Plan provides that all contractual and statutory obligations to indemnify officers, directors and employees are assumed under the Plan. Substantially all of the Holders of Allowed Claims will be paid through the issuance of securities in Reorganized Biovest. The value of such securities will be enhanced by the Debtors receiving releases of all claims under the Confirmation Order, including a release of obligations which could be implicated by the Reorganized Debtors' duty to indemnify their officers, directors and employees.

*General Injunction.* Pursuant to Sections 105, 1123, 1129 and 1141 of the Bankruptcy Code, in order to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, all Persons or Entities that have held, currently hold or may hold a Claim, Debt, or Liability or Equity Interest that is discharged or terminated pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged or terminated Claims, Debts, or Liabilities. or Equity Interests, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtors or the Reorganized Debtors or their respective Properties; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors or the Reorganized Debtors or their respective Properties; (c) creating, perfecting or enforcing any Lien or encumbrance against the Debtors or the Reorganized Debtors or their respective Properties; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtors or the Reorganized Debtors; (e) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order; or (f) interfering with or in any manner whatsoever disturbing the rights and remedies of the Debtors or the Reorganized Debtors under the Plan and the Plan Documents and the other documents executed in connection therewith. The Debtors and the Reorganized Debtors shall have the right to independently seek enforcement of this general injunction provision. This general injunction provision is an integral part of the Plan and is essential to its implementation. Notwithstanding anything to the contrary contained herein or in the Plan, this

general injunction provision shall not release, or be deemed a release of, any of the Causes of Action.

*Term of Certain Injunctions and Automatic Stay.* All injunctions or automatic stays for the benefit of the Debtors pursuant to Sections 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise provided for in the Bankruptcy Cases, and in existence on the Confirmation Date, shall remain in full force and effect following the Confirmation Date and until the Final Decree Date, unless otherwise ordered by the Bankruptcy Court. With respect to all lawsuits pending in courts in any jurisdiction (other than the Bankruptcy Court) that seek to establish the Debtors' liability on Prepetition Claims asserted therein and that are stayed pursuant to Section 362 of the Bankruptcy Code, such lawsuits shall be deemed dismissed as of the Effective Date, unless the Debtors affirmatively elect to have the Debtors' liability established by such other courts, and any pending motions seeking relief from the automatic stay for purposes of continuing any such lawsuits in such other courts shall be deemed denied as of the Effective Date, and the automatic stay shall continue in effect, unless the Debtors affirmatively elect to have the automatic stay lifted and to have the Debtors' liability established by such other courts; and the Prepetition Claims at issue in such lawsuits shall be determined and either Allowed or disallowed in whole or part by the Bankruptcy Court pursuant to the applicable provisions of the Plan, unless otherwise elected by the Debtors as provided therein.

*No Liability for Tax Claims.* Unless a taxing Governmental Unit has asserted a Claim against the Debtors before the Governmental Unit Bar Date or Administrative Expense Claim Bar Date established therefor, no Claim of such Governmental Unit shall be Allowed against the Debtors, the Reorganized Debtors or their respective directors, officers, employees or agents for taxes, penalties, interest, additions to tax or other charges arising out of (i) the failure, if any, of the Debtors, any of their Affiliates, or any other Person or Entity to have paid tax or to have filed any tax return (including any income tax return or franchise tax return) in or for any prior year or period, or (ii) an audit of any return for a period before the Petition Date.

*Regulatory or Enforcement Actions.* Nothing in the Plan shall restrict any federal government regulatory agency from pursuing any regulatory or police enforcement action ~~against the Debtors, the Reorganized Debtors, or their respective successors or assigns~~or performing its statutory duties against any Person or Entity in any forum, but only to the extent not prohibited by the automatic stay of Section 362 of the Bankruptcy Code or discharged or enjoined pursuant to Section 524 or 1141(d) of the Bankruptcy Code. Nothing contained in the Disclosure Statement or the Plan is intended to, nor shall it, supersede or alter any applicable provisions of the Bankruptcy Code.

## Distributions under the Plan

*Initial Distributions.* As soon as reasonably practicable (as determined by Reorganized Biovest) after the Effective Date, Reorganized Biovest shall shall (i) make the Distributions required under the Plan to Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals) and Allowed Claims in Classes 5 and ~~9~~9; provided, however, that the Distributions as to Allowed Administrative Expense Claims of Professionals shall be made no more than ten (10) days after the Effective Date; and (ii) issue the Plan Shares to the Holders of Allowed Claims in Classes 2, 3, 4, 6, 7, and 8 as required by the

terms of the Plan ((i) and (ii), collectively, the "Initial Distribution"). Thereafter, Reorganized Biovest shall make additional Distributions to Holders of Allowed Claims as and when required by the terms of the Plan.

*Execution and Delivery of Plan Notes and Security Documents.* On the Effective Date or the Determination Date, as the case may be, Reorganized Biovest shall execute and deliver the Plan Notes and the Security Documents.

*Determination of Claims.* From and after the Effective Date, Reorganized Biovest shall have the exclusive authority to, and shall, file, settle, compromise, withdraw, or litigate to judgment all objections to Claims. Except as to any late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases, if any, all objections to Claims shall be filed with the Bankruptcy Court by no later than ninety (90) days following the Effective Date (unless such period is extended by the Bankruptcy Court upon motion of the Debtors or Reorganized Biovest), and the Confirmation Order shall contain appropriate language to that effect. Holders of Unsecured Claims that have not filed such Claims on or before the Bar Date shall serve the Notice Parties with any request to the Bankruptcy Court for allowance to file late Unsecured Claims. If the Bankruptcy Court grants the request to file a late Unsecured Claim, such Unsecured Claim shall be treated in all respects as a Class 8 Unsecured Claim. Objections to late-filed Claims and Claims resulting from the rejection of executory contracts or unexpired leases shall be filed on the later of (a) ninety (90) days following the Effective Date or (b) the date sixty (60) days after Reorganized Biovest receives actual notice of the filing of such Claim.

Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the Holder of the Claim if the Debtors or Reorganized Biovest, as the case may be, effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004, (b) to the extent counsel for the Holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the Proof of Claim or other representative identified on the Proof of Claim or any attachment thereto, or (c) by first class mail, postage prepaid, on any counsel that has filed a notice of appearance in the Bankruptcy Cases on behalf of the Holder of a Claim.

Disputed Claims shall be fixed or liquidated in the Bankruptcy Court as core proceedings within the meaning of 28 U.S.C. § 157(b)(2)(B) unless the Bankruptcy Court orders otherwise. If the fixing or liquidation of a contingent or unliquidated Claim would cause undue delay in the administration of the Bankruptcy Cases, such Claim shall be estimated by the Bankruptcy Court for purposes of allowance and Distribution. The Debtors or Reorganized Biovest may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code regardless of whether the Debtors or Reorganized Biovest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, such estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or Reorganized Biovest may elect to pursue any supplemental proceedings to object to

any ultimate allowance of such Claim. The determination of Claims in Estimation Hearings shall be binding for purposes of establishing the maximum amount of the Claim for purposes of allowance and Distribution. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another. Procedures for specific Estimation Hearings, including provisions for discovery, shall be set by the Bankruptcy Court giving due consideration to applicable Bankruptcy Rules and the need for prompt determination of the Disputed Claim.

*Distributions as to Allowed Claims in Classes 8 and 11.* Each Holder of an Allowed Unsecured Claim in Class 8 who elects Option A and each Holder of an Allowed Claim in Class 11 shall receive a Cash Distribution, on the applicable Distribution Date, in the amount provided for in Article 5 of the Plan. Notwithstanding any provision in the Plan to the contrary, no Distribution shall be made to the Holder of a Disputed Claim in Class 8 or in Class 11 unless and until such Disputed Claim becomes an Allowed Claim. At such time that such Disputed Claim becomes an Allowed Class 8 Claim or an Allowed Class 11 Claim, the Holder of such Allowed Class 8 Claim or Allowed Class 11 Claim shall receive the Distribution to which such Holder is then entitled under the Plan. Notwithstanding any provision in the Plan to the contrary, if, on any applicable Distribution Date, the Holder of a Class 8 Claim or a Class 11 Claim is subject to a proceeding against it by Reorganized Biovest under Section 502(d) of the Bankruptcy Code, then Reorganized Biovest (in its sole discretion) may withhold a Distribution to such Holder until the final resolution of such proceeding. Distributions to a Holder of an Allowed Claim in Class 8 or Class 11 shall be made at the address of such Holder set forth in the Schedules or on the books and records of the Debtors or Reorganized Biovest at the time of the Distribution, unless Reorganized Biovest has been notified in writing of a change of address, including by the filing of a Proof of Claim or statement pursuant to Bankruptcy Rule 3003 by such Holder that contains an address for such Holder different than the address for such Holder as set forth in the Schedules. Reorganized Biovest shall not be liable for any Distribution sent to the address of record of a Holder in the absence of the written change thereof as provided above.

*Unclaimed Distributions.* If the Holder of an Allowed Claim fails to negotiate a check for a Distribution issued to such Holder within sixty (60) days of the date such check was issued, then Reorganized Biovest shall provide written notice to such Holder stating that, unless such Holder negotiates such check within thirty (30) days of the date of such notice, the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim. If a check for a Distribution made pursuant to the Plan to any Holder of an Allowed Claim is returned to Reorganized Biovest due to an incorrect or incomplete address for the Holder of such Allowed Claim, and no claim is made in writing to Reorganized Biovest as to such check within sixty (60) days of the date such Distribution was made, then the amount of Cash attributable to such check shall be deemed to be unclaimed, such Holder shall be deemed to have no further Claim in respect of such check, such Holder's Allowed Claim shall no longer be deemed to be Allowed, and such Holder shall not be entitled to participate in any further Distributions under the Plan in respect of such Claim. Any unclaimed Distribution as described above sent by Reorganized Biovest shall become the property of Reorganized Biovest. If a stock certificate for Reorganized Biovest Common Stock distributed to the Holder of an Allowed Claim pursuant to the Plan is returned to Reorganized

Biovest or the Transfer Agent due to an incorrect or incomplete address for the recipient, and no claim is made in writing to Reorganized Biovest or the Transfer Agent as to such stock certificate within ninety (90) days of the date such stock certificate was distributed, then the number of shares of Reorganized Biovest Common Stock evidenced by such stock certificate shall be deemed to be unclaimed and such recipient shall be deemed to have no further rights in respect of such stock certificate or the shares of Reorganized Biovest Common Stock evidenced thereby.

## Determination of Voting and Distribution Rights of Holders of Equity Interests

All proofs of Equity Interests filed by Holders of Equity Interests to evidence Equity Interests shall be deemed disallowed, and the stock register that is maintained by the Transfer Agent shall be deemed to constitute good and sufficient evidence of the existence, amount, and Holders of Equity Interests. At the close of business on the Record Date, the Transfer Agent's stock transfer ledgers regarding the Equity Interests shall close for the purpose of voting on the Plan. The Debtors shall not have any obligation to recognize any transfers of Equity Interests occurring during the period from the Record Date until the Voting Deadline, but shall be entitled instead to recognize and deal with, for purposes of voting on the Plan, only those Holders of Equity Interests reflected on the books of the Transfer Agent as of the close of business on the Record Date. ~~At the close of business on the Effective Date, the Transfer Agent's stock transfer ledgers regarding the Equity Interests shall close for the purpose of issuance of the Class 12 Plan Shares under the Plan.~~ In the event that a dispute with respect to the voting or distribution rights of the Holder of any Equity Interest exists as of the Record Date or as of the Effective Date, the Debtors or any other party in interest may apply to the Bankruptcy Court for a determination of such dispute.

## Issuance of Reorganized Biovest Common Stock

Reorganized Biovest shall issue and distribute, in accordance with the provisions of the Plan, shares of Reorganized Biovest Common Stock to those Entities entitled to receive the Plan Shares thereunder. Exhibit GF attached to the Plan sets forth a pro forma recapitalization of Reorganized Biovest after giving effect to the maximum possible issuance of shares of Reorganized Biovest Common Stock under the terms of the Plan as of the Effective Date (excluding the DIP Lender Plan Shares), the Laurus/Valens Settlement Documents, the Existing Biovest Stock Options, and the Existing Biovest Stock Warrants. ~~On the Effective Date, Reorganized Biovest will be a public company subject to the reporting requirements under the Exchange Act. Reorganized Biovest will use its best efforts to list, as promptly as practicable after the Effective Date, the Reorganized Biovest Common Stock on a Trading Market, but will have no liability if it is unable to do so.~~

## Exemptions from Securities Laws

*General.* Pursuant to Section 1125(e) of the Bankruptcy Code, any Person that solicits the acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, or that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a Security, offered or sold under the plan, of the debtor, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the

solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of Securities.

*Issuance of Reorganized Biovest Common Stock under the Plan.*  Section 1145(a) of the Bankruptcy Code exempts from registration under the Securities Act and under equivalent state securities or "blue sky" laws (a) the offer or sale under a plan of reorganization of a Security of a debtor if such offer or sale is either (i) in exchange for a claim against, an interest in, or a claim for an administrative expense in the bankruptcy case concerning, the debtor, or (ii) "principally in stock exchange and partly for cash or property", or (b) the offer of a Security of a debtor through any warrant, option, right to subscribe, or conversion privilege that was sold in the manner specified in subparagraph (a) above, or the sale of a Security upon the exercise of such a warrant, option, right to subscribe, or conversion privilege.  The Debtors believe that the offer and issuance of the Plan Notes and the Plan Shares in exchange for Claims and Equity Interests under the Plan satisfy the requirements of Section 1145(a) of the Bankruptcy Code and that such transactions, therefore, are exempt from registration under federal and state securities laws.  The Confirmation Order will include a finding and conclusion, ~~binding on all parties to the Bankruptcy Cases, the Debtors, the Reorganized Debtors, the SEC and all other federal, state, and local regulatory agencies,~~ to the effect that such offer and issuance fall within the exemptions from registration under the Securities Act and state and local securities laws pursuant to Section 1145 of the Bankruptcy Code.

*Subsequent Transfers of Plan Shares.*

*Plan Shares Issued Pursuant to Section 1145 Exemption.*  The Plan Shares may be freely transferred by most recipients thereof, and all resales of and subsequent transactions for the Plan Shares are exempt from registration under federal and state securities laws, unless the holder is an "underwriter" with respect to the Plan Shares.  Section 1145(b)(1) of the Bankruptcy Code defines four types of "underwriters":

>    (i)    an Entity that purchases a claim against, an interest in, or a claim for an administrative expense in the bankruptcy case concerning, the debtor, if such purchase is with a view to distribution of any Security received or to be received in exchange for such a claim or interest;

>    (ii)    an Entity that offers to sell Securities offered or sold under a bankruptcy plan for the holders of such Securities;

>    (iii)    an Entity that offers to buy Securities offered or sold under a bankruptcy plan from the holders of such Securities, if the offer to buy is (x) with a view to distribution of such Securities, and (y) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of Securities under the plan; and

>    (iv)    an Entity that is an "issuer" with respect to such Securities, as the term "issuer" is defined in Section 2(11) of the Securities Act.

Under Section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer. "Control" (as such term is defined in Rule 405 of Regulation C under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor (or its affiliate or successor) under a plan of reorganization may be deemed to "control" such debtor (and therefore be an underwriter for purposes of Section 1145), particularly if such management position is coupled with the ownership of a significant percentage of the debtor's (or affiliate's or successor's) voting securities. Moreover, the legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns at least 10% of the securities of a reorganized debtor may be presumed to be a "control person."

To the extent that Persons deemed to be "underwriters" receive Plan Shares pursuant to the Plan, resales of such Plan Shares by such Persons would not be exempted by Section 1145(a) of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters, however, may be able to sell such Plan Shares without registration subject to the provisions of Rule 144 under the Securities Act as discussed below.

*Plan Shares Held by Underwriters.* Holders of Plan Shares who are deemed to be "underwriters" within the meaning of Section 1145(b)(1) of the Bankruptcy Code or who may otherwise be deemed to be "affiliates" of, or to exercise "control" over, Reorganized Biovest within the meaning of Rule 405 of Regulation C under the Securities Act, may, in addition to any other exemptions that may be available under federal and state securities laws, under certain circumstances, be able to sell their Plan Shares pursuant to the more limited safe harbor resale provisions of Rule 144 under the Securities Act. Generally, Rule 144 provides that, if certain conditions are met (e.g., volume limitations, manner of sale, availability of current information about the issuer, etc.), specified persons who resell such securities and are "affiliates" of the issuer of the securities sought to be resold will not be deemed to be "underwriters" as defined in Section 2(11) of the Securities Act.

The foregoing summary discussion regarding Section 1145 of the Bankruptcy Code is general in nature and has been included in this Disclosure Statement solely for informational purposes. Although the Plan Shares will become freely tradable by most recipients thereof as described above, it should be noted that there can be no assurance that ~~Reorganized Biovest will be able to effect the listing of the Reorganized Biovest Common Stock or, if listed, that~~ an active trading market for the Reorganized Biovest Common Stock will develop or, if developed, that it will continue. Accordingly, no assurance can be given concerning the actual market for the Plan Shares or a Person's ability to sell the Plan Shares at any particular time. The Debtors do not make any representations concerning, and do not provide any opinion or advice with respect to, the securities law and bankruptcy law matters described above. In view of the uncertainty concerning the availability of exemptions from the registration requirements of the Securities Act and equivalent state securities or "blue sky" laws to a recipient of Plan Shares who may be deemed to be an "underwriter" (within the meaning of Section 1145(b)(1) of the Bankruptcy Code) and/or an "affiliate" of, or a person who exercises "control" over, Reorganized Biovest under applicable federal and state securities laws, the Debtors encourage each Person who is to

receive Plan Shares pursuant to the Plan to consider carefully and consult with its own legal advisor(s) with respect to such (and any related) matters.

**Fractional Shares**

The Distribution of shares of Reorganized Biovest Common Stock as provided in the Plan may mathematically entitle the recipient to a fractional share of Reorganized Biovest Common Stock. Notwithstanding any provision in the Plan to the contrary, payments of fractions of shares of Reorganized Biovest Common Stock shall not be made and shall be deemed to be zero. No consideration (Cash or otherwise) shall be provided in lieu of fractional shares that are deemed to be zero.

**Certain Restrictions on Stock Transfers**

Any shares of Reorganized Biovest Common Stock issued to the Holder of an Allowed Claim in Classes 4, 6, 7, and 8, who is also a holder of at least five percent (5%) of the issued and outstanding shares of Reorganized Biovest Common Stock, shall be subject to the following provisions: (a) any restrictions or limitations under Rule 144(e), (b) a limit on the sale of such shares in any ninety (90) day period to that number of such shares equal to one percent (1%) of the issued and outstanding shares of Reorganized Biovest Common Stock, (c) a prohibition on the sale of any such shares for a period of one hundred twenty (120) days following any debt or equity raise by Reorganized Biovest of less than $10,000,000.00, and (d) a prohibition on the sale of any such shares for a period of one hundred eighty (180) days following any debt or equity raise by Reorganized Biovest of $10,000,000.00 or more. _The Debtors do not believe that any Class 8 Unsecured Creditor will be subject to the foregoing provisions. Any certificate for shares of Reorganized Biovest Common Stock issued under the Plan to a holder of at least five percent (5%) of the issued and outstanding shares of Reorganized Biovest Common Stock shall contain a legend thereon setting forth the foregoing provisions and restrictions._

**~~Delinquency in Filing~~_SEC_ Public Reports**

The Biovest Common Stock is registered under the Exchange Act. Section 13(a) of the Exchange Act requires that Biovest file with the SEC annual reports on Form 10-K and quarterly reports on Form 10-Q. ~~At present, Biovest is delinquent in several of its periodic filing obligations~~_Following the Petition Date, Biovest voluntarily ceased filing certain required reports with the SEC_, including ~~not having filed~~ its annual reports on Form 10-K for the 2008 and 2009 fiscal years and its quarterly reports on Form 10-Q for the 2009 fiscal year and the first quarter of the 2010 fiscal year. ~~After Biovest filed for bankruptcy, Biovest sought, but did not receive, a waiver from the SEC of its periodic filing obligations during the course of the Bankruptcy Cases. Biovest is currently using its best efforts to prepare the delinquent annual and quarterly reports under the Exchange Act and presently anticipates that such reports (including all required financial statements) will be~~ _On July 8, 2010, Biovest filed with the SEC all such reports that had not previously been filed, and Biovest is considered current in its SEC filings as of the date of the Plan. Copies of all such reports_ filed with the SEC by ~~no later than July 15, 2010.~~ _Biovest can be accessed through Biovest's website at www.biovest.com._

**Corporate Action**

All matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, or any corporate action to be taken by or required of the Debtors or the Reorganized Debtors, including all action taken to approve the Reorganized Biovest Charter and the Reorganized Biovest Bylaws, shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan, and shall be authorized and approved in all respects without any requirement for further action by the stockholders or directors of the Debtors or the Reorganized Debtors.

## Section 1146 Exemption

Pursuant to Section 1146(a) of the Bankruptcy Code, the issuance, distribution, transfer or exchange of any Security (including the Reorganized Biovest Common Stock), or the making, delivery or recording of any instrument of transfer, pursuant to, in implementation of or as contemplated by the Plan or any Plan Document or the Laurus/Valens Settlement Documents, or the vesting, re-vesting, transfer or sale of any Property of, by or in the Debtors or their Estates or Reorganized Biovest pursuant to, in implementation of or as contemplated by the Plan or any Plan Document or the Laurus/Valens Settlement Documents, or any transaction arising out of, contemplated by or in any way related to the foregoing, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangible or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall be, and hereby are, directed to forego the collection of any such tax or governmental assessment and to accept for filing and recording any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## Pursuit of Causes of Action

On the Effective Date, the Causes of Action shall be vested in Reorganized Biovest, except to the extent a Creditor or other third party has been specifically released from any Cause of Action by the terms of the Plan or by ~~an order~~ a Final Order of the Bankruptcy Court. Reorganized Biovest will have the right, in its sole and absolute discretion, to pursue, not pursue, settle, release or enforce any Causes of Action without seeking any approval from the Bankruptcy Court except as provided in Article 8.13 of the Plan. The Debtors are currently not in a position to express an opinion on the merits of any of the Causes of Action or on the recoverability of any amounts as a result of any such Causes of Action. For purposes of providing notice, the Debtors state that any party in interest that engaged in business or other transactions with the Debtors Prepetition or that received payments from the Debtors Prepetition may be subject to litigation to the extent that applicable bankruptcy or non-bankruptcy law supports such litigation. Reorganized Biovest will fund the costs and expenses (including legal fees) to pursue the Causes of Action.

No Creditor or other party should vote for the Plan or otherwise rely on the Confirmation of the Plan or the entry of the Confirmation Order in order to obtain, or on the belief that it will obtain, any defense to any Cause of Action. No Creditor or other party should act or refrain from acting on the belief that it will obtain any defense to any Cause of Action. ADDITIONALLY, THE PLAN DOES NOT, AND IS NOT INTENDED TO, RELEASE ANY CAUSES OF

ACTION OR OBJECTIONS TO CLAIMS, AND ALL SUCH RIGHTS ARE SPECIFICALLY RESERVED IN FAVOR OF REORGANIZED BIOVEST. Creditors are advised that legal rights, claims and rights of action the Debtors may have against them, if they exist, are retained under the Plan for prosecution unless a ~~specific order~~Final Order of the Bankruptcy Court authorizes the Debtors to release such claims. As such, Creditors are cautioned not to rely on (i) the absence of the listing of any legal right, claim or right of action against a particular Creditor in the Disclosure Statement, the Plan, or the Schedules, or (ii) the absence of litigation or demand prior to the Effective Date of the Plan as any indication that the Debtors or Reorganized Biovest do not possess or do not intend to prosecute a particular claim or Cause of Action if a particular Creditor votes to accept the Plan. It is the expressed intention of the Plan to preserve rights, objections to Claims, and rights of action of the Debtors, whether now known or unknown, for the benefit of Reorganized Biovest. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall Reorganized Biovest, as a result of such failure, be estopped or precluded under any theory from pursuing such Cause of Action. Nothing in the Plan operates as a release of any of the Causes of Action.

The Debtors do not presently know the full extent of the Causes of Action and, for purposes of voting on the Plan, all Creditors are advised that Reorganized Biovest will have substantially the same rights that a Chapter 7 trustee would have with respect to the Causes of Action. Accordingly, neither a vote to accept the Plan by any Creditor nor the entry of the Confirmation Order will act as a release, waiver, bar or estoppel of any Cause of Action against such Creditor or any other Person or Entity, unless such Creditor, Person or Entity is specifically identified by name as a released party in the Plan, in the Confirmation Order, or in any other Final Order of the Bankruptcy Court. Confirmation of the Plan and entry of the Confirmation Order is not intended to and shall not be deemed to have any res judicata or collateral estoppel or other preclusive effect that would precede, preclude, or inhibit prosecution of such Causes of Action following Confirmation of the Plan.

The Bankruptcy Code gives a trustee or a debtor-in-possession the right to avoid and recover for the benefit of creditors in the bankruptcy case certain transfers that the debtor made prior to the bankruptcy filing. One such type of avoidance power is provided by the preference provisions of Section 547 of the Bankruptcy Code. Under Section 547(b) of the Bankruptcy Code, an avoidable preference is (1) a transfer, (2) of an interest of the debtor in property, (3) to or for the benefit of a creditor, (4) for or on account of antecedent debt, (5) made while the debtor was insolvent, (6) on or within ninety (90) days (one year for "insiders") before bankruptcy, and (7) that enables the creditor to receive more than it would have received in a Chapter 7 liquidation case if the transfer had not been made.

At this time, and without waiver of the Debtors' right to pursue any and all other Causes of Action, the Debtors believe the Causes of Action consist primarily of (i) Avoidance Actions ~~relating to preferential transfers and possible fraudulent transfers under various provisions of the Bankruptcy Code against various trade Creditors and other Prepetition Creditors~~, and (ii) the Rosensweig Adversary Proceeding. In the Statements of Financial Affairs filed in the Biovest Bankruptcy Cases, the Debtors identified Persons who received payments or other transfers within ninety (90) days prior to the Chapter 11 filings and insiders who received payments or other transfers within one (1) year prior to the Chapter 11 filings or other payments or transfers

that may be avoidable under the Bankruptcy Code. ~~Those parties are included on the Schedule of Potential Causes of Action attached as Exhibit F to the Plan for avoidable transfers against those parties.~~ Some or all of such Persons may dispute or deny that Causes of Action may be brought against them and could assert defenses thereto. The investigation as to these Causes of Action has not been conducted thus far and no decision has been made yet with respect to the pursuit thereof; however, because the Plan is premised on the Debtors' solvency and provides for payment in full of all Allowed Claims of Creditors, with interest, the Debtors presently anticipate that no Avoidance Actions will be pursued.

The Debtors and the Reorganized Debtors also reserve all rights under Section 506(c) of the Bankruptcy Code with respect to any and all Secured Claims. The Biovest Estate shall remain open, even if the Biovest Bankruptcy Cases shall have been closed, as to any and all Causes of Action until such time as the Causes of Action have been fully administered and the Causes of Action Recoveries have been received by Reorganized Biovest.

## Prosecution and Settlement of Claims and Causes of Action

Reorganized Biovest (a) may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of any Cause of Action which the Debtors had or had power to assert immediately prior to the Effective Date, and (b) may settle or adjust such Cause of Action. From and after the Effective Date, Reorganized Biovest shall be authorized, pursuant to Bankruptcy Rule 9019 and Section 105(a) of the Bankruptcy Code, to compromise and settle any Cause of Action or objection to a Claim in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements: (i) if the resulting settlement provides for settlement of a Cause of Action or objection to a Claim originally asserted in an amount equal to or less than $50,000.00, then Reorganized Biovest may settle the Cause of Action or objection to Claim and execute necessary documents, including a stipulation of settlement or release, subject to notifying the United States Trustee and counsel to Laurus/Valens of the terms of the settlement agreement; provided, however, that if the United States Trustee or counsel to Laurus/Valens indicates its approval or does not provide Reorganized Biovest with an objection to the proposed settlement within ten (10) days after it receives notice of such settlement in writing, then Reorganized Biovest shall be authorized to accept and consummate the settlement; and provided further, however, that if a timely written objection is made by the United States Trustee or counsel to Laurus/Valens to the proposed settlement, then the settlement may not be consummated without approval of the Bankruptcy Court in accordance with Bankruptcy Rule 9019; and (ii) if the resulting settlement involves a Cause of Action or objection to a Claim originally asserted in an amount exceeding $50,000.00, then Reorganized Biovest shall be authorized and empowered to settle such Cause of Action or objection to Claim only upon Bankruptcy Court approval in accordance with Bankruptcy Rule 9019 and after notice to the Notice Parties.

## Dissolution of the Committee

The Committee shall continue in existence until the <u>later of (i) the</u> 1 Month Anniversary Date. ~~Upon the 1 Month Anniversary Date~~ <u>or (ii) the Initial Distribution Date. Thereafter</u>, the Committee shall be deemed dissolved and the members  of the Committee shall be deemed

~~released and~~ discharged from all rights, duties and liabilities arising from, or related to, the Bankruptcy Cases.

**Retention of Jurisdiction**

The Plan provides for the retention of jurisdiction by the Bankruptcy Court following the Effective Date to, among other things, determine all disputes relating to Claims, Equity Interests and other issues presented by or arising under the Plan. The Bankruptcy Court will also retain jurisdiction under the Plan for any actions brought in connection with the implementation and consummation of the Plan and the transactions contemplated thereby. See Article 13 of the Plan for a more detailed description.

## EVENTS LEADING TO THE CHAPTER 11 FILINGS

In deciding to seek reorganization under Chapter 11 of the Bankruptcy Code in the Fall of 2008, the Debtors and the Accentia Debtors considered, among other things, their limited access to additional financing in the capital markets to fund operations, which had been negatively impacted by the crises in the worldwide debt and equity markets. The Debtors and the Accentia Debtors particularly believed that the then precipitous decline in the stock price of Biovest and Accentia was a result of the global equity market crisis, including selling pressure created by forced redemptions by hedge funds. At that time, limited access to the capital markets appeared to be a systemic condition within the biotech markets as, according to the Biotechnology Industry Organization, 38% of 370 United States small biotech companies were then operating with less than a year's worth of cash, and nearly 100 publicly-traded biotech companies had less than six months' cash.

After evaluating alternatives, the Debtors and the Accentia Debtors determined that reorganization under Chapter 11 was the best option at that time, enabling the Debtors and the Accentia Debtors to remain focused on the commercialization of their drug portfolios consisting of novel products and technologies that targeted significant market opportunities, including therapies for the treatment of many kinds of blood cancers and autoimmune diseases such as multiple sclerosis. The Debtors and the Accentia Debtors also believed the reorganization process would enable them to implement a series of initiatives designed to significantly decrease operating expenses and financing costs, and focus cash and resources on drug development and other priority programs that would allow the Debtors and the Accentia Debtors to attract key funding/partnering opportunities. Accordingly, on November 10, 2008, the Debtors and the Accentia Debtors filed Voluntary Petitions for reorganization under Chapter 11 of the Bankruptcy Code.

## BUSINESS OF BIOVEST

The information contained in this section of the Disclosure Statement is intended as a summary of the Debtors' history and business operations prior to and after the filing of their Voluntary Petitions on November 10, 2008. For a more detailed description of events and matters occurring prior to the Petition Date, Holders of Claims and Equity Interests are

encouraged to review (i) Biovest International, Inc.'s Form 10-K Annual Report for the fiscal year ended September 30, 2008 filed with the SEC on July ~,8, 2010; (ii) Biovest International, Inc.'s Form 10-K Annual Report for the fiscal year ended September 30, 2009 filed with the SEC on July ~,8, 2010; (iii) Biovest International, Inc.'s Form 10-Q Quarterly Report for the fiscal quarter ended December 31, 2009 filed with the SEC on July ~,8, 2010; and (iv) Biovest International, Inc.'s Form 10-Q Quarterly Report for the fiscal quarter ended March 31, 2010 filed with the SEC on July ~,8, 2010. Each of the above referenced Reports can be accessed on the Internet at www.sec.gov~ or on Biovest's website at www.biovest.com. In addition, Holders of Claims and Equity Interests are encouraged to review information contained on Biovest's website for current business and other developments.

## Introduction

Biovest is a Delaware corporation which owns 100% of the stock or membership interests of Biovax, Inc., AutovaxID, Inc., Biolender, LLC and Biolender II, LLC. Biovest was originally incorporated in March 2001. The company which is now Biovest was originally incorporated in Minnesota in 1981, under the name Endotronics, Inc. In 1993, the company's name was changed to Cellex Biosciences, Inc. In 2001, Cellex Biosciences, Inc. changed its corporate name to Biovest International, Inc. and the Minnesota corporation changed its state of incorporation from Minnesota to Delaware via a merger of the Minnesota corporation into the current Delaware corporation. Biovest is a publicly held company and, as of the Petition Date, there were 97,549,783 shares of its common stock issued and outstanding. Approximately 75% of Biovest's outstanding common stock is owned by Accentia.

Prior to the Petition Date, Biovest licensed its subsidiary, Biovax, Inc., to manufacture vaccines for the Phase 3 clinical trial of BiovaxID®. In addition, prior to the Petition Date, AutovaxID, Inc. was involved in the manufacturing of the AutovaxID™ cell culture system. These entities, for which Biovest is the sole stockholder, have no current business operations. Biolender, LLC and Biolender II, LLC, both Delaware limited liability companies, were formed prior to the Petition Date to facilitate transactions based upon the ability to obtain certain tax credits. These entities, for which Biovest is the sole member and manager, have no current business operations. As a result, the following discussion of the Debtors' business operations will focus solely on Biovest.

## Overview of Businesses

As a result of Biovest's collaboration with the National Cancer Institute ("NCI"), Biovest is developing BiovaxID® as a personalized therapeutic cancer vaccine for the treatment of non-Hodgkin's lymphoma ("NHL"), specifically follicular lymphoma ("FL"), mantle cell lymphoma ("MCL"), and potentially other B-cell blood cancers. Both FL and MCL are generally considered to be incurable with currently approved therapies. This generally fatal disease arises from the lymphoid tissue and is characterized by an uncontrolled proliferation and spread throughout the body of mature B-cells, which are a type of white blood cell.

Three clinical trials conducted under Biovest's Investigational New Drug Application ("IND") have studied BiovaxID® in NHL. These studies include a Phase 2 clinical trial and a Phase 3 clinical trial in patients with FL, as well as a Phase 2 clinical trial in patients with MCL.

Biovest believes that these clinical trials have demonstrated that BiovaxID®, which is personalized and autologous (derived from a patient's own tumor cells), has an excellent safety profile and is effective in the treatment of these lethal diseases. Biovest is currently preparing for discussions with the United States Food and Drug Administration (the "FDA") and international agencies regarding regulatory approvals of BiovaxID® for FL and MCL based on these clinical trials. Biovest expects BiovaxID® may also have applications for treatment of other B-cell lymphomas.

To support Biovest's planned commercialization of BiovaxID®, Biovest developed an automated cell culture instrument called AutovaxID™. Biovest believes that AutovaxID™ has significant potential application in the production of a broad range of patient-specific medicines, such as BiovaxID® as well as other monoclonal antibodies. Biovest is under contract with the United States Department of Defense to further develop AutovaxID™ and to explore potential production of additional vaccines including vaccines for viral indications such as influenza. AutovaxID™ is automated and computer controlled to improve cell production reliability and to maximize cell production. AutovaxID™ uses a disposable production unit which minimizes the need for FDA required "clean rooms" in the production process and provides for robust and dependable manufacturing while complying with the industry cGMP standards. AutovaxID™ has a small footprint and supports scalable production.

Biovest also manufactures instruments and disposables used in the hollow fiber production of cell culture products. Biovest's hollow fiber cell culture products and instruments are used by biopharmaceutical and biotech companies, medical schools, universities, research facilities, hospitals and public and private laboratories. Biovest also produces mammalian and insect cells, monoclonal antibodies, recombinant and secreted proteins and other cell culture products using Biovest's unique capability, expertise and proprietary advancements in the cell production process known as hollow fiber perfusion.

Biovest's business consists of three primary business segments: development of BiovaxID® and potentially other B-cell blood cancer vaccines; the manufacture and sale of AutovaxID™ and other instruments and consumables; and commercial production of cell culture products and services.

## Therapeutic Cancer Vaccine -- BiovaxID®

*The Human Immune System.* The immune system functions as the body's natural defense mechanism for identifying and killing or eliminating disease-causing pathogens (such as bacteria, viruses, or other foreign microorganisms) and tumor cells. In humans, the primary disease fighting function of the immune system is carried out by white blood cells (leukocytes), which mediate two types of immune responses: innate immunity and adaptive immunity. Innate immunity refers to the broad first-line immune defense that recognizes and eliminates certain pathogens prior to the initiation of a more specific adaptive immune response. While the cells of the innate immune system provide a first line of defense, they cannot always eliminate or recognize infectious organisms. In some cases, new infections may not always be recognized or detected by the innate immune system. In these cases, the adaptive immune response has evolved to provide a highly-specific and versatile means of defense which also provides long-lasting protection (immune memory) against subsequent re-infection by the same pathogen.

This adaptive immune response facilitates the use of preventative vaccines that protect against viral and bacterial infections such as measles, polio, diphtheria, and tetanus.

Adaptive immunity is mediated by a subset of white blood cells called lymphocytes, which are divided into two types: B-cells and T-cells. In the bloodstream, B-cells and T-cells recognize antigens, which are molecules that are capable of triggering a response in the immune system. Antigens are molecules from bacterial, viral, or fungal origin, foreign (non-self) proteins, and, in some cases, tumor-derived proteins that can stimulate. The human body makes millions of different types of B-cells that circulate in the blood and lymphatic systems and perform immune surveillance. Each B-cell has a unique receptor protein (immunoglobulin) on its surface that binds to one particular antigen. Once a B-cell recognizes its specific antigen and receives additional signals from a T-helper cell, it can proliferate and become activated in order to secrete antibodies (immunoglobulins) which can neutralize the antigen and target it for destruction. T-cells may also recognize antigens on foreign cells, whereby they can promote the activation of other white blood cells or initiate destruction of the targeted cells directly. A person's B-cells and T-cells can collectively recognize a wide variety of antigens, but each individual B-cell or T-cell will recognize only one specific antigen. Consequently, in each person's bloodstream, only a relatively few lymphocytes will recognize the same antigen.

Since B-cell cancers such as NHL are tumors arising from a single malignant transformed B-cell, the tumor cells in NHL maintain on their surface the original malignant B-cell's immunoglobulin (collectively referred to as the tumor idiotype) that is distinct from that found on normal B cells. The idiotype of a B-cell lymphoma can therefore serve as a tumor-specific antigen for therapeutic cancer vaccine development.

In many cases, including in NHL, cancer cells produce molecules known as tumor-associated antigens, which may or may not be present in normal cells but may be over-produced in cancer cells. T-cells and B-cells have receptors on their surfaces that enable them to recognize the tumor-associated antigens. While cancer cells may naturally trigger a B-cell or T-cell-based immune response during the initial appearance of the disease, this response may be only weakly specific or attenuated in such a way that it does not fully eradicate all tumor cells. Subsequently, tumor cells gradually evolve and escape from this weak immune response and are able to grow into larger tumors. In addition, because cancer cells arise from normal tissue cells, they are often able to exploit or increase existing immune tolerance mechanisms to suppress the body's immune response which would normally destroy them. In other cases, chemotherapy or other treatment regimens used to treat the cancer may themselves weaken the immune response and render it unable to reject and kill tumor cells. Even with an activated immune system, however, the number and size of tumors can often overwhelm the immune system.

In the case of cancer and other diseases, immunotherapies are designed to activate a person's immune system in an attempt to combat the disease. There are two forms of immunotherapy used to treat diseases: passive and active. Passive immunotherapy is exemplified by the intravenous infusion into a patient of antibodies specific to the particular antigen. While passive immunotherapies have shown clinical benefits in some cancers, they require repeated infusions and can cause the destruction of normal cells in addition to cancer cells. An active immunotherapy, on the other hand, generates an adaptive immune response by introducing an antigen into a patient, often in combination with other components, that can

enhance an immune response to the antigen. Although active immunotherapeutics have been successful in preventing many infectious diseases, their ability to combat cancers of various types has been limited by a variety of factors, including the inability of tumor antigens to elicit an effective immune response, difficulty in identifying suitable target tumor antigens, inability to manufacture tumor antigens in sufficiently pure form, and inability to manufacture sufficient quantities of tumor antigens. Nevertheless, in 2010, one active immunotherapy, Provenge® developed by Dendreon Corporation, received marketing approval from the FDA. This represents the first case of an active immunotherapy to successfully gain marketing approval in the United States. In addition to BiovaxID®, there are a number of other active immunotherapeutics for cancer in various stages of clinical trials that have demonstrated promising results.

A number of features of NHL make these tumors particularly suitable for treatment with a therapeutic cancer vaccine. The malignant B-cell lymphocytes of NHL express a unique, identifiable tumor-specific antigen which is not expressed by other (healthy) cells in the body. In contrast, the majority of human cancers typically lack strong ubiquitous expression of tumor-specific antigens to distinguish them from normal cells, or they express a potentially widely-varying mix of antigens which can be difficult to identify and formulate into a successful therapeutic vaccine.

*Non-Hodgkin's Lymphoma.* NHL is a heterogeneous group of malignancies of the lymphatic system with differing clinical behaviors and responses to treatment. BiovaxID® has been studied in two distinct forms of NHL, namely, FL and MCL. NHL is the fifth most common type of cancer in the United States, with an estimated prevalence of 438,325 cases in 2007 in the United States. NHL accounts for 5% of all cancer deaths in the United States. NHL is one of the few malignancies in which there continues to be a rise in incidence. Since the early 1970's, incidence rates for NHL have nearly doubled. Moreover, in spite of recent advances in the standard of care, the overall five-year survival rate remains at approximately 63%. According to the NCI, in 2009, it is estimated that 65,980 new cases of NHL will be diagnosed and 19,500 Americans will die from the disease, with a comparable number estimated in Europe.

NHL is usually classified for clinical purposes as being either "indolent" or "aggressive," depending on how quickly the cancer cells are likely to grow and spread. The indolent, or slow-growing, form of NHL has a very slow growth rate and may need little or no treatment for months or possibly years. Aggressive, or fast-growing, NHL tends to grow and spread quickly and cause severe symptoms, and patients with aggressive NHL have shorter overall survival.

*Follicular Lymphoma.* Indolent (slow growing) and aggressive NHL each constitute approximately half of all newly diagnosed B-cell NHL, and roughly half of the indolent B-cell NHL is FL. Accordingly, approximately 22% of new cases of NHL fall into the category of disease known as indolent FL. The United States prevalence (a number of cases) for FL is estimated to be 100,603 cases in 2006. Biovest has conducted a Phase 2 clinical trial followed by a Phase 3 clinical trial in FL under Biovest's IND. FL is a form of NHL that is derived from a type of cell known as a follicle center cell. Despite its slow progression, FL is almost invariably fatal. The median survival reported for FL patients ranges between 8 and 10 years, although these figures may have become slightly higher within the last decade as a result of the introduction and widespread use of rituximab, which is a monoclonal antibody (a protein that can

target and bind to a specific target protein; in rituximab's case this target is a B-cell protein called CD20).

The current standard of care for the first-line treatment of FL consists of rituximab-containing chemotherapies and, increasingly, long-term use of rituximab following chemotherapy (known as rituximab maintenance therapy). Recently, a Phase 3 clinical trial (the GELA-sponsored PRIMA study reported at the 2010 Annual Meeting of the American Society of Clinical Oncology) investigating the use of two years of rituximab maintenance therapy in FL patients responding to first line immunochemotherapy has demonstrated that rituximab maintenance therapy improves progression-free survival (the time elapsed between assessment of treatment effect and tumor progression or death) in treated patients. Over time, a significant number of patients develop tumors which become refractory (resistant or unresponsive) to rituximab therapy and with prolonged use of rituximab (as is the case with maintenance therapy), Biovest believes that a substantial fraction of treated patients may develop tumor resistance to rituximab or rituximab-like agents. Notwithstanding treatment with the standard of care including rituximab maintenance therapy, most FL patients eventually relapse and their lymphoma will return. In spite of additional therapies or autologous stem cell transplants, many FL patients will die of their lymphoma. Accordingly, many patients with FL will likely require treatment options in addition to rituximab based immunotherapy, rituximab maintenance therapy, and/or other CD20-targeting therapies like radioimmunotherapy.

The Boxed Warnings Section included in the FDA's Official Product Label for rituximab cites numerous complications to be considered in the use of the agent. These include: fatal infusion reactions, tumor lysis syndrome with associated acute renal failure, severe mucocutaneous reactions and progressive multifocal leukoencephalopathy. The Product Label provides additional warnings and precautions including hepatitis B virus, reactivation infections, cardiovascular events, renal toxicity and bowel obstruction and perforation. In light of the risks raised by the existing reports, Biovest believes that the indefinite use of rituximab maintenance therapy to treat patients beyond the two-year maintenance regimen is likely to be the subject of additional study.

Biovest is developing BiovaxID® to offer patients a therapy which is complementary to the current standard of care (including rituximab maintenance therapy) and which has a completely different mode of action than rituximab and other anti-CD20 therapies, such as the radioimmunotherapies tositumomab (Bexxar) or ibritumomab tiuxetan (Zevalin). Rituximab targets a cell-surface protein found on virtually all B-cells (i.e., healthy and cancerous), called CD20. Thus, rituximab as an anti-CD20 therapy seeks to destroy both cancerous cells and healthy cells. In contrast, BiovaxID® is not an anti-CD20 therapy because BiovaxID®'s mode of action does not target or rely upon the CD20 protein, making BiovaxID® a new therapeutic approach. Specifically, BiovaxID® targets the idiotype protein, which is a tumor-specific antigen present only on the surface of cancerous B-cells and not on the surface of healthy B-cells. Biovest therefore expects that resistance mechanisms affecting rituximab and anti-CD20 agents, which are largely related to alterations in CD20 expression, will not affect BiovaxID®, which targets an entirely distinct protein on the tumor.

*Mantle Cell Lymphoma.* MCL is a rare, aggressive subtype of NHL characterized by short remissions and rapid progression similar to aggressive lymphomas and successive relapses,

reflecting incurability similar to indolent lymphomas. The median overall survival for MCL has been cited as 3 to 5 years and the disease currently lacks a consensus standard of care. MCL represents approximately 6% of all NHL cases, and worldwide there are approximately 7,000 new cases each year of which approximately one half are in the United States.

The majority of MCL patients have disseminated disease and bone marrow involvement at diagnosis. Patients' clinical outcomes from currently available therapies are poor. Although many therapeutic regimens are capable of rendering high initial response rates, these responses are of short duration (i.e., about 20 months) and the relative survival rates of MCL patients are among the lowest compared to other types of NHL. The prognosis after the first relapse is very poor, with an expected median overall survival of about 1-2 years. No currently available therapeutic regimens are curative.

While several therapeutic regimens are available to treat MCL patients, there is currently no consensus standard of care for treatment of first-line relapsed MCL. As such, MCL remains incurable and it is generally considered that additional treatment options are required given this significant unmet medical need.

Currently, upon first diagnosis of MCL, patients are often evaluated for eligibility for autologous stem cell transplantation eligibility. Stem cell transplantation, an aggressive treatment protocol consisting of high-dose chemotherapy, immunotherapy and full-body radiation, aims to treat patients' tumors and purge the bone marrow of lymphoma cells. MCL patients who are eligible for stem cell transplantation received R-CHOP (rituximab, cyclophophamide, doxorubicin, vincristine, prednisone) immunotherapeutic therapy followed by stem cell transplantation. In some protocols, the use of very aggressive chemotherapy regimens such as R-HyperCVAD (rituximab, cyclophosphamide, vincristine, doxorubicin, and dexamethasone alternating with rituximab plus high dose methotrexate and cytarabine) with severe toxicities have also been described. Unlike in FL, the addition of rituximab to immunotherapy to treat MCL has not been definitively established to significantly extend progression free survival or provide overall survival benefits.

MCL patients who are not eligible for stem cell transplantation commonly receive chemo-immunotherapy; however, overall, conventional chemotherapy regimens do not control the disease over the long-term.

The use of these aggressive chemotherapeutic and transplant approaches is associated with high rates of treatment discontinuation, non-trivial mortality rates, and high risk of myelodysplastic syndrome. The toxicity associated with these regimens largely limits these options primarily to a select subset of the MCL patient population (namely the younger and more initially healthy patients who can tolerate high-intensity treatments); even this subset, however, ultimately gains only modest benefits from existing treatment options. Moreover, the use of these more aggressive regimens appears not to result in superior overall survival as compared to standard therapies.

Biovest is developing BiovaxID® as an additional treatment option for MCL patients. Under Biovest's IND, Biovest has conducted a Phase 2 clinical trial studying BiovaxID® to treat MCL. Based on the safety data from the three BiovaxID® clinical trials conducted in NHL under Biovest's IND combined with data from Biovest's Phase 2 clinical trial in MCL, as well as,

based on the efficacy data from Biovest's Phase 2 clinical trial in MCL, Biovest believes that BiovaxID® may represent a new treatment option for MCL patients.

## Development Status of BiovaxID®

*Introduction.* Preliminary studies demonstrated that treatment of patients with FL with an active immunotherapy could allow a patient's immune system to produce B-cells and/or T-cells that recognized numerous portions of their tumor antigen and generate clinically significant immune responses. These studies provided the rationale for large-scale trials of active specific immunotherapy of this disease. These studies have been published in *The New England Journal of Medicine* (October 1992), *Blood* (May 1997), and *Nature Medicine* (October 1999). In the treatment of cancer, residual tumor cells remaining in the patient after completion of surgery or anti-tumor therapy are often the cause of tumor relapse. These residual tumor cells cannot always be detected by standard imaging techniques, but their destruction may be feasible by active immunotherapy. The use of such vaccines differs from traditional cancer treatment in that the ultimate mechanism of action against the tumor is indirect: the anti-tumor immunity induced by vaccination, rather than the vaccine itself, is ultimately responsible for treatment benefit.

In 1994, the NCI filed for initiation of an IND for the purpose of conducting clinical trial(s) investigating the use of BiovaxID® in patients with FL. Under this IND, the NCI began in 1994 a Phase 2 clinical trial in FL; in 1999, a Phase 3 clinical trial in FL; and in 2000 a Phase 2 clinical trial in MCL. The NCI selected Biovest to produce the vaccine for the initial Phase 2 clinical trial in FL. In 2001, Biovest entered into a formal cooperative research and development agreement ("CRADA") with the NCI which formalized Biovest's collaboration with the NCI. The IND filed by the NCI was formally transferred to Biovest in April 2004, which made Biovest the exclusive sponsor of the IND with full rights to complete the NCI-initiated Phase 3 clinical trial in FL and the NCI-initiated Phase 2 clinical trial in MCL, to communicate and negotiate with the FDA relating to marketing approval for BiovaxID®, and to conduct other clinical studies in NHL under the IND.

*Regulatory.* In May 2006, the FDA granted Biovest fast track status ("*Fast Track*") for BiovaxID® for the treatment of FL. The Food and Drug Administration Modernization Act of 1997 includes Section 112, "Expediting study and approval of fast track drugs." This section mandates the FDA to facilitate the development and expedite the review of drugs and biologics intended to treat serious or life-threatening conditions and that demonstrate the potential to address unmet medical needs. *Fast Track* adds to existing programs, such as accelerated approval, the possibility of a "rolling submission" for a marketing application. An important feature of *Fast Track* is that it emphasizes the critical nature of close early communication between the FDA and a sponsor to improve the efficiency of product development. *Fast Track* is a formal mechanism to interact with the FDA using approaches that are available to all applicants for marketing claims. The benefits of *Fast Track* include scheduled meetings to seek FDA input into development plans, the option of submitting a New Drug Application in sections rather than all components simultaneously, and the option of requesting evaluation of studies using surrogate endpoints. The *Fast Track* status is intended for the combination of a product and a claim that addresses an unmet medical need, but is independent of priority review and accelerated approval. An applicant may use any or all of the components of *Fast Track* without

the formal designation. *Fast Track* status does not necessarily lead to a priority review or accelerated approval.

In October 2006, the European Medicines Agency ("EMEA") granted Biovest Orphan Medicinal Product designation for BiovaxID® for the treatment of FL. This designation is intended to promote the development of products that may offer therapeutic benefits for diseases affecting less than five in 10,000 people in the European Union. The Commission of the European Union entered BiovaxID® into the European Community's Drug Register for Rare Diseases. This acceptance by the Commission followed the previous recommendation by the Committee on Orphan Medical Products of the EMEA that BiovaxID® be granted designation as a treatment for a rare disease. The EMEA's Orphan Medicinal Product designations are based on several criteria that include the rarity and seriousness of the condition and the availability of other effective therapies. In addition, it is required that an orphan drug product treats disorders inflicting fewer than five in 10,000 people. Orphan Medicinal Product designation provides opportunities for free protocol assistance, fee reductions for access to the centralized community procedures before and after marketing authorization, and 10 years of market exclusivity following drug approval.

In October 2009, the FDA granted Biovest Orphan Drug ("Orphan Drug") designation for BiovaxID® for the treatment of FL. Under the Orphan Drug Act, the FDA may grant Orphan Drug designation to drugs intended to treat a "rare disease or condition," which generally is a disease or condition that affects fewer than 200,000 individuals in the United States. After the FDA grants Orphan Drug designation to a product, the generic identity of the therapeutic agent and its potential orphan use are publicly disclosed by the FDA. Orphan Drug designation does not convey any advantage in, or shorten the duration of, the regulatory review and approval process. If a product which has an Orphan Drug designation subsequently receives the first FDA approval for the indication for which it has such designation, the product is entitled to orphan exclusivity, which means that the FDA may not approve any other applications to market the same drug for the same indication for a period of seven years, except in limited circumstances such as greater effectiveness, greater safety, major contribution to patient care, or inadequate supply.

*Phase 2 Clinical Trial—Follicular Lymphoma.* In 1994, a Phase 2 clinical trial was commenced by the NCI to evaluate the ability of BiovaxID® to eradicate residual lymphoma cells in 20 patients with FL who were in chemotherapy-induced first clinical complete remission. All 11 patients with a detectable lymphoma gene sequence (translocation) in their primary tumors had cells from the malignant clone detectable in their blood by DNA polymerase chain reaction ("PCR") analysis both at diagnosis and after chemotherapy, despite being in complete remission. In this clinical trial, molecular remission was defined as patients lacking any detectable residual cancer cells bearing the translocation as determined by a very sensitive PCR technique. After vaccination, 8 of 11 patients converted to lacking cells in their blood from the malignant lymphoma clone detectable by PCR. Anti-tumor T-cell responses were found in the vast majority of the patients (19 of 20 patients), whereas anti-tumor antibodies were detected, but apparently were not required for molecular remission. Vaccination was thus associated with clearance of residual tumor cells from the blood and long-term disease-free survival. The demonstration of molecular remissions and uniform, specific T-cell responses against lymphoma tumor targets, as well as the addition of granulocyte–monocyte colony-stimulating factor (GM-

CSF) to the vaccine formulation provided the rationale for the initiation of a larger Phase 3 clinical trial at the NCI in 2000. These results were published in *Nature Medicine* (October 1999).

*Phase 2 Clinical Trial--Mantle Cell Lymphoma.* In 2000, the NCI initiated a Phase 2 open-label clinical trial (NCT00020215) of BiovaxID® for the treatment of MCL. This Phase 2 clinical trial was based upon the NCI's Phase 2 clinical trial in FL. The primary objective of this Phase 2 clinical trial was to study BiovaxID® in treatment-naïve patients with MCL and to determine the safety and efficacy of BiovaxID® following a rituximab-based immunotherapy. Twenty-six patients with untreated, mostly (92%) stage IV MCL, were enrolled. All patients received six cycles of EPOCH-R (which is an immunotherapy consisting of etoposide, prednisone, vincristine, cyclophosphamide, doxorubicin, rituximab); 92% of the patients achieved complete response (CR) and 8% achieved partial response. All but 3 patients (i.e., due to disease progression or inability to manufacture the vaccine) received BiovaxID® together with KLH on day 1, along with GM-CSF (100 µg/m2/day) on days 1-4 at 1, 2, 3, 4, and 6 months starting at least 3 months post-chemotherapy.

The results of the MCL Phase 2 study were reported in *Nature Medicine* (August 2005). As reported in Nature Medicine, after a median follow-up of 46 months, the overall survival was 89%, the median event-free survival was 22 months, and five patients remained in continuous first CR. Antibody responses to immunization were detected in 30% of the patients, following a delayed pattern (i.e., detected mostly after the 4th to 5th vaccination) which paralleled the peripheral blood B-cell recovery. Most importantly, specific CD4+ and CD8+ T-cell responses were detected in 87% of patients post-vaccine, and in 7 of 9 patients tested these responses were detected after the 3rd vaccination when peripheral B-cells were by and large undetectable. The detected cytokine release response included GM-CSF, INF-g, and TNF-a (type I). In this study, BiovaxID® induced both humoral and cellular immune responses following almost complete depletion of B-cells following rituximab-containing chemotherapy. The adverse events observed in this trial were minimal and comparable to the toxicities observed in the FL studies. These were limited mostly to injection site reactions, similar to those reported in the Phase 2 and Phase 3 FL clinical trials.

On May 13, 2010, Biovest submitted an application to the FDA seeking Orphan Drug designation for BiovaxID® to treat MCL. Biovest believes that Orphan Drug designation may be granted for BiovaxID® to treat MCL because Orphan Drug designations are largely based on the prevalence of the disease and MCL is within the designated prevalence levels. Biovest is also preparing to submit applications seeking Orphan Drug designation for MCL from the EMEA and "*Fast-Track*" status for MCL from the FDA. Once Biovest's Orphan Drug application is concluded, Biovest plans to meet with the FDA to discuss the data from the Phase 2 MCL clinical trial supported by the data from the Phase 2 and Phase 3 clinical trials in FL and the pathway for marketing approval for BiovaxID® to treat MCL.

## Phase 3 Clinical Trial (BV301) of BiovaxID® for Treatment of Follicular Lymphoma

*Overview and Objectives.* In January 2000, a Phase 3 multi-center, double-blind, randomized, controlled clinical trial (BV301) of BiovaxID® modeled on the NCI Phase 2 clinical trial was initiated by the NCI. As was the NCI Phase 2 clinical trial, in the Phase 3 clinical trial,

BiovaxID® consisted of patient specific idiotype conjugated with keyhole limpet hemocyanin (KLH) immunogenic carrier protein and administered with granulocyte-monocyte colony stimulating factor (which is known as GM-CSF and which is a biological response modifier).

The primary objectives of the Phase 3 clinical trial were to confirm the safety and efficacy of BiovaxID® in two pre-defined groups:

(1)     All Randomized Patients: all randomized patients including patients who completed initial chemotherapy but relapsed and did not receive either BiovaxID® or control.

(2)     All Treated Patients: randomized patients who were disease-free at the time of vaccination and consequently received at least one dose of BiovaxID® or control.

The secondary objectives of the Phase 3 clinical trial included: (1) to determine the ability of BiovaxID® to produce a molecular CR in subjects in clinical CR, but with polymerase chain reaction (PCR) evidence of residual disease after standard chemotherapy; (2) to determine the impact of BiovaxID® on molecular DFS in FL patients; (3) to evaluate the ability of BiovaxID® to generate an immune response against autologous tumor; (4) to determine and compare the overall survival of subjects randomized to receive either treatment assignment; and (5) to evaluate the safety of BiovaxID® administered with GM-CSF.

*Biopsy, Chemotherapy, and Immune Recovery.*   Prior to chemotherapy initiation, an excisional lymph node biopsy was performed to obtain tissue for tumor classification and characterization, and to provide starting material for BiovaxID® production.   Following this biopsy, patients were initially treated with PACE chemotherapy (a combination of prednisone, doxorubicin, cyclophosphamide, etoposide) in order to induce a complete tumor remission, Complete Response (CR) or a suspected but unconfirmed complete tumor remission (CRu) as measured by CT radiological scans.

The trial protocol stipulated that, for all patients, an Immune Recovery Period of approximately 6 months following completion of chemotherapy was required to be completed without relapse before vaccination.   The Immune Recovery Period was required in order to maximize the potential for immune response to vaccine and to avoid confounding factors from any potential lingering immunosuppressive effects of chemotherapy.

*Randomization to Immune Recovery Followed By BiovaxID® or Control.*   When the NCI designed the Phase 3 clinical trial protocol, a decision was made to randomize patients immediately after completion of chemotherapy and to not wait for the completion of the Immune Recovery Period in an effort to avoid expending NCI resources to manufacture patient-specific vaccines for patients who were not anticipated to receive the vaccine (e.g., control patients).   In the Phase 3 clinical trial, of 234 patients initially enrolled into the clinical trial, 177 patients completed chemotherapy successfully and were randomized.

As per the design of the study, patients who relapsed during the Immune Recovery Period were excluded from treatment with BiovaxID® or control notwithstanding the fact that they had been randomized.   In the clinical trial, of the 177 initially randomized patients, 117 remained

eligible to be treated with either BiovaxID® (76 patients) or control (41 patients) at the end of the Immune Recovery Period. Sixty patients of the 177 randomized patients relapsed during the Immune Recovery Period and were not treated with either BiovaxID® or control.

*Trial Enrollment and The Use of Rituximab-Containing Induction Chemotherapy.* During the course of the Phase 3 clinical trial, the standard of care for induction chemotherapy in FL changed to include rituximab, which reduced Biovest's ability to recruit and enroll patients into the study. In order to facilitate enrollment in the trial, Biovest amended the study protocol in 2007 to permit the use of a rituximab-containing chemotherapy regimen (CHOP-R), as induction therapy. Before patients receiving CHOP-R could be treated with BiovaxID® or control, and due to the protracted enrollment, the study's Independent Data Monitoring Committee ("DMC"-- a committee responsible for reviewing the available unblinded clinical trial data in the study and responsible for recommendations to the sponsor and the FDA) recommended an interim analysis of the clinical trial's endpoints and overall safety profile which resulted in the termination and halting of the trial in 2008.

In light of the recommendation of the DMC, and before any patients treated with CHOP-R had been vaccinated with BiovaxID® or control, the FDA requested that Biovest abstain from vaccinating any patients who received CHOP-R. Accordingly, Biovest did not vaccinate any of the patients who received CHOP-R chemotherapy under the clinical trial protocol.

As of April 15, 2008, when the clinical trial was officially closed, a total of 234 subjects had been enrolled and 177 subjects had been randomized in the Phase 3 clinical trial, which was less than the original clinical trial plan which called for 629 subjects to be enrolled and 540 to be randomized. While the termination of the trial before completion of the planned accrual resulted in a smaller sample size than was originally intended, Biovest believes that the randomized nature of its trial yields a valid conclusion because its baseline characteristics were well balanced, allocation to treatment arms was concealed, and the study was double-blinded.

*Results.* As reported at the plenary session of the Annual Meeting of the American Society of Clinical Oncology (ASCO 2009, Orlando, Florida), the patient cohort of the 177 All Randomized Patients (which included 117 (66%) Treated Patients and 60 (35%) patients who were not treated) demonstrated no statistically significant difference in median DFS from randomization between treatment and control arms. At ASCO, Biovest further reported that the 117 Treated Patients who received at least one dose of either BiovaxID® or control, which represents a modified intent-to-treat population, demonstrated approximately 13.6 months of prolonged DFS. Biovest further reported that the Treated Patient analysis satisfies the prospectively defined primary clinical trial objective. Of these 117 Treated Patients, 76 patients received at least one dose of BiovaxID® (referred to as the BiovaxID® Arm) and 41 patients received at least one dose of control (referred to as the Control Arm). No serious adverse events were reported in either the BiovaxID® Arm or the Control Arm. At the median follow-up of 56.6 months (range 12.6-89.3 months), a statistically significant improvement of 13.6 months was observed in the disease-free survival between patients in the BiovaxID® Arm (44.2 months), versus the Control arm (30.6 months) (log-rank p-value = 0.045; HR = 1.6). Using a Cox proportional-hazard model, a statistically significant hazard ratio (HR) of 0.62 was achieved (p=0.048; 95% CI: 0.39, 0.99). This means that patients receiving BiovaxID® experienced an approximately 61% (1/0.62) lower risk of cancer recurrence compared to patients who received

the control vaccine. The Phase 3 clinical trial's secondary endpoint of overall survival has not yet been reached for either group due to the length of follow-up to date.

Biovest is currently preparing for discussions with the FDA regarding marketing approval of BiovaxID® for the treatment of FL. Biovest's pending Chapter 11, which commenced in November 2008, resulted in a delay in Biovest's planned meetings with the FDA. Additionally, Biovest wanted to examine patient tissue samples from the Phase 3 clinical trial to determine and report to the FDA certain secondary endpoints including molecular remission and immune response because molecular and immune response data reported in the Phase 2 clinical trial discussed above was very encouraging (*Nature Medicine October 1999*). Biovest has not yet conducted this analysis due primarily to delays related to various internal policies and laws concerning patients' confidentiality at the NCI where the patient tissue samples are held. Biovest believes that these administrative issues have recently been resolved and that the desired analysis will commence shortly. Biovest anticipates conducting such meetings with the FDA in 2010.

## BiovaxID® Manufacturing Process and Manufacturing Facility

*Manufacturing Process.* The BiovaxID® production process begins when a sample of the patient's tumor is extracted by a biopsy and the sample is shipped refrigerated to Biovest's facility in Minneapolis, Minnesota. At Biovest's facility, Biovest identifies the antigen idiotype that is expressed on the surface of the patient's tumor cells through laboratory analysis. In NHL, the tumor B-cells bear the surface idiotype (immunoglobulin or antibody) derived from the original transformed malignant B-cell, but do not typically secrete it in an amount suitable for vaccine production. In order to make sufficient quantities of idiotype for vaccination, the patient's tumor cells are then fused with an exclusively licensed cell line (mouse/human heterohybridoma cell line K6H6) from Stanford University to create a hybridoma or hybrid cell.

After the creation of the hybridoma, Biovest determines which hybridoma cells display the same antigen idiotype as the patient's tumor cells, and those cells are selected to produce the vaccine. The selected hybridoma cells are then seeded into Biovest's proprietary hollow fiber bioreactors, where they are cultured and where they secrete or produce idiotype antigen. The secreted idiotype is then collected from the cells growing in the hollow fiber reactor. After a sufficient amount of idiotype is collected for the production of an appropriate amount of the vaccine, the patient's idiotype is purified using multi-step purification processes.

Biovest uses a method known as "hollow-fiber perfusion" to produce the cell cultures used in the manufacture of BiovaxID®. Hollow-fiber perfusion, as compared to other cell culture methods, seeks to grow cells to higher densities more closely approaching the density of cells naturally occurring in body tissue. The hollow-fiber perfusion method involves using hair-like plastic fibers with hollow centers which are intended to simulate human capillaries. Thousands of these fibers are inserted in a cartridge, which Biovest refers to as a bioreactor. The cells are grown on the outside of the hollow fibers while nutrient media used to support cell growth is delivered through the hollow centers of the fibers. The fiber walls have small pores, allowing nutrients to pass from the hollow center to the cells. The fibers act as filters and yield concentrated secreted products. Because the cells are immobilized in the bioreactor, the concentrated product can be harvested during the ongoing cell growth process. Biovest believes

that hollow-fiber technology permits the harvest of cell culture products with generally higher purities than stirred-tank fermentation, a common alternative cell culture method, thereby reducing the cost of purification as compared to stirred tank fermentation. Additionally, the technology associated with the hollow-fiber process generally minimizes the amount of costly nutrient media required for cell growth as opposed to other cell culturing techniques.

After manufacture and purification, the resulting purified idiotype is then conjugated, or joined together, with KLH, to create the vaccine. KLH is a foreign carrier protein that is used to improve the immunogenicity, or ability to evoke an immune response, of the tumor-specific idiotype. The vaccine is then frozen and shipped to the treating physician. At the treating physician's office, the vaccine is thawed and injected into the patient.

The vaccine is administered in conjunction with granulocyte macrophage colony-stimulating factor (GM-CSF), a natural immune system growth factor that is administered with an idiotype to stimulate the immune system and increase the response to the idiotype. In the clinical trials, patients were administered five monthly BiovaxID® injections in the amount of 0.5 milligram of idiotype per injection, with the injections being given over a six-month period of time in which the fifth month is skipped. Through this process, the patient-specific idiotype is used to stimulate the patient's immune system into targeting and destroying malignant B-cells bearing the same idiotype.

Biovest estimates that an average of three (3) months is required to manufacture each vaccine, which for most patients may overlap the time period when induction chemotherapy is being administered. While the manufacturing process for the BiovaxID® vaccine is highly personalized to each patient and somewhat complex, Biovest considers it to be highly controlled and predictable. During the Phase 3 clinical trial, Biovest experienced an approximately 95% success rate in manufacturing vaccines with the most common reason for a failure to successfully produce a patient's vaccine being attributed to the presence of rare idiotype variants as opposed to the failure of a step in the manufacturing process.

*Manufacturing Facility.* BiovaxID® is a personalized medicine which is produced separately for each individual patient through a laboratory process based on the patient's own tumor cells derived by biopsy. Following regulatory approval of BiovaxID®, Biovest plans to produce BiovaxID® in Biovest's existing facility located in Minneapolis, Minnesota. In order to facilitate the regulatory process, Biovest is preparing a dedicated suite of laboratory clean rooms especially designed to produce BiovaxID®. As the regulatory process advances toward completion, Biovest anticipates expanding Biovest's manufacturing facility as required to meet anticipated commercial requirements. During the Phase 3 clinical trial, BiovaxID® was produced at Biovest's facility in Worcester, Massachusetts. Because Biovest has relocated the site of the manufacturing process to Biovest's Minneapolis facility following the clinical trials and because Biovest is expanding that facility, Biovest is currently in the process of demonstrating to the FDA that the product under these new conditions is comparable to the product that was the subject of earlier clinical testing. This requirement will also apply to future expansions of the Minneapolis manufacturing facility, such as the possible expansion to additional facilities that may be required for successful commercialization of the vaccine. There is also a requirement for validation of the manufacturing process for BiovaxID® utilizing Biovest's AutovaxID™ instrument. A showing of comparability requires data demonstrating that the product continues

to be safe, pure, and potent and may be based on chemical, physical, and biological assays and, in some cases, other non-clinical data.

**Instruments and Disposables**

Biovest sells hollow fiber perfusion instruments used for the production of significant quantities of cell culture products. Biovest's product line includes:

*AutovaxID™.* AutovaxID™ is a fully automated, reusable instrument that employs a fully disposable, closed-system cell-growth chamber incorporating a hollow-fiber cell-growth cartridge. Since it is fully enclosed, computer controlled and automated, AutovaxID™ requires limited supervision and manpower to operate compared to manual instruments. AutovaxID™ is suitable for growing antibody-secreting cell lines, including hybridomas and Chinese hamster ovary cells which are among the leading kinds of cell lines used for commercial therapeutic protein manufacture. Biovest plans to utilize the AutovaxID™ technology to streamline commercial manufacture of BiovaxID®. AutovaxID™ is the first cell culture system that enables production of personalized cell-based treatments economically and in compliance with FDA Good Manufacturing Practices. In September 2009, Biovest entered into a contract with the United States Department of Defense to further develop and modify the AutovaxID™ instrument including for purposes of applying this technology to applications of potential military interest, including research and production of antiviral vaccines such as those targeting influenzas.

*Primer HF®.* The Primer HF® is a low cost hollow fiber cell culture system capable of producing small quantities of monoclonal antibody. This system also provides a relatively inexpensive option to evaluate the efficacy of new cell lines in perfusion technology.

*MiniMax®.* The miniMax® provides the flexibility and technology needed to support optimization studies and research scale production of mammalian cell secreted proteins. This automated cell culture system is a table-top unit complete with microprocessor controller, self-contained incubator, and pump panel. The miniMax® is an economical tool for researching scale-up processes and producing small quantities of protein of up to 10 grams per month.

*Maximizer®.* The Maximizer® provides maximum flexibility to support optimization studies and pilot scale production of mammalian cell secreted proteins. This automated cell culture system is a table-top unit complete with validated microprocessor controller, self-contained incubator, and pump panel. With production rates up to one gram a day, the Maximizer® is a tool for process development and production.

*XCellerator™.* The XCellerator™ is a self-standing floor system containing an incubator and refrigerator section, control fixtures and pump panel. Each Xcellerator™ supports two independent flow paths, is controlled by a process control computer and has the capability of remote monitoring. The combined features of the XCellerator™ support production of 60-500 grams of protein per month, per XCellerator™ unit.

In addition to instruments sales, Biovest has recurring revenue from the sale of hollow fiber bioreactors, cultureware, tubing sets and other disposable products and supplies for use with Biovest's instruments. Revenues from such disposable products represented approximately

45% and 46% of Biovest's total revenue from this business segment for the fiscal years ended September 30, 2009 and 2008, respectively.

Currently, Biovest assembles, validates and packages the instruments and disposables which Biovest sells. Customers for Biovest's instruments and disposables are the same potential customers targeted for Biovest's contract production services, which include biopharmaceutical and biotech companies, medical schools, universities, research facilities, hospitals and public and private laboratories.

## Cell Culture Products and Services

Biovest manufactures mammalian cell culture products such as whole cells, recombinant and secreted proteins, and monoclonal antibodies. Additionally, Biovest provides related services as a contract resource to assist Biovest's customers in developing cell production process protocols, cell line optimization, cell culture production optimization, media evaluation and other related services. This segment of Biovest's business represented approximately $1.5 million (approximately 41%) and $2.0 million (approximately 37%) in revenues for the fiscal years ended September 30, 2009, and 2008, respectively.

Biovest's customers include biopharmaceutical and biotech companies, medical schools, universities, research facilities, hospitals and public and private laboratories. Biovest generally produces cell culture products pursuant to contracts which specify the customer's requirements for the cell culture products to be produced or the services to be performed.

There are various processes commonly used to produce mammalian cells generally used in the production of antibodies. These may include hollow fiber bioreactor perfusion, stirred tank fermentation, roller bottle and other processes. Biovest primarily uses hollow fiber bioreactor technology to expand customer provided cell lines and produce the respective monoclonal antibodies. This technology grows cells to higher densities which more closely mimics mammalian physiology. Biovest has significant expertise with in vitro (outside the living body) cell culture methods for a wide variety of mammalian cells. Mammalian cells are complicated and dynamic, with constantly changing needs. A primary component of hollow fiber bioreactors is fibers made of plastic polymers. The fibers are hair-like with hollow centers which simulate human capillaries. Thousands of these fibers are inserted in a cartridge, which Biovest refers to as a bioreactor. The cells are grown on the outside of the hollow fibers while nutrient media used to support cell growth is perfused through the lumen of the fibers. The fiber walls have small pores, allowing nutrients to pass from the hollow center to the cells. The fibers act as filters and yield concentrated secreted products. Because the cells are immobilized in the bioreactor, the concentrated product can be harvested during the on-going cell growth process. Hollow fiber technology permits harvests of cell culture products with generally higher purities thereby reducing the cost of downstream purification processes. This technology generally minimizes the amount of costly nutrient media required for cell growth.

The most generally used process for mammalian cell production is stirred tank fermentation. Hollow fiber bioreactor technology can be contrasted with the competitive stirred tank fermentation process which takes place in tanks of various sizes. Cells are grown inside the tanks in culture medium which is maintained under controlled conditions and continuously

stirred to stimulate growth. At the end of the growing process, as opposed to incrementally during the growth process, cells are separated from the medium and the protein of interest is isolated through a series of complex purification processes. The size of the tanks generally result in stirred tank fermentation facilities requiring significantly more start-up costs, space and infrastructure than comparable production facilities using hollow fiber technology. While stirred tank fermentation and hollow fiber technology are both used for cell production of various quantities, Biovest believes that the stirred tank fermentation process is currently more commonly used for larger scale commercial production requirements. Biovest believes that hollow fiber technology has advantages in scalability, start-up time and cost in the early development of antibody production. In the expanding field of personalized medicine where patient specific drugs and therapeutics are frequently envisioned, such as the therapeutic vaccine which Biovest is developing, Biovest believes that hollow fiber technology may be the appropriate cell culture production technology.

## Competition for BiovaxID®

If approved, BiovaxID® will be required to compete with currently approved therapies, as well as therapies which may be approved in the future. There are currently no approved therapies which use the BiovaxID® mode of action, which is to induce an adaptive, specific and durable immune response to identify and eradicate the residual lymphoma cells remaining after a patient achieves remission in an effort to extend that remission or avoid relapse. BiovaxID® is a therapy designed to be administered to lymphoma patients who have achieved complete remission after initial chemotherapy treatment. BiovaxID® represents a new treatment approach which utilizes the biology of lymphoma to selectively stimulate the patient's own immune system to identify and kill cancerous B-cells that Biovest believes may optimize and complement existing therapies.

BiovaxID® is the only personalized cancer vaccine for treatment of FL that has demonstrated significant clinical benefit in a Phase 3 clinical trial. Two other vaccines (MyVax™ developed by Genitope Corporation and Specifid™ developed by Favrille, Inc.) which were studied in Phase 3 trials in FL patients did not report statistically significant clinical benefit. There are fundamental structural differences between BiovaxID® and the personalized cancer vaccines developed by Genitope Corporation and Favrille, Inc., as well as with regards to the clinical trial designs under which the clinical efficacy of these vaccines were tested, which Biovest believes explains why BiovaxID® achieved significant clinical benefit while the other vaccines did not.

Chemotherapy and monoclonal antibodies are widely used for the treatment of FL. Although chemotherapy and monoclonal antibodies can substantially reduce the tumor mass and in most instances achieve clinical remission, the remission is generally of limited duration. FL patients generally relapse and the cancer usually becomes increasingly resistant to further chemotherapy treatments. The patient's response to therapy becomes briefer and weaker with each additional course of therapy, such that eventually further chemotherapy would offer no clinical benefit.

A number of passive immunotherapies, such as rituximab and radioimmunotherapeutic agents (radioisotopes linked to monoclonal antibodies), are approved by the FDA for the

treatment of FL. A monoclonal antibody is a type of antibody produced in large quantity that is specific to an antigen that is expressed by tumor cells but may also be expressed by at least some normal cells. These therapies have been used as primary treatment and also as part of combination induction therapy including chemotherapy and rituximab based therapy and are considered to be the standard of care to treat FL. In an effort to prolong the duration of the clinical remission, monoclonal antibodies have increasingly been used as maintenance therapies; however, such treatments are "off-label" and no maintenance therapy is currently FDA approved to treat FL. Supplemental marketing applications have been filed with the FDA and the EMEA in 2010 to expand the indication for rituximab to include its use as a maintenance therapy for NHL, and it is anticipated that such approvals will be granted. However, the prolonged use of rituximab results in a substantial proportion of patients becoming non-responsive to rituximab-based therapy over time. Generally, these therapies do not provide unlimited remissions for most patients. Rituximab has a different mode of action from BiovaxID® and Biovest is developing BiovaxID® as a new therapeutic approach to treat FL. Biovest believes that BiovaxID® may be consistent with an additive to therapies based on rituximab.

If BiovaxID is approved for treatment of MCL, it will be required to compete with other approved and/or development therapies for the treatment of MCL. There are currently no FDA-approved therapies for the first line treatment of MCL and the only approved therapy, bortezomib (Velcade), is indicated for patients in relapse.

## Patents, Trademarks and Protection of Proprietary Technology

Biovest owns several patents covering various aspects of Biovest's hollow fiber perfusion process, instruments and proprietary cell culturing methods. Biovest's patents also cover aspects of its therapeutic vaccine production process. Biovest plans to continue pursuing patent and other proprietary protection for Biovest's cancer vaccine technology and instrumentation. Currently, Biovest has four (4) issued United States patents. Additionally, Biovest has filed several patent applications that are pending. The expiration dates of Biovest's presently issued United States patents range from October 2011 to November 2017. A list of Biovest's active United States patents and published United States and foreign patent applications are as follows:

| Patent No. | Title and Inventor(s) | Filing Date/Issue Date | Expiration Date |
|---|---|---|---|
| 5,998,184 | BASKET-TYPE BIOREACTOR by Yuan Shi | Oct. 8, 1997/Dec. 7, 1999 | Oct. 8, 2017 |
| 5,330,915 | PRESSURE CONTROL SYSTEM FOR A BIOREACTOR by John R. Wilson | Oct. 18, 1991/Jul. 19, 1994 | Oct. 18, 2011 |
| 5,541,105 | METHOD OF CULTURING LEUKOCYTES by Georgiann B. Melink | Apr. 26, 1994/Jul. 30, 1996 | July 30, 2013 |
| 6,001,585 | MICRO HOLLOW FIBER BIOREACTOR by Michael J. Gramer | Nov. 14, 1997/Dec 14, 1999 | Nov. 14, 2017 |

| Publication No. | Title and Inventor(s) | Filing Date/Publication Date |
|---|---|---|
| US 2009/0215022 | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page et al. | Nov. 20, 2008/Aug. 27, 2009 |

| US 2009/0269841 | METHOD AND SYSTEM FOR THE PRODUCTION OF CELLS AND CELL PRODUCTS AND APPLICATIONS THEREOF by Robert J. Wojciechowski *et al.* | Nov. 20, 2008/Oct. 29, 2009 |
|---|---|---|
| EP 2027247 | EXTRA-CAPILLARY FLUID CYCLING SYSTEM AND METHOD FOR A CELL CULTURE DEVICE by Darrell P. Page *et al.* | May 21, 2007/Feb. 25, 2009 |
| EP 2029722 | METHOD AND SYSTEM FOR THE PRODUCTION OF CELLS AND CELL PRODUCTS AND APPLICATIONS THEREOF by Robert J. Wojciechowski *et al.* | May 21, 2007/Mar. 4, 2009 |
| WO 2010/042644 | METHODS FOR INDUCING A SUSTAINED IMMUNE RESPONSE AGAINST A B-CELL IDIOTYPE USING AUTOLOGOUS ANTI-IDIOTYPIC VACCINES by Angelos M. Stergiou *et al.* | Oct. 7, 2009/Apr. 15, 2010 |
| WO 2010/048417 | PERFUSION BIOREACTORS, CELL CULTURE SYSTEMS, AND METHODS FOR PRODUCTION OF CELLS AND CELL PRODUCTS by Mark Hirschel *et al.* | Oct. 22, 2009/Apr. 29, 2010 |

Biovest also possesses licensed intellectual property used in the development and manufacture of BiovaxID®. BiovaxID® is manufactured with a proprietary cell line, which Biovest has licensed on a world-wide exclusive basis from Stanford University. This is significant because Biovest believes that the use of any cell line other than its exclusively licensed cell line, in the production of a similar idiotype vaccine, would require filing a separate IND application and undergoing clinical testing evaluation by the FDA.

As a result of Orphan Drug designation for the treatment of FL, Biovest has seven years of market exclusivity in the United States from the date of FDA marketing approval. Biovest has ten years of market exclusivity in Europe as a result of Orphan Medicinal Product designation for the treatment of FL by the EMEA. In addition to market exclusivity based on governmental regulation, Biovest relies on proprietary rights provided by a combination of an exclusive world-wide license to the cell line that is used in the production of BiovaxID®, patent protection, trade secret protection, and Biovest's ongoing innovation. Although the composition of matter of the BiovaxID® vaccine is not patentable, Biovest has filed an international patent application relating to methods of treatment using Biovest's vaccine. In addition, Biovest has filed United States and foreign patent applications relating to certain features of the AutovaxID instrument used in the production of the vaccine. Biovest's proprietary production system will use fully enclosed and disposable components for each patient's vaccine. Biovest believes that, without the availability of an automated production system, the methods used to produce a patient-specific immunotherapy are time-consuming and labor-intensive, resulting in a very expensive process that would be difficult to scale up.

Additionally, Biovest considers trademarks to be important to its business. Biovest has established trademarks covering various aspects of its hollow fiber perfusion process, instruments and proprietary cell culturing methods. Biovest has registered the trademark BiovaxID® in connection with its therapeutic cancer vaccine. Biovest plans to continue

aggressively pursuing trademark and other proprietary protection for its therapeutic vaccine technology and instrumentation, including seeking protection of its trademarks internationally.

**Government Regulation**

The FDA has extensive regulatory authority over biopharmaceutical products (drugs and diagnostic products produced from biologic processes). The principal FDA regulations that pertain to Biovest's cell production activity include, but are not limited to, 21 CFR Parts 600 and 610 – General Biological Products and Standards; 21 CFR Parts 210 and 211 – Current Good Manufacturing Practices for Finished Pharmaceuticals; 21 CFR Part 820 – Quality System Regulations (medical devices); and 21 CFR Part 58 – Good Laboratory Practice for Non-Clinical Laboratory Studies. FDA guidelines include controls over procedures and systems related to the production of mammalian proteins and quality control testing of any new biological drug or product intended for use in humans (including, to a somewhat lesser degree, in vivo biodiagnostic products). FDA guidelines are intended to assure that the biological drug or product meets the requirements through rigorous testing with respect to safety and efficacy, and meets the purity characteristics for identity and strength. FDA approvals for the use of new biological drugs or products (which can never be assured) require several rounds of extensive preclinical testing and clinical investigations conducted by the sponsoring pharmaceutical company prior to sale and use of the product. At each stage, the approvals granted by the FDA include the manufacturing process utilized to produce the product. Accordingly, Biovest's cell culture systems used for the production of therapeutic or biotherapeutic products (biological drug or product) are subject to significant regulation by the FDA under the Federal Food, Drug and Cosmetic Act, as amended (the "FD&C Act").

Biovest's cell culture systems used to produce cells for diagnostic uses are regulated under the FD&C Act as Class I medical devices. Medical devices are classified by the FDA into three classes (Class I, Class II and Class III) based upon the potential risk to the consumer posed by the medical device (Class I devices pose the least amount of risk, while Class III devices and "new" devices are presumed to inherently pose the greatest amount of risk). As Class I devices, Biovest's systems must be manufactured in accordance with Good Manufacturing Practices guidelines. Sales of such systems to customers using them to manufacture materials for clinical studies and licensure do not require prior FDA approval.

The process of complying with FDA guidelines and obtaining approvals from the FDA of applications to market biopharmaceutical drugs and products is costly, time consuming and subject to unanticipated delays. There is no assurance that Biovest's customers will be able to obtain FDA approval for biological drugs and products produced with Biovest's systems, and failure to receive such approvals may adversely affect the demand for Biovest's services.

Under the FD&C Act, Biovest's customers must establish and validate Standard Operating Procedures ("SOPs") utilizing Biovest's cell culture technologies in their Drug Master Files. Biovest provides assistance in operational, validation, calibration and preventive maintenance SOPs to customers, as needed, to support their product development and commercialization processes. For example, Biovest will typically provide existing and prospective customers who are utilizing Biovest's contract production services or constructing production facilities based on Biovest's cell culture technologies with information to enable such

customers to comply with the FDA's guidelines required for facility layout and design. This information may be provided either in a drug/biologic Master File that Biovest gives permission to customers to cross reference in their submission to the FDA, or provided to customers to include in their FDA submissions.

As Biovest currently does business in a significant number of countries, in addition to the requirements of the FDA, Biovest is subject to the regulations of other countries and governmental agencies which apply to its goods and services when sold in their jurisdictions.

Biovest is subject to various regulations regarding handling and disposal of potentially hazardous materials, wastes and chemicals such as cells and their secreted waste products, including those enforced by the United States Environmental Protection Agency and various state and local agencies.

## Insurance

Biovest may be exposed to potential product liability claims by users of Biovest's products. Biovest presently maintains products liability insurance coverage, in connection with Biovest's systems and other products and services, in amounts which Biovest believes to be adequate and on acceptable terms.

Although Biovest believes that Biovest's current level of coverage is adequate to protect its business from foreseeable product liability and clinical trial claims, Biovest may seek to increase its insurance coverage in the future in the event that Biovest significantly increases its level of contract production services. There can be no assurance, however, that Biovest will be able to maintain its existing coverage or obtain additional coverage on acceptable terms, or that such insurance will provide adequate coverage against all potential claims to which Biovest may be exposed. A successful partially or completely uninsured claim against Biovest could have a material adverse effect on Biovest's operations. Biovest's cell culture production services may expose Biovest to potential risk of liability. Biovest seeks to obtain agreements from contract production customers to mitigate such potential liability and to indemnify Biovest under certain circumstances. There can be no assurance, however, that Biovest will be successful in obtaining such agreements or that such indemnification, if obtained, will adequately protect Biovest against potential claims.

The terms and conditions of Biovest's sales and instruments include provisions which are intended to limit Biovest's liability for indirect, special, incidental or consequential damages.

## Employees

As of ~~September 30, 2009,~~ July 31, 2010, Biovest had ~~31~~ 27 full time employees, ~~including four in research and development, five in manufacturing and quality control, six in contract production services, one in marketing and sales, four in management, and six in finance, accounting, administrative, and clerical positions.~~ and two part time employees. Biovest supplements Biovest's staff with temporary employees and consultants as required. Biovest believes that Biovest's relations with employees are satisfactory. None of Biovest's employees is covered by a collective bargaining agreement. Biovest's ability to continue to develop and

improve marketable products and to establish and maintain Biovest's competitive position in light of technological developments will depend, in part, upon Biovest's ability to attract and retain qualified technical personnel.

## Properties

Biovest currently leases approximately 35,000 square feet of space in Minneapolis, Minnesota, which Biovest uses for offices, a laboratory, manufacturing, warehousing areas to support the production of perfusion cell culture equipment, and contract cell culture services. This facility lease agreement has expired and Biovest continues to occupy this facility on a month-to-month basis with a long-term lease currently being negotiated, which is expected to include improvements to the facility to provide a dedicated laboratory space for the production of BiovaxID® and potential future expansion to the facility to permit additional BiovaxID® production capacity when required.

Prior to the Petition Date, Biovest leased approximately 17,000 square feet of space in Worcester, Massachusetts, which Biovest used for BiovaxID® production, contract cell production, offices, and storage. Biovest had extended Biovest's lease term on this facility through February 28, 2010. On December 8, 2008, the Bankruptcy Court entered an order approving the rejection of the Worcester lease and Biovest no longer occupies these premises.

Prior to the Petition Date, Biovest leased approximately 24,000 square feet of space in St. Louis, Missouri under a three year lease term which ran through January 2010. On December 1, 2008, Biovest and the landlord amended this lease, which shortened the lease term to November 30, 2009 and decreased the leased premises to 10,000 square feet. On March 31, 2009, pursuant to the terms of the amended lease, Biovest terminated the lease.

Biovest anticipates that Biovest's facilities will continue to meet Biovest's needs. Biovest anticipates that, as Biovest's development of BiovaxID® advances and as Biovest prepares for the future commercialization of Biovest's products, Biovest's facilities requirements will increase.

## Market for Biovest Common Stock

The following table sets forth the range of high and low bid quotations for the Biovest Common Stock for each of the quarterly periods indicated as reported by the OTC Bulletin Board and Pink Sheets. Bid quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission, and may not represent actual transactions.

|  | High | Low |
|---|---|---|
| **Year Ended September 30, 2008:** | | |
| First Quarter | $ 0.55 | $ 0.32 |
| Second Quarter | $ 0.69 | $ 0.42 |
| Third Quarter | $ 1.01 | $ 0.34 |
| Fourth Quarter | $ 0.51 | $ 0.26 |
|  | | |

| | | |
|---|---|---|
| **Year Ended September 30, 2009:** | | |
| First Quarter | $ 0.40 | $ 0.03 |
| Second Quarter | $ 0.13 | $ 0.04 |
| Third Quarter | $ 1.50 | $ 0.10 |
| Fourth Quarter | $ 0.75 | $ 0.26 |
| | | |
| **Year Ended September 30, 2010:** | | |
| First Quarter | $ 0.48 | $ 0.35 |
| Second Quarter | $ 2.00 | $ 0.36 |
| Third Quarter | $ 1.89 | $ 1.15 |

## Prepetition Secured Obligations

*Laurus/Valens.* Prior to the Petition Date, Biovest, as borrower, entered into a number of financing and other transactions with Laurus/Valens. For a detailed description of these transactions, Holders of Claims and Equity Interests are encouraged to read the Laurus/Valens Compromise Motion, which is on file with the Bankruptcy Court at Docket No. 627. In summary, as a result of those transactions, Laurus/Valens asserted the following secured and other claims against Biovest, its subsidiaries (Biovax, AutovaxID, Biolender and Biolender II) and Accentia, and the following equity interests in Biovest, as of the Petition Date: (i) a secured claim for principal of $15,331,095.16 due under various promissory notes, (ii) a secured claim for interest and fees of $7,322,987.49 due under various promissory notes, (iii) a royalty in the aggregate amount of 19.50% of the net sales and license revenue received from the Biovest Biologic Products, including the BiovaxID® anti-cancer vaccine, (iv) a secured claim for the remaining guaranteed minimum payment of $7,500,000.00 due from the royalty equal to 3% of world-wide net sales of the AutovaxID™ instrument, (v) warrants to purchase 13,371,358 shares of Biovest Common Stock at an exercise price of $0.01 per share (which, when combined with (a) a warrant issued by Accentia to Laurus to purchase 10,000,000 shares of Biovest Common Stock owned by Accentia at an exercise price of $0.01 per share, (b) the warrants described in subparagraph (vi) below, and (c) the shares of Biovest Common Stock described in subparagraph (viii) below, would equal a total equity ownership of approximately 20.94% of the Biovest Common Stock as of the Petition Date, assuming all such warrants were then exercised), (vi) warrants to purchase 1,015,625 shares of Biovest Common Stock at an exercise price of $0.40 per share, (vii) the right to convert the 2008 Secured Debentures owned by Valens U.S. into shares of Biovest Common Stock at a conversion price of $0.32 per share, (viii) ownership of 1,148,708 shares of Biovest Common Stock, subject to a restrictive legend, (ix) a guaranty from Accentia for up to $4,991,360 of the Biovest indebtedness to Laurus/Valens, (x) guaranties from the subsidiaries of Biovest and Analytica of the indebtedness of Biovest to Laurus/Valens, and (xi) first priority liens in substantially all of the assets of Biovest and its subsidiaries and of certain of the other Debtors, including certain shares of Biovest Common Stock owned by Accentia. As stated above, the Debtors and the Accentia Debtors and Laurus/Valens have settled all disputes between them and the Bankruptcy Court has approved the terms of that settlement in the Laurus/Valens Compromise Order. The Secured Claims and other Claims of Laurus/Valens are treated as Class 2 Claims under the Plan. See Article 5.3 of the Plan for a description of the treatment of the Class 2 Claims of Laurus/Valens, including the terms of the settlement.

*Accentia.* On April 10, 2003, Biovest entered into an Investment Agreement with

Accentia. The Investment Agreement closed on June 16, 2003. As a result, Accentia acquired approximately 81% of the Biovest Common Stock for a purchase price of $20.0 million. A portion of the purchase price was paid by promissory notes. Biovest's need for funding exceeded the payments as scheduled under these promissory notes and, in August 2004, Biovest entered into an amendment to the Investment Agreement under which Accentia agreed to use reasonable efforts to make advances to Biovest as intercompany loans, to become due and retired as payments become due under the original Investment Agreement. As of September 30, 2008, all amounts due under the Investment Agreement had been paid timely. Subsequently, Biovest required additional funding and, through September 30, 2008, Biovest borrowed an additional $11.8 million from Accentia in the form of three intercompany demand notes. All sums owed pursuant to this demand indebtedness are secured by a security interest in all of Biovest's assets junior only to the Liens in favor of Laurus/Valens and the 2008 Secured Debentures Holders as described herein. On February 5, 2008, the terms of the intercompany demand notes payable to Accentia were modified to allow Accentia the option to convert part or all of the principal and interest due into shares of Biovest Common Stock at a conversion price of $1.10 per share subject to adjustment in the event of certain recapitalizations or in the event of the sale of Biovest Common Stock at prices below the conversion price. As of the Petition Date, the outstanding amount due to Accentia under the intercompany demand notes was $11,991,510.00. The Secured Claims of Accentia under the intercompany demand notes are treated as Class 3 Claims under the Plan. See Article 5.4 of the Plan for a description of the treatment of the Class 3 Claims of Accentia.

   *2008 Secured Debentures.* In September and October 2008, Biovest issued its 15% Secured Convertible Debentures Due March 31, 2010 (the "2008 Secured Debentures") in the non-converted aggregate principal amount of $1,450,000.00 to Kathleen M. O'Donnell, Trustee, Irrevocable Trust #1 FBO Francis E. O'Donnell, Jr. ($100,000.00), Ronald E. Osman ($400,000.00), Phillip E. Rosensweig ($300,000.00), and Valens U.S. ($650,000.00) (collectively, the "2008 Secured Debentures Holders"). The 2008 Secured Debentures provide for an interest rate of fifteen percent (15%), with the first payment beginning October 1, 2008. The 2008 Secured Debentures are secured by Liens on substantially all of the assets of Biovest junior only to the Liens in favor of Laurus/Valens. The 2008 Secured Debentures are convertible into shares of Biovest Common Stock at the rate of $0.32 per share and, provided certain conditions are satisfied, Biovest may, at its option, redeem the 2008 Secured Debentures for an amount equal to 110% of the then outstanding principal. The 2008 Secured Debentures Holders have the right to elect to be repaid in one of the following methods: (a) commencing six months after closing, the 2008 Secured Debentures could be amortized through twelve equal monthly payments, or (b) a single lump-sum payment of all remaining outstanding principal and accrued interest on March 31, 2010. All principal amortization payments and monthly interest payments could be made in cash or Biovest could elect to make the payments in shares of Biovest Common Stock, subject to certain specified conditions. The maturity date of the 2008 Secured Debentures is March 31, 2010. In connection with the issuance of the 2008 Secured Debentures, the 2008 Secured Debentures Holders were also issued warrants to purchase shares of Biovest Common Stock. As of the Petition Date, the outstanding amount due to the 2008 Secured Debentures Holders was approximately $1,519,300.00. The Secured Claims of the 2008 Secured Debentures Holders are treated as Class 4 Claims under the Plan. See Article 5.5 of the Plan for a description of the treatment of the Class 4 Claims of the 2008 Secured Debentures Holders.

**Financial Projections and Information**

Set forth on Exhibit 1 to this Disclosure Statement are cash flow projections for Reorganized Biovest for the fiscal quarters ended ~~September 30,~~December 31, 2010 through ~~December~~March 31, ~~2013~~2014 (the "Projections"). The Debtors' assumptions in the Projections include (i) an additional DIP Advance under the DIP Facility of $350,000.00 prior to the Effective Date, (ii) the receipt of Exit Financing in the amount of $8,500,000.00 on or shortly after the Effective Date, a portion of which will be used to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Secured Claims in Class 5, and Allowed Unsecured Convenience Claims in Class 9, and the remainder of which will be used by Reorganized Biovest for working capital, (iii) a strategic licensing arrangement or offering of Reorganized Biovest Common Stock at or about the 24th month following the Effective Date (in order to pay off the Laurus/Valens Allowed Secured Claim), (iv) that the DIP Lender will convert the DIP Lender Allowed Claim into shares of Reorganized Biovest Common Stock at the maturity date of the DIP Lender Plan Note (i.e., 24 months following the Effective Date), and (v) that approximately 60% of Unsecured Claims will be converted into shares of Reorganized Biovest Common Stock under the Plan. All Holders of Claims and Equity Interests are encouraged to review carefully the Projections in connection with their decision to accept or reject the Plan. IN PREPARING SUCH PROJECTIONS, THE ASSUMPTIONS UNDERLYING THE ANTICIPATION OF FUTURE EVENTS REPRESENT AN ESTIMATE BY THE DEBTORS, BUT BECAUSE THESE ARE ONLY ASSUMPTIONS OR PREDICTIONS OF FUTURE EVENTS (MOST OF WHICH ARE BEYOND THE DEBTORS' CONTROL), THERE CAN BE NO ASSURANCE THAT THE EVENTS WILL OCCUR.

Holders of Claims and Equity Interests should also review Biovest's reports filed with the SEC and the monthly operating reports filed with the Bankruptcy Court for the most current financial information regarding Biovest. Biovest currently expects that it will file with the SEC its Form 10-Q Quarterly Report for the fiscal quarter ended June 30, 2010 by no later than August 16, 2010. Such Report can be accessed on the Internet at www.sec.gov or on Biovest's website at www.biovest.com.

## CERTAIN RISK FACTORS TO BE CONSIDERED

The Reorganized Biovest Common Stock to be issued pursuant to the Plan is subject to a number of risks, including those discussed below. In determining whether or not to vote in favor of the Plan, each Holder of a Claim in Classes 2, 3, 4, 6, 7, and 8 and each Holder of an Equity Interest in Class 12 should carefully consider the following risk factors, together with all of the other information contained in this Disclosure Statement, the Plan, and the Exhibits attached hereto and to the Plan.

Statements in this Disclosure Statement not strictly historical in nature are forward-looking statements. These statements may include, but are not limited to, statements about: the timing of the commencement, enrollment, and completion of Biovest's clinical trials for Biovest's product candidates; the progress or success of Biovest's product development programs; the status of regulatory approvals for Biovest's product candidates; the timing of product launches; Biovest's ability to protect its intellectual property and operate its business

without infringing upon the intellectual property rights of others; and Biovest's estimates for future performance, anticipated operating losses, future revenues, capital requirements, and needs for additional financing. In some cases, you can identify forward-looking statements by terms such as "anticipates," "believes," "could," "estimates," "expects," "intends," "may," "plans," "potential," "predicts," "projects," "should," "will," "would," "goal," or other variations of these terms (including their use in the negative) or by discussions of strategies, plans or intentions. These statements are only predictions based on current information and expectations and involve a number of risks and uncertainties. The underlying information and expectations are likely to change over time.

Factors that could cause actual results to differ materially from what is expressed or forecasted in Biovest's forward-looking statements include, but are not limited to, the following:

*Biovest has a history of operating losses and expects to incur further losses.* Biovest has never been profitable and it has incurred significant losses and cash flow deficits. For the fiscal years ended September 30, 2009, 2008, and 2007, Biovest reported net losses of $14.7 million, $20.6 million, and $44.3 million, respectively, and negative cash flow from operating activities of $1.9 million, $8.3 million, and $10.8 million, respectively. Although Biovest has not yet filed its annual ~~reports~~report with the SEC for its fiscal ~~years 2009 or~~year 2010, Biovest will report net losses for ~~these periods~~that period as well, in amounts to be finally determined after completion of review by its independent auditors. As of September 30, 2009, Biovest had an aggregate accumulated deficit of $132 million. Biovest anticipates that operations may continue to show losses and negative cash flow, particularly with the anticipated expenses associated with the clinical trials for BiovaxID®. There is no assurance that the additional required funds can be obtained on terms acceptable or favorable to Biovest, if at all. The audit opinion issued by Biovest's independent auditors with respect to Biovest's financial statements for the 2008 and 2009 fiscal ~~year~~years indicated that there was substantial doubt about Biovest's ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty. Biovest expects to receive a similar audit opinion from Biovest's independent auditors with respect to Biovest's financial statements for the ~~2009 and~~ 2010 fiscal ~~years~~year.

Biovest's ability to achieve and sustain profitability is to a large degree dependent on obtaining regulatory approval to market BiovaxID®. Biovest may not be successful in its efforts to develop and commercialize BiovaxID®. Moreover, Biovest's operations may not be profitable even if BiovaxID® is commercialized.

*Biovest's independent registered public accountants have expressed substantial doubt as to Biovest's ability to continue as a going concern.* As of September 30, 2009, Biovest had a working capital deficit of $35.1 million. Biovest expects to continue to incur substantial net operating losses at least until BiovaxID® receives marketing approval, which may never occur. Continued operating losses would impair Biovest's ability to continue operations. Biovest may not be able to generate sufficient product revenue to become profitable on a sustained basis, or at all. Biovest has operating and liquidity concerns due to Biovest's significant net losses and negative cash flows from operations. As a result of these and other factors, Biovest's independent registered certified public accountants, Cherry, Bekaert and Holland, L.L.P., have indicated, in their report to Biovest's 2008 and 2009 financial statements, that there is substantial doubt about Biovest's ability to continue as a going concern. Biovest's ability to continue as a

going concern is dependent upon generating sufficient cash flow to conduct operations and obtaining additional capital and financing. Any financing activity is likely to result in significant dilution to current shareholders.

Biovest's financial statements have been prepared assuming Biovest will continue as a going concern and do not include any adjustments that might result from the outcome of this uncertainty. Biovest incurred net losses of $14.7 million, $20.6 million, and $44.3 million in 2009, 2008, and 2007, respectively. Biovest has also experienced negative cash flows from operations for the past three fiscal years. In addition, Biovest's projected cash receipts from operations for fiscal 2009 are anticipated to be insufficient to finance operations without funding from other sources. Biovest has had difficulty in meeting its cash requirements. Biovest has, in-part, met its cash requirements through proceeds from Biovest's cell culture and instrument manufacturing activities, various financing transactions, the use of cash on hand, short-term borrowings (primarily from affiliates), and trade-vendor credit. There can be no assurances that management will obtain the necessary funding, reduce the level of historical losses and achieve successful commercialization of BiovaxID®. Continuation as a going concern is ultimately dependent upon achieving profitable operations and positive operating cash flows sufficient to pay all obligations as they come due.

*Until recently, Biovest has not filed required annual or quarterly SEC reports since October 2008.* The Biovest Common Stock is registered under the Exchange Act. Section 13(a) of the Exchange Act requires that Biovest file with the SEC current and accurate information in annual reports and quarterly reports. Until recently, Biovest iswas delinquent in several of its periodic filing obligations, including not having filed its annual reports for the 2008 and 2009 fiscal years and its quarterly reports for the 2008 and 2009 fiscal years. A company that has not filed all of its Section 13 reports is not considered "current" in its Exchange Act reporting. Delinquent filers do not satisfy the current public information requirement of Securities Act Rule 144(c)(1) or the reporting issuer definition of Rule 902(l) of Regulation S. Furthermore, the SEC may pursue an enforcement action against delinquent filers, such as an administrative proceeding to suspend trading pursuant to Section (12)(k) of the Exchange Act, or a civil action seeking an injunction, and/or civil monetary penalties against the delinquent filer and/or its directors. At the present time, Biovest cannot say what, if any, action the SEC may take against Biovest; however, any such action could have an adverse impact on Reorganized Biovest and the Plan.

*Biovest will need substantial additional financing but its access to capital funding is uncertain.* During prior years, Biovest met its cash requirements through the use of cash on hand, the sale of common stock, and short-term loans from affiliates. In 2003, Biovest entered into an Investment Agreement with Accentia. The aggregate investment commitment received from Accentia was $20.0 million. Additionally, Accentia has loaned Biovest or otherwise paid on Biovest's behalf an additional $12.6 million through September 30, 2009, as represented by three secured demand promissory notes. Biovest has been informed by Accentia that provisions of certain of its loan and debenture financing agreements preclude Accentia from making any additional direct cash contributions to Biovest. Additionally, Biovest has borrowed funds from third parties. Furthermore, because much of this indebtedness is secured by all of Biovest's assets, including the assets of its subsidiaries, Biovest's creditors may be able to foreclose on Biovest's assets if Biovest is unable to meet Biovest's obligations as they become due. In addition, Biovest is obligated to pay royalties which will reduce profit.

Biovest's ability to continue present operations is dependent upon Biovest's ability to obtain significant external funding. Additional sources of funding have not been established; however, additional financing is currently being sought from a number of sources other than Accentia, including the sale of equity or debt securities, strategic collaborations, recognized research funding programs, as well as domestic and/or foreign licensing of Biovest's vaccine and Biovest's AutovaxID™ equipment line. Biovest is exploring various financing alternatives, and has hired investment consultants to assist in these efforts. There can be no assurance that Biovest will be successful in securing such financing on acceptable terms, if at all. If adequate funds are not available from the foregoing sources, or if Biovest determines it to otherwise be in Biovest's best interests, Biovest may consider additional strategic financing options, including sales of assets or business units that are non-essential to the ongoing development or future commercialization of BiovaxID® and AutovaxID™, or Biovest may be required to delay, reduce the scope of, or eliminate one or more of Biovest's research or development programs or curtail some of Biovest's commercialization efforts.

*There is a high risk of failure because Biovest is trying to develop a new anti-cancer vaccine.* Biovest is pursuing a novel patient specific cancer therapy. Commercialization requires governmental approval, establishment of cost effective production capability, distribution capability and market acceptance. Biovest's vaccine is subject to all of the risks of failure that are inherent in developing products based on new technologies and the risks associated with drug development generally. These risks include the possibility that:

- Biovest's technology or the product based on its technology will be ineffective or toxic, or otherwise fail to receive necessary regulatory approvals;
- future products based on Biovest's technology will be difficult to manufacture on a large scale or at all or will prove to be uneconomical to produce or market;
- proprietary rights of third parties will prevent Biovest or Biovest's collaborators from marketing products;
- third parties will market superior or equivalent products; and

- the products will not attain market acceptance.


Drug development, including clinical trials required for governmental approval, is expensive and new drugs have a high risk of failure. Based on results at any stage of development, including later-stage clinical trials, and Biovest's inability to bear the related costs associated with product development or product production or marketing, Biovest may decide to discontinue development or clinical trial at any time.

Preparing for and processing the Biologics License Application for BiovaxID® will be expensive and time consuming. The FDA response to any application is uncertain and the FDA may reject or deny the application, or may impose additional requirements. Such additional requirements may be expensive and/or time consuming, and meeting these additional requirements may be difficult or impossible.

*Biovest might be unable to manufacture Biovest's vaccine on a commercial scale.* Assuming approval of BiovaxID®, manufacturing, supply and quality control problems could

arise as Biovest, either alone or with subcontractors, attempts to scale-up manufacturing capabilities for products under development. Biovest might be unable to scale-up in a timely manner or at a commercially reasonable cost. Problems could lead to delays or pose a threat to the ultimate commercialization of Biovest's product and cause Biovest to fail.

Manufacturing facilities, and those of any future contract manufacturers, are or will be subject to periodic regulatory inspections by the FDA and other federal and state regulatory agencies and these facilities are subject to Quality System Regulation, or QSR, requirements of the FDA. If Biovest or Biovest's third-party manufacturers fail to maintain facilities in accordance with QSR regulations, other international quality standards, or other regulatory requirements, then the manufacturing process could be suspended or terminated, which would harm Biovest.

*Because the product development and the regulatory approval process for BiovaxID®*
*will be expensive and its outcome is uncertain, Biovest must incur substantial expenses that*
*might not result in any viable product and the process could take longer than expected.*
Regulatory approval of a pharmaceutical product is a lengthy, time-consuming and expensive process. Before obtaining regulatory approvals for the commercial sale of BiovaxID®, Biovest must demonstrate that BiovaxID® is safe and effective for use in humans. This is expected to result in substantial expense and require significant time.

Historically, the results from pre-clinical testing and early clinical trials often have not been predictive of results obtained in later clinical trials. A number of new drugs have shown promising results in clinical trials, but subsequently failed to establish sufficient safety and efficacy data to obtain necessary regulatory approvals. Data obtained from pre-clinical and clinical activities are susceptible to varying interpretations, which could delay, limit or prevent regulatory approval. In addition, regulatory delays or rejections could be encountered as a result of many factors, including changes in regulatory policy during the period of product development.

Clinical trials conducted by Biovest or by third parties on Biovest's behalf might not demonstrate sufficient safety, efficacy or statistical significance to obtain the requisite regulatory approval for Biovest's products. Regulatory authorities might not permit Biovest to undertake any additional clinical trials for Biovest's product candidates.

Biovest has completed a single Phase 3 clinical trial for BiovaxID®; however, Biovest cannot be certain that the FDA will not require additional clinical trials, either prior to or in conjunction with approval of BiovaxID®. Biovest's initial Phase 3 clinical trial spanned approximately eight years and the completion of any required additional clinical trials would likely take a significant number of years. The length of time generally varies substantially according to the type, complexity, novelty and intended use of the product candidate. Although for planning purposes Biovest forecast the commencement and completion of clinical development, and has included many of those forecasts in reports filed with the SEC and in other public disclosures, the actual timing of these events can vary dramatically. For example, Biovest has experienced delays in Biovest's clinical development program in the past as a result of slower than anticipated patient enrollment. These delays may recur. Biovest's rate of completion of development efforts could be delayed by many factors. In addition, Biovest may need to

delay or suspend this regulatory process if Biovest is unable to obtain additional funding when needed. Moreover, Biovest has limited experience in vaccine development and the regulatory process.

*Biovest cannot predict the impact, if any, that "Fast Track" designation will have on the regulatory approval process for BiovaxID®.* The FDA has granted "*Fast Track*" review designation to BiovaxID® for the indication of FL, which means that this product may be eligible for expedited review procedures by the FDA. However, Biovest cannot predict the impact, if any, that *Fast Track* designation will actually have on the duration of the regulatory approval process for this product candidate, and the FDA may deny regulatory approval of this product candidate notwithstanding its *Fast Track* designation.

*Biovest may experience difficulties in manufacturing BiovaxID® or in obtaining approval of the change in manufacturing site from the FDA, which could prevent or delay Biovest in the commercialization of BiovaxID®.* Manufacturing BiovaxID® is complex and requires coordination internally among Biovest's employees, as well as externally with physicians, hospitals and third-party suppliers and carriers. This process involves several risks that may lead to failures or delays in manufacturing BiovaxID®, including:

- difficulties in obtaining adequate tumor samples from physicians;
- difficulties in timely shipping of tumor samples to Biovest or in the shipping of BiovaxID® to the treating physicians due to errors by third-party carriers, transportation restrictions or other reasons;
- destruction of, or damage to, tumor samples or BiovaxID® during the shipping process due to the improper handling by third-party carriers, hospitals, physicians or Biovest;
- destruction of, or damage to, tumor samples or BiovaxID® during storage at Biovest's facility; and
- difficulties in ensuring the availability, quality, and consistency of materials provided by Biovest's suppliers.

If Biovest experiences any difficulties in manufacturing BiovaxID®, the commercialization of BiovaxID® may be delayed, resulting in delays in generating revenue and increased costs.

In addition, because Biovest has relocated the site of the manufacturing process to Biovest's Minneapolis facility following the clinical trials, Biovest is required to demonstrate to the FDA that the product under new conditions is comparable to the product that was the subject of earlier clinical testing. This requirement applies to the relocation at the Minneapolis facility as well as future expansions of the manufacturing facilities, such as the possible expansion to additional facilities that may be required for successful commercialization of the vaccine, resulting in increased costs. There is also a requirement for validation of the manufacturing process for BiovaxID® utilizing Biovest's AutovaxID™ instrument.

A showing of comparability requires data demonstrating that the product continues to be safe, pure, and potent and may be based on chemical, physical, and biological assays and, in some cases, other non-clinical data. If Biovest demonstrates comparability, additional clinical safety and/or efficacy trials with the new product may not be needed. The FDA will determine if

comparability data are sufficient to demonstrate that additional clinical studies are unnecessary. If the FDA requires additional clinical safety or efficacy trials to demonstrate comparability, Biovest's clinical trials or FDA approval of BiovaxID® may be delayed, which would cause delays in generating revenue and increased costs.

*Because Biovest has limited experience, Biovest might be unsuccessful in its efforts to develop, obtain approval for, commercially produce or successfully market BiovaxID®.* The extent to which Biovest develops and commercializes BiovaxID® will depend on Biovest's ability to:

- complete required clinical trials;
- obtain necessary regulatory approvals;

- establish, or contract for, required manufacturing capacity; and

- establish, or contract for, sales and marketing resources.

Biovest has limited experience with these activities and might not be successful in the trials, product development or commercialization.

*Competing technologies may adversely affect Biovest.* Biotechnology has experienced, and is expected to continue to experience, rapid and significant change. The use of monoclonal antibodies as initial or induction therapy, and increasingly for maintenance therapy, has become well-established and generally accepted. Products that are well-established or accepted, including monoclonal antibodies such as Rituxan®, including its anticipated pending expanded approval as a NHL maintenance therapy, may constitute significant barriers to market penetration and regulatory approval which may be expensive, difficult or even impossible to overcome. New developments in biotechnological processes are expected to continue at a rapid pace in both industry and academia, and these developments are likely to result in commercial applications competitive with Biovest's proposed vaccine. Biovest expects to encounter intense competition from a number of companies that offer products in Biovest's targeted application area. Biovest anticipates that Biovest's competitors in these areas will consist of both well-established and development-stage companies and will include:

- healthcare companies;
- chemical and biotechnology companies;

- biopharmaceutical companies; and

- companies developing drug discovery technologies.

The cell culture production and technology business is also intensely competitive and is in many areas dominated by large service providers. In many instances, Biovest's competitors have substantially greater financial, technical, research and other resources and larger, more established marketing, sales, distribution and service organizations than Biovest. Moreover, these competitors may offer broader product lines and have greater name recognition than

Biovest and may offer discounts as a competitive tactic.

Competitors might succeed in developing, marketing, or obtaining FDA approval for technologies, products, or services that are more effective or commercially attractive than those Biovest offers or is developing, or that render Biovest's products or services obsolete. As these companies develop their technologies, they might develop proprietary positions, which might prevent Biovest from successfully commercializing products. Also, Biovest might not have the financial resources, technical expertise or marketing, distribution or support capabilities to compete successfully in the future.

*Biovest's clinical trials for BiovaxID® may not be regarded by the FDA or other regulatory authorities as conclusive, and Biovest may decide, or regulators may require, Biovest to conduct additional clinical testing for this product candidate or cease its trials.* In April 2008, Biovest closed its only Phase 3 clinical trial of BiovaxID® with 234 patients enrolled instead of the 563 patients anticipated to be enrolled pursuant to Biovest's clinical trial protocol. Biovest announced clinical results based upon a relatively smaller number of patients. Additionally, Biovest's only Phase 3 clinical trial enrolled or randomized patients before their treatment with BiovaxID® or control resulting in a significant number of patients being randomized but not treated with either BiovaxID® or control because of failure to maintain compliance with protocol requirements including maintenance of complete remission. Biovest does not know if the design of Biovest's Phase 3 clinical trial or an evaluation, which is limited to only patients that received at least one dose of BiovaxID® or control, will be acceptable to the FDA for demonstrating sufficient safety and efficacy required to obtain marketing approval.

While the Phase 3 clinical trial reported clinical benefit that was statistically significant (p-value of 0.045) in patients receiving at least one dose of BiovaxID® or control, the results did not achieve "high" statistical significance which is generally considered to be a p-value of 0.01 or better. While it is not required, it is not uncommon for the FDA to require a second confirming Phase 3 clinical trial, when "high" statistical significance has not been demonstrated. Biovest does not know whether its existing or future clinical trials will be considered by the FDA and/or other regulatory authorities to sufficiently demonstrate safety and efficacy to result in marketing approval. Because Biovest's clinical trials for BiovaxID® may be considered to be inconclusive, Biovest may decide, or regulators may require Biovest, to conduct additional clinical and/or preclinical testing for this product candidate or cease Biovest's clinical trials. If this happens, Biovest may not be able to obtain approval for this product or the anticipated time to market for this product may be substantially delayed, and Biovest may also experience significant additional development costs. Biovest may also be required to undertake additional clinical testing if Biovest changes or expands the indications for Biovest's product candidate.

*The ongoing detailed analysis being performed in Biovest's clinical trials for BiovaxID® may produce negative or inconclusive results and may delay Biovest's efforts to obtain approval for this product.* Biovest is currently engaged in performing detailed analyses of the safety and efficacy data generated by Biovest's Phase 3 clinical trial of BiovaxID® in FL and Biovest's Phase 2 clinical trial in MCL. Biovest cannot predict with certainty the results of the analyses, and if the results are negative or inconclusive Biovest may decide, or regulators may require Biovest, to conduct additional clinical and/or preclinical testing for this product candidate or cease Biovest's clinical trials. If this happens, Biovest may not be able to obtain approval for

BiovaxID® for FL, MCL or both, or the anticipated time to market for this product may be substantially delayed, and Biovest may also experience significant additional development costs.

*The clinical trials for BiovaxID® have demonstrated that certain side effects may be associated with this treatment and ongoing or future clinical trials may reveal additional unexpected or unanticipated side effects.* Biovest cannot guarantee that its current or future trials for BiovaxID® will not demonstrate additional adverse side effects that may delay or even preclude regulatory approval. Even if BiovaxID® receives regulatory approval, if Biovest or others identify previously unknown side effects following approval, regulatory approval could be withdrawn and sales of BiovaxID® could be significantly reduced.

*Inability to obtain regulatory approval for Biovest's BiovaxID® manufacturing facility or to manufacture on a commercial scale may delay or disrupt its commercialization efforts.* Before Biovest can obtain FDA approval for any new drug, the manufacturing facility for the drug must be inspected and approved by the FDA. Therefore, before Biovest can obtain the FDA approval necessary to allow Biovest to begin commercially manufacturing BiovaxID®, Biovest must pass a pre-approval inspection of Biovest's BiovaxID® manufacturing facility by the FDA. In order to obtain approval, Biovest will need to ensure that all of Biovest's processes, methods, and equipment are compliant with the current Good Manufacturing Practices, or cGMP, and perform extensive audits of vendors, contract laboratories, and suppliers. The cGMP requirements govern quality control of the manufacturing process and documentation policies and procedures. Biovest has undertaken steps towards achieving compliance with these regulatory requirements required for commercialization. In complying with cGMP, Biovest will be obligated to expend time, money, and effort in production, record keeping, and quality control to assure that the product meets applicable specifications and other requirements. If Biovest fails to comply with these requirements, Biovest could experience product liability claims from patients receiving Biovest's vaccines, Biovest might be subject to possible regulatory action, and Biovest may be limited in the jurisdictions in which Biovest is permitted to sell BiovaxID®.

In order to commercialize BiovaxID®, Biovest will need to develop and qualify one or more additional manufacturing facilities. Preparing a facility for commercial manufacturing may involve unanticipated delays, and the costs of complying with state, local, and FDA regulations may be higher than Biovest anticipated. In addition, any material changes Biovest makes to the manufacturing process may require approval by the FDA and state or foreign regulatory authorities. Obtaining these approvals is a lengthy, involved process, and Biovest may experience delays. Such delays could increase costs and adversely affect Biovest's business. In general, the FDA views cGMP standards as being more rigorously applied as products move forward in development and commercialization. In seeking to comply with these standards, Biovest may encounter problems with, among other things, controlling costs and quality control and assurance. It may be difficult to maintain compliance with cGMP standards as the development and commercialization of BiovaxID® progresses, if it progresses.

Biovest and its products are subject to comprehensive regulation by the FDA in the United States and by comparable authorities in other countries. These national agencies and other federal, state and local entities regulate, among other things, the pre-clinical and clinical testing, safety, approval, manufacture, labeling, marketing, export, storage, record keeping, advertising and promotion of Biovest's products. If Biovest violates regulatory requirements at

any stage, whether before or after marketing approval is obtained, then Biovest may be subject to forced removal of a product from the market, product seizure, civil and criminal penalties and other adverse consequences.

*Biovest cannot predict the impact, if any, that "Orphan Drug" exclusivity status will have on the regulatory approval process for BiovaxID®.* In October 2009, the FDA granted Orphan Drug designation to BiovaxID® for the treatment of FL. Under the Orphan Drug Act, the FDA may grant Orphan Drug designation to drugs intended to treat a "rare disease or condition," which generally is a disease or condition that affects fewer than 200,000 individuals in the United States. After the FDA grants Orphan Drug designation to a product, the generic identity of the therapeutic agent and its potential orphan use are publicly disclosed by the FDA. Orphan Drug designation does not convey any advantage in, or shorten the duration of, the regulatory review and approval process. If a product which has an Orphan Drug designation subsequently receives the first FDA approval for the indication for which it has such designation, the product is entitled to orphan exclusivity, which means that the FDA may not approve any other applications to market the same drug for the same indication for a period of seven years, except in limited circumstances such as greater effectiveness, greater safety, major contribution to patient care, or inadequate supply.

Even though it has been designated as an Orphan Drug, BiovaxID® may not be approved, or may not be approved before other applications, or granted Orphan Drug exclusivity if approved. Biovest's competitors may obtain Orphan Drug exclusivity for products competitive with Biovest's product candidate before Biovest does or even if Biovest does not obtain such status, in which case Biovest would be excluded from that market if the FDA deems the competitive drug to be the same drug as BiovaxID®. Even though Biovest obtained Orphan Drug exclusivity for BiovaxID® for FL, Biovest may not be able to maintain it. For example, if a competitive product is shown to be clinically superior to Biovest's product, any Orphan Drug exclusivity Biovest has obtained will not block the approval of such competitive product.

Biovest anticipates submitting an application for Orphan Drug designation for BiovaxID® for the treatment of MCL. Biovest cannot predict whether Orphan Drug designation will be granted for BiovaxID® for the treatment of MCL and, if granted, Biovest cannot predict the impact, if any, that Orphan Drug designation will have on the regulatory approval process for BiovaxID® in MCL.

*Biovest is not able to prevent third parties, including potential competitors, from developing and selling an anti-cancer vaccine for NHL having the same composition of matter as BiovaxID®.* Biovest's BiovaxID® vaccine is based on research and studies conducted at Stanford University and the NCI. As a result of published studies, the concept of the vaccine and its composition of matter are in the public domain and cannot be patented by Biovest, the NCI, or any other party. Biovest has filed a PCT patent application on the type of cell media that is used to grow cell cultures in the production of Biovest's vaccine, and Biovest has filed a PCT patent application on certain features of the integrated production and purification system used to produce and purify the vaccine in an automated closed system. Biovest has obtained an exclusive worldwide license for use of a proprietary cell line which Biovest uses to manufacture BiovaxID®, but Biovest cannot be certain that Biovest will be successful in preventing others from utilizing this cell line or will be able to maintain and enforce the exclusive license in all

jurisdictions. Biovest cannot prevent other companies using different manufacturing processes from developing active immunotherapies that directly compete with BiovaxID®. For example, Bayer Innovation GmbH has commenced a Phase 1 clinical trial for its autologous anti-idiotype lymphoma vaccine produced in a tobacco plant cell line.

Several companies, such as Genentech, Inc., Corixa Corporation, Biogen Idec, and Immunomedics, Inc., are involved in the development of passive immunotherapies for NHL. These passive immunotherapies include Rituxan®, a monoclonal antibody, and Zevalin® and Bexxar®, which are passive radioimmunotherapy products. Passive immunotherapies, particularly the monoclonal antibody Rituxan, are well accepted and established in the treatment of NHL and as such will impact both regulatory considerations and market penetration.

*Biovest currently depends on a sole-source supplier for KLH, a critical raw material used in the manufacture of BiovaxID®, and physicians who administer BiovaxID® depend on a sole-source supplier for GM-CSF, an immune system stimulant administered with BiovaxID®.* Biovest currently depends on single source suppliers for critical raw materials used in BiovaxID® and other components used in the manufacturing process and required for the administration of BiovaxID®. In particular, manufacturing of BiovaxID® requires keyhole limpet hemocyanin, or KLH, a foreign carrier protein. Biovest purchases KLH from BioSyn Arzneimittel GmbH, or BioSyn, a single source supplier. Biovest has entered into a supply agreement with BioSyn, pursuant to which BioSyn has agreed to supply Biovest with KLH. The supply agreement has an initial term of three years and is renewable for indefinite additional terms of five years each at Biovest's discretion, so long as Biovest is not in default of Biovest's obligations pursuant to this agreement. Either party may terminate the supply agreement earlier upon a breach that is not cured within 60 days or other events relating to insolvency or bankruptcy. Under this agreement, BioSyn is not contractually obligated to supply Biovest with the amounts of KLH necessary for Biovest for commercialization. Biovest has become aware of additional suppliers who now market KLH, but it has not yet established a relationship with these suppliers and has not performed testing to insure that the KLH supplied by them is suitable for use in the BiovaxID® production process.

When BiovaxID® is administered, the administering physician uses a cytokine to enhance the patient's immune response, and this cytokine is administered concurrently with BiovaxID®. The cytokine used by physicians for this purpose is Leukine® sargramostim, a commercially available recombinant human granulocyte-macrophage colony stimulating factor known as GM-CSF. This cytokine is a substance that is purchased by the administering physician and is administered with an antigen to enhance or increase the immune response to that antigen. The physicians who administer BiovaxID® will rely on Berlex Inc., or Berlex, as a supplier of GM-CSF, and these physicians will generally not have the benefit of a long-term supply contract with Berlex. GM-CSF is not commercially available from other sources in the United States or Canada. Establishing additional or replacement suppliers for these materials or components may take a substantial amount of time. In addition, Biovest may have difficulty obtaining similar components from other suppliers that are acceptable to the FDA.

If Biovest has to switch to a replacement supplier, Biovest may face additional regulatory delays and the manufacture and delivery of BiovaxID® could be interrupted for an extended period of time, which may delay commercialization of BiovaxID®. If Biovest is unable to obtain

adequate amounts of these components, Biovest may be required to obtain regulatory clearance from the FDA to use different components that may not be as safe or as effective. As a result, regulatory approval of BiovaxID® may be suspended or delayed or may not be received at all. All these delays could cause delays in commercialization of BiovaxID®, delays in Biovest's ability to generate revenue from BiovaxID®, and increased costs.

Other than BioSyn and Berlex, Biovest is not dependent on any sole-source suppliers.

*The NCI is not precluded from working with other companies on developing products that are competitive with BiovaxID®.* Biovest's BiovaxID® vaccine is based on research and studies conducted at Stanford University and the NCI. The concept of producing a patient-specific anti-cancer vaccine through the hybridoma method from a patient's own cancer cells has been discussed in a variety of publications over a period of many years, and, accordingly, the general method and concept of such a vaccine is not eligible to be patented by Biovest, the NCI, or any other party. Until November 2006, Biovest was a party to a Cooperative Research and Development Agreement, or CRADA, with the NCI for the development of a hybridoma-based patient-specific idiotypic vaccine for the treatment of indolent FL. Biovest gave notice of termination of the CRADA in September 2006. Although the NCI transferred sponsorship of the IND for BiovaxID® to Biovest in 2004, and although there are certain confidentiality protections for information generated pursuant to the CRADA, the CRADA does not prevent the NCI from working with other companies on other hybridoma-based idiotypic vaccines for indolent FL or other forms of cancer, and the NCI or its future partners may be able to utilize certain technology developed under Biovest's prior CRADA. If the NCI chooses to work with other companies in connection with the development of such a vaccine, such other companies may also develop technology and know-how that may ultimately enable such companies to develop products that compete with BiovaxID®. Additionally, through their partnership with the NCI, these companies could develop immunotherapies for other forms of cancer that may serve as barriers to any future products that Biovest may develop for such indications.

*The uncertainty of patent and proprietary technology protection and Biovest's potential inability to license technology from third parties may adversely affect Biovest.* Biovest's success will depend, in part, on obtaining and maintaining meaningful patent protection on Biovest's inventions, technologies and discoveries. The patent position of biotechnology and pharmaceutical firms is highly uncertain and involves many complex legal and technical issues. There is no clear policy involving the breadth of claims allowed, or the degree of protection afforded, under patents in this area. Biovest's ability to compete effectively will depend on Biovest's ability to develop and maintain proprietary aspects of Biovest's technology, as well as to operate without infringing, or, if necessary, to obtain rights to, the proprietary rights of others. Biovest's pending patent applications might not result in the issuance of patents. Biovest's patent applications might not have priority over others' applications and, even if issued, Biovest's patents might not offer protection against competitors with similar technologies. Any patents issued to Biovest might be challenged, invalidated or circumvented and the rights created thereunder may not afford Biovest a competitive advantage. Furthermore, patents that Biovest owns or licenses may not enable Biovest to preclude competitors from commercializing drugs, and consequently may not provide Biovest with any meaningful competitive advantage.

Biovest's commercial success also depends in part on Biovest neither infringing patents or proprietary rights of third parties nor breaching any licenses that Biovest has obtained from third parties permitting Biovest to incorporate technology into Biovest's products. It is possible that Biovest might infringe these patents or other patents or proprietary rights of third parties. In the future, Biovest might receive notices claiming infringement from third parties. Any legal action against Biovest or Biovest's collaborative partners claiming infringement and damages or seeking to enjoin commercial activities relating to Biovest's products and processes may require Biovest or Biovest's collaborative partners to alter Biovest's products, cease certain activities and/or obtain licenses in order to continue to manufacture or market the affected products and processes. In addition, these actions may subject Biovest to potential liability for damages. Biovest's collaborative partners might not prevail in an action, and any license required under a patent might not be made available on commercially acceptable terms, or at all.

There are many United States and foreign patents and patent applications held by third parties in Biovest's areas of interest, and Biovest believes that there may be significant litigation in the industry regarding patent and other intellectual property rights. Potential future litigation could result in substantial costs and the diversion of management's efforts regardless of the merits or results of the litigation. Additionally, from time to time Biovest may engage in the defense and prosecution of interference proceedings before the U.S. Patent and Trademark Office and related administrative proceedings that can result in Biovest's patent position being limited or in substantial expense to Biovest and significant diversion of effort by its technical and management personnel. In addition, laws of some foreign countries do not protect intellectual property to the same extent as do laws in the United States, which could subject Biovest to additional difficulties in protecting Biovest's intellectual property in those countries.

Biovest also relies on unpatented technology, trade secrets, technical know-how, confidential information and continuing inventions to develop and maintain Biovest's competitive position. Others might independently develop substantially equivalent proprietary information and techniques or otherwise gain access to Biovest's trade secrets or disclose Biovest's technology, and Biovest may not be able to protect its rights to its trade secrets. Biovest seeks to protect its technology and patents, in part, by confidentiality agreements with Biovest's employees and contractors. Biovest's employees might breach their existing proprietary information, inventions and dispute resolution agreements. Accordingly, these agreements may not protect Biovest's intellectual property, and Biovest's employees' breaches of those agreements could have a material adverse effect on Biovest.

*Biovest's operating results may fluctuate widely between reporting periods.* Biovest's operating results may vary significantly from quarter to quarter or year to year, depending on factors such as timing of biopharmaceutical development and commercialization of products by Biovest's customers, the timing of increased research and development and sales and marketing expenditures, the timing and size of contracts and whether Biovest introduces to the market new products or processes. Consequently, revenues, profits or losses may vary significantly from quarter to quarter or year to year, and revenue or profits in any period will not necessarily be indicative of results in subsequent periods. These period to period fluctuations in financial results may have a significant impact on the market price, if any, of Biovest's securities.

*Biovest's contract cell production services are subject to product liability claims.* The

contract production services for therapeutic products that Biovest offers expose Biovest to a potential risk of liability as the proteins or other substances manufactured by Biovest, at the request and to the specifications of Biovest's customers, could potentially cause adverse effects. Biovest generally obtains agreements from its contract production customers indemnifying and defending Biovest from any potential liability arising from such risk.

There can be no assurance, however, that Biovest will be successful in obtaining such agreements in the future or that such indemnification agreements will adequately protect Biovest against potential claims relating to such contract production services. Biovest may also be exposed to potential product liability claims by users of Biovest's products. Biovest may seek to increase Biovest's insurance coverage in the future in the event of any significant increases in Biovest's level of contract production services. There can be no assurance that Biovest will be able to maintain Biovest's existing coverage or obtain additional coverage on commercially reasonable terms, or at all, or that such insurance will provide adequate coverage against all potential claims to which Biovest might be exposed. A successful partially or completely uninsured claim against Biovest would have a material adverse effect on Biovest's operations.

*Biovest's contract cell production business is subject to intense competition.* The contract cell production business is highly competitive. Customers can select other cell production facilities, other cell production methods and other cell production instruments. Biovest considers its business environment to be competitive. Many of Biovest's competitors are better established with greater capital resources. Historically, Biovest's cell production facilities, method and equipment have been primarily used to produce relatively small batches, such as those used in research and development. While Biovest is seeking broader acceptance of its cell production facilities, method and equipment for larger and commercial scale production, Biovest may not be successful in cost effectively penetrating these larger markets.

*If Biovest loses its key personnel or is unable to attract and retain additional personnel, Biovest's efforts would be hindered and Biovest might be unable to develop its own products or pursue collaborations.* Biovest's success will depend on its ability to attract and retain key employees and scientific advisors. Competition among biotechnology and biopharmaceutical companies, as well as among other organizations and companies, academic institutions and government entities, for highly skilled scientific and management personnel is intense. There is no guarantee that Biovest will be successful in retaining Biovest's existing personnel or advisors, or in attracting additional qualified employees. If Biovest fails to acquire personnel or if Biovest loses existing personnel, Biovest's business could be seriously interrupted.

*Biovest does not expect to pay any dividends.* Biovest has not declared or paid cash dividends since Biovest's inception. Biovest currently intends to retain all of its earnings to finance future growth and, therefore, does not expect to declare or pay cash dividends in the foreseeable future.

*Biovest's tax-loss carryforwards are subject to restrictions.* As of September 30, 2008, Biovest had substantial net operating loss carry-forwards ("NOLs") for federal income tax purposes of approximately $53.9 million (which will begin to expire in 2021) which will be available to offset future taxable income. As a result of certain changes in ownership and pursuant to Section 382 of the Internal Revenue Code of 1986, as amended, utilization of NOLs

is limited after an ownership change, as defined in Section 382, to an annual amount equal to the value of the loss corporation's outstanding stock immediately before the date of the ownership change multiplied by the federal long-term exempt tax rate. Due to the various changes in Biovest's ownership, and as a result of Biovest's Chapter 11 bankruptcy proceeding, a significant portion of these NOLs are subject to significant restrictions with respect to Biovest's ability to use those amounts to offset future taxable income. Use of Biovest's NOLs may be further limited as a result of future equity transactions.

*Biovest is subject to various government regulations.* The cell culture systems and services that Biovest sells are subject to significant regulation by the FDA under the FD&C Act. Biovest's cell culture bioprocessing systems are regulated as Class I medical devices and must be manufactured in accordance with the FDA's QSR requirements. Biovest's cell culture instruments must comply with a variety of safety regulations to be sold in Europe, including, but not limited, to CE. Biovest's customers who use these cell culture bioprocessing systems must also comply with more extensive and rigorous FDA regulation. The process of complying with FDA regulations and obtaining approvals from the FDA is costly and time consuming. The process from investigational stage until approval to market can take a minimum of seven and up to as many as ten to twelve years currently and is subject to unanticipated delays. Furthermore, there is no assurance that Biovest's customers will be able to obtain FDA approval for bioproducts produced with their systems.

*Biovest uses hazardous materials in Biovest's business. Any claims relating to improper handling, storage or disposal of these materials could be costly and time consuming.* Biovest's manufacturing, clinical laboratory, and research and development processes involve the storage, use and disposal of hazardous substances, including hazardous chemicals and biological hazardous materials. Because Biovest handles biohazardous waste with respect to its contract production services, Biovest is required to conform its customers' procedures and processes to the standards set by the EPA, as well as those of local environmental protection authorities. Accordingly, Biovest is subject to federal, state and local regulations governing the use, manufacture, storage, handling and disposal of materials and waste products. Although Biovest believes that its safety and environmental management practices and procedures for handling and disposing of these hazardous materials are in accordance with good industry practice and comply with applicable laws, permits, licenses and regulations, the risk of accidental environmental or human contamination or injury from the release or exposure of hazardous materials cannot be completely eliminated. In the event of an accident, Biovest could be held liable for any damages that result, including environmental clean-up or decontamination costs, and any such liability could exceed the limits of, or fall outside the coverage of, Biovest's insurance. Biovest may not be able to maintain insurance on acceptable terms, or at all. Biovest could be required to incur significant costs to comply with current or future environmental and public and workplace safety and health laws and regulations.

*The availability and amount of reimbursement for BiovaxID® and the manner in which government and private payers may reimburse for BiovaxID® is uncertain.* In many of the markets where Biovest may do business in the future, the prices of pharmaceutical products are subject to direct price controls pursuant to applicable law or regulation and to drug reimbursement programs with varying price control mechanisms.

Biovest expects that many of the patients who will seek treatment with BiovaxID® if approved for marketing will be eligible for Medicare benefits. Other patients may be covered by private health plans or uninsured. The Medicare program is administered by the Centers for Medicare & Medicaid Services ("CMS"), an agency within the U.S. Department of Health and Human Services. Coverage and reimbursement for products and services under Medicare are determined pursuant to regulations promulgated by CMS and pursuant to CMS's subregulatory coverage and reimbursement determinations. It is difficult to predict how CMS may apply those regulations and subregulatory determinations to newly approved products, especially novel products such as Biovest's, and those regulations and interpretive determinations are subject to change.

Moreover, the methodology under which CMS makes coverage and reimbursement determinations is subject to change, particularly because of budgetary pressures facing the Medicare program. For example, the Medicare Prescription Drug, Improvement, and Modernization Act (the "Medicare Modernization Act"), enacted in December 2003, provides for a change in reimbursement methodology that reduces the Medicare reimbursement rates for many drugs, including oncology therapeutics, which may adversely affect reimbursement for BiovaxID®, if it is approved for sale. If Biovest is unable to obtain or retain adequate levels of reimbursement from Medicare or from private health plans, Biovest's ability to sell BiovaxID® will be adversely affected. Medicare regulations and interpretive determinations also may determine who may be reimbursed for certain services. This may adversely affect Biovest's ability to market or sell BiovaxID®, if approved.

Federal, state and foreign governments continue to propose legislation designed to contain or reduce health care costs. Legislation and regulations affecting the pricing of products like Biovest's potential products may change further or be adopted before BiovaxID® is potentially approved for marketing. It is difficult to predict which, if any, of these proposals will be enacted, and, if so, when. Cost control initiatives by governments or third party payers could decrease the price that Biovest receives for any one or all of its potential products or increase patient coinsurance to a level that makes BiovaxID® unaffordable.

In addition, government and private health plans persistently challenge the price and cost-effectiveness of therapeutic products. Accordingly, these third parties may ultimately not consider BiovaxID® to be cost-effective, which could result in products not being covered under their health plans or covered only at a lower price. Any of these initiatives or developments could prevent Biovest from successfully marketing and selling any of its potential products. Biovest is unable to predict what impact the Medicare Modernization Act or other future regulation or third party payer initiatives, if any, relating to reimbursement for BiovaxID® will have on sales of BiovaxID®, if approved for sale.

In the European Union, governments influence the price of pharmaceutical products through their pricing and reimbursement rules and control of national health care systems that fund a large part of the cost of such products to consumers. The approach taken varies from member state to member state. Some jurisdictions operate positive and/or negative list systems under which products may only be marketed once a reimbursement price has been agreed. Other member states allow companies to fix their own prices for medicines, but monitor and control company profits. The downward pressure on health care costs in general, particularly

prescription drugs, has become very intense. As a result, increasingly high barriers are being erected to the entry of new products, as exemplified by the role of the National Institute for Health and Clinical Excellence in the United Kingdom which evaluates the data supporting new medicines and passes reimbursement recommendations to the government. In addition, in some countries cross-border imports from low-priced markets (parallel imports) exert commercial pressure on pricing within a country. All of these factors could adversely impact Biovest's ability to successfully commercialize BiovaxID® in these jurisdictions.

*Even if approved, BiovaxID® may be subject to promotional limitations.* Biovest may not be able to obtain the labeling claims necessary or desirable for the promotion of its products. The FDA has the authority to impose significant restrictions on an approved product through the product label and allowed advertising, promotional and distribution activities. The FDA also may approve a product for fewer indications than are requested or may condition approval on the performance of post-approval clinical studies. Biovest may also be required to undertake post-marketing clinical trials. There may be monetary penalties if post-approval requirements are not fulfilled. If the results of such post-marketing studies are not satisfactory, the FDA may withdraw marketing authorization or may condition continued marketing on commitments from Biovest that may be expensive and/or time consuming to fulfill. Even if Biovest receives FDA and other regulatory approvals, if Biovest or others identify adverse side effects after any of Biovest's products are on the market, or if manufacturing problems occur, regulatory approval may be withdrawn and reformulation of Biovest's products, additional clinical trials, changes in labeling of Biovest's products and additional marketing applications may be required.

*Biovest has limited experience attempting to comply with public company obligations, including Section 404 of the Sarbanes-Oxley Act of 2002.* As directed by Section 404 of the Sarbanes-Oxley Act of 2002, the SEC has adopted rules requiring public companies to include a report of management on the company's internal controls over financial reporting in their annual reports on Form 10-K. The requirement for a report of management, as currently in effect, will be first applied to Biovest's Annual Report on Form 10-K for the fiscal year ending September 30, 2008.

*Biovest Common Stock is quoted on the OTC Pink Sheets.* Biovest Common Stock is quoted on the OTC Pink Sheets as opposed to a larger or better accepted market. Thus, an investor might find it more difficult than it would be on a national exchange to dispose of, or to obtain accurate quotations as to the market value of, the Biovest Common Stock. Biovest cannot be certain that an active trading market will develop or, if developed, be sustained. Biovest also cannot be certain that purchasers of Biovest Common Stock will be able to resell their common stock at prices equal to or greater than their purchase price. The development of a public market having the desirable characteristics of depth, liquidity and orderliness depends upon the presence in the marketplace of a sufficient number of willing buyers and sellers at any given time. Biovest does not have any control over whether there will be sufficient numbers of buyers and sellers. Accordingly, Biovest cannot be certain that an established and liquid market for Biovest Common Stock will develop or be maintained. The market price of Biovest Common Stock could experience significant fluctuations in response to Biovest's operating results and other factors. In addition, the stock market in recent years has experienced extreme price and volume fluctuations that often have been unrelated or disproportionate to the operating performance of

individual companies. These fluctuations, and general economic and market conditions, may hurt the market price of Biovest Common Stock.

Biovest is also subject to an SEC rule that, if Biovest fails to meet certain criteria set forth in such rule, the rule imposes various sales practice requirements on broker-dealers who sell securities governed by the rule to persons other than established customers and accredited investors. For these types of transactions, the broker-dealer must make a special suitability determination for the purchaser and have received the purchaser's written consent to the transaction prior to sale. Consequently, the rule may have an adverse effect on the ability of broker-dealers to sell Biovest's securities and may affect the ability of Biovest's stockholders to buy and sell Biovest's securities in the secondary market. The additional burdens imposed upon broker-dealers may discourage broker-dealers from effecting transactions in penny stocks, which could reduce the liquidity of the Biovest Common Stock and have a material adverse effect on the trading market for Biovest's securities.

*The price of the Biovest Common Stock may be highly volatile.* The market price for Biovest Common Stock is likely to fluctuate due to factors unique to Biovest or arising out of the highly volatile market prices of securities of biotechnology companies. Biovest's shareholders may not be able to resell shares of Biovest Common Stock following periods of volatility. In addition, Biovest's shareholders may not be able to resell shares at or above their purchase price.

Biovest's stock price may be affected by many factors, many of which are outside of Biovest's control, which may include:

- actual or anticipated variations in quarterly operating results;
- the results of clinical trials and preclinical studies involving Biovest's products or those of Biovest's competitors;
- changes in the status of any of Biovest's drug development programs, including delays in clinical trials or program terminations;
- developments in Biovest's relationships with other collaborative partners;

- developments in patent or other proprietary rights;

- governmental regulation;

- public concern as to the safety and efficacy of products developed by Biovest, Biovest's collaborators or Biovest's competitors;
- Biovest's ability to fund ongoing operations;

- announcements of technological innovations or new products or services by Bivoest or Biovest's competitors;
- changes in financial estimates by securities analysts;

- conditions or trends in the biotechnology industry; and

- changes in the economic performance or market valuations of other biotechnology companies.

*Biovest's principal stockholder is able to exert significant influence over matters submitted to stockholders for approval.* As of the Petition Date, Accentia owned a majority of the outstanding shares of Biovest Common Stock. Accentia exerts significant influence in determining the outcome of corporate actions requiring stockholder approval and that otherwise control Biovest's business. This control could have the effect of delaying or preventing a change in control of Biovest and, consequently, could adversely affect the market price of Biovest Common Stock.

*Biovest may be unable to obtain necessary additional financing.* The capital requirements for Biovest's operations have been and will continue to be significant. Biovest's ability to generate cash from operations is dependent upon, among other things, increased demand for Biovest's products and services and the successful development of direct marketing and product distribution capabilities. There can be no assurance that Biovest will have sufficient capital resources to implement Biovest's business plan and Biovest may need additional external debt and/or equity financing to fund Biovest's future operations. In addition, there can be no assurance that Biovest will be able to obtain the funds necessary to conduct future operations.

*Market for Biovest Common Stock.* Upon demonstrating compliance with SEC financial reporting requirements, Biovest will be eligible to list on the OTCQB™ marketplace, which was launched in April 2010 by Pink OTC Markets, Inc. to better distinguish OTC securities that are registered and reporting with United States regulators. In order for Biovest to qualify for listing on the OTC Bulletin Board, a market maker must complete and submit the appropriate applications to Financial Industry Regulatory Authority ("FINRA") for potential approval. There are no assurances that a market maker will be willing to submit such an application or, if submitted, that FINRA will approve it. Accordingly, no assurance can be given that a holder of Biovest Common Stock will be able to sell such securities in the future or as to the price at which such securities might trade. The liquidity of the market for such securities and the prices at which such securities trade will depend upon the number of holders thereof, the interest of securities dealers in maintaining a market in such securities and other factors beyond Biovest's control.

*No Independent Valuation.* No investment banker or underwriter has been retained to value Biovest Common Stock. Biovest has not attempted to make any estimate of the prices at which Biovest Common Stock may trade in the market. Moreover, there can be no assurance given as to the market prices that will prevail.

*Dilution.* It is possible that Biovest will need to issue additional shares of common stock or securities or warrants convertible into such shares in order to raise additional equity. In such event, Biovest's stockholders could suffer significant dilution.

*Biovest may not be able to obtain confirmation of the Plan.* Biovest's ability to continue as a going concern is dependent upon, among other things, its ability to successfully restructure its indebtedness and to emerge from bankruptcy with a viable plan of reorganization and with adequate liquidity. Biovest cannot be certain that the Plan will be confirmed by the Bankruptcy Court or successfully implemented by Biovest. If the Plan is not confirmed by the Bankruptcy Court: (a) Biovest may not be able to reorganize its businesses; (b) the distributions that Holders

of Claims ultimately would receive, if any, with respect to their Claims are uncertain; and (c) there is no assurance that Biovest will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only Biovest may propose and confirm a plan of reorganization.

*Biovest's emergence from Chapter 11 of the Bankruptcy Code is not assured.* While Biovest expects to emerge from Chapter 11, there can be no assurance that Biovest will successfully reorganize or when this reorganization will occur, irrespective of Biovest's obtaining confirmation of the Plan.

*The conditions precedent to the Effective Date of the Plan may not occur.* As more fully set forth in the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

## SIGNIFICANT EVENTS IN THE
## CHAPTER 11 BANKRUPTCY CASES

### Introduction

On November 10, 2008, each of the Debtors and the Accentia Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code, which cases are designated as Case Numbers 8:08-bk-17795-KRM (Accentia Biopharmaceuticals, Inc.), 8:08-bk-17796-KRM (Biovest International, Inc.), 8:08-bk-17798-KRM (Analytica International, Inc.), 8:08-bk-17800-KRM (TEAMM Pharmaceuticals, Inc.), 8:08-bk-17801-KRM (AccentRx, Inc.), 8:08-bk-17802-KRM (Accentia Specialty Pharmacy, Inc.), 8:08-bk-17803-KRM (Biovax, Inc.), 8:08-bk-17804-KRM (AutovaxID, Inc.), 8:08-bk-17805-KRM (Biolender, LLC), and 8:08-bk-17806-KRM (Biolender II, LLC). The Debtors and the Accentia Debtors remain in possession of their properties and continue to manage their assets as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. Set forth below is a brief summary of significant matters or events which have occurred to date in the Bankruptcy Cases. The description of such matters or events is qualified in its entirety by the actual pleadings filed in the Bankruptcy Cases and, to the extent of any inconsistencies between the descriptions in this Disclosure Statement and such pleadings, such pleadings shall control. All of such pleadings are on file with, and may be obtained from, the Bankruptcy Court. Unless otherwise indicated, the term "Debtors" as used in this section of the Disclosure Statement shall mean the Debtors and the Accentia Debtors, collectively.

### Joint Administration

On November 13, 2008, the Bankruptcy Court entered orders directing the joint administration of the Debtors' ten (10) Chapter 11 cases for procedural purposes only. Pursuant to the terms of those orders, the Chapter 11 case of Accentia Biopharmaceuticals, Inc., Case No. 8:08-bk-17795-KRM, is the lead case.

### Payment of Prepetition Employee Obligations

On November 19, 2008, the Bankruptcy Court entered an order authorizing the Debtors to pay (i) Prepetition accrued, unpaid employee wages and related taxes, benefits and business expenses, (ii) all Prepetition premiums and contributions on policies and plans of insurance for the benefit of their employees, including, without limitation, policies and plans pertaining to health, medical, dental, disability and accidental death and dismemberment claims, together with all costs and expenses incurred in connection with the servicing and processing of such claims and such other amounts as may be required to keep such policies and plans in full force and effect, (iii) all Prepetition payments, premiums or benefits due to or for the benefit of employees pursuant to worker's compensation laws and policies (excluding any retroactive adjustments under any existing policies), and (iv) all payments for employee 401(k) plans. Pursuant to the terms of that order, the Debtors have made all such payments, none of which exceeded the allowed statutory priority claims under Sections 507(a)(4) and (5) of the Bankruptcy Code.

**Master Service List**

On November 19, 2008, the Bankruptcy Court entered an order establishing a master service list (the "Master Service List") for the Bankruptcy Cases, which order provides that parties may serve substantially all pleadings filed in the Bankruptcy Cases upon certain parties, including those parties who file a written request with the Bankruptcy Court to receive service of all pleadings filed in the Bankruptcy Cases. Pursuant to the terms of that order, the Debtors are required to update the Master Service List on a monthly basis and file the updated list with the Bankruptcy Court.

**Adequate Assurance as to Utility Companies**

At the Petition Date, the Debtors used electricity, water, telephone, and other utility services provided by numerous utility companies. It was necessary for the Debtors to seek an immediate order from the Bankruptcy Court which prohibited any such utility company from altering, refusing, or discontinuing utility services on account of a Prepetition amount owed to such utility company or the Debtors' failure to furnish a Postpetition deposit to such utility company. On November 25, 2008, the Bankruptcy Court entered an order (i) prohibiting any such utility company from altering, refusing, or discontinuing utility services to the Debtors on account of the filing of the Bankruptcy Cases or a Prepetition amount owed to such utility company, and (ii) finding that all utility companies were adequately assured of future performance due to the Debtors' agreement to provide a cash deposit equal to one week's worth of utility services based on the Debtors' anticipated Postpetition usage, coupled with the Debtors' ability to pay for Postpetition utility services.

**Rejection of Prepetition Employment Agreement with Steven Arikian, M.D.**

Prior to the Petition Date, Accentia and Steven Arikian, M.D. ("Dr. Arikian") entered into an employment agreement dated October 19, 2004, as amended on February 10, 2005, pursuant to which Dr. Arikian was employed as the President and Chief Operating Officer, Biopharmaceutical Products and Services, of Accentia and Chairman and Chief Executive Officer of Analytica. The term of the employment agreement was for a period of five (5) years ending on October 19, 2009, unless earlier terminated. In November 2008, Accentia and

Analytica filed a motion with the Bankruptcy Court seeking to reject the employment agreement pursuant to Section 365 of the Bankruptcy Code. On January 9, 2009, the Bankruptcy Court entered an order granting the motion to reject the employment agreement, which order incorporated a number of agreements reached between the Debtors and Dr. Arikian. Dr. Arikian has filed a Claim for damages in connection with the rejection of the employment agreement, and the Debtors are still evaluating the merits of that Claim.

**Retention of Professionals by the Debtors**

The Debtors have retained the law firm of Stichter, Riedel, Blain & Prosser, P.A. ("Stichter, Riedel") as their general bankruptcy counsel in the Bankruptcy Cases. On November 19, 2008, the Bankruptcy Court entered an order approving the application by the Debtors to employ Stichter, Riedel as their general bankruptcy counsel in the Bankruptcy Cases. The Bankruptcy Court has also entered orders approving the retention by the Debtors of the following law firms: (i) Rocke McLean & Sbar, P.A. as special counsel in connection with matters involving litigation, including contract disputes and the disputes with Collegium Pharmaceutical, Inc. described below, (ii) Ellenoff Grossman & Schole, LLP as special counsel to represent the Debtors in connection with securities law matters, including assistance with filings with, and requests to, the SEC and litigation matters involving securities law (subsequent to their employment, the Ellenoff firm resigned as special securities counsel to the Debtors), ~~and~~ (iii) Saliwanchik, Lloyd & Saliwanchik as special counsel to represent the Debtors in connection with matters involving the Debtors' intellectual property. ~~On June 29, 2010, Accentia and Biovest filed applications to employ~~, and (iv) Foley Lardner LLP as special counsel to represent ~~them~~the Debtors in connection with securities law matters~~, which applications have been set for hearing before the Bankruptcy Court on July 15, 2010.~~, The Bankruptcy Court has also entered orders approving the retention by the Debtors of the following accounting firms: (i) Cherry, Bekaert & Holland, L.L.P. to provide audit and accounting services including with respect to the Debtors' reporting requirements under the Exchange Act, and (ii) The LSC Group LLC on a limited basis to provide calculation services in connection with the preparation of Accentia's financial statements for the fiscal year ended September 30, 2008.

**Appointment of Unsecured Creditors Committee**

On December 1, 2008, the United States Trustee appointed a committee of Creditors holding Unsecured Claims in the Bankruptcy Cases (the "Committee"). The initial members of the Committee were Midsummer Investment, Ltd., Whitebox Hedged High Yield Managers, LP, Rockmore Investment Master Fund, Ltd., Arbor Pharmaceuticals, Inc., and American Defense International, Inc. On June 9, 2009, the United States Trustee filed a notice with the Bankruptcy Court amending the membership of the Committee to remove Rockmore Investment Master Fund, Ltd. (who had resigned). On May 27, 2010, the United States Trustee filed a notice with the Bankruptcy Court further amending the membership of the Committee to remove American Defense International, Inc. (who had resigned).

**Retention of Professionals by the Committee**

The Bankruptcy Court has entered orders approving the retention of Olshan Grundman Frome Rosenzwieg & Wolosky LLP and Genovese Joblove & Battista, P.A. as counsel to the Committee.

**Schedules and Statements of Financial Affairs**

On December 5, 2008, each of the Debtors filed its Schedules and Statement of Financial Affairs with the Bankruptcy Court. Since that date, certain of the Debtors have filed amendments to their Schedules and Statements of Financial Affairs.

**Section 341 Meetings of Creditors**

On December 10, 2008, the United States Trustee convened meetings of Creditors in each of the Bankruptcy Cases pursuant to Section 341 of the Bankruptcy Code.

**List of Equity Security Holders**

On December 5, 2008, each of Accentia and Biovest, which are publicly-held companies, filed its list of equity security holders with the Bankruptcy Court.

**Non-Appointment of Equity Security Holders Committee**

The United States Trustee has not appointed a committee in the Bankruptcy Cases to represent the equity security holders of Accentia or Biovest.

**Use of Cash Collateral**

On December 15, 2008, the Bankruptcy Court entered a final order (the "December 15 Order") authorizing the Debtors' use of "cash collateral" (as defined in 11 U.S.C. §363(a)) for the period from the Petition Date through and including January 7, 2009 in accordance with budgets as submitted by the Debtors to Laurus/Valens and the Committee and attached to the December 15 Order. Since the entry of the December 15 Order, the Bankruptcy Court has held periodic hearings and entered numerous orders (those orders, together with the December 15 Order, are collectively referred to as the "Cash Collateral Order") authorizing the Debtors' continued use of cash collateral in accordance with rolling six-week budgets prepared by the Debtors and approved by Laurus/Valens and the Committee. Pursuant to the Cash Collateral Order, the Debtors can only use cash collateral to pay ordinary, necessary and reasonable operating expenses incurred by the Debtors in connection with the operation of their businesses as set forth in the budgets plus five percent (5%). In addition, pursuant to the Cash Collateral Order, for the purpose of providing adequate protection, Laurus/Valens and certain other Prepetition lenders listed therein were granted (retroactive to the Petition Date), as security, a replacement Lien on Postpetition collateral of equal extent, validity, priority, and dignity to their Prepetition Liens on the same collateral (excluding claims or causes of action under Chapter 5 of the Bankruptcy Code or the proceeds therefrom), such Lien to secure an amount equal to the

aggregate cash collateral used or consumed by the Debtors. The Debtors intend to continue seeking extensions for the use of cash collateral through the Effective Date.

**Debtor in Possession Financing for Biovest**

On December 22, 2008, the Bankruptcy Court entered an interim order (the "December 22 Order") approving a $3,000,000.00 debtor in possession credit facility (the "DIP Facility") from Corps Real, LLC (the "DIP Lender") to Biovest. Pursuant to the December 22 Order, Biovest was authorized to borrow up to $750,000.00 from the DIP Lender to fund Biovest's working capital and other needs as set forth in a budget attached to the December 22 Order. The DIP Facility is evidenced by a Secured Promissory Note dated December 22, 2008 and a Security Agreement dated December 22, 2008, each executed by Biovest in favor of the DIP Lender. Pursuant to the December 22 Order, Biovest (i) granted the DIP Lender a first priority priming Lien on and security interest in all of Biovest's Property, senior to all Prepetition and Postpetition Liens on any of Biovest's Property but subject to a carve-out for fees of Professionals and the United States Trustee, and (ii) granted the DIP Lender a Superpriority Claim against Biovest subject to such carve-out. The December 22 Order provided that the DIP Lender would not have any Lien on any claims, causes of action or rights of Biovest arising under Chapter 5 of the Bankruptcy Code, including Sections 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, and all proceeds or recoveries therefrom.

Subsequent to the entry of the December 22 Order, the Bankruptcy Court held a continued interim hearing on January 7, 2009, at which the Bankruptcy Court authorized Biovest to borrow an additional $250,000.00 under the DIP Facility in accordance with a budget submitted by Biovest. On February 6, 2009, the Bankruptcy Court entered an interim order authorizing such borrowing under substantially the same terms set forth in the December 22 Order (the "February 6 Order"). Since the entry of the February 6 Order, the Bankruptcy Court has held periodic hearings and entered numerous interim orders (those orders, together with the December 22 Order and the February 6 Order, are collectively referred to as the "DIP Financing Order") authorizing the DIP Facility in accordance with a rolling six-week budget prepared by Biovest and approved by Laurus/Valens and the Committee.

On July 31, 2009, Biovest filed a motion for authority to borrow up to an additional $640,000.00 from the DIP Lender under the DIP Facility in accordance with the terms and conditions set forth in the motion. On August 6, 2009, the Bankruptcy Court entered an interim order granting the motion and authorizing the additional borrowing under substantially the same terms as set forth in the December 22 Order.

As of the date of this Disclosure Statement, the DIP Advances totaled $~~1,390,000.00 (excluding accrued and unpaid interest) and an additional $250,000.00 has been authorized in the DIP Financing Order to be advanced by the DIP Lender to Biovest.~~1,640,000.00. The DIP Advances may increase by another $~~1,610,000.00 (which includes the previously authorized amount of $250,000.00)~~1,360,000.00 to a total of $3,000,000.00, prior to or after the Effective Date, with the consent of the DIP Lender. Any request for additional advances above the $1,640,000.00 previously authorized by the Bankruptcy Court will be pursuant to a motion filed by Biovest with the Bankruptcy Court, with notice to all of the Notice Parties. As of the date of the Disclosure Statement, Biovest anticipates that it will file a motion with the Bankruptcy Court

in the near future to request an additional advance of $250,000.00 under the DIP Facility during the month of August 2010. As set forth in the Laurus/Valens Compromise Motion, Laurus/Valens has agreed to support any request by Biovest seeking such additional advances, whether prior to or after the Effective Date, up to a maximum principal amount of $3,000,000.00 outstanding under the DIP Facility. The treatment of the Claims of the DIP Lender as to the DIP Facility is set forth in Article 3.3 of the Plan.

**Bar Dates**

On March 17, 2009, the Debtors filed a motion with the Bankruptcy Court seeking a bar date (or deadline) for the filing of Claims in the Bankruptcy Cases and approval of the form of notice of the bar date to be mailed to the Creditors of the Debtors. On April 8, 2009, the Bankruptcy Court entered an order establishing June 1, 2009 as the deadline for filing Claims against the Debtors by all Creditors (including Governmental Units). The order also approved the form and manner of notice of the June 1, 2009 bar date to be sent to all Creditors of the Debtors. On April 8, 2009, the Debtors mailed such notice and a Proof of Claim form to all Creditors of the Debtors.

The Court has not yet established a bar date for the filing of Adminstrative Expense Claims in the Biovest Bankruptcy Cases, but it is expected that such bar date will be set forth in the Disclosure Statement Approval Order.

**Amendment of Lease for Corporate Offices in Tampa, Florida**

Prior to the Petition Date, Accentia, pursuant to the terms of a lease with Hyde Park Plaza Associates, Ltd., leased approximately 9,835 square feet of space on the second and third floors in a building located at 324 Hyde Park Avenue in Tampa, Florida. The leased premises served as the corporate offices for the Debtors. The monthly rental for the leased premises was approximately $17,800.00 as of the Petition Date. Following the Petition Date, Accentia and the landlord entered into discussions for Accentia to utilize a smaller amount of space in the building at a reduced rental amount and, subject to the approval of the Bankruptcy Court, Accentia and the landlord entered into an amendment to the lease dated as of December 1, 2008. Pursuant to the terms of the amendment, Accentia agreed to lease premises of approximately 7,405 square feet in the building and pay rent in the amount of $13,573.50 per month. The term of the amendment is from December 1, 2008 through September 30, 2011. As part of this transaction, the landlord waived certain claims against Accentia with respect to amounts due under the lease, and the parties agreed that the amount of Prepetition rent due under the lease was $60,194.66. In February 2009, Accentia filed a motion with the Bankruptcy Court seeking approval of the amendment to the lease, which motion was granted by an order of the Bankruptcy Court.

**New Sublease for Analytica Offices in New York, New York**

Prior to the Petition Date, Analytica, pursuant to the terms of a lease with 460 Park Associates, leased approximately 13,800 square feet of space at 450 Park Avenue South, New York, New York for its offices. Following the Petition Date, Analytica and 460 Park Associates engaged in discussions for a restructuring of that lease but the parties were unable to reach an agreement. As a result, Analytica began looking for alternate space in New York and, upon

locating new space, filed a motion to reject the lease with 460 Park Associates. On April 30, 2009, Analytica filed a motion with the Bankruptcy Court for authority to enter into a sublease with P/S/L Group America Limited for the rentable area of the 8th floor of the building known as 24 West 40th Street, New York, New York. The term of the sublease will expire on May 30, 2014. The monthly rent under the sublease ranges from approximately $18,000.00 for the first year to $21,000.00 for the last year. Pursuant to the sublease, Analytica was required to deliver to the sublandlord a standby, unconditional, irrevocable, transferable letter of credit in the amount of $55,068.75 as a security deposit. In order to obtain the letter of credit, Wachovia Bank, National Association required that Analytica grant to Wachovia a first priority security interest in a certificate of deposit account at Wachovia in the minimum amount of $60,575.63. On May 7, 2009, the Bankruptcy Court entered an order granting the motion, which order authorized Analytica to enter into the sublease and also approved the Postpetition financing with Wachovia as to the letter of credit.

## New Sublease for Analytica Offices in Lorrach, Germany

Prior to December 2009, Analytica's operations in Germany had been conducted through its wholly-owned subsidiary, Analytica International GmbH, and consisted both of an Outcomes Research ("OR") group performing operations similar to those conducted by Analytica through its United States office as well as a Clinical Trials Services group, which is a business not engaged in by Analytica in the United States. As of December 1, 2009, Analytica consolidated its OR operations by hiring the employees of its German subsidiary engaged in the OR business, so that all of the OR business would be conducted through Analytica directly. In addition, it was becoming evident that Analytica's German subsidiary would need to file a petition in insolvency pursuant to German law and that the German subsidiary would be wound up and liquidated. As a result of the foregoing, Analytica had an immediate need to find office space to relocate its OR personnel in Germany so that they could continue to operate the OR business, service Analytica's clients, and generate revenue for Analytica. As a result, Analytica located new office space in Lorrach, Germany and executed a sublease for approximately 2,000 square feet of space. The initial term of the sublease will be for one (1) year and commence on March 1, 2010 and end on February 28, 2011. Analytica has the right to extend the term for one (1) additional year if the sublandlord and overlandlord agree and Analytica provides written notice of its desire to extend the term by no later than November 30, 2010. Analytica will pay the monthly amount of 3427.20 Euros (or US $4,661.00 based on a recent currency exchange rate) to the sublandlord for rent, utilities and other costs. On February 18, 2010, Analytica filed a motion with the Bankruptcy Court to approve the sublease, which motion was granted by an order of the Bankruptcy Court.

## Insurance Premium Finance Agreements

During the course of the Bankruptcy Cases, the Bankruptcy Court has entered several orders authorizing the Debtors to either assume or enter into insurance premium finance agreements with First Insurance Funding Corp. for the financing of premiums for various types of insurance coverage. The Debtors have made all required payments under those finance agreements.

## Settlement with Laurus/Valens

As discussed elsewhere in this Disclosure Statement, prior to the Petition Date, Biovest, as borrower, entered into a number of financing and other transactions with Laurus/Valens. For a detailed description of these transactions, Holders of Claims and Equity Interests are encouraged to read the Laurus/Valens Compromise Motion, which is on file with the Bankruptcy Court at Docket No. 627. Following extensive negotiations, the Debtors, the Accentia Debtors, and Laurus/Valens reached a compromise as to all disputes with respect to the Laurus/Valens Prepetition Claims and all disputes between Laurus/Valens and the Accentia Debtors (the "Laurus/Valens Settlement"). On April 16, 2010, the Debtors filed the Laurus/Valens Compromise Motion with the Bankruptcy Court, which sets forth the principal terms of the Laurus/Valens Settlement and includes substantially all of the documents to be executed by the Debtors, the Accentia Debtors, Laurus/Valens and certain other parties in order to consummate the Laurus/Valens Settlement (collectively, the "Laurus/Valens Settlement Documents"). On June 8, 2010, after notice and a hearing, the Bankruptcy Court entered the Laurus/Valens Compromise Order, which approved all of the terms of the Laurus/Valens Settlement. The closing of the Laurus/Valens Settlement (the "Closing") for both the Debtors and the Accentia Debtors must occur concurrently and will occur upon the Effective Date of the Plan and the effective date of the Accentia Plan and the satisfaction or waiver of the other conditions to Closing set forth in the Biovest Term Loan Agreement and in the Accentia Term Loan Agreement. The principal terms of the Laurus/Valens Settlement with the Debtors are summarized in Article 5.3 of the Plan.

**Settlement with BioDelivery Sciences International, Inc. and Arius Pharmaceuticals, Inc.**

On December 30, 2009, Accentia and TEAMM entered into an Emezine Settlement Agreement with BioDelivery Sciences International, Inc. and Arius Pharmaceuticals, Inc. (collectively, "BDSI") regarding a dispute under a March 2004 distribution agreement pursuant to which BDSI had granted TEAMM an exclusive license to sell, market, promote, and distribute a product for the treatment of nausea and vomiting known as Emezine following the approval of Emezine by the FDA. The Emezine product was not approved by the FDA, which triggered certain rights of TEAMM to receive equity in Arius Pharmaceuticals, Inc. After months of negotiations, the parties agreed on the following settlement terms: (i) BDSI would pay $2,500,000.00 in cash to TEAMM, (ii) TEAMM would be entitled to certain royalty rights to share in revenues from the sale and sublicensing of a new product of BDSI upon its approval by the FDA (the terms of such revenue sharing are set forth in the settlement agreement), (iii) in the event that either BioDelivery Sciences International, Inc. or Arius Pharmaceuticals, Inc. receives a bona fide offer from a third party to acquire all or substantially all of their respective assets or stock, BDSI will have the right, in its sole discretion, to terminate its payment and all other obligations relating to the product as described in subparagraph (ii) above, by payment to TEAMM of the greater of the fair market value of the product as determined by an independent firm or $4,500,000.00 in cash, and (iv) Accentia would sell and issue to BDSI a warrant to purchase 2,000,000 shares of Biovest Common Stock held by Accentia, such warrant to (a) be for a term of seven (7) years, (b) be fully vested, (c) have a strike price equal to 120% of the closing bid price for shares of the Biovest Common Stock on the date of the approval of the settlement by the Bankruptcy Court, and (d) have a cashless exercise feature. For the two year period immediately following approval by the Bankruptcy Court, BDSI must obtain the prior written approval of Biovest in order to exercise all or any portion of the warrant. At the end of

such two year period, Biovest is required to file a registration statement with the SEC covering the shares of Biovest Common Stock issuable under the warrant, which registration statement must remain effective for the remaining term of the warrant. On February 2, 2010, the Debtors filed a motion with the Bankruptcy Court to approve the settlement with BDSI. On February 17, 2010, the Bankruptcy Court entered an order granting the motion, and the settlement was thereafter consummated.

**Disputes with Collegium Pharmaceutical, Inc.; Collegium Adversary Proceeding**

In January 2009, Collegium Pharmaceutical, Inc. ("Collegium") filed a motion for relief from stay, requesting authority to proceed with a Prepetition arbitration proceeding to resolve issues under that certain Licensing and Distribution Agreement dated November 22, 2005 (the "Collegium Licensing Agreement") between Collegium and TEAMM. Pursuant to the Collegium Licensing Agreement, Collegium granted TEAMM an exclusive license to sell, market, and distribute Collegium's AllerNase AQ product. In the arbitration proceeding, Collegium was seeking (i) a determination that Collegium properly terminated the Collegium Licensing Agreement due to the failure of TEAMM to make a payment of $250,000.00 to Collegium and (ii) damages of at least $250,000.00. In a separate arbitration proceeding, Accentia and TEAMM were seeking an award from Collegium for damages of at least $1,500,000.00 incurred by Accentia and TEAMM as a result of the breach of the Collegium Licensing Agreement and negligent misrepresentation by Collegium. In March 2009, Collegium filed a motion with the Bankruptcy Court to compel the rejection of the Collegium Licensing Agreement or, alternatively, fixing the time for Accentia and TEAMM to assume or reject the Collegium Licensing Agreement.

On April 1, 2009, Accentia, TEAMM and Collegium entered into a settlement agreement to resolve certain of the outstanding disputes between the parties. The principal terms of the settlement agreement were as follows: (i) Collegium paid the cash sum of $100,000.00 to the Debtors, (ii) the Debtors retained the right to seek any monetary damages from Collegium available under applicable law or equitable principles (and expressly not against any licensees, transferees or purchasers of any intellectual property rights or other assets granted to the Debtors under the Collegium Licensing Agreement ), including, but not limited to, claims arising out of or relating to Collegium's conduct relating to or under the Collegium Licensing Agreement, alleged breach of the Collegium Licensing Agreement, alleged negligence in connection with or related to the Collegium Licensing Agreement and alleged misrepresentations, (iii) Collegium consented to the institution by the Debtors of an adversary proceeding in the Bankruptcy Court for the sole purpose of permitting the Debtors to pursue the claims described in subparagraph (ii) above against Collegium, (iv) in connection with any adversary proceeding, Collegium would retain all defenses available under applicable law including, but not limited to, the defenses of termination, setoff and recoupment; provided, however, that Collegium waived all rights to receive any affirmative recovery of money from the Debtors or their respective bankruptcy estates of any nature whatsoever on account of any rights, claims or defenses, including, but not limited to, any claim for milestone payments allegedly owed by the Debtors under the Collegium Licensing Agreement or any claims against any of the Debtors or their bankruptcy estates in the Bankruptcy Cases (including, but not limited to, any administrative expense or other priority claim, any claim for rejection damages, any claims arising prior to the Petition Date, or any claims scheduled by the Debtors in the Bankruptcy Cases), (v) the $100,000.00 payment to the

Debtors, as set forth above, would be credited to any recovery, if any, by the Debtors in any adversary proceeding, (vi) the arbitration proceedings were withdrawn, (vii) Collegium agreed to not file any Proofs of Claim in the Bankruptcy Cases (Collegium, in fact, withdrew its filed Proof of Claim), (viii) no party to the Collegium Licensing Agreement retained any remaining or future rights and/or obligations thereunder except as provided in the settlement agreement, and the Collegium Licensing Agreement was deemed rejected and terminated, and (ix) except as set forth above, the Debtors and Collegium released each other from all claims. On April 28, 2009, the Bankruptcy Court entered an order approving the settlement agreement, including the rejection of the Collegium Licensing Agreement.

On June 11, 2009, Accentia and TEAMM commenced Adversary Proceeding No. 8:09-ap-00377-KRM against Collegium seeking damages for breach of contract and negligent misrepresentation with respect to the Collegium Licensing Agreement. The Bankruptcy Court has set a trial for the week of ~~October 18–22,~~ December 6-9, 2010 for the adversary proceeding.

**Disputes with Phillip Rosensweig; Rosensweig Adversary Proceeding**

As stated above, Phillip Rosensweig ("Rosensweig") holds $300,000.00 of the 2008 Secured Debentures. In addition, Rosensweig has warrants to purchase 843,750 shares of Biovest Common Stock at an exercise price of $0.40 per share. Additionally, prior to the Petition Date, Rosensweig was issued approximately 947,867 shares of Biovest Common Stock, which upon information and belief have been liquidated. On February 12, 2010, Rosensweig filed a motion with the Bankruptcy Court seeking an order (i) compelling Biovest to convert his 2008 Secured Debentures into Biovest Common Stock and (ii) allowing him to exercise the warrants described above. The Debtors filed a response to the motion, requesting that the motion be denied on several grounds. The Court has not yet ruled on Rosensweig's motion and will consider it a future date dependent on the outcome of the adversary proceeding described in the next paragraph.

On March 4, 2010, Biovest commenced Adversary Proceeding No. 8:10-ap-00249-KRM against Rosensweig seeking (i) to avoid and recover transfers made and obligations incurred pursuant to which Rosensweig, in exchange for an unsecured one year loan of $300,000.00, received a total of 1,791,617 shares of Biovest Common Stock or warrants for the issuance of shares of Biovest Common Stock and a secured convertible note in the amount of $300,000.00, and (ii) a declaratory judgment that certain actions taken by Rosensweig constitute violations of the automatic stay. The Bankruptcy Court has not yet set a trial date for the adversary proceeding. While Biovest believes that it will be successful in the adversary proceeding, it is possible that the Bankruptcy Court could determine that the claims asserted by Rosensweig are valid and not subject to avoidance or recovery. <u>As of the date of this Disclosure Statement, the parties have reached an agreement in principle to settlement of the Rosensweig Adversary Proceeding.</u>

**Motion for Adequate Protection Filed by Cranshire Capital, L.P**

On April 27, 2009, Cranshire Capital, L.P. ("Cranshire") filed a motion for adequate protection with the Bankruptcy Court, requesting that the Bankruptcy Court enter an order directing Accentia to make monthly principal and interest payments to Cranshire, as adequate protection, under certain debentures issued to Cranshire prior to the Petition Date. Cranshire requested that such payments be made in unlegended shares of common stock of Accentia. The Debtors filed a response to the motion, requesting that the motion be denied on several grounds. On July 1, 2009, the Bankruptcy Court entered an order denying Cranshire's motion.

**Requests for Administrative Expense Claims**

On May 29, 2009, 460 Park Associates and 460 Park Avenue South Associates LLC filed a request for an Administrative Expense Claim in the amount of $162,378.26 for Postpetition rent and additional rent allegedly due under a nonresidential real property lease with Analytica in New York, New York. The request was filed following the rejection of this lease by Analytica (see "Rejection of Unexpired Leases of Nonresidential Real Property" below). This matter was subsequently settled by the parties under the following terms: (i) 460 Park Associates was permitted to apply one-half of a Prepetition letter of credit in the amount of approximately $88,000.00 to its Prepetition Claim and one-half to its Administrative Expense Claim, and (ii) with respect to the remaining balance of approximately $118,000.00 due on its Administrative Expense Claim, 460 Park Associates agreed to reduce it to $59,175.00 (which amount has been paid in full). 460 Park Associates filed a Claim for damages in connection with the rejection of the lease, and the Debtors are still evaluating the merits of that Claim.

On May 29, 2009, ARE-337 Plantation Street, LLC filed a request for an Administrative Expense Claim in the amount of $50,407.81 for Postpetition environmental remediation expenses allegedly due under a nonresidential real property lease with Biovest in Worcester, Massachusetts. The request was filed following the rejection of this lease by Biovest (see "Rejection of Unexpired Leases of Nonresidential Real Property" below). This matter was subsequently settled by the parties, with ARE-337 Plantation Street, LLC receiving an Allowed Administrative Expense Claim in the amount of $14,000.00 (which amount has been paid in full). ARE-337 Plantation Street, LLC filed a Claim for damages in connection with the rejection of the lease, and the Debtors are still evaluating the merits of that Claim.

**Rejection of Unexpired Leases of Nonresidential Real Property**

During the course of the Bankruptcy Cases, the Debtors filed motions with the Bankruptcy Court seeking authority (i) for Biovest to reject a lease with ARE-337 Plantation Street, LLC for premises in Worcester, Massachusetts, (ii) for AutovaxID to reject a lease with Spruce, LLC for premises in St. Louis, Missouri, (iii) for Accentia to reject a lease with We're Associates Company and a related sublease for premises located in Melville, New York, and (iv) for Analytica to reject a lease with 460 Park Associates and 460 Park Avenue South Associates LLC for premises in New York, New York, which motions have been granted by orders of the Bankruptcy Court.

## Rejection of Executory Contracts

During the course of the Bankruptcy Cases, the Debtors filed motions with the Bankruptcy Court to reject executory contracts with (i) DDN/Obergfel, LLC (services agreement for distribution of pharmaceutical products), and (ii) Catalent Pharma Solutions, LLC f/k/a Cardinal Health PTS, LLC (services agreements for supplies), which motions have been granted by orders of the Bankruptcy Court.

## Motion for Turnover of Stock Records

On September 10, 2009, the Debtors filed a motion seeking the turnover of the stock records and related documents for Accentia and Biovest from American Stock Transfer & Trust Company ("AST") to their new transfer agent, StockTrans, Inc. AST had refused to turn over the stock records due to non-payment of Prepetition invoices and alleged unpaid contract termination fees. On September 16, 2009, the Bankruptcy Court entered an order directing that AST turn over the records to StockTrans, Inc.

## Extension of Exclusivity Periods

Under Section 1121 of the Bankruptcy Code, the exclusive periods in which only the Debtors may file a plan of reorganization under Section 1121(b) of the Bankruptcy Code (the "Proposal Period") and solicit acceptances thereof under Section 1121(c)(3) of the Bankruptcy Code (the "Solicitation Period") were to expire initially on March 10, 2009 and May 9, 2009, respectively. On February 16, 2009, the Debtors filed a motion with the Bankruptcy Court seeking an extension of such periods. On March 25, 2009, the Bankruptcy Court entered its order pursuant to Section 1121(d) of the Bankruptcy Code extending the Proposal Period to July 8, 2009 and extending the Solicitation Period to September 6, 2009. Thereafter, the Debtors filed a second motion with the Bankruptcy Court seeking further extensions of such periods. On July 23, 2009, the Bankruptcy Court entered its order pursuant to Section 1121(d) of the Bankruptcy Code extending the Proposal Period to September 30, 2009 and extending the Solicitation Period to December 29, 2009. Following the entry of that order, the Debtors and Laurus/Valens entered into a series of joint stipulations (all of which have been approved by the Bankruptcy Court) extending the exclusive periods while the parties sought to reach a settlement of their disputes, with the last joint stipulation extending the Proposal Period through June 4, ~~2010 and~~2010. By order of the Bankruptcy Court dated August 9, 2010, the Solicitation Period has been extended through ~~August 3,~~September 30, 2010. Biovest and its subsidiaries filed their joint plan of reorganization with the Bankruptcy Court on May 14, 2010. Accentia and its subsidiaries filed their joint plan of reorganization with the Bankruptcy Court on May 28, 2010.

## Engagement of ROTH Capital Partners, LLC

On July 23, 2010, Biovest filed a motion with the Bankruptcy Court to engage ROTH Capital Partners, LLC ("ROTH") for the purpose of procuring the Exit Financing for Biovest (see Docket No. 785). On July 14, 2010, Biovest and ROTH entered into a letter agreement setting forth the terms of the engagement (the "LetterAgreement"). Under the terms of the Letter Agreement, Biovest has agreed to engage ROTH, for a period of sixty (60) days from July 14, 2010 (the "Engagement Period"), as its exclusive placement agent or underwriter in connection

with a private placement (the "Private Placement") of Biovest Common Stock and warrants to purchase Biovest Common Stock (the "Warrants"). ROTH is not being engaged in connection with any equity securities of Biovest being offered under the Plan, and nothing contained in the Letter Agreement will restrict Biovest's ability to issue equity securities to its Creditors and stockholders under the Plan. The pertinent terms and conditions of the Letter Agreement are as follows:

a.  In connection with the Private Placement, ROTH will prepare a placement agency agreement (the "Placement Agency Agreement") between ROTH and Biovest covering the sale of Biovest Common Stock and the Warrants and containing customary terms and conditions. The Placement Agency Agreement will provide for a commission to ROTH consisting of a cash payment equal to 6.5% of the total gross proceeds from the Private Placement plus 6.5% of the Warrants issued in the Private Placement. For purposes of the Letter Agreement, the term "gross proceeds" means the proceeds actually received by Biovest on the closing date from the Private Placement, excluding any proceeds received from exercise of the Warrants. As to any investor identified on Exhibit A to the Letter Agreement, the commission payable to ROTH from proceeds received from any such investor in connection with the Private Placement, including any such proceeds during the Tail Period (as defined below), shall be reduced both as to cash and Warrants by 25%. The Placement Agency Agreement will provide for, and closing of the Private Placement will be conditioned upon, approval by the Bankruptcy Court, delivery to ROTH of customary legal opinions from Biovest's counsel, including traditional negative assurance, and a customary comfort letter from Biovest's independent public accountants. In addition, Biovest has agreed not to issue or sell any equity or equity-linked securities (other than equity securities under the Plan and equity securities under existing warrants and stock option plans) for thirty (30) days after the closing date at less than the offering price in the Private Placement, and the officers and directors of Biovest will agree not to sell or dispose of any shares of Biovest Common Stock during this period (except as provided in the Plan).

b.  In the event of any termination of the Letter Agreement, other than by ROTH, ROTH shall be entitled to a placement agent or underwriter's fee and Warrants, calculated as described in subparagraph a. above, with respect to any proceeds received by Biovest from investors introduced by ROTH in connection with the Private Placement, to the extent that such offering is consummated or a written agreement for sale of securities is entered into within the six (6) month period following the termination of the Letter Agreement (the "Tail Period"). For purposes of the Letter Agreement, an "investor introduced by ROTH" (excluding those listed on Exhibit A to the Letter Agreement) shall be defined as an investor, introduced by ROTH, with whom a substantive meeting has taken place involving executive officers of Biovest, either in person or by telephone, during the term of the Letter Agreement.

c.  In addition to the compensation payable to ROTH pursuant to the Placement Agency Agreement, and provided that the Private Placement is consummated, Biovest will reimburse ROTH for reasonable and documented out-of-pocket

expenses incurred by ROTH in connection with the engagement, including fees and disbursements of its counsel, up to a maximum of $30,000. Such reimbursement shall be payable from the proceeds of the Private Placement.

d.  Biovest has agreed to indemnify ROTH and its affiliates as set forth in Exhibit I attached to the Letter Agreement.

e.  In the event that the Letter Agreement is not terminated by ROTH, and provided that the Private Placement is consummated as contemplated therein, if, during the Engagement Period and for a period of 12 months thereafter, Biovest decides to (i) pursue any private placement not contemplated by the Letter Agreement, or (ii) pursue any public offering of equity, equity-linked or debt securities, then Biovest shall offer ROTH the opportunity to act as the exclusive or co-placement agent or underwriter, as applicable, for any such financing, under a separate agreement containing terms and conditions customary for ROTH and mutually agreed upon by Biovest and ROTH.

f.  Either party may terminate the Letter Agreement upon written notice to the other party; provided, however, that the provisions of Sections 3 through 10 of the Letter Agreement (including the indemnification provisions set forth in Exhibit I) shall survive termination of the Letter Agreement.

g.  Any dispute between Biovest and ROTH to be resolved before the Effective Date will be resolved by the Court, and any dispute to be resolved after the Effective Date will be resolved through binding arbitration with the venue to be in Los Angeles County, California.

On August 9, 2010, the Bankruptcy Court entered an order approving the terms of the Letter Agreement.

## Claims Objections

There are hundreds of filed and scheduled claims in the Bankruptcy Cases. The Debtors are currently reviewing and analyzing the filed and scheduled Claims in the Bankruptcy Cases in order to determine the necessity of filing objections to such Claims. The Debtors have already started the process of filing objections to Claims in the Biovest Bankruptcy Cases.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES

## General

The tax consequences of the Plan to the Debtors and to Holders of Claims and Equity Interests (collectively, "Holders") are discussed below. This discussion of the federal income tax consequences of the Plan to the Debtors and Holders under U.S. federal income tax law, including the Internal Revenue Code of 1986, as amended (the "Tax Code"), is provided for informational purposes only. While this discussion addresses certain of the material tax consequences of the Plan, it is not a complete discussion of all such consequences and is subject

to substantial uncertainties. Moreover, the consequences to a Holder may be affected by matters not discussed below (including, without limitation, special rules applicable to certain types of persons, such as persons holding non-vested stock or otherwise subject to special rules, nonresident aliens, life insurance companies, and tax-exempt organizations) and by such Holder's particular tax situation. In addition, this discussion does not address any state, local, or foreign tax considerations that may be applicable to particular Holders.

**HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.**

**THE DEBTORS' GENERAL BANKRUPTCY COUNSEL HAS NO TAX EXPERTISE AND HAS NOT RESEARCHED OR ANALYZED TAX CONSEQUENCES RESULTING FROM THE PLAN.**

**SOME OF THE ISSUES DISCUSSED BELOW ARE COMPLEX, AND THERE CAN BE NO ASSURANCE OF THE ACCURACY OF THIS INFORMATION.**

## General Federal Income Tax Consequences to Holders

*In General.* The following discussion addresses certain of the material consequences of the Plan to Holders. Under the Plan, the tax consequences of the Plan to a Holder will depend, in part, on the type of consideration received in exchange for the Claim or Equity Interest and the tax status of the Holder, such as whether the Holder is an individual, corporation or other entity, whether the Holder is a resident of the United States, the accounting method of the Holder, and the tax classification of the Holder's particular Claim or Equity Interest. **HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIM OR EQUITY INTEREST.**

*Tax Consequences to Holders of Claims and Equity Interests.* The Holders of Claims against and Equity Interests in the Debtors are urged to consult with their tax advisors as to the consequences of the Plan to them. Among the issues the Holders of Claims and/or Equity Interests and their advisors may wish to consider are:

(1)     The extent to which the Holder of a Claim and/or Equity Interest is entitled to a bad debt deduction or a worthless securities loss.

(2)     The extent to which the Holder of a Claim or Equity Interest recognizes gain or loss on the exchange of its Claim or Equity Interest for property, debt, and stock of the Debtors and the character of that gain or loss.

(3)     The basis and the holding period for any property, debt, and stock received by the Holder of a Claim or Equity Interest.

(4)     Whether the original issue discount rules, market discount rule, and amortizable bond premium rules apply to any debt received by the Holder of a Claim or Equity Interest.

(5)     The treatment of property, stock, or debt, if any, received by the Holder of a Claim or Equity Interest in satisfaction of accrued interest.

(6)     The effect of a Holder of a Claim or Equity Interest receiving deferred distributions or distributions that are contingent in amount.

**Certain Federal Income Tax Consequences to the Debtors**

*Reduction of Tax Attributes and Cancellation of Debt.*  The operation of the Debtors' businesses has resulted in significant losses.  These losses have been reported on the consolidated federal income tax returns of the Debtors as those returns have been filed.  Issues related to the preservation of the Debtors' net operating losses are complex and are still undergoing analysis and review by tax professionals.  The information discussed below summarizes the current status of this analysis; the Debtors, however, reserve the right to modify or further amend such information.

Taxpayers are generally required to recognize taxable income as a result of cancellation of debt.  The receipt of borrowed funds is not subject to tax, on the premise that the debtor will repay them.  If the debt is cancelled without repayment, the recognition of income takes into account the debtor's receipt of the borrowed funds.

Special rules, however, apply to the cancellation of debt in a bankruptcy proceeding. Generally, a debtor in a bankruptcy case is not required to recognize income from the cancellation of debt.  However, the debtor has to pay for this exclusion by reducing specified tax attributes, such as any net operating loss ("NOL") incurred by the taxpayer in the year that the debt discharge occurs, any NOL carryovers to that year, and tax credit and capital loss carryforwards.

Based on the assumed reorganization value of the Debtors, it is anticipated that the Debtors will recognize cancellation of indebtedness income.  Because the discharge of indebtedness will occur in bankruptcy, the Debtors will not be subject to tax on this income, but will be required to reduce their tax attributes by the amount excluded from their income.  The Debtors have NOL carryforwards as of September 30, 2009, and expect to incur further NOLs during their current taxable year.  Thus, after reduction for the excluded cancellation of indebtedness income, the Debtors still expect to have NOL carryforwards remaining.  Many of these NOL carryforwards may be subject to limitation as a result of prior changes in ownership of the stock of the Debtors under the rules described in the following section.  The Plan has been structured to comply with the exceptions to the change in ownership limitations imposed by the Tax Code, as the Debtors believe that the recipients of the newly issued common stock of the Reorganized Parent would meet such exceptions.  Any additional issuances of common stock that do not meet the criteria provided for in the Tax Code would impose an additional limitation under those rules on the Debtors' ability to use these NOL carryforwards to offset income earned after confirmation of the Plan.

*Limitation on NOL Carryforwards and Other Tax Attributes.*  To deter "trafficking" in NOL carryforwards, Section 382 of the Tax Code limits a corporation's ability to use losses

incurred before an "ownership change" to offset income earned thereafter. A similar limitation applies to tax credits. In general, an ownership change occurs if more than fifty percent (50%) of the stock of a corporation changes hands within a three-year period.

If an ownership change occurs, the corporation can use pre-change NOL carryforwards to offset only an amount of income each year equal to the value of the stock of the corporation immediately before the ownership change multiplied by a prescribed interest rate. The limitation is intended to estimate the earning power of the corporation's pool of capital at the time of the ownership change. The limitation thus prevents the use of pre-change NOL carryforwards to offset income from new capital contributed by the new owners.

Special rules apply, however, in the case of ownership changes that occur in a bankruptcy proceeding. Under the general rules, the annual limitation usually would be quite low, because the corporation's stock immediately before the ownership change often has little or no value. Essentially eliminating the NOL carryforwards of a corporation in bankruptcy could hinder the corporation's ability to reorganize successfully, contrary to the goals of the federal bankruptcy laws. Therefore, Congress provided special bankruptcy rules in Section 382. If an ownership change occurs in bankruptcy, Section 382(l)(6) allows the corporation, in computing the annual limitation on the use of NOL carryforwards, to increase its value to reflect the cancellation of claims in the bankruptcy reorganization. The regulations provide for this result by using as the value of corporation the lesser of the value of its gross assets immediately before the ownership change or the value of its stock immediately thereafter. This amount is multiplied by the prescribed interest rate to arrive at the annual limitation on the amount of income that can be offset by pre-change NOL carryforwards.

Another special rule, provided in Section 382(l)(5), applies if at least fifty percent (50%) of the corporation's stock immediately after the ownership change is owned by persons who were shareholders or creditors of the corporation immediately before the ownership change. For purposes of computing the fifty-percent threshold, however, stock issued to creditors who own at least five percent (5%) of the corporation's stock after the ownership change is taken into account only if the creditor held its claim for at least eighteen months before filing of the bankruptcy petition or if the claim arose in the ordinary course of the corporation's business and was owned at all times by the same person. When the conditions of Section 382(l)(5) are met, the annual limitation on NOL carryovers does not apply. Instead, the corporation is required to reduce its NOL carryforwards by the amount of deductions claimed in the prior three years for interest on debt that is exchanged for stock in the bankruptcy reorganization. The corporation can then use its remaining NOL carryforwards to offset future income without limitation. Even if the corporation qualifies for the special rule of Section 382(l)(5), it can still elect to apply instead the general bankruptcy rule of Section 382(l)(6), under which an annual limitation applies, but is computed under special rules taking into account the effect of the cancellation of claims on the value of the corporation.

Any limitation on NOL carryforwards that may result from the ownership change will probably also apply to "built-in" losses and deductions that accrued economically before the ownership change but are not taken into account under tax accounting rules until after the ownership change.

PERSONS CONCERNED WITH THE TAX CONSEQUENCES OF THE PLAN SHOULD CONSULT THEIR OWN ACCOUNTANTS, ATTORNEYS AND/OR ADVISORS. THE DEBTORS MAKE THE ABOVE-NOTED DISCLOSURE OF POSSIBLE TAX CONSEQUENCES FOR THE SOLE PURPOSE OF ALERTING READERS TO TAX ISSUES THEY MAY WISH TO CONSIDER. THE DEBTORS CANNOT AND DO NOT REPRESENT THAT THE TAX CONSEQUENCES MENTIONED ABOVE ARE COMPLETELY ACCURATE BECAUSE, AMONG OTHER THINGS, THE TAX LAW EMBODIES MANY COMPLICATED RULES THAT MAKE IT DIFFICULT TO STATE ACCURATELY WHAT THE TAX IMPLICATIONS OF ANY ACTION MIGHT BE.

## VOTING ON AND CONFIRMATION OF THE PLAN

### Confirmation and Acceptance by All Impaired Classes

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all of the requirements of Bankruptcy Code Section 1129 are met. Among the requirements for confirmation of a plan are that the plan be accepted by all impaired classes of claims and equity interests, and satisfaction of the matters described below.

*Feasibility.* A plan may be confirmed only if it is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor. The Debtors believe that they will be able to perform their obligations under the Plan without further financial reorganization.

The Plan basically provides for payment in full of Allowed Claims, including contingent, unliquidated and Disputed Claims to the extent they become Allowed Claims, in the order of their priority. At the present time, the Debtors believe that Reorganized Biovest will have sufficient funds, as of the Effective Date, to pay in full the expected payments required under the Plan to the Holders of Allowed Administrative Expense Claims (including Allowed Administrative Expense Claims of Professionals), Allowed Secured Tax Claims in Class 5, and Allowed Unsecured Convenience Claims in Class 9. Cash payments to be made under the Plan after the Effective Date to the Holders of Allowed Priority Tax Claims and Allowed Claims in Classes 1, 2, 4, 6, 7, 8, and 11 will be derived from the operations of Reorganized Biovest or from any new capital or financing raised by Reorganized Biovest, in each case as shown in the Projections. Accordingly, the Debtors believe that the Plan is per se feasible.

*Best Interests Standard.* The Bankruptcy Code requires that the Plan meet the "best interest" test, which requires that members of a Class must receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtors were liquidated under Chapter 7 on the same date. The Debtors believe that Distributions to all Impaired Classes of Claims in accordance with the terms of the Plan would exceed the net distribution that would otherwise take place in Chapter 7. See "ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN— Liquidation under Chapter 7 or Chapter 11."

### Confirmation Without Acceptance by All Impaired Classes

If one or more of the Impaired Classes of Claims or Equity Interests does not accept the Plan, the Plan may nevertheless be confirmed and be binding upon the non-accepting Impaired Class under the "cram-down" provisions of the Bankruptcy Code, if the Plan does not "discriminate unfairly" and is "fair and equitable" to the non-accepting Impaired Classes under the Plan.

*Discriminate Unfairly.* The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting class must be treated equally with respect to other classes of equal rank. The Debtors believe that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests because no class is afforded treatment which is disproportionate to the treatment afforded other Classes of equal rank.

*Fair and Equitable Standard.* The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting class receive full compensation for its allowed claims or interests before any junior class receives any distribution. The Debtors believe the Plan is fair and equitable to all Classes pursuant to this standard.

With respect to the Impaired Classes of Unsecured Claims, Bankruptcy Code Section 1129(b)(2)(B) provides that a plan is "fair and equitable" if it provides that (i) each holder of a claim of such a class receives or retains on account of such claim, property of a value as of the effective date of the plan equal to the allowed amount of such claim; or (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or interest. The Debtors believe that the Plan meets these standards.

With respect to Impaired Classes of Equity Interests, Bankruptcy Code Section 1129(b)(2)(C) provides that a plan is "fair and equitable" if it provides that (i) each stockholder receives or retains on account of its stockholder interest, property of a value equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest, or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan. The Debtors believe that the Plan meets these standards.

Accordingly, if necessary, the Debtors believe that the Plan meets the requirements for Confirmation by the Bankruptcy Court, notwithstanding the non-acceptance by an Impaired Class of Claims or Equity Interests.

The Debtors intend to evaluate the results of the balloting and determine whether to seek Confirmation of the Plan in the event that less than all the Impaired Classes of Claims or Equity Interests do not vote to accept the Plan. The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

**Absolute Priority Rule**

The Bankruptcy Code and other applicable law establishes the priority for distribution of funds in bankruptcy cases. These priority provisions are sometimes referred to as the "absolute priority" rule. Normally, and subject to exceptions not relevant here, valid secured claims are

first paid to the extent of the amount of the claim or the value of the claimant's collateral (if less than the claim).

Any property in the bankruptcy estate, net of the valid secured claims described above, is first distributed to holders of priority claims, including (a) the costs of administering the bankruptcy case, including the cost of operating the Debtors' businesses during the Bankruptcy Cases; (b) certain wage and benefit claims; and (c) certain tax claims. After payment of priority claims, unsecured creditors share pro rata in the remaining funds until paid in full. Equity holders (i.e., stockholders) are paid only after all creditors have been paid.

**Non-Confirmation of the Plan**

If the Plan is not confirmed by the Bankruptcy Court, the Court may permit the filing of an amended plan, dismiss the cases, or convert the cases to Chapter 7. In a Chapter 7 case, the Debtors' assets would be sold and distributed to the Unsecured Creditors after the payment of all Secured Claims, costs of administration and the payment of priority claims.

The cost of distributing the Plan and this Disclosure Statement, as well as the costs, if any, of soliciting acceptances, will be borne by the Debtors.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the potential alternatives include (a) alternative plans under Chapter 11 (including a liquidation plan), (b) dismissal of the cases, or (c) conversion of the cases to cases under Chapter 7 of the Bankruptcy Code.

**Alternative Plans of Reorganization**

If the Plan is not confirmed, the Debtors or, subject to further determination by the Bankruptcy Court as to extensions of exclusivity under the Bankruptcy Code, any other party in interest in the Bankruptcy Cases could attempt to formulate and propose a different plan or plans. Such plans might involve an orderly liquidation of their assets, or a combination thereof. The Debtors believe that the Plan will enable Creditors to be paid the maximum amount possible for their Allowed Claims.

**Liquidation under Chapter 7 or Chapter 11**

If a plan is not confirmed, the Bankruptcy Cases may be converted to Chapter 7 liquidation cases. In a Chapter 7 case, a trustee would be elected or appointed to liquidate the assets of the Debtors. The proceeds of the liquidation would be distributed to the Creditors and Holders of Equity Interests of the Debtors in accordance with the priorities established by the Bankruptcy Code. Because the Liens of Laurus/Valens and the DIP Lender under the DIP Loan Documents exceed the value of the Debtors' assets, there would likely be no distribution in Chapter 7 to Unsecured Creditors. The Debtors have attached hereto as <u>Exhibit 2</u> a Liquidation

Analysis as of ~~June 30,~~ July 31, 2010 which shows that Unsecured Creditors would receive no distribution in a Chapter 7 proceeding.

In general, the Debtors believe that liquidation under Chapter 7 would result in diminution of the value of the interests of the Creditors because of (a) additional administrative expenses involved in the appointment of a trustee and attorneys, accountants and other professionals to assist such trustee; (b) additional expenses and claims, some of which might be entitled to priority, which would arise by reason of the liquidation; (c) failure to realize the full value of the Debtors' assets; (d) the inability to utilize the work product and knowledge of the Debtors and the Committee and their respective Professionals; (e) the substantial delay which would elapse before Creditors would receive any distribution in respect of their Claims; and (f) the loss to Unsecured Creditors and Holders of Class 12 Equity Interests of any ongoing equity interest in Reorganized Biovest.

In a liquidation under Chapter 11, the Debtors' assets would be sold in an orderly fashion over a more extended period of time than in liquidation under Chapter 7. The Debtors believe that the Plan is superior to liquidation under Chapter 7 or Chapter 11.

## SUMMARY, RECOMMENDATION AND CONCLUSION

The Plan provides for an orderly and prompt distribution to Holders of Allowed Claims and Allowed Equity Interests against the Debtors. The Debtors believe that their efforts to maximize the return for Creditors and Holders of Equity Interests have been full and complete. The Debtors further believe that the Plan is in the best interests of all Creditors and Holders of Equity Interests. In the event of a liquidation of the Debtors' assets under Chapter 7 of the Bankruptcy Code, the Debtors believe there would be no distribution to Unsecured Creditors and, in addition, Unsecured Creditors and the Holders of Equity Interests would not receive the value attributable to the Reorganized Biovest Common Stock. For these reasons, the Debtors urge that the Plan is in the best interests of all Creditors and Holders of Equity Interests and that the Plan be accepted.

Dated as of ~~June 30,~~ August 9, 2010   Respectfully submitted,

BIOVEST INTERNATIONAL, INC.

By: _____
   David Moser, Secretary


BIOVAX, INC.

By: _____
   David Moser, Secretary


AUTOVAXID, INC.

By: _____
   David Moser, Secretary


BIOLENDER, LLC

By: _____
   David Moser, Secretary of
   Biovest International, Inc., Member


BIOLENDER II, LLC

By: _____
   David Moser, Secretary of
   Biovest International, Inc., Member


_____
Charles A. Postler (Florida Bar No. 455318)
STICHTER, RIEDEL, BLAIN & PROSSER, P.A.
110 East Madison Street, Suite 200
Tampa, Florida 33602
Telephone: (813) 229-0144
Facsimile: (813) 229-1811
Email: cpostler@srbp.com
Counsel for Debtors and Debtors in Possession

116

# **EXHIBIT 1**

Cash Flow Projections for Reorganized Biovest for the Fiscal Quarters Ended ~~September 30,~~ December 31, 2010 through ~~December~~March 31, ~~2013~~2014

## EXHIBIT 2

Liquidation Analysis as of ~~June 30,~~ July 31, 2010

# SCHEDULE 1

MASTER SERVICE LIST
ACCENTIA BIOPHARMACEUTICALS, INC.
08/09/2010

Charles A. Postler, Esq.
Stichter, Riedel, Blain & Prosser, P.A.
110 Madison Street, Suite 200
Tampa, FL 33602

Accentia Biopharmaceuticals, Inc.
Attn: Samuel S. Duffey
324 South Hyde Park Avenue
Suite 350
Tampa , FL 33606

Office of the United States Trustee
501 East Polk Street, Suite 1200
Tampa, FL 33602

Securities and Exchange Commission
c/o Susan R. Sherrill-Beard
3475 Lenox Road, N.E., Suite 1000
Atlanta, GA 30326-1232

Honorable Eric H. Holder, Jr.
U.S. Attorney General
Department of Justice - Room 4400
950 Pennsylvania Avenue NW
Washington, DC 20530-0001

Internal Revenue Service
Spec Proc Br MC 5720 P&I I
400 W. Bay St., Ste 35045, Bkcy Sect
Jacksonville, FL 32202-4437

Florida Department of Revenue
P.O. Box 6668
Tallahassee FL 32314-6668

Stuart Komrower, Esq.
Cole, Schotz, Meisel, et al.
Court Plaza North
25 Main Street
Hackensack, NJ 07601

Adam H. Friedman, Esq.
Olshan Grundman Frome, et al.
Park Avenue Tower
65 East 55th Street
New York, NY 10022

Paul J. Battista, Esq.
Genovese Joblove & Battista, P.A.
Bank of America Tower
100 SE 2nd Street, 44th Floor
Miami, FL 33131

Tina M. Talarchyk, Esq.
McDonald Hopkins, LLC
505 South Flagler Drive
Suite 300
West Palm Beach, FL 33401

Christine R. Etheridge
Bankruptcy Administration
IKON Financial Services
1738 Bass Road
P.O. Box 13708
Macon, GA 31208-3708

Sheryl L. Moreau
Special Assistant Attorney General
Missouri Department of Revenue
301 W. High Street, Room 670
P.O. Box 475
Jefferson City, MO 65105-0475

Dale Willenbring, Portfolio Manager
Whitebox Hedged High Yield Partners, LP
3033 Excelsior Blvd.
Suite 300
Minneapolis, MN 55416

Joshua Thomas, Portfolio Manager
Midsummer Investment, Ltd.
295 Madison Ave
38th Floor
New York, NY 10017

Jarrett Disbrow, President
Arbor Pharmaceuticals, Inc.
4505 Falls of Neuse Rd.
Suite 420
Raleigh, NC 27609

Brian S. Behar, Esq.
Behar, Gutt & Glazer, P.A.
2999 N.E. 191st Street, Fifth Floor
Aventura, FL 33180

William C. Crenshaw, Esq.
Akerman Senterfitt LLP
750 9th Street N.W., Suite 750
Washington, DC 20001

W. Bard Brockman
Gwendolyn J. Godfrey
Powell Goldstein LP
One Atlantic Center, 14th Floor
1201 West Peachtree Street, NW
Atlanta, GA 30309-3488

Michael H. Resnikoff, Esq.
Dreier LLP
499 Park Avenue
New York, NY 10022

Robert B. Glenn, Esq.
Glenn Rasmussen Fogarty & Hooker, P.A.
100 South Ashley Drive, Suite 1300
Tampa, FL 33602

Samuel J. Zusmann, Jr., Esq.
Holland & Knight LLP
a/f Collegium Pharmaceutical, Inc.
200 S. Orange Avenue, Suite 2600
Orlando, FL 32802-1526

Edward M. Fitzgerald, Esq.
Holland & Knight LLP
a/f Collegium Pharmaceutical, Inc.
200 S. Orange Avenue, Suite 2600
Orlando, FL 32802-1526

James L. Fly, Esq.
Holland & Knight LLP
a/f Collegium Pharmaceutical, Inc.
200 S. Orange Avenue, Suite 2600
Orlando, FL 32802-1526

Robert C. Edmundson, Esq.
Senior Deputy Attorney General
Counsel to Pennsylvania, Dept. of Revenue
5th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA 15219

Frank F. McGinn, Esq.
Bartlett Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

American Express Travel Related Svcs Co.
 Inc. Corp. Card
c/o Becket and Lee LLP
Gilbert B. Weisman, Esq.
P. O. Box 3001
Malvern, PA 19355-0701

Alvin F. Benton, Jr., Esq.
Holland & Knight, LLP
a/f Collegium Pharmaceutical, Inc.
200 S. Orange Avenue, Suite 2600
Orlando, FL 32802-1526

Jose I. Moreno, Esq.
240 NW 76th Drive, Suite D
Gainesville, FL 32607

Brian G. Rich, Esq.
Berger Singerman, P.A.
125 South Gadsden Street, Suite 300
Tallahassee, FL 32301

Robert D. Zebro, Esq.
Akerman Senterfitt
SunTrust Financial Centre, Suite 1700
401 E. Jackson Street
Tampa, FL 33602

Maria K. Pum, Esq.
Henderson, Caverly, Pum & Charney LLP
P.O. Box 9144
Rancho Sante Fe, CA 92067-9144

Mike Heffernan
Collegium Pharmaceutical, Inc.
400 Highland Corporate Drive
Cumberland, RI 02864

Noel R. Boeke, Esq.
Holland & Knight LLP
P.O. Box 1288
Tampa, FL 33601-1288

Robert T. Doty
Assistant Attorney General
Ohio Dept of Jobs and Family Services
One Government Center, Suite 1240
Toledo, OH 43604-2261

John D. Emmanuel, Esq.
Fowler White Boggs P.A.
P.O. Box 1438
Tampa, FL 33601

Philip E. Rosensweig
7035 Spyglass Avenue
Parkland, FL 33076

Francis L. Carter, Esq.
Katz Barron Squitero Faust
2699 S. Bayshore Dr., 7th Floor
Miami, FL 33133

BAM Opportunity Fund LP
44 Wall Street
Suite 1603
New York, NY 10005

BioHedge Holdings Limited
175 Bloor Street
South Tower, Suite 807
Toronto ON M4W3R8
CANADA

Roswell Capital Partners
c/o BridgePointe Master Fund
Attn: Brad Hathom
1120 Sanctuary Parkway, Suite 325
Alpharetta, GA 30009

Cranshire Capital, L.P.
3100 Dundee Rd.
Suite 703
Northbrook, IL 60015

Crescent International, Ltd.
84 Av. Louis-Casai
Cointrin/Geneva CH-1216
SWITZERLAND

Dell Financial Services, L.P.
12234 North IH-35
Building B
Austin, TX 78753

Diamond Opportunity Fund, LLC
500 Skokie Blvd
Suite 300
Northbrook, IL 60062

GCA Investment Fund Limited
12 Church Street
Mechanic Bldg
Hamilton HM11
BERMUDA

GPC LIX LLC
3033 Excelsior Blvd.
Suite 300
Minneapolis, MN 55416

Guggenheim Porfolio Company XXXI, LLC
3033 Excelsior Blvd.
Suite 300
Minneapolis, MN 55416

Hudson Bay Fund, LP
120 Broadway
40th Floor
New York, NY 10271

Laurus Master Fund, Ltd.
335 Madison Avenue
10th Floor
New York, NY 10017

Lloyd I. Miller
4550 Gordon Dr.
Naples, FL 34102

McKesson Corporation
One Post Street
20th Floor
San Francisco, CA 94104

Pandora Select Partners, LP
3033 Excelsior Blvd.
Suite 300
Minneapolis, MN 55416

Psource Structured Debt Limited
Two Enbarcadero Center
Suite 2220
San Francisco, CA 94111

Rockmore Investment Master Fund, Ltd.
150 East 58th Street
New York, NY 10155

Rosalind Capital Partners, L.P.
175 Bloor Street
South Tower, Suite 807
Toronto ON M4W3R8
CANADA

RRC BioFund, LP
217R Concord Ave
Cambridge, MA 02138

Southwest Bank, an M&I Bank
13205 Manchester Rd.
St. Louis, MO 63131

UBS O'Connor LLC
One North Wacker Dr.
Chicago, IL 60606

WB Special Opportunities Fund, Ltd.
3033 Excelsior Blvd.
Suite 300
Minneapolis, MN 55416

Ron Osman
1602 W. Kimmel St
PO Box 939
Marion, IL 62959

Enterprise Fleet Services - North Carolina
8335 IBM Drive
Suite 100
Charlotte, NC 28262